## [2017 (2) CILR 24]

## IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED

## QUNAR CAYMAN ISLANDS LIMITED v. MASO CAPITAL INVESTMENTS LIMITED and SEVEN OTHERS

GRAND CT. (Parker, J.) July 20th, 2017

*Companies — arrangements and reconstructions — dissenting shareholders — fair value of shares — on application for determination of fair value of shares under Companies Law (2016 Revision), s.238, company has general and ongoing obligation to disclose relevant documents — experts best judges of relevance*

   A company applied for the determination of the fair value of its shares pursuant to s.238 of the Companies Law (2016 Revision).

   The company was a Cayman Islands exempted limited company, the operations and business of which had been mainly conducted in China. Its merger with two other companies was approved at an EGM in February. There were eight dissenting shareholders forming four groups: the Maso dissenters, the Athos dissenters, the Senrigan dissenters and the PAG dissenters. The company sought the determination of the fair value of its shares pursuant to the dissenters' action under s.238 of the Companies Law (2016 Revision).

   There were disputes between the parties concerning the scope of the company's discovery obligations and the way it should give discovery; whether the dissenters should be ordered to give discovery; and whether the dissenters should instruct one expert jointly or be given leave to instruct one expert each.

   On behalf of the Maso dissenters it was submitted *inter alia* that the court should not limit in advance the types of documents that the experts should be entitled to see and that the company should be required to list all relevant documents at the outset. The Maso dissenters sought leave to instruct their own expert, rather than relying on an expert jointly instructed on behalf of the dissenting shareholders.

   The company submitted that (a) it should give discovery of documents that were relevant to the court's determination of fair value by reference to specific categories of documents in accordance with O.24, r.3 and there was no jurisdiction to order general discovery in actions begun by

petition; (b) the categories of documents in Schedule A to its draft order had been agreed by the Maso dissenters' expert and further documents would only be disclosed if requested by an expert; (c) it should be provided that a requesting expert should be required, if asked, to explain why requested documents were relevant, which was a matter of proportionality; (d) s.238 petitions were adversarial civil proceedings and O.24, r.3(1) provided that the court could order any party to give discovery; and (e) the court should order the dissenting shareholders to give discovery.

**Held,** ruling as follows:
(1) Dissenting shareholders were not required to accept a merger or consolidation agreement that had been approved by the requisite majority. They were instead entitled to dissent and demand payment for the fair value of their shares. The effect of having given notice of dissent was that they ceased to have any of the rights of shareholders except the right to be paid the fair value of their shares and the corresponding right to participate in the proceedings before the court for the determination of the fair value. The information contained in the company's own books and records was highly relevant to any appraisal of its fair value as a going concern. In the context of establishing an electronic data room, all the relevant material to that issue should be uploaded and made available for inspection by the experts (and those instructing them), subject to giving appropriate confidentiality undertakings. The experts were the best judges of the information that was relevant for their purposes and a company should not control what information should be made available to them, based on its own assessment of relevance. Section 238 of the Companies Law did not dictate any particular valuation methodology. It was well established in both Canadian and Delaware jurisprudence that fair value should be proved by any techniques or methods that were generally considered acceptable in the financial community and were otherwise admissible in court. In determining fair value, the court was not itself an expert valuation tribunal and must be guided by the expert evidence from experienced valuers. Such experts typically required access to relevant historical data, documents and information relating to the company's past trading and auditing, together with its forecasts (whether produced by internal management or others) in relation to future trading and not only those which have been publicly disclosed (paras. 17–18).
(2) The company should give discovery by uploading all documents relevant to determining the fair value of its shares, after having first uploaded to the data room the specific classes of documents which came into being in the "take private" process, which it should have readily available. This was the usual order and there was no good reason to depart from it in the present case. In a number of cases, orders for directions had been made which were consistent with regard to a company giving discovery on a "catch all" general basis, after it had given the specific discovery agreed. The court did not accept the company's submission that there was no power under the GCR to order general discovery in actions

25

begun by petition. It should be a general obligation of the company to search for and produce all documents relevant to fair value. The company would know the documents it possessed, whereas the dissenting shareholders would not. They were essentially outsiders and if the company were to be properly valued as a going concern they had to have access to its information, concerning both its existing business and future projections. Although the question of relevance was primarily for the experts, the company should have a general obligation to produce information and documents of relevance to value based upon which the experts could, if they deemed it necessary, request further specific information. It was not appropriate, therefore, to limit the company's discovery to the documents listed in Schedule A to its draft order and then to rely on only searching for and producing further documents relevant to valuation on the basis that they were requested. In addition, the documents should be disclosed in the prescribed form, *i.e.* by way of a list (GCR Appendix 1, Form No. 16). As the company likely held all the relevant information for a determination of fair value, it was necessary not to limit in any way the company's obligation to produce it for the court's assessment (paras. 22–31).

(3) No additional protection would be included in the discovery order to protect the company from futile and onerous requests by experts for evidence. The parties' conduct would ultimately be regulated by the court. As the question of fair value was a matter for the court's judgment to be made in light of all the factual evidence put before it and on the basis of expert assistance from valuation experts on both sides, it was not for the company or its expert to seek to limit in advance the experts' line of enquiry. If the requests were oppressive, disproportionate or calculated to embarrass or harass the company, the court would intervene if asked to do so. Likewise, it would intervene if the company unreasonably delayed or failed to give proper discovery. It was not necessary to provide for such eventualities in an order that protected the company in advance which would risk overburdening the dissenting shareholders' expert and could lead to further interlocutory applications and take up scarce court resources with matters that could and should be resolved by the parties' experts (paras. 36–40).

(4) The dissenting shareholders would be ordered jointly to instruct an expert. The court had discretion to give leave for a party to call expert evidence and it could also limit expert evidence by O.38, r.4. The discretion was exercised not merely as a matter of case management, efficiency and economy (in accordance with the overriding objective) but also of course to ensure a fair trial so that each party had a proper opportunity to put forward its case and test the other party's case. In the interests of ensuring that the overriding objective was achieved at trial and because the other dissenters should be entitled to instruct an expert in whom they too had complete confidence and to whom they had at least equal access and transparency in communications, one expert jointly instructed for all dissenters should be ordered. If the court were to have

GRAND CT. IN RE QUNAR CAYMAN ISLANDS LTD.

granted the Maso dissenters leave to instruct their own expert, that would have been likely to lead to five experts (one for the company and one for each dissenter group), which would not be a sensible way to proceed in the present case. Experts were instructed in order to assist the court on matters within their expertise and were to provide independent assistance to the court by way of an objective and unbiased opinion. As no good reason had been put forward in the present case for the Maso dissenters to instruct their own expert, their desire to do so should yield to the interests of the other dissenting shareholders who were prepared to instruct an expert jointly. Furthermore, one expert instructed by all the dissenters was likely to be of most assistance to the court. The court was not persuaded that the Maso dissenters had the right to instruct an expert of their choice. It was a case management decision for the judge to take, balancing the competing interests of all parties involved in the trial. The court was not persuaded that the Maso dissenters would be prejudiced by an order for the appointment of a single joint expert on behalf of all the dissenters who, although business competitors, had the same interests in this case (paras. 47–54).

(5) There were no grounds for ordering the dissenting shareholders to give discovery. In a s.238 petition it would not be appropriate for dissenting shareholders to be ordered to give discovery in the usual way pursuant to a standard direction under O.24 of the GCR. Although the court had jurisdiction to order discovery of specific documents in the possession of dissenting shareholders, it would only do so in exceptional circumstances when there were clear grounds that an order for discovery was appropriate and would assist the court in determining the fair value of the shares. The court would have to be satisfied under GCR O.24, r.8 that discovery was necessary under r.3 and would not make an order if it was not necessary for disposing fairly of the matter or for saving costs. The overriding objective would also need to be satisfied to ensure that the substantive law was rendered effective and that it was carried out consistently by saving expense and dealing with the matter proportionately. It would not be a ground upon which to make such an order that the material might be of assistance to the company in seeking to undermine the credibility of the dissenters or witnesses. For example, material that might give an indication of value which the dissenters themselves might have thought the company or its shares to have had prior to or for the purposes of mergers would be irrelevant and of no assistance to the court in determining fair value. Nor would the motivations and views of dissenting shareholders assist the court in its rather narrow valuation exercise. Section 238 cases should not be treated as ordinary civil litigation in respect of discovery where parties sought to undermine each other's cases through evidence obtained by discovery (paras. 64–76).

**Cases cited:**

(1) *Bona Film Group Ltd.*, *In re*, Grand Ct., Cause No. FSD 215 of 2016, March 13th, 2017, unreported, referred to.

27

(2) *China Shanshui Cement Group Ltd., In re*, 2015 (2) CILR 255, referred to.
(3) *Dole Food Co. Inc. (Appraisal)*, *In re* (2014), 114 A.3d 541, distinguished.
(4) *Homeinns Hotel Group* v. *Maso Capital Invs. Ltd.*, 2017 (1) CILR 206, followed.
(5) *Howard's Will Trusts*, *In re*, [1961] Ch. 507; [1961] 2 All E.R. 413, referred to.
(6) *Integra Group, In re*, 2016 (1) CILR 192, followed.
(7) *Lornamead Acquis. Ltd.* v. *Kaupthing Bank HF*, [2011] EWHC 2611 (Comm); [2013] 1 BCLC 73, referred to.
(8) *Morelle Ltd.* v. *Wakeling*, [1955] 2 Q.B. 379; [1955] 2 W.L.R. 672; [1955] 1 All E.R. 708, referred to.
(9) *Qihoo 360 Technology Ltd.*, *In re*, Grand Ct., Cause No. FSD 129 of 2016, January 26th, 2017, unreported, referred to.
(10) *Shanda Games Ltd.*, *In re*, Grand Ct., Cause No. FSD 14 of 2016, April 25th, 2017, unreported, *dicta* of Segal, J. considered.

**Legislation construed:**
Companies Law (2016 Revision), s.238:
   "(1) A member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of his shares upon dissenting from a merger or consolidation.
      . . .
      (9) If the company and a dissenting member fail, within the period specified . . . to agree on the price to be paid for the shares owned by the member . . .
         (a) the company shall (and any dissenting member may) file a petition with the Court for a determination of the fair value of the shares of all dissenting members . . ."
Grand Court Rules 1995 (Revised), Preamble, para. 1.1:
   "The overriding objective of these Rules is to enable the Court to deal with every cause or matter in a just, expeditious and economical way."
O.1, r.2: "(1) Subject to the following provisions of this rule, these Rules shall apply in relation to all proceedings in the Court."
O.24, r.3: "(1) Subject to the provisions of this rule and of rules 4 and 8, the Court may order any party to a cause or matter . . . to make and serve on any other party a list of the documents which are or have been in his possession, custody or power relating to any matter in question in the cause or matter . . .
      . . .
      (3) An order under this rule may be limited to such documents or classes of documents only or to such only of the matters in question in the cause or matter, as may be specified in the order."

GRAND CT.                                    IN RE QUNAR CAYMAN ISLANDS LTD.

O.24, r.8: "On the hearing of an application for an order under rule 3 or 7 the Court, if satisfied that discovery is not necessary, or not necessary at that stage of the cause or matter, may dismiss or, as the case may be, adjourn the application and shall in any case refuse to make such an order if and so far as it is of opinion that discovery is not necessary either for disposing fairly of the cause or matter or for saving costs."

O.38, r.4: "The Court may, at or before the trial of any action, order that the number of medical or other expert witnesses who may be called at the trial shall be limited as specified by the order."

*T. Mowschenson*, Q.C. and *L. Greig* for the company;
*N. Meeson*, Q.C. and *E. Bodden* for the PAG dissenters;
*P. Girolami*, Q.C., *T. Heaver-Wren* and *A. Jackson* for the Athos dissenters;
*R. Levy*, Q.C. and *R. Cecere* for the Maso dissenters;
*P. Girolami, Q.C.* and *S. Maloney* for the Senrigan dissenters.

1   PARKER, J.:

**Introduction**

Qunar Cayman Islands Ltd. ("the company") seeks determination of the fair value of the company's shares pursuant to a dissenters' action under s.238 of the Companies Law (2016 Revision).

2   There are eight dissenters in total. They have formed four groups. One group of dissenters is known as Maso (and Blackwell), the others are Athos, Senrigan and PAG. They are all separately represented.

3   The Athos dissenters own 31.4% of the total shares of all dissenters, Senrigan dissenters own 16.5%, PAG dissenters own 35.6% and Maso dissenters own 16.5%.

4   There are two summonses for directions. The first is issued by Maso and Blackwell ("Maso") (FSD No. 73 of 2017) and the second by the company (FSD No. 76 of 2017). The two sets of proceedings have been consolidated by agreement bearing the number and title Cause No. FSD 76 of 2017.

**Background**

5   The company is a Cayman Islands exempted limited company. Its operations and business have mainly been conducted in the People's Republic of China ("the PRC"). It has described itself in a public filing as "one of the leading mobile and online commerce platforms for travel in China." The company, which had been listed on NASDAQ since 2013, was the subject of a "take private" transaction which was announced on June 23rd, 2016 and concluded on February 28th, 2017.

29

6   On October 19th, 2016, the company entered into an agreement and plan of merger ("the merger") with Ocean Management Holdings Ltd. and Ocean Management Merger Sub Ltd.

7   On January 24th, 2017, the company gave notice of an extraordinary general meeting to be held on February 24th, 2017 to consider, amongst other things, the approval of the merger.

8   The merger was approved at the EGM and on February 28th, 2017 the plan of merger was filed with the Registrar of Companies in the Cayman Islands.

9   The dissenters have taken all the necessary steps to object to and dissent from the merger.

**The summonses**

10   There are a number of areas of disagreement over directions. Two of them are: (i) whether the dissenters should be ordered to give discovery; and (ii) whether they should be given leave to instruct one expert jointly, or be given leave to instruct one expert each.

11   There are also disputes in a third area concerning the scope of the company's discovery obligations and the way it should give discovery. I will deal with this last point first as a matter of principle.

**Approach to discovery**

12   Mr. Levy, Q.C., who represents Maso, appeared last year for dissenting shareholders in a case which dealt with directions under s.238: *Homeinns Hotel Group* v. *Maso Capital Invs. Ltd.* (4). That was heard by Mangatal, J. He referred me to the submissions he made in that case. Her Ladyship's judgment was delivered on August 12th, 2016 and in material part provides as follows (2017 (1) CILR 206, at para. 20):

> "In my judgment, overall, the draft order presented by the dissenting shareholders . . . in relation to discovery appears more consonant with the requirements of the court in adjudicating an application under s.238. In particular, it does appear to me that the discovery order should contemplate the documents listed . . . which the [company] has readily to hand and which must be relevant. The discovery order in a s.238 application is somewhat unusual in that it is the company that will have the documents and information relevant to the determination of fair value. I accept the submission of Mr. Levy, Q.C. in . . . the skeleton argument. In particular, I accept that the experts and the court are to have regard to all relevant documents and information, not just publicly available information. Further, in my judgment, it is not appropriate to make a standard order under O.24 of the GCR for disclosure by both parties. In my judgment, it is not

> in keeping with the purposes of s.238 for the dissenting shareholders to be ordered to provide discovery."

13  Mr. Levy, Q.C. relies on Her Ladyship's decision and also referred to a number of other s.238 cases (*In re Shanda Games Ltd.* (10); *In re Bona Film Group Ltd.* (1); *In re Qihoo 360 Technology Ltd.* (9)) which have had, in his submission, some tried and tested similar directions. He submits that the court should not limit in advance the types of documents which the expert should be entitled to see and to call for and that the company should be required to list all relevant documents at the outset.

14  Those directions, in so far as relevant and in summary, have provided for—

- the establishment of an electronic data room;
- the company to upload to the data room certain specific classes of relevant documents which came into being in the course of the "take private" process (which by definition, will have been a transaction that closed relatively recently and should therefore be readily to hand so far as the company is concerned);
- the company also to upload all other documents relevant to fair value (NB no obligation to do so by dissenters);
- experts to ask questions of and request further documents from the company;
- the company has the ability, within 7 to 21 days of such a request, to apply to the court to be relieved of the obligation to comply; and
- there are to be meetings between the experts and the company's management.

15  He submits that the Maso dissenters' summons seeks an order which is in materially similar terms and there is no good reason for the court to depart from these directions.

16  He also referred me to the judgment of Jones, J. in *In re Integra Group* (6).

17  In that case, which was the first time that the court had been called upon to value a company's shares in connection with a merger carried out in accordance with Part XVI of the Companies Law, Jones, J. helpfully set out the jurisdiction and general approach of the court (under s.238), from which I respectfully derive the following propositions:

31

(a) Dissenting shareholders are not required to accept a merger or consolidation agreement which has been approved by the requisite majority. Instead they are entitled to dissent and demand payment for the fair value of their shares.

(b) The effect of having given notices of dissent is that they cease to have any of the rights of shareholders, except the right to be paid the fair value of their shares and the corresponding right to participate in the proceedings before the court for the determination of the fair value.

(c) The information contained in the company's own books and records is highly relevant to any appraisal of its fair value as a going concern and (in the context of establishing an electronic data room) all the relevant material to that issue should be uploaded and be available for inspection by the experts (and those instructing them), subject to giving appropriate confidentiality undertakings.

(d) The experts are the best judges of what information is or is not relevant for their purposes and so a company should not control what information should be made available to the experts based upon its own assessment of relevance.

(e) Section 238 does not dictate any particular valuation methodology. It is well established in both Canadian and Delaware jurisprudence that fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community, and are otherwise admissible in court.

18   In addition to these general propositions, I also accept Mr. Levy, Q.C.'s submission that in determining fair value the court is not itself an expert valuation tribunal and must be guided by the expert evidence from experienced valuers. Such experts typically require access to relevant historical data, documents and information relating to the company's past trading and auditing, together with its forecasts (whether produced by internal management or others) in relation to trading in the future and not only those that have been publicly disclosed (or disclosed to advisers in the course of the "take private" process).

19   In *In re Shanda Games Ltd.* (10), Segal, J. said (at para. 55 of his judgment):

> "The Directions Order also provided that all additional documents or information needed and requested by the parties' experts would be made available within fourteen days of receipt of a request and easily accessible to them via the data room (or sent to them directly if uploading to the data room was impossible). By this means it was envisaged that [the company] would make full disclosure of all relevant documents and information on a timely basis (although the Directions Order did not refer to the discovery procedures and

GRAND CT. IN RE QUNAR CAYMAN ISLANDS LTD.

obligations in GCR O.24 and there was at this stage no consideration as to whether GCR O.24 applied to a section 238 petition, the effect of the Directions Order, made by consent, was that [the company] assumed an obligation to make disclosure in terms similar to those contained in GCR O.24, and in some respects in wider terms)."

20   Mr. Mowschenson, Q.C., on behalf of the company, submits that the company should give discovery of documents that are relevant to the court's determination of fair value by reference to specific categories of documents in accordance with O.24, r.3. He argues that there is no power to order general discovery in actions begun by petition.

21   He submits that O.24, rr. 3 and 8 provide the tools with which a court should regulate disclosure to what is necessary or which relates to matters in question. The overriding objective in the Preamble to the GCR, para. 1, requires a court to ensure that the substantive law is rendered effective and that it is carried out consistently with saving expense and dealing with the matter proportionately. He relies on the first and second affidavits of Mr. Reid in support of his argument to limit discovery in the first instance to certain categories of documents which according to Mr. Reid would be "sufficient . . . to produce a robust valuation analysis." He argues that the categories of documents in Schedule A of the company's draft order has been agreed by the Maso dissenters' expert, Mr. Arboit, in his first affidavit dated June 9th, 2017 at para. 23, and that they should not be given a second tranche to cover other documents relevant to fair value without more. Further documents would only be provided on request by an expert.

**Decision**

22   The company should give discovery by uploading all documents that are relevant to fair value, after having first uploaded to the data room the specific classes of documents which came into being in the course of the "take private" process, which it should have readily available. This is the usual order and I can see no good reason to depart from it in this case.

23   Whilst directions given in particular cases are not to be regarded as precedents, I am cognizant that there have been a number of cases in which orders for directions have been made which have been consistent with regard to the company giving discovery on a "catch all" general basis, after it has given the specific discovery agreed. I do not accept Mr. Mowshenson, Q.C.'s submission that there is no power under the GCR to order general discovery in actions begun by petition.

24   GCR O.1, r.2 sets out specific circumstances where the rules will not apply. Then by sub-para. (1): "Subject to the following provisions of this rule, these Rules shall apply in relation to all proceedings in this Court." See also Quin, J. in *In re Qihoo 360 Technology Ltd.* (9) (at para. 69).

33

25   This seems to me to be in keeping with the court's approach in these types of cases. I do not think the company should be made to do so only if an expert requires further documents and asks for them; rather it should be a general obligation of the company to search for and produce all documents relevant to fair value.

26   I bear in mind that the company will know what documents it has, whilst the dissenting shareholders will not. They are essentially outsiders and if the company is to be properly valued as a going concern they must have access to the information that the company has, both with regard to its existing business and future projections.

27   Whilst the question of relevance is primarily one for the experts, the company should have a general obligation to produce information and documents of relevance to value based upon which the experts can, if they deem it necessary, ask for further specific information.

28   It is not appropriate therefore to limit the company's discovery to the documents listed in Schedule A of the company's draft order and then to rely on only searching for and producing further documents relevant to valuation on the basis that they are asked for. In addition, and as is well known, discovery is an ongoing obligation. In this regard I prefer the evidence of Mr. Arboit to that of Mr. Reid.

29   Moreover, in case there is any doubt, the documents should be disclosed in the prescribed form, *i.e.* by way of a list (GCR Appendix 1, Form No. 16). In that way Schedule 1, Part 1 to the list could be satisfied by incorporation by reference of the data room index, but as is also well known, Part 2 of the list requires the identification of documents which the company objects to produce (usually on the grounds of privilege).

30   Schedule 2 also requires the company to identify relevant documents which it has had, but has not now, in its possession, custody or power (because they have been lost or destroyed or for some other reason). The company is also required to state whether and when any such documents were last in its possession or power, what has become of them, and in whose possession they are now. As Jones, J. stated in ):

"The Canadian courts have emphasized . . .

'. . . the problem of finding fair value of stock is a special problem in every particular instance. It defies being reduced to a set of rules for selecting a method of valuation, or to a formula or equation which will produce an answer with the illusion of mathematical certainty. Each case must be examined on its own facts, and each presents its own difficulties. Factors

which may be critically important in one case may be meaningless in another. Calculations which may be accurate guides for one stock may be entirely flawed when applied to another stock.

   The one true rule is to consider all the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all the evidence and all the factors. I emphasize: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the courts not by a formula that can be stated in the legislation.'"

31   Since the company will likely hold all the relevant information which will go to a determination of fair value, it is therefore necessary not to limit in any way the company's obligation to discover and produce it for the court's assessment.

32   Another related issue was argued by Mr. Mowschenson, Q.C. for the company concerning whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the company, to state (and if necessary verify) why the information and documents were relevant to the determination of fair value and necessary for the expert to complete his report and/or where appropriate, whether the expert's request can be limited.

33   He said that it is a matter of proportionality and raises an important issue for case management in these types of cases.

34   He argues that dissenting shareholders regularly make time-consuming, futile and successively onerous requests for information and there needs to be some kind of protection mechanism for companies facing such a barrage.

35   Mr. Levy, Q.C. submits on his part that companies regularly give inadequate disclosure and any attempt to limit disclosure should be viewed with scepticism by this court.

36   I approach this case on the basis that all parties will comply with orders of the court. They will in their conduct ultimately be regulated by the court, in the sense that the court will rule, as it must when asked to do so, on all matters relating to law and procedure leading up to the trial. No doubt the communications between experts doing their best to assist the court and the parties will involve clarification and explanations relating to the relevance of requests.

37   I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr. Mowschenson, Q.C. has suggested in order to give the company some added protection. Since the

question of fair value is a matter for the court's judgment to be reached in light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to embarrass or harass the company, the court will step in if asked to do so. Likewise, the court will step in if the company is unreasonably delaying or failing to give proper discovery.

38   I do not think it is necessary to provide for these eventualities in an order which protects the company in advance as there is a risk that the dissenting shareholders' expert would be overburdened with having to justify by reference to relevance and necessity each and every request made.

39   The experts' overriding duty is to assist the court and that should ensure that all requests are proportionate and of relevance to the fair value issue and not any other issue. I accept there may be different approaches and what one expert considers necessary and relevant another expert may not. That does not mean that the dissenting shareholders' expert should have to justify each and every request.

40   This could in my view lead to further interlocutory applications and could result in scarce court resources being taken up with matters which could and should be dealt with by parties who have instructed expert professionals to assist them in the presentation of their cases.

41   All parties will have liberty to apply to the court at any stage if the process is not being followed or is being circumvented in some way.

42   There had been some debate about the costs occasioned by the setting up of the data room which by the time the hearing concluded was effectively agreed so I say no more about that.

43   I turn now to the second issue, namely the number of experts, and whether all the dissenters should be given leave to instruct only one between them, or one each.

**Number of experts**

44   Mr. Levy, Q.C., who was in the minority on this issue, argues that he cannot be made to instruct one expert jointly with anyone else and that he is entitled to his own expert; he should not be forced to rely on the expert of another party or to have imposed upon him the terms of instructions of a particular expert, to include funding. He submits that it would be inconsistent with the *FSD Guide*, 2nd ed., at para. B5.1(b) (2015) and the right to a fair trial to force him to do so.

GRAND CT.                                                         IN RE QUNAR CAYMAN ISLANDS LTD.

45    Para. B5.1(b) is to the effect that where the use of a single joint expert is not considered appropriate (and none of the parties advocates a single joint expert) then "each party will generally be given leave to call one expert in each different field requiring expert evidence." That he says is consistent with *Phipson on Evidence*, 19th ed., para. 33–35, at 1207 (2017): "the prevailing judicial attitude appeared to be to allow the parties to call the experts of their choice just as they could call the factual witnesses of their choice."

46    The company and the other dissenters all agree that there should be two experts, one for the company and one to be instructed jointly by all of the dissenters.

**Decision**

47    The court in its discretion may give leave for a party to be allowed to call expert evidence. The court may also limit expert evidence by O.38, r.4. The discretion is exercised not merely as a matter of case management, efficiency and economy (in accordance with the overriding objective), but also of course to ensure a fair trial so that each party has a proper opportunity to put forward its case and test the other party's case.

48    It was apparent in argument that the Maso dissenters wish to retain their own expert to achieve a greater degree of control over the instruction of and communications with that expert than a joint instruction of an expert with the other dissenters would afford them.

49    It seems to me that both in the interests of ensuring that the overriding objective is achieved at trial, and because the other dissenters should be entitled to instruct an expert in whom they too have complete confidence and to whom they have at least equal access and transparency in communications, one expert jointly (and severally, in case one or more parties wishes to settle before trial) instructed for all three camps should be ordered. No confidence issues were raised by Mr. Levy, Q.C. over the expert that the other two parties were content to instruct.

50    The Athos and Senrigan and PAG dissenters between them hold all but 16.5% of the shares whose fair value falls to be determined and if the court were to grant the Maso dissenters leave to call their own expert, Mr. Meeson, Q.C. and Mr. Girolami, Q.C. for the other three camps say that they would require their own experts. That would in all likelihood lead to five experts (one for the company and one for each dissenter group) all trying to assist the court. That in my view is not a sensible way to proceed in this case. After all it is the duty of experts under Cayman Islands law to help the court on matters within their expertise, and that is paramount and overrides any obligation to the party from whom they may have received instructions or by whom they are paid. Given that their evidence should be and should be seen to be independent work product uninfluenced by the

37

pressures of litigation or any party, so that they can provide independent assistance to the court by way of an objective and unbiased opinion, there is no room for them in any way taking on the features of an advocate for their client.

51   In circumstances where no good reason relating to the sole issue in the case has been put forward for the Maso dissenters to instruct their own expert, in my judgment their desire to have their own expert should yield to the interests of the other dissenting shareholders who are prepared to jointly instruct an expert.

52   I am told by counsel that the identity of the expert is not the issue, so that should not produce an immediate practical problem. The issue, although put forward as one of principle by Mr. Levy, Q.C., seemed to me to be around access and instructions, which should be capable of resolution.

53   Furthermore, I take the view that one expert instructed by all dissenters is likely to be of most assistance to the court, especially in relation to interactions with the company's expert, and will be in keeping with the overriding objective.

54   I was not persuaded by Mr. Levy, Q.C. that his client had the right to call an expert of its choice. In my view this is a case management decision for a judge to take, balancing the competing interests of all parties involved in the trial, namely the other dissenters and the company. I am not persuaded that Mr. Levy, Q.C.'s clients will be prejudiced by an order for the appointment of a single joint expert on behalf of all dissenters who all share a common interest in the determination of a fair value for their shares. They may be business competitors but their interests should be aligned in this case. I turn now to the final issue.

**Should the dissenters be ordered to give discovery?**

55   Mr. Mowschenson, Q.C. submits that s.238 petitions are adversarial civil proceedings between the parties and O.24, r.3(1) provides that the court may order any party to a cause or matter (whether begun by writ, originating summons or otherwise) to give discovery.

56   He points to the notes to the *Supreme Court Practice 1999* which confirm that, unlike the provisions for automatic discovery in r.2(1), O.24, r.3 is not limited to an action with pleadings and allows a party to apply for discovery by list. He accepts that (just as he submits that O.24, r.3(3) limits discovery in actions begun by petition to documents or classes of documents as may be specified in the order for directions for the company), so he too is limited in applying for specific discovery of documents against the dissenters. I have already decided that discovery in

GRAND CT.                          IN RE QUNAR CAYMAN ISLANDS LTD.

s.238 cases begun by petition is not so limited and that the company should give discovery of all relevant documents in its possession.

57    He submits that Mangatal, J.'s decision in *Homeinns* (4) did not determine once and for all the question of whether dissenters should be required to give discovery by list of documents relevant to fair value in their possession. He seeks a narrower class of documents he says than would be required by an order for standard discovery under O.24, rr. 1 and 2.

58    He relies in particular on a Delaware decision in *In re Appraisal of Dole Foods Co. Inc.* (3), which apparently was not cited to Mangatal, J. *Dole* is a decision of the Court of Chancery in Delaware. Vice Chancellor Laster ordered discovery of the material sought by the company from the dissenting shareholders and gave reasons in support of his decision. Mr. Mowschenson, Q.C. submits that much of the Vice Chancellor's reasoning is of general application, including that—

    (a) pre-litigation valuations are relevant to the central issue in appraisal proceedings, namely the fair value of the company (114 A.3d at 549);

    (b) such materials are also relevant to issues facing the experts such as the appropriate inputs and considerations for valuation methodologies (*ibid.*);

    (c) they are also potentially relevant to witness credibility, for example dissenter-advanced positions in litigation that were at variance with its own pre-litigation views; the information might be useful for purposes of cross-examination or rebuttal of expert testimony;

    (d) the court may consider a wide range of factual evidence in support of its decision, including the market price, merger price, other offers, prices at which knowledgeable insiders sold their shares, internal corporate documents and valuations prepared for pre-litigation purposes (*ibid.* at 550);

    (e) where the court relies primarily on court-appointed experts to determine fair value, factual evidence relating to valuation is often relied on as a cross-check or reality check and may bear on witness credibility; and

    (f) experts themselves often referred to other valuation work in their own report, for example by citing other valuations to demonstrate the reasonableness of their inputs (*ibid.*, at 553).

59    From this decision, Mr. Mowschenson, Q.C. argues that there are persuasive reasons that, as a matter of principle, the dissenters' discovery is relevant to the issue of fair value and ought to be ordered. He points to the decision of Segal, J. in *Shanda* (10) as support for the proposition that although Delaware authorities are not binding on this court, s.238 uses the

39

same core concepts and terms as well as similar procedural mechanisms and that Delaware in particular has a well-developed jurisprudence. He urged me to follow *Dole* (3).

60   Mr. Levy, Q.C. submits that by definition the dissenters are all outsiders and will not have the detailed information the experts will require to fulfil their duties. All of the information will be based upon the company's own books and records and will be "inside" valuation materials rather than a valuation based on publicly available materials.

61   Moreover, he relies on the decision of Mangatal, J., which he says is an end of the matter, unless I am convinced that she was wrong; see *Lornamead Acquis. Ltd.* v. *Kaupthing Bank HF* (7) and *In re China Shanshui Cement Group Ltd.* (2).

62   He submits that it is well established that judges of one division should speak with the same voice—see *In re Howard's Will Trusts* (5)—and that this is clearly sensible for reasons of certainty and comity.

63   He relies on the affidavit evidence of Mr. Margules to show that the procedure for giving disclosure in Delaware is radically different from that which pertains in the Cayman Islands. Relying on *Morelle Ltd.* v. *Wakeling* (8), he submits that Mangatal, J.'s decision was not given *per incuriam* because *inter alia* the Delaware authority in *Dole* was not binding on this court.

**Decision**

64   I am prepared to accept that in a hypothetical case discovery from dissenters may be ordered by this court for specific documents that are in the dissenters' possession but not the company's.

65   The court would require very clear grounds upon which to make such an order, which would be solely directed towards assisting the court in determining fair value. The court would, under O.24, r.8, have to be satisfied that discovery was necessary under r.3 and would not make an order if it was not necessary either for disposing fairly of the cause or matter or for saving costs. The overriding objective would also need to be satisfied to ensure that the substantive law was rendered effective and that it is carried out consistently by saving expense and dealing with the matter proportionately.

66   It would not be a ground upon which to make such an order that the material might be of assistance to the company in seeking to undermine the credibility of the dissenters or its witnesses. The reasoning in *Dole* (3) is not of much assistance when one is applying Cayman law and procedure on this question.

GRAND CT.                                        IN RE QUNAR CAYMAN ISLANDS LTD.

67    For example, material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of merger, is irrelevant and of no assistance to the court in determining fair value in this jurisdiction.

68    So although I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds. No such grounds are being advanced by Mr. Mowschenson, Q.C. in this case.

69    I am not persuaded by Mr. Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value. Once an expert has the company's full records I do not see that anything helpful could be gained by reviewing third-party valuations. It may be that the dissenters being hedge funds and private equity firms have used securities analysts to gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities, as Mr. Reid suggests. Those analysts would not have access to all of the company's information, but will have access to a large amount of information that is generally available in respect of publicly listed companies, including investor relations information. I do not agree with Mr. Reid's view that the views of these securities analysts relying on those sources of information "are potentially highly relevant to the issue of the fair value of the company."

70    I prefer the evidence of Mr. Arboit which he gives in his first affidavit at paras. 53 and 54 to the effect that the documents listed in the company's request for information relating to the dissenters' investment in the company and internal analyses are not relevant to the determination of fair value of a publicly listed company's shares. He does not consider that any analysis produced by the dissenting shareholders to be relevant to valuation and he would not factor their analysis into his own valuation, he states, "in order to ensure that my valuation was wholly my own."

71    He goes on to say that analyses produced by dissenting shareholders are no doubt produced for a variety of purposes and are likely to be informed by their own methodologies.

72    I agree with Mr. Arboit's evidence in this regard. Moreover the motivations and views of the dissenting shareholder are unlikely to assist the court in its rather narrow exercise of adjudication, informed as it will be by the expert evidence.

73    Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery where parties seek to undermine each other's cases through evidence obtained in discovery or other related interlocutory proceedings, which may be designed to assist in the cross-examination of witnesses.

74   In this case, the witnesses facing cross-examination on previous inconsistencies or matters related to their investment strategies would be on the dissenting shareholders' side if the court ordered them to give discovery. Those matters are irrelevant to the court's task and may indeed be inadmissible in a s.238 trial.

75   As to *Dole* (3), of course I take into account and pay close attention to the decisions of the courts in Delaware (and Canada for that matter) to assist me in determining matters of substantive law, given the similarity of the jurisprudence and the actual words used in s.238. However, I derive little assistance in relation to procedural matters such as discovery where the Delaware jurisdiction is so different. As Segal, J. said in *Shanda* (10):

> "However, it will also be necessary always to take care and be satisfied that the law and practice developed by such other Courts fits and is consistent with other relevant parts of Cayman law and practice."

76   Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a s.238 case. This is in keeping with the approach taken both in *Integra* (6) and *Homeinns* (4). It follows, in my respectful opinion, that Mangatal, J. was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way pursuant to a standard direction under O.24 of the GCR in the context of a s.238 appraisal action.

**Conclusion**

77   No doubt counsel will be able to agree an order reflecting my decision in relation to the three issues which have arisen on this application.

*Orders accordingly.*

Attorneys: *Harney Westwood & Riegels* for the company; *Conyers Dill & Pearman* for the PAG dissenters; *Appleby* for the Athos dissenters; *Mourant Ozannes* for the Maso dissenters; *Ogier* for the Senrigan dissenters.