**[2018 (1) CILR 199]**

# IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED

## QUNAR CAYMAN ISLANDS LIMITED v. ATHOS ASIA EVENT DRIVEN MASTER FUND and SEVEN OTHERS

C.A. (Goldring, P., Rix and Field, JJ.A.) April 10th, 2018

*Companies — arrangements and reconstructions — dissenting shareholders — fair value of shares — on application for determination of fair value of shares under Companies Law (2016 Revision), s.238, no rule that dissenting shareholders only ordered to give discovery in exceptional circumstances — disclosure is mutual obligation — dissenting shareholders to disclose documents in their possession relating to value of company*

The company applied in the Grand Court for the determination of the fair value of its shares pursuant to s.238 of the Companies Law (2016 Revision).

The company was a Cayman Islands exempted limited company, the operations and business of which had been mainly conducted in China. Its merger with two other companies was approved by a special resolution of its shareholders in February 2017. The company sought the determination of the fair value of its shares pursuant to the dissenting shareholders' action under s.238 of the Companies Law (2016 Revision).

Both the company and the dissenting shareholders appointed experts. There were disputes between the parties concerning the scope of the company's discovery obligations and whether the dissenting shareholders should be ordered to give discovery. The parties agreed a schedule of documents to be disclosed by the company (Schedule A). The company sought documents and information from the dissenting shareholders (as set out in Schedule B). The dissenting shareholders did not consider that any documents in their possession were relevant to the determination of the fair value of their shares in the company. Their expert sought the widest possible disclosure from the company while asserting the irrelevance of the dissenting shareholders' documents relating to their investment in the company.

At the directions hearing, the Grand Court (Parker, J.) ordered the company to upload to the data room (a) all documents set out in Schedule A (para. 5 of the order); (b) in addition, any additional documents,

199

communications and other materials in its possession, custody or power which were relevant to the determination of the fair value of the company's shares (para. 6 of the order); and (c) any additional documents, materials, communications or information requested by either of the parties' experts for the purpose of preparing his or her opinion (para. 11 of the order). The judge also decided that it was not appropriate for the dissenting shareholders to be ordered to provide discovery. He considered that on a s.238 petition it would not be appropriate for dissenting shareholders to be ordered to give discovery in the usual way and that discovery of specific documents in the possession of dissenting shareholders would only be ordered in exceptional circumstances (that judgment is reported at 2017 (2) CILR 24).

The company appealed (a) against para. 6 of the order, submitting that there was no case for such general disclosure; (b) against para. 11, submitting that there was no need for such further disclosure and that the process contemplated by that part of the order was outside GCR O.24; and (c) submitting that the judge had been wrong to rule that disclosure from the dissenting shareholders was irrelevant and to have declined to order it on that basis.

The dissenting shareholders submitted in reply that paras. 6 and 11 of the Grand Court's order had been agreed between the parties before the directions hearing. The dissenting shareholders supported the judge's refusal to order them to make any disclosure, which was a matter of precedent in the Cayman Islands where in all previous s.238 cases disclosure had been a one-way process.

**Held,** ruling as follows:

(1) The company's appeal against para. 6 of the order, which required it to upload any additional documents and other materials which were relevant to a determination of the fair value of the shares, would be dismissed. The company's appeal on this ground was wholly undermined by clear evidence that it had conceded the catch-all provision of para. 6. Such agreement was not altogether surprising in the light of previous orders possibly agreed but in any event sanctioned in earlier cases involving s.238 of the Companies Law. Furthermore, it was clear that GCR O.24, r.3 applied in any proceedings ("whether begun by writ, originating summons or otherwise") and allowed the court to make an order for general discovery. It was unlike r.7, which was concerned with discovery of particular documents. Whereas r.7 required an affidavit from the requesting party, r.3 did not. Although it was true that production went beyond discovery and inspection, and would only be ordered where necessary, it was likely to be an unusual case where the documents discovered as being relevant went beyond what was necessary for production. Because of discovery by list, it would be open to the parties to anticipate how much actual production would be necessary. If there was a dispute, r.14 made it clear that the burden was on the party seeking production. In the present case, however, it was agreed that the relevant

documents, whether under para. 5 of the order (Schedule A) or under para. 6 (the catch-all provision) were not merely to be discovered by list but also uploaded, *i.e.* produced. In s.238 fair value proceedings, such an attitude to the company's disclosure obligations was entirely understandable. It was the company itself which had put forward a price for the merger buy-out of its shares, and it had done so on the basis of its own internal assessment of its business and prospects. It therefore knew better than anyone else the documentary material that was relevant to its assessment (paras. 41–46).

(2) The appeal against para. 11 of the order, which required the company to provide such further disclosure and/or information as the experts might require, would also be dismissed. The company had effectively withdrawn its appeal against para. 11 during the course of submissions. In any event, the company could not successfully appeal against the concept of expert engagement in the process of disclosure which had been sanctioned by the parties and the court not only in para. 11 of the order but also in paras. 6 and 12 (paras. 51–52).

(3) The company's appeal concerning disclosure by the dissenting shareholders would be allowed. The court approached this issue from the starting point that one-sided disclosure on the central issue of a case was anomalous, unprecedented in the Cayman Islands outside s.238 cases, and *prima facie* counterintuitive. Both experts in the present case were agreed that third party valuations were relevant and helpful and should be disclosed if in the company's possession. If third party valuations in the company's possession were relevant, so were third party valuations in the possession of the dissenting shareholders. The question of fair value was closely related to the question of what a willing buyer and a willing seller would exchange for the shares of the company (or for the company as a whole), and that question was closely related to valuations conducted within the market generally. The company's own documents, however important to the issue of fair value (as to which there was no doubt), must be exposed to the arguments that could flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market had made or performed. It must also be remembered that the documents of investors prior to litigation were not driven by the litigation itself but by their willingness to invest based on the findings and evaluations. The court considered that previous decisions in the Cayman Islands in which dissenting shareholders were not ordered to provide discovery were of very little assistance. The value of a company depended on a multiplicity of factors and methodologies, about which sophisticated analysts had different insights, and no one was more relevantly concerned with getting the research and analysis and those insights right than those who were thinking of investing or had invested in a company. It was inappropriate at this stage of the proceedings to form *a priori* assumptions about relevance. The court was not persuaded that the normal rule that disclosure was a mutual obligation should not apply in

s.238 proceedings. The court was not persuaded of the extreme and unique position that only the company concerned and not its sophisticated investors had disclosure relevant to fair value. If dissenting shareholders possessed, as they were likely to do, documentary material relating to the value of companies in which they invested, that material was as much a matter for disclosure as such documents in the possession of the company. It could not be said that the judge's decision was an exercise of discretion and not readily amenable to appeal. The decision was not so much an exercise of discretion as a decision of law and/or principle. In any event, even if it were a matter of discretion, the judge had erred fundamentally and in principle by creating a unique field for one-sided disclosure. The court would grant discovery as set out in Schedule B, subject to certain minor amendments (paras. 57–80).

**Cases cited:**
(1) *Bona Film Group Ltd.*, *In re*, Grand Ct., Cause No. FSD 215 of 2016, March 13th, 2017, unreported, referred to.
(2) *Cyprus Anvil Mining Corp.* v. *Dickson* (1986), 33 D.L.R. (4th) 641; 8 B.C.L.R. (2nd) 145, referred to.
(3) *Dole Food Co. Inc. (Appraisal)*, *In re* (2014), 114 A.3d 541, approved.
(4) *Homeinns Hotel Group* v. *Maso Capital Invs. Ltd.*, 2017 (1) CILR 206, not followed.
(5) *Integra Group, In re*, 2016 (1) CILR 192, considered.
(6) *Qihoo 360 Technology Co. Ltd.*, *In re*, 2017 (2) CILR 585, considered.
(7) *Shanda Games Ltd.*, *In re*, Grand Ct., Cause No. FSD No. 14 of 2016, April 25th, 2017, unreported, referred to.
(8) *Trina Solar Ltd.*, *In re*, Grand Ct., Cause No. FSD 138 of 2017, unreported, referred to.

**Legislation construed:**
Companies Law (2016 Revision), s.238: The relevant terms of this section are set out in para. 8.

Grand Court Rules 1995 (Revised), O.24, r.3(1):
"... [T]he Court may order any party to a cause or matter (whether begun by writ, originating summons or otherwise) to make and serve on any other party a list of the documents which are or have been in his possession, custody or power relating to any matter in question in the cause or matter, and may at the same time or subsequently also order him to make and file an affidavit verifying such a list and to serve a copy thereof on the other party."

O.24, r.14(1): "No order for the production of any documents for inspection or to the Court or for the supply of a copy of any document shall be made under any of the foregoing rules unless the Court is of opinion that the order is necessary either for disposing fairly of the cause or matter or for saving costs."

C.A.                                                        IN RE QUNAR

*T. Lowe*, *Q.C.*, *P. Madden* and *L. Greig* for the petitioner/appellant;
*P. Girolami*, *Q.C.* and *A. Jackson* for the first, second and fifth respondents;
*R. Levy*, *Q.C.*, *R. Cecere* and *J. Bush* for the third and fourth respondents;
*N. Meeson*, *Q.C.* and *E. Bodden* for the sixth, seventh and eighth respondents.

1   **RIX, J.A.:** This appeal concerns three aspects of disclosure which formed part of a judgment dated July 20th, 2017 and an order dated August 31st, 2017, both of Parker, J.

2   The appeal arises in the context of proceedings pursuant to s.238 of the Companies Law (2016 Revision) by which dissenting shareholders (the respondents) challenge the price offered for their shares in a merger by which Qunar Cayman Islands Ltd., the appellant, a NASDAQ quoted company, was taken private by Ocean Management Merger Sub Ltd., a wholly owned subsidiary of Ocean Management Holdings Ltd. The appellant (the "company") continues as the surviving company.

3   The respondents (the "dissenting shareholders") between them owned 5.2% of the issued share capital of the company. The dissenting shareholders fall into three groups (the judge below said there were four) each of which has been separately represented. As a result there was a certain unevenness in the quantity of the submissions made on behalf of the company and the dissenting shareholders respectively.

4   The merger was proposed on June 23rd, 2016, a finalized merger agreement was executed on October 19th, 2016, and the merger was approved on February 24th, 2017 by a special resolution of the company's shareholders at an AGM called for that purpose. The dissenting shareholders had already given notice in writing of their objection prior to the AGM (pursuant to s.238(2)). As of February 28th, 2017, the merger was certified as effective by the Assistant Registrar of Companies.

5   The value of the company according to the merger price was some US$4.6 bn. This reflected a price per share of US$10.13 (or US$30.39 for American Depository Shares, each representing three ordinary shares). Despite their dissent, the dissenting shareholders' shares were cancelled, pursuant to s.238, in exchange for the right to receive the "fair value" of their shares.

6   On April 24th, 2017, two petitions were filed pursuant to s.238(9) seeking a determination of the fair value of the company's shares. It was agreed that the proceedings should be consolidated.

7   Directions summonses were heard on June 23rd, 2017 before Parker, J. The company's appeals concern three aspects of the outcome of those summonses, two of which relate to the disclosure to be given by the company and the third of which relates to the disclosure to be given by the

dissenting shareholders. In brief, the company complains that the company is being required to give too much disclosure, and that the dissenting shareholders are being required to give no disclosure at all.

**Section 238**

8   For present purposes the critical parts of s.238 are as follows:

"(7) Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of his shares and the rights referred to in subsections (12) and (16).

. . .

(11) At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be the fair value."

**The experts**

9   For the purposes of assisting the parties in relation to disclosure, the company and the dissenting shareholders each appointed experts. My understanding is that these will not be the experts who will ultimately give respective opinions on fair value.

10   The company appointed Mr. Timothy James Reid, of Singapore, and the dissenting shareholders appointed Mr. Bruno Arboit, of Hong Kong. For the purposes of the directions summons, each expert produced two affidavits.

11   In his first affidavit sworn May 23rd, 2017, Mr. Reid spoke to a schedule of documents to be disclosed by the company. This schedule came to be called Schedule A (because it was so called as attached to the company's summons for directions). Mr. Reid said of this Schedule:

"The Schedule is intended to be equally relevant and applicable to both the company and the dissenting shareholders in any given section 238 action. That is, the categories of documents listed are sufficient for either side's expert to produce a robust valuation analysis. In preparing this, I have been careful to acknowledge and take into account the inherent imbalance between the information available to the company and that available to the dissenting shareholders."

12   Mr. Reid went on to say this about the process of valuation:

". . . [T]here are five widely recognised and accepted valuation methodologies used to value the total assets of a company or the

equity in that company. A decision of which methodology or methodologies to use will be influenced by the purpose of the valuation, the nature of the assets being valued and the relevant available information. In theory all valuations are based on cash flows that are then discounted to reflect the time value of money. Valuations methodologies which do not use the discounted cash flow methodology are, in theory, surrogates for cash flow based valuations. The other four basis recognised methodologies are:

    (a) Capitalisation of future maintainable profits;

    (b) Notional realisation of assets;

    (c) Value of net tangible assets;

    (d) Capitalisation of future maintainable dividends."

13   In his first affidavit sworn June 9th, 2017, Mr. Arboit acknowledged Schedule A as broadly following the categories of documents ordered in other s.238 cases in the Cayman Islands, but he emphasized that such categories should not be regarded as closed. It was "a good starting point." He also said this:

"28.   In my opinion, it is an essential and critical requirement that the Experts be allowed the opportunity to request further documents/information and to have reasonable access to Company management, particularly those involved in the production and finalisation of any management projections or heavily involved in the strategic planning of the business . . .

29.   Additionally, companies in different sectors may require different documents in order to produce a report. It is only after an expert has done extensive research on the company, its business model, and competitors within the sector, that the relevance of certain documents might become clear to him/her . . .

36.   Additionally, it is unclear why [Schedule] A limits information to those from within the last three years prior to the date of valuation. I consider that information from a longer time period (usually five years) will be required to clearly demonstrate historical patterns of growth . . .

45.   . . . The experts may also reference fair value by way of comparison with peers (where appropriate) but often directly comparable companies do not exist.

46.   In my professional opinion, a review of documents is required in order to determine the appropriate methodology/ies . . ."

14   Mr. Arboit also referred extensively to Cayman Island jurisprudence on s.238 valuations, *inter alia* to Mangatal, J. in *Homeinns Hotel Group* v.

*Maso Capital Invs. Ltd.* (4), from whose judgment he quoted this (2017 (1) CILR 206, at para. 22): "I am of the view that the additional requirements should relate not only to documents but also to information . . . experts are the best judge of what is relevant when it comes to disclosure."

15   Mr. Arboit next turned to a so-called Schedule B, also attached to the company's summons for directions, in which documents sought from the dissenting shareholders were set out. As to Schedule B he said this:

"53.   I do not consider that the documents listed in Qunar's Request for Information—[Schedule] B, that is documents and information relating to the Dissenters' investment in the Company and internal analysis, are relevant to the determination of fair value of a publicly listed company's shares. The rationale and motivations of each dissenting shareholder in making investment in the Company are not factors that I would take into account in forming my own independent determination of fair value and would have no bearing on my opinion thereof.

54.   To this end I would not consider any analysis produced by dissenting shareholders to be relevant to a valuation and would not factor their analysis into my valuation (in order to ensure that my valuation was wholly my own). Analyses produced by dissenting [shareholders] are no doubt produced for a variety of purposes, and are likely to be informed by their own methodologies."

16   In sum, Mr. Arboit, as the expert appointed by the dissenting shareholders, was anxious to get the widest possible disclosure from the company, but repeatedly asserted the irrelevance of the dissenting shareholders' documents relating to their investment in the company. For this he gave no reason other than his personal anxiety to distance his own opinion from anything revealed from such documentation. He said, no doubt plausibly, that dissenters' analyses are likely to be informed by their own methodologies—but given his own evidence that at this stage methodology remains open and that "a review of documents is required in order to determine the appropriate methodology/ies," the fact that dissenters may adopt methodologies of their own can hardly be a factor negative to the relevance of their analyses. It may be noted moreover that among the categories of documents Mr. Arboit sought from the company were third-party market and industry reports relevant to the markets in which the company operates which were included in the order made by the judge in Appendix 2 to his order as item (l). It is not immediately clear why such third party and industry reports in the possession of the company are relevant for disclosure by the company, and not if in the possession of dissenting shareholders, even though they may be incorporated in and/or relevant to their own analyses of the company and its operations.

17   Mr. Arboit's first affidavit elicited a response from Mr. Reid in his second affidavit, sworn June 16th, 2017. He there stated as follows:

"14.   As an expert valuer it is helpful to consider all forms of valuations of the Company and especially those conducted at or around the time of merger and particularly those that were participating in the market at that time as willing buyers and sellers.

15.   I understand that all of the Dissenters are hedge funds or private equity firms who specialise in investing in companies prior to a merger or management buy-out. The strategy of these firms is to identify companies where the merger or buy-out has been 'mis-priced', allowing them to make a profit for their investors and clients. Such firms will usually employ experienced securities analysts to identify suitable companies for this type of event-driven investment.

16.   Securities analysts are finance professionals who gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities. They employ a wide range of techniques, from conducting comparisons of similar companies to modifying the figures in a company's annual statements where the analyst spots items in those statements that can be questioned. A securities analyst will typically produce detailed research and valuation reports to justify his or her recommendations in relation to a particular investment opportunity.

17.   In my opinion, the views of securities analysts employed by the Dissenters are potentially highly relevant to the issue of the fair value of the Company. While the analysts do not have access to all of a company's internal information, they are able to rely on the large quantity of information that is available generally . . . It is highly likely that the Dissenters have produced their own sophisticated and informed valuations and analyses of the Company, and in my opinion these are potentially highly relevant due to the experience and expertise of the securities analysts."

18   Schedule A also includes "External projections and reports relating to the Company's long-term plans" and "Third-party market and industry reports relevant to the markets in which the Company operates." While such documents would not have been prepared internally by the company, they can still be relevant for many reasons, including as a cross-check and to compare any inputs and/or assumptions employed. I note again that Arboit 1 does not dispute the relevance of these documents. In my opinion any valuations relied on by the dissenters would be just as relevant for an expert valuer's purposes as third-party valuations or reports in the company's possession. As with third-party reports used by the company, the fact that the reports or valuations originate outside the company itself does not prevent them from being useful or relevant for valuation purposes.

207

19    Mr. Arboit also made a second affidavit, sworn June 20th, 2017. On the subject of disclosure by the dissenting shareholders, he had this further to say:

"5.    I re-iterate that 'the valuers should be valuing as if they are "inside the company", rather than outsiders' (Arboit 1, paragraph 30). Relevant information for these purposes entails the universe of both public information and private information available to the Company . . .

6.    . . . [T]o the extent that third-party market reports have been relied upon by the Company (and may have informed the views of the Company's management on the question of valuation), I would consider these reports relevant because in valuing from 'inside the company', the Experts will necessarily require full access to the information that may have influenced Company management in its business planning or may underpin the assumptions in any projections.

7.    That is not to say that in a determination of fair value I would not seek access to publicly available information beyond that which is known to be (or have been) in the possession of the Company, however this information is available, as it is in the public domain, and can (and should) be sourced independently. Whilst the public documents themselves may be relevant, the opinions of specific investors derived from these public sources are of no relevance and would not inform my valuation. The Experts should develop their own deeper understanding of the true drivers of the intrinsic value of the Company . . .

8.    . . . They [the Dissenters] will have necessarily performed their analysis disclosure on the basis of publicly available information. That is, they have no more information than the experts would already have access to in the public domain. I consider the request for disclosure in [Schedule] B to be irrelevant for the purposes of determining fair value because the valuation opinion of the Dissenting Shareholders is precisely that—simply an opinion. That is, an opinion based on less relevant and complete information than the Experts would already have access to by way of the information supplied by the Company . . ."

20    I add to these extracts the observation that both Mr. Arboit and Mr. Reid, beginning with Mr. Arboit, cited some jurisprudence, both in the Cayman Islands and elsewhere. However, I will consider that jurisprudence below. The experts may be experts in valuation, but they are not lawyers.

C.A.                                                                                          IN ʀᴇ QUNAR

**Schedules A and B**

21   Reference has been made above to Schedules A and B. Schedule A became a document agreed between the experts listing disclosure to be made by the company: it was annexed to the judge's order as Appendix 2 thereto. Schedule B, however, was not annexed because the judge determined that anything in the possession of the dissenting shareholders was irrelevant. I will refer to the judge's judgment below. It is relevant, however, to set out Schedule B, as proposed by the company and supported by Mr. Reid's evidence:

"1.   All documents reflecting or relating to any valuations or similar analyses of the company that the respondents prepared, reviewed, or considered, including but not limited to—

   1.1   all written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company shares;

   1.2   any internal valuations of the Company or the Company's shares; and

   1.3   any valuations of the Company or Company stock reviewed or considered by the Respondents in connection with this action.

2.   A list of any communications that the Respondents had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger;

3.   Confirmation of the date the Respondents purchased any or all of their shares in the Company, including the method of purchase;

4.   A history of the Respondent's trades in the shares of the Company;

5.   Confirmation as to whether the Respondents have ever taken a short position in the Company's shares; and

6.   All documents, information and material issued or shared between the Respondents' investment manager and/or investment advisor and the Respondents' Investment Committee for their consideration of the Company's go-private action including file notes of meetings, meeting agendas and all forms of written communications."

22   In effect Mr. Arboit was saying that because, in his opinion, company documents would be *more* relevant or more persuasive than dissenting shareholders' documents, therefore the latter had no relevance at all. That is not, to my mind, a sound argument.

209

**The three issues on appeal**

23   There are three issues raised on this appeal by the company concerning the judge's judgment and order. The first two relate to the extent of the company's disclosure. The second relates to the complete absence of any disclosure required from the dissenting shareholders.

24   Thus the company complains about the terms of paras. 6 and 11 of the judge's order. Under para. 6, the company is required to give general disclosure of all relevant documents, beyond that required by Schedule A or Appendix 2 which is the separate subject matter of para. 5. The company complains that there is no case for such general disclosure. And under para. 11, the company is required to provide such further disclosure and/or information as the experts might require after they have assimilated the first rounds of disclosure. The company complains that there is no call for such further disclosure, nor, separately, for the right to obtain further information from the company. The company submits that this is, inappropriately, to delegate powers to the experts, and to do so on a flimsy basis.

25   I shall set out the terms of paras. 6 and 11 below. These are the basis of the company's first two issues on appeal, which it is convenient to call the "para. 6 issue" and the "para. 11 issue" respectively.

26   As for disclosure from the dissenting shareholders, the company submits that the judge was wrong to rule that any such disclosure was irrelevant and on that ground to decline to order it.

**The order and the judgment**

27   The relevant paragraphs of the order made by the judge are as follows:

"5.   By 4.00 pm on 4 September 2017 (Cayman Islands time), the Company shall upload to the Data Room all documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents prepared or created in the five year period ending with 24 February 2017 (the 'Valuation date') set out in Appendix 2 together with an index of the same.

6.   In addition to paragraph 5 above, by 4pm (Cayman Islands time) on 18 September 2017, the Company shall upload any additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date and shall include any such documents in the index.

210

. . .

11.    The Company shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by any Expert for the purpose of preparing his/her own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such requests for information of any Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 5 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party or parties to the email addresses notified in paragraph 10.

12.    The Company by consent agrees to procure that appropriate members of its management team shall be available to meet both Experts, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions . . ."

28    Thus it will be seen that the judge provided for disclosure by the company (i) pursuant to Appendix 2 (by para. 5); (ii) two weeks later in respect to "any additional documents . . . relevant to the determination of the fair value" (by para. 6); and (iii) by subsequent request "by any Expert for the purpose of preparing his/her own opinion," albeit "unless otherwise agreed or directed by order of the Court" (by para. 11). Any expert could also (by para. 11) request "information," and para. 12 "by consent" of the company provides for the manner in which such information might be provided, in addition to the documentary form in which it was to be given or copied to an opposing party's expert under para. 11.

29    The judgment explained these orders for production of documents and information as follows.

30    The judge referred to prior cases under s.238, such as , *per* Mangatal, J.): "I accept that the experts are to have regard to all relevant documents and information, not just publicly available information"; and ), from which the judge derived a number of propositions including (2017 (2) CILR 24, at para. 17): "The experts are the best judges of what information is or is not relevant for their purposes and so a company should not

control what information should be made available to the experts, based upon its own assessment of relevance"; and *In re Shanda Games Ltd.* (7), where, albeit by consent, the disclosure order "also provided that all additional documents or information needed and requested by the parties' experts would be made available within fourteen days of receipt of a request" (*per* Segal, J., at para. 55).

31   The judge also spoke (2017 (2) CILR 24, at para. 20) of a submission made by Mr. Terence Mowschenson, Q.C. on behalf of the company that there was no power to order general discovery (under GCR O.24, r.1) in actions begun by petition (as distinct from actions begun by writ) and that disclosure should therefore be confined to disclosure by request for specific categories of documents under rr. 3 and 8—such as the requests made in Schedule A, which were agreed, and which were all that was necessary, and that (*ibid.*, at para. 21) "Further documents would only be provided on request by an expert."

32   The judge decided otherwise, however (*ibid.*, at paras. 22 ff.). He said that disclosure of "all documents that are relevant to fair value," on a "'catch all' basis," after production of specific classes of document agreed, "is the usual order" (as indeed the authorities he had cited demonstrate). He rejected the submission that there was no power under the GCR to order general discovery in actions begun by petition. That was in respect of the para. 6 issue.

33   The judge then turned (*ibid.*, at para. 32) to the para. 11 issue, which he described as the issue "whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the company, to state (and if necessary verify) why the information and documents were relevant . . ." Mr. Mowschenson had submitted that this requirement was necessary, in the interests of proportionality and to prevent abusive requests.

34   The judge answered this issue, however, in the negative. He said (*ibid.*, at paras. 36–37):

"36   I approach this case on the basis that all parties will comply with the orders of the court. They will in their conduct ultimately be regulated by the court, in the sense that the court will rule, as it must when asked to do so, on all matters relating to the law and procedure leading up to the trial . . .

37   I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr. Mowschenson, Q.C. has suggested in order to give the company some added protection. Since the question of fair value is a matter for the court's judgment to be reached in the light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides,

it is not for the company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to embarrass or harass the company, the court will step in if asked to do so."

35   Thirdly, the judge addressed the disputed question of whether the dissenting shareholders should give disclosure of their documents (*ibid.*, at paras. 55 ff.). Mr. Mowschenson submitted that they should, and pointed to the fact that, in a similar situation of the assessment of fair value in Delaware, dissenters were required to give disclosure: *In re Appraisal of Dole Foods Co. Inc.* (3). On the other side, however, Mr. Robert Levy, Q.C. said that the decision of Mangatal, J. in *Homeinns* (4), to the effect that "it is not in keeping with the purposes of s.238 for the dissenting shareholders to be ordered to provide discovery" (2017 (1) CILR 206, at para. 20), was an end to the matter, and that judges of one division should speak with the same voice.

36   On this issue too, the judge decided in favour of the dissenting shareholders. He said that he preferred the evidence on this subject of Mr. Arboit over that of Mr. Reid. It will be recalled that Mr. Arboit said that the dissenting shareholders' documents were "not . . . relevant." The judge agreed. He said (2017 (2) CILR 24, at para. 69) that "I am not persuaded by Mr. Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value." He said (*ibid.*, at para. 70) that he preferred the evidence of Mr. Arboit that the dissenting shareholders' internal analyses "are not relevant." He said (*ibid.*, at para. 73) that "Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery . . ." As for the Delaware case of *Dole*, he said (*ibid.*, at para 75) that he would pay close attention to the decisions of the courts in Delaware on matters of substantive law "given the similarity of the jurisprudence and the actual words used in s.238." But not on matters of procedure, where care had to be taken that Delaware law was consistent with Cayman law and practice. He concluded (*ibid.*, at para. 76):

"Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a s.238 case. This is in keeping with the approach taken both in *Integra* . . . and *Homeinns* . . . It follows, in my respectful opinion, that Mangatal, J. was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way . . ."

**The first issue, concerning para. 6 of the order: submissions**

37   On this appeal, Mr. Mowschenson, Q.C., although present in court to present a different appeal on behalf of the company, was replaced by Mr. Thomas Lowe, Q.C. It was suggested that this was because Mr. Mowschenson had conceded the para. 6 and para. 11 issues below, before the judge.

38   Be that as it may, Mr. Lowe submitted on behalf of the company that there should not be automatic or "blanket" disclosure of all relevant documents in an action begun by petition; that discovery should be by requested categories under O.24, rr. 3, 8 and 14, not r.1, and that such requests had to be justified as necessary and proportionate; and that in any event production should not be ordered unless so justified.

39   On behalf of the dissenting shareholders, Messrs. Girolami, Q.C., Levy, Q.C. and Meeson, Q.C. all submitted that the judge was right, *inter alia* because para. 6 had been agreed below between the parties. It was true that in para. 20 of his judgment, Parker, J. had mistakenly suggested that para. 6 was in issue, but that reflected an earlier stage of skeleton argument, whereas by the time of the court hearing the parties had agreed on the terms of a "catch-all" provision in para. 6 of the draft order, in addition to the Schedule A categories for disclosure which had been agreed pursuant to para. 5 of the draft order. In any event counsel submitted that the judge had been right, for the reason he proposed, to conclude that a catch-all provision was necessary, as had previous judges before him in s.238 cases.

**The first issue: discussion and decision**

40   To some extent, in their oral submissions the three counsel appearing for one or another of the dissenting shareholders sought to divide up their firepower so as not to overlap on the three issues. But there was no complete success in this endeavour. In any event, all three had filed full written skeleton arguments. This had the effect of somewhat overwhelming the advocacy.

41   Be that as it may, this first ground of the company's appeal was wholly undermined by clear evidence that the company had conceded the catch-all provision of para. 6 below. Such agreement was not altogether surprising in the light of previous orders possibly agreed but in any event sanctioned in earlier s.238 cases.

42   Thus, a travelling draft of what was ultimately agreed as para. 6 demonstrated that the company had accepted para. 6 and had made some (albeit relatively small) changes to it.

43   In any event, it is clear that GCR O.24, r.3 applies in any proceedings ("whether begun by writ, originating summons or otherwise") and allows

the court to make an order for general discovery. It is unlike r.7 which is concerned with discovery of particular documents. Whereas r.7 requires an affidavit from the requesting party, r.3 does not. And although it is true that production goes beyond discovery and inspection, and that production will only be ordered where necessary, it is likely to be an unusual case where the documents discovered as being relevant go beyond what is necessary for production—even if that can of course happen where disclosure is vast and goes well beyond what is necessary for a fair trial of the proceedings, especially on matters of only tangential interest. Because of discovery by list, it will be open to the parties to anticipate how much actual production will be necessary. Where there is a dispute, r.14 makes it clear that the burden is on the party seeking production.

44   In the present case, however, it was agreed that the relevant documents, whether under para. 5 (Appendix 2 documents) or under para. 6 (the catch-all provision) were not merely to be discovered by list but "uploaded" *i.e.* produced.

45   In a s.238 fair value proceeding, moreover, such an attitude to the company's disclosure obligations is entirely understandable. It is the company itself which has put forward a price for the merger buy-out of its shares, and it has done that on the basis of its own internal assessment of its business and its prospects. For these purposes it knows better than anyone else the documentary material which is relevant to its assessment. Although independent experts may make a good start at categorizing likely documents for disclosure, as has been done in Schedule A/Appendix 2, and, subject to the second issue concerning para. 11 of the order discussed below, those experts may usefully be able to follow through with further requests for documentation, it makes good sense for the standard obligation on a party, to make disclosure of its relevant documents, to stand behind such initiatives. The judge said (2017 (2) CILR 24, at para. 25):

   "This seems to me to be in keeping with the court's approach in these types of cases. I do not think the company should be made to do so only if an expert requires further documents and asks for them; rather it should be a general obligation of the company to search for and produce all documents relevant to fair value."

46   In these circumstances, the appeal with respect to para. 6 of the order is dismissed.

**The second issue, concerning para. 11 of the order: submissions**

47   Mr. Lowe submitted on behalf of the company that the process contemplated in para. 11 of the judge's order was "wholly outside Order 24." The judge had no power to delegate his powers under O.24. Rule 7 was the regular process for seeking further specific documents, and that

process required support in the form of an affidavit and was subject to well-recognized limitations. In the present case, the dissenting shareholders' (new) expert had produced two long lists of additional materials which had every appearance of being an unrestrained catch-all. Moreover, the reference to "information" in para. 11 was an additional error: it effectively allowed an expert to administer interrogatories, which usually required the specific permission of the court. By delegating its functions to the experts, the court had put it out of its power to control the process of disclosure and interrogatories in a way that circumvented recognized safeguards.

48   On behalf of the dissenting shareholders, however, it was again submitted that the company had agreed to the essential terms of para. 11 in the run-up to the hearing before the judge below. This was demonstrated by the travelling drafts of the draft order prior to the hearing, from which it was clear that the company had agreed both to the concept of further experts' requests for documents and to their requests for information, and had only disagreed on how such requests might be policed. Thus, the company sought protection in the form below (with emphasis added by me):

> "11. *Each expert personally and not through parties' attorneys, can make a request for such* additional documents or information *as he/she reasonably believes to be relevant* to the determination of the fair value of the shares in the Company at the Valuation date and for the purposes of preparing his/her own opinion . . .
>
> 12. *The Company or Respondent shall respond to the expert request . . . within 21 days* of receipt of such a request unless otherwise agreed. *In responding to such request the Company or Respondent may, if they consider appropriate, request further clarification of the request from the expert if the Company or the Respondent is concerned that the request is too broad, disproportionate or not relevant to the determination of fair value . . . and for the purposes of the expert preparing their own report . . .*
>
> 13. *The expert shall respond to any request for clarification . . . within 7 days of such request providing the clarification requested . . .*
>
> 15. *The Company may, on 5 days' notice, apply to the Court for an order that the Dissenters' Expert certify by affidavit that the documents sought are both relevant and necessary for him/her to prepare his/her report.*"

49   Ultimately, however, the judge decided in effect, with the aid of prior cases, that the experts were less likely to abuse their position than the company was. He also inserted into his order at para. 11 the words "unless

. . . directed by order of the Court" and made specific reference in his judgment (2017 (2) CILR 24, at para. 41) to a liberty to apply, in these terms: "All parties have liberty to apply to the court at any stage if the process is not being followed or is being circumvented in some way."

50   During submissions, Mr. Lowe accepted that the words inserted into para. 11, understood as the court made clear it understood them, namely as a further protection on the part of the court against any abuse on the part of the experts and maintaining the ultimate control of the court over the para. 11 process, went far and perhaps the whole way to meet the company's objection to that process.

### The second issue: discussion and decision

51   In the circumstances, there is little that needs to be said under this heading. Mr. Lowe effectively withdrew the company's appeal against para. 11 during the course of submissions. In my judgment, the company cannot in any event successfully appeal against the concept of expert engagement in the process of disclosure which had been sanctioned by the parties and the court not only in para. 11 of the order, but also in para. 6 (dealt with above) and in para. 12 (against which there has been no appeal).

52   In sum, I would dismiss the company's appeal on the para. 11 issue.

### The third issue, concerning disclosure by the dissenting shareholders: submissions

53   In the event, this was the issue which most divided the parties on this appeal.

54   On behalf of the company, Mr. Lowe submitted that the dissenting shareholders' own documents concerning the valuation of the company were relevant and it was for the dissenting shareholders to show why they should not be disclosed. The company's expert had asked for these documents, as set out in Schedule B, on the basis they were relevant for the purposes of a report on fair value. There was no logic in the judge's rejection of the company's expert's views in favour of relevance. The judge was wrong to say that the requested documents were irrelevant.

55   On behalf of the dissenting shareholders, counsel supported the judge's decision refusing any disclosure from the dissenting shareholders for the reasons he had given. In essence, it was a matter of precedent in the Cayman Islands where in all previous s.238 cases "disclosure has been a one-way process"; a conflicting view from Delaware in the *Dole* case (3) could be explained on the basis of a different and broader view about disclosure there, *inter alia* because disclosure was allowed simply on the basis that it was relevant to credit in cross-examination, which was not the

217

case in the Cayman Islands, and reference was also made to what Segal, J. had to say about Delaware authorities in *Shanda* (7) (at paras. 73–80), and in any event it was the law of the forum which prevailed; the question of fair value was a matter for independent experts examining objective data; the views of the dissenting shareholders were subjective, based on merely public and incomplete information, and in any event irrelevant as mere opinion and, what was worse, opinion from non-experts and non-independent sources; there was no need for any "reality check" since experts could be trusted; any documents were likely to be privileged; the judge's decision was a case management decision within his discretion and could not be faulted on any of the limited grounds on which an exercise of discretion could be attacked.

### The third issue: discussion and decision

56   It was somewhat anomalous that the dissenting shareholders devoted much more energy to responding to this branch of the company's appeal than the company itself devoted to advancing it. That was not only due to the fact that the dissenting shareholders had three separate skeleton arguments and three separate leading counsel duplicating their submissions. However, the point is of substantial importance in s.238 proceedings generally, and arises in the Court of Appeal substantially for the first time.

57   I approach this issue from the point of view that one-sided disclosure on the central issue of a case (*a fortiori* where that issue is one of fair value and the dissenting shareholders are only shareholders in the first place because, as professional and sophisticated investors, they have taken a decision to invest in the company whose value is in issue), is anomalous, unprecedented outside s.238 cases in the Cayman Islands, and *prima facie* counterintuitive, and therefore the argument in favour of such one-sided disclosure has to be considered with the greatest of care.

58   I ask myself first what can be learned from previous cases in the Cayman Islands. It appears that, whatever may have been done in practice, the *issue* has only risen in two cases, one of which is cited by the judge and the other of which emerges from one of the skeleton arguments before the court. The case cited by the judge is *Homeinns* (4), a decision of Mangatal, J. which he cited (2017 (2) CILR 24, at para. 12) and referred to again at paras. 61 and 75. I repeat the relevant part of her judgment (2017 (1) CILR 206, at para. 20):

> "Further, in my judgment, it is not appropriate to make a standard order under O.24 of the GCR for disclosure by both parties. In my judgment, it is not in keeping with the purposes of s.238 for the dissenting shareholders to be ordered to provide discovery."

59   The case relied on in Mr. Levy's skeleton is *In re Trina Solar Ltd.* (8). The court does not have a judgment in that case, but Mr. Levy has annexed to his skeleton an email dated July 25th, 2017 (five days after the judgment of Parker, J. in the present case) sent by Segal, J. to the parties in that case, in which the following appears:

> "As regards the Petitioner's application for a direction that the Dissenting Shareholders upload to the Data Room and provide discovery of the documents listed in paragraph 7 of the draft directions order dated 4 July, I am not persuaded by the evidence relied on by the Petitioner that valuations of third parties based on public information are relevant to a determination of fair value. It seems to me that once an expert has the Petitioner's full records he does not need to see and nothing helpful could be gained by reviewing such third-party valuations. Nor do I consider that the other documents referred to in paragraph 7 (being information relating to the Dissenting Shareholders' investment in the Petitioner and the Dissenting Shareholders' internal analyses) are relevant to the determination of fair value of a publicly listed company's shares."

60   The trouble with these views, as it seems to me, is as follows. Mangatal, J.'s only reason for her conclusion is that discovery from dissenters "is not in keeping with the purposes of section 238." However, she does not explain, and I can find nothing within s.238 to explain, why any discovery from dissenters is inappropriate or not in keeping with the purposes of s.238. As for Segal, J.'s views, he is equally against disclosure of "valuations by third parties" and dissenters' "internal analyses." As for the former, he says that the experts do not need them; as for the latter he says simply that they are "not relevant." Nevertheless, both experts in this case are agreed that third party valuations are relevant and helpful, and, where in the possession of the company, should be disclosed; and at any rate Mr. Reid is of the opinion that Schedule B documents, which include the dissenting shareholders' analyses, are also relevant and will assist him for the purposes of a report. Segal, J. gives no reason for his statement that such documents are irrelevant. In my judgment, if third party valuations in the possession of the company are relevant, so are third party valuations not in the possession of the company but, for instance, in the possession of the dissenting shareholders. After all, the question of fair value is closely related to the question of what a willing buyer and a willing seller would exchange for the shares of the company (or for the company as a whole): and that question is closely related to valuations conducted within the market generally. And if that is the case, then analyses and valuations conducted by the dissenting shareholders, which may well in any event be based in part on "third party" valuations, assessments and analyses, are as relevant as any such valuations, assessments and analyses, or even more so for the very reason that the dissenting shareholders are not merely

potential investors, but actual investors in the company. They are active members of the market who are willing to put their money where their analysis is.

61   I conclude therefore that prior decisions in the Cayman Islands are of very little assistance to this court.

62   I also remind myself that the dissenting shareholders' counsel, when asked, could cite no other jurisprudence, in the Cayman Islands or in the United Kingdom, in which wholly one-sided discovery has been tolerated or practised, outside s.238 in the Cayman Islands.

63   Next I go to the jurisprudence of Delaware, which has had long familiarity with the concept of fair value in the context of dissenting shareholders and a statute with similar wording to s.238. Reference was made to the case of *Dole* (3) before the judge, and in the dissenting shareholders' skeleton arguments before this court. A significant part of the judge's judgment below consisted in setting *Dole* aside as not throwing any light on the issue before this court. Mr. Lowe did not refer to it in his submissions, but that as it seems to me does not relieve this court of the need to consider whether the judge was justified in what amounts to his disparagement of that case for present purposes. I do not, however, take any account of *Dole* as constituting any authority or precedent. In any event it comes from a separate jurisdiction. However, I cannot ignore considerations which are addressed in *Dole* as though such matters did not exist in the world. That would be to shut my eyes to the realities of life.

64   What I find in *Dole* is a sophisticated, well-informed, modern judgment (delivered in 2014) with extensive citation of jurisprudence. The current issue of disclosure by dissenting shareholders is considered in real depth, unlike the brief assertions made in the Cayman Islands jurisprudence cited above. I assume that the Delaware law of discovery is broader than the law in the Cayman Islands, and that it also allows discovery going to credit, which is not the law in the Cayman Islands or in English law. I therefore fully understand that in these respects Delaware jurisprudence will be an unsafe guide. I will also assume, for the sake of argument, that experts in Delaware may be less conscious of the need to assist the court as distinct from promoting the interests of the party appointing them, than will be the case in the Cayman Islands (or from wherever the experts in Cayman Islands cases may be brought). Nevertheless, a reading of *Dole* demonstrates that its reasons for requiring normal cross-party disclosure go much deeper than could be explained by those factors. I cite passages in Laster, V.C.'s opinion to exemplify the power of its reasoning (but omitting the extensive footnotes) (114 A.3d at 549–550; 552–553; 558; 560):

"Several Court of Chancery decisions have ordered production of pre-suit valuation material prepared by appraisal petitioners. These

220

decisions recognize that the pre-litigation valuations are relevant to the central issue in the proceeding, which is the value of the subject company. They are also relevant to issues of such as the appropriate inputs and considerations for valuation methodologies . . .

The petitioners argue that their valuations are opinions, not facts, and that the question of valuation in an appraisal is purely a matter for the experts . . .

In my view, the valuation-related information that Dole seeks easily satisfies the potential admissibility requirement. A statutory appraisal proceeding is not a fault-based case in which one side has the burden of proof and loses if it fails to meet its burden . . .

In making its determination, this court can consider a wide range of factual evidence, including, but not limited to, the market price, the merger price, other offers for the company or its assets, prices at which knowledgeable insiders sold their shares, internal corporate documents from the respondent, and valuation work prepared for non-litigation purposes. Even when parties have retained valuation experts and the court relies on their opinions when determining fair value, the court has considered factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures generated by the experts. The fact that a party has retained an expert does not enable the party to shield factual material relating to valuation that otherwise would be discoverable and admissible . . .

Nor, in this case, are the petitioners' witnesses unqualified to express views on value. In my view, their testimony and their pre-litigation valuations will be 'helpful to . . . the determination of a fact in issue,' namely the determination of the fair value of Dole . . .

Experts on valuation in this court often consider other valuation work when rendering their opinions. For example, when developing a weighted average cost of capital for the subject company, an expert may prepare her own calculation and then demonstrate the reasonableness of the selected inputs by showing that other valuations have used the identical or similar inputs, or that the inputs that the expert selected were more conservative than the inputs used by others. The expert may employ similar reasoning to attack the opposing expert's work by showing that other valuations have not used comparable inputs or that the approach selected by the other side's expert was particularly aggressive. Comparisons are made frequently to reports from securities analysts, presentations by the investment bankers who worked on the deal, or internal materials prepared by corporate personnel . . .

The petitioners' internal, contemporaneous valuations are real-world assessments by 'astute investors' who must 'back their beliefs with their purses.' Their views may prove to be as or even more credible than the litigation-crafted opinions of valuation experts . . .

Experts can act strategically when selecting comparable companies or precedent transactions, when picking multiples, or when choosing inputs for their cost-of-capital calculations. Perhaps more importantly, academic studies have shown that experts unconsciously reach higher or lower results depending on whether they represent the plaintiff or the defendant due to cognitive phenomena like attachment bias. It is helpful to check an expert's litigation-driven work or a party's litigation-inspired arguments against other valuations, particularly pre-litigation analyses . . .

Discovery into the petitioners' analyses also should help promote settlement . . . Access to both sides' pre-litigation valuations should help de-bias the litigation positions, constrain the range, and promote settlement."

65   Irrespective of the foreign source of these remarks, I consider there is wisdom in them. It has been my experience in cases in which experts and share valuation experts play a significant or dominant role, that such experts, however professional and loyal to court or tribunal rather than party, always tend to diverge from each other in favour of their appointing party. It has also been my experience in share valuation cases that there can be much room for issues on the facts of a company's history, its financial performance, the validity of its predictions, projections as to the state of an industry, or markets, or products, or technological developments, and so on. However important a company's own documents may be on such matters, the company and its personnel and advisers have no monopoly on understanding of or insight into the world in which the company operates. The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. Moreover, it must be remembered that the documents of investors prior to litigation are not driven by the litigation itself but by their willingness to put their own cash to work in support of those findings and evaluations. There is a reality to that which must not go unrecognized.

66   I turn next to the evidence of the experts involved in the current stage of these proceedings, Mr. Reid and Mr. Arboit. In a nutshell, Mr. Arboit says that the dissenting shareholders' documents cannot be relevant, Mr. Reid says that they are likely to be highly relevant. Mr. Arboit says that he would prefer to distance himself from them (because as I understand it,

they are the documents of his appointing party), whereas Mr. Reid says that he would use them as being relevant for the purposes of his report. The judge accepted the evidence of Mr. Arboit and rejected the evidence of Mr. Reid. Why? In my respectful opinion, there is something unbecoming about an expert appointed by one party opining that its appointing party's documents *cannot* be relevant; and there is something unfortunate in a judge at a merely interlocutory stage choosing between the differing views of the experts, when it will only ultimately be at trial, and in the light of adequate disclosure and of experts' reports that an objective position is capable of satisfactory evaluation.

67   It is often the case that at the *procedural and interlocutory* stage of disclosure, one or other party to a dispute seeks to take up an extreme position about the irrelevance of some category of documents, when what it is really doing is making an unwarranted assumption about the final outcome of the *substantive* arguments raised in the parties' dispute. Courts have to be wary of that approach, for otherwise they may find themselves taking up a final position about some aspect of the argument before they are in a position to do so. Something of that kind seems to me to be going on in this case. The dissenting shareholders, who want to focus on the company's own internal documents, almost to the exclusion of any other documents (I will revert to that "almost"), do so because that approach best suits their case that the company is the most knowledgeable judge of its own affairs. No one else can be privy to as much of its own information as itself. Public information is all very well, but that is only half the story. Because only the company is privy to all the information, both public and internal, the dissenting shareholders point to the company's own submission (even if that is not accepted) that its view of its own value has a precedence which cannot be challenged by anyone with only a partial view. Therefore the views of others are irrelevant. And saying that the views of others are irrelevant involves also saying, albeit implicitly, that their views of everything which goes to make up a business's value are irrelevant: not only their ultimate view of value, but every ingredient which goes to make up that ultimate view, such as the state of the industry, the state of the market, the position of competitors, the state of the company's products and competing products, the ability to predict the future, the discount which has to be made for that uncertainty, the cost of capital, both loan and equity, and so on and so on. But the implicit theory of the company's submissions, supported by Mr. Arboit, is that everyone's views on all these matters are irrelevant.

68   Except (and I now come to that "almost") that Mr. Arboit, although he seeks to make that case of total irrelevance, *inter alia* by talking about valuers valuing "as if they are 'inside the company'" (see above at para. 18)—in itself an arguably controversial concept, unless all it means is that the company's internal documents have to be considered as of significant

importance, but I doubt that that is all it means—nevertheless still has to accept that he would take into consideration as potentially relevant both (a) "*third-party market reports . . . relied upon by the Company*," and (b) "publicly available information beyond that which is known to be (or have been) in the possession of the Company," but even so *not*, he says, (c) the reports of specific investors, which "are of no relevance." This does not make sense to me: if the reports of third parties should be taken into account, I do not understand why the reports of specific investors should not also be taken into account. They are part of the market, they are third parties so far as the company is concerned and were in every sense third parties immediately before their investment, and their reports are likely to be all the more pertinent in that they are likely to be highly contemporaneous and professional reports of sophisticated members of the market who are not only observers but ready to act on their own research and scholarship (see Mr. Reid's second affidavit cited at para. 17 above). In these circumstances, I do not understand Mr. Arboit's view that only these reports are irrelevant, or, with respect, why the judge was willing to act on that view. I respectfully consider that the judge was wrong to do so, and wrong in principle to find any support in Mr. Arboit's view for a totally exceptional exclusion of any obligation of disclosure from one party.

69   Mr. Arboit, of course, had to accept that third party reports were relevant because he had put his agreement to asking the company to produce, *inter alia*, "third party and industry reports relevant to the markets in which the Company operates" (*ex* Schedule A/Appendix 2).

70   Moreover, I find it inconsistent that the judge was willing to accept, under the regime provided for in para. 11 of his order, that the view of *either* expert as to further documents or information to be provided by the company was sufficient, subject to the order of the court, for the company to have an obligation to provide such material, whereas he was not willing to accept Mr. Reid's well-reasoned evidence that *he* would require the documents of the dissenting shareholders on value to assist him in the preparation of a report on fair value, even if Mr. Arboit would choose to ignore them. It is a strong thing indeed, in the face of a general regime for mutual disclosure, or even in the absence of such a regime, to rule at an interlocutory hearing that documents that an expert says that he would find useful in the preparation of his report would not be permitted to him.

71   I would next refer to the oddity of the contrast between the dissenting shareholders', Mr. Arboit's and the judge's views that *all* factors are relevant to the court's finding of fair value, and the selection of the dissenting shareholders' documents as alone being excluded from that totality. The judge's judgment is replete with references to the width of the investigation leading to the court's determination of fair value (s.238(11)): "the Court shall determine the value of the shares"). Thus the judge cites—

   (i) Mangatal, J. in ): "In particular, I accept that the experts and the court are to have regard to *all* relevant documents and information, not just publicly available information" (cited at 2017 (2) CILR 24, at para. 12);

   (ii) Mr. Levy's submission that the s.238 cases of *Shanda* (7); *In re Bona Film Group Ltd.* (1); and *Qihoo* (6) demonstrated that "the court *should not limit in advance* the types of documents which the expert should be entitled to see and to call for" (cited at 2017 (2) CILR 24, at para. 13);

   (iii) the proposition which (*inter alia*) the judge derived from the judgment of Jones, J. in ) to the effect that "Section 238 of the Companies Law (2013 Revision) does not dictate *any* particular valuation methodology . . . fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community" (cited at 2017 (2) CILR 24, at para. 17);

   (iv) his own view that "it should be a general obligation of the company to search for and produce *all* documents relevant to fair value" (2017 (2) CILR 24, at para. 25);

   (v) Jones, J. in , quoting from *Cyprus Anvil Mining Corp.* v. *Dickson* (2)): "The one true rule is to consider *all the evidence* that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on *all the evidence and all the factors.* I emphasize: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the courts not by a formula that can be stated in the legislation" (cited at 2017 (2) CILR 24, at para. 30);

   (vi) his own view that "Since the question of fair value is a matter for the court's judgment to be reached in the light of *all the factual evidence* put before it and on the basis of expert assistance from valuation experts from both sides, *it is not for the company or its expert to limit in advance the expert's line of enquiry*" (2017 (2) CILR 24, at para. 37); and I would add that what applies to the company or its expert applies equally to the dissenting shareholders or their expert; and

   (vii) his own view that "I accept that there may be different approaches and what one expert considers necessary and relevant another expert may not" (*ibid.*, at para. 39).

72   What is then striking is the contrasting approach that the judge takes to (a much smaller number of) documents identified by an expert as relevant documents in the hands of dissenting shareholders, a contrasting approach which the judge asserts on the *a priori* conception that *all* the

relevant documents will be held by the *company* (a proposition which not even Mr. Arboit accepts), and that dissenters' documents relating to fair value are irrelevant. Thus the judge repeatedly assumes the conclusion at which he arrives, for he states:

(i) "Since the company will likely hold all the relevant information which will go to a determination of fair value" (*ibid.*, at para. 31).

(ii) "The court would require very clear grounds upon which to make such an order [discovery from dissenters]" (*ibid.*, at para. 65); "material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of the merger, is irrelevant" (*ibid.*, at para. 67).

(iii) "[A]lthough I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds" (*ibid.*, at para. 68).

(iv) "I am not persuaded by Mr. Reid's second affidavit that valuations of third parties based on public information are relevant" (*ibid.*, at para. 69): but he ordered the disclosure by the company of such third party valuations on the basis that they were relevant, as they were agreed to be by both experts.

(v) "I prefer the evidence of Mr. Arboit . . . that [the requested documents] are not relevant" (*ibid.*, at para. 70).

(vi) "Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery" (*ibid.*, at para. 73).

(vii) ". . . Mangatal, J. was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way" (*ibid.*, at para. 76).

73   It seems to me that all these statements are at root the same simple assertion of irrelevance. Rather inconsistently, the judge allowed that in exceptional cases some (unidentified) documents might have a special case made for their disclosure from dissenters. But that perhaps merely reflects the judicial caution of "never say never." On the judge's assertion of irrelevance, however, no case could be made, and even if in theory it could be, no one could ever know of what documents to ask for.

74   I have stated my reasons above for respectfully disagreeing with the judge's *a priori* assertion of irrelevance. In sum, dissenters live in the same world as companies whose fair value has to be assessed. Such companies may have internal information and projections which are not in the public domain, albeit in the case of a listed company like Qunar the room for such private information may be more limited than in the case of unlisted companies. In any event, no one disputes the relevance and

potential importance of such companies' documents. It remains true, nevertheless, that value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "getting it right" is not the point at this stage of the proceedings. What is needed is for the court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.

75    In my judgment, it is unhealthy in such a context, and in litigation especially, to form *a priori* assumptions about relevance. The normal rule is that disclosure is a mutual obligation. Mutuality in this respect is equity and fairness. Of course some litigants may have more of what needs to be disclosed than other litigants. And it is always possible that the documents of one party will turn out to be of greater influence than those of the other side. But I would need to be clearly persuaded that s.238 litigation is the unique field in which one-sided disclosure ought to be practised, and I would in principle regard that as a heavy task. Counsel have not suggested that there is one-sided disclosure in any other field. I am not persuaded of that extreme and unique position by repeated assertions that only the companies concerned, and not their sophisticated investors, have disclosure relevant to fair value. It seems to me that if dissenters have in their possession, as they are likely to do, documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies, and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. In this context I find the evidence contained in Mr. Reid's second affidavit, which merits repeated re-reading (see at para. 18 above) highly persuasive. At any rate it is arguably highly persuasive, and that is all that is needed at this stage of the proceedings.

76    It is submitted for the dissenting shareholders that the judge's decision is an exercise of discretion and not readily amenable to appeal, subject to the usual limited grounds on which the exercise of discretion can be attacked. There are three answers. First, the ruling is not so much an exercise of discretion (for instance in relation to particular documents) as a decision of law (as to relevance) and/or principle. The fact that the judge allowed the remote possibility that in some (unexplained) case a dissenter could be made to disclose a document in

227

exceptional circumstances does not change the reality of the judge's rationale. Secondly, however, even if his decision were a matter of discretion, the judge has erred fundamentally and in principle, by creating a unique field for one-sided disclosure. Thirdly, the judge wrongly considered himself to be following in the line of established precedent, in the form of Mangatal, J. in *Homeinns* (4), and even if not strictly binding on him, but it is clear to me that her assumption, that s.238 somehow makes disclosure by dissenters inappropriate, cannot carry weight.

77   Finally, I refer briefly to two judgments of this Court of Appeal on the subject of disclosure in s.238 proceedings, albeit judgments only at the permission to appeal stage. The first is *In re Qihoo 360 Technology Co. Ltd.* (6), where permission to appeal against disclosure by the company concerned was refused, but this court (Martin, Newman and Morrison, JJ.A.) ended by warning of the possibility of abuse by dissenters conducting "a 'drains up' inspection of the entire business, regardless of the relevance to fair value" (2017 (2) CILR 585, at para. 27). The second is to the permission to appeal judgment of Martin, J.A. in this very case, where he repeated his concern about possible abuse by dissenters in their disclosure demands of companies, and was also clearly concerned in general that, in the light of a series of s.238 petitions coming before the Grand Court, the Court of Appeal should have an opportunity to consider the proper parameters of the interlocutory stages of a s.238 petition. It seems to me that in the present case there is as yet no sign of danger of abuse in respect of potential further requests of the experts from the company, provided that they are properly held, subject to the control of the court which will wish to prevent anything abusive or disproportionate. However, there would to my mind be a danger of abuse in a situation where one-sided disclosure is demanded of a company, on matters of relevance to fair value, but dissenters are given *carte blanche* to address any arguments on fair value they wish or can, free of any discipline that would be imposed by having, where necessary, to present to the experts and ultimately to the court their own documents on matters of relevance to fair value, which must inevitably exist.

78   Thus dissenting shareholders in this case have not submitted that they do not possess the documents which they have been requested to disclose pursuant to Schedule B. The list of documents within Schedule B is a short list, and certainly not a difficult list to answer, and there is nothing disproportionate about that list. It has not been suggested that there is. The list has been sanctioned by the company's expert.

79   Even so, item 5 is not so much a request for documentation as a request for information, and I would not allow that. Item 4 could be reflected in documentation, but it is much simpler if the position is simply scheduled, as requested. If the schedule is challenged, the dissenting shareholders should stand ready to confirm it by documents. (Incidentally,

the idea that dissenting shareholders should not be required to disclose their dealings in the shares of a s.238 company seems to me to be inexplicable.) Item 4 may incidentally answer the question in item 5. Item 2 should be confined to communications regarding the value of the company or its shares. Item 1.3 should be amended to read "in connection with the above" rather than "in connection with this action."

80   Subject to the above paragraph, I would therefore allow the company's appeal under this third issue.

**Conclusion**

81   In sum, I would dismiss the company's appeal on the first two issues, against paras. 6 and 11 of the order, but allow the company's appeal on the third issue, concerning discovery from the dissenting shareholders, so as to grant discovery as set out in Schedule B to the draft order, subject to the detailed comments at para. 79 above.

82   **FIELD, J.A.** concurred.

83   **GOLDRING, P.** concurred.

*Appeal dismissed.*

Attorneys: *Harney Westwood & Riegels* for the petitioner/appellant; *Appleby* for the first, second and fifth respondents; *Mourant Ozannes* for the third and fourth respondents; *Conyers Dill & Pearman* for the sixth, seventh and eighth respondents.

———————————————