A

accounting in this context is, of course, that these principles will normally afford the surest means of ascertaining the *true* profits or losses of a trader, as the case may be. The commissioner in my judgment reached the right decision. I would concur in allowing these two appeals and in the form of order proposed.

*Appeals allowed with costs.*
*Leave to appeal.*

B

Solicitors: *Solicitor of Inland Revenue; Herbert Wilkes, Birmingham.*

H. D.

C

D

PANAYIOTOU AND OTHERS v. SONY MUSIC ENTERTAINMENT
(U.K.) LTD.

[Ch. 1992 P. No. 8711]

E

1993  June 29, 30;                                    Sir Donald Nicholls V.-C.
      July 1; 15

Evidence—*Foreign tribunal, for—Jurisdiction of English court—Letters rogatory—Request for production of documents by overseas company—Whether English court having jurisdiction to issue letter of request—R.S.C., Ord. 39, r. 2*

F

The power of the High Court to issue a letter of request to the court of another country for assistance in obtaining the production of a document as evidence in an action stems from the inherent jurisdiction exercisable when the request is confined to a particular document which is admissible in evidence and directly material to an issue in the action and the court is satisfied that the document exists or did exist and is likely to be in the possession of the person from whom production is sought, and the jurisdiction is not impliedly ousted by R.S.C., Ord. 39, r. 2[1] (*post*, pp. 149H, 150H–151A, 153H–154A).

G

Where, therefore, the plaintiffs applied for the issue of a letter of request to a court in New York in order to obtain the production of a number of documents by a company carrying on business there:—

H

*Held*, that an order would be made directing the issue of a letter of request for the production of documents to the extent

[1] R.S.C., Ord. 39, r. 2(1): see *post*, p. 148E–F.

A    that the request was not a disguise for seeking discovery of documents (post, pp. 153E–H, 157C–D).

     *Cape Copper Co. v. Comptoir d'Escompte de Paris* (1890) 38 W.R. 763, C.A. distinguished.

     *Per curiam.* There would be obvious advantages in the Rule Committee prescribing a simple form of letter of request to be used when the request is confined to the production of documents (post, p. 151B).

B

The following cases are referred to in the judgment:

*Amey v. Long* (1808) 9 East 473
*Asbestos Insurance Coverage Cases, In re* [1985] 1 W.L.R. 331; [1985] 1 All E.R. 716, H.L.(E.)
*Bremer Vulkan Schiffbau und Maschinenfabrik v. South India Shipping*
C     *Corporation Ltd.* [1981] A.C. 909; [1981] 2 W.L.R. 141; [1981] 1 All E.R. 289, H.L.(E.)
*Burchard v. Macfarlane* [1891] 2 Q.B. 241, C.A.
*Cape Copper Co. v. Comptoir d'Escompte de Paris* (1890) 38 W.R. 763, C.A.
*Elder v. Carter* (1890) 25 Q.B.D. 194, C.A.
*Lee v. Angas* (1866) L.R. 2 Eq. 59
*Mackinnon v. Donaldson, Lufkin and Jenrette Securities Corporation* [1986]
D     Ch. 482; [1986] 2 W.L.R. 453; [1986] 1 All E.R. 653
*Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. 133; [1973] 3 W.L.R. 164; [1973] 2 All E.R. 943, H.L.(E.)
*Penn-Texas Corporation v. Murat Anstalt* [1964] 1 Q.B. 40; [1963] 2 W.L.R. 111; [1963] 1 All E.R. 258, C.A.
*Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647; [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A.
*Sunderland Steamship P. and I. Association v. Gatoil International Inc.* [1988]
E     1 Lloyd's Rep. 180
*Wakefield v. Outhwaite* [1990] 2 Lloyd's Rep. 157
*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235, In re* [1978] A.C. 547; [1978] 2 W.L.R. 81; [1978] 1 All E.R. 434, H.L.(E.)

F

The following additional cases were cited in argument:

*Attorney-General v. Wilson* (1839) 9 Sim. 526
*British South Africa Co. v. Companhia de Moçambique* [1893] A.C. 602, H.L.(E.)
*Ehrmann v. Ehrmann* [1896] 2 Ch. 611, C.A.
*Lonrho Ltd. v. Shell Petroleum Co. Ltd.* [1980] 1 W.L.R. 627, H.L.(E.)
*Mason & Barry Ltd. v. Comptoir d'Escompte* (1890) 38 W.R. 685, D.C.
G    *Rayner (J.H.) (Mincing Lane) Ltd. v. Department of Trade and Industry* [1990] 2 A.C. 418; [1989] 3 W.L.R. 969; [1989] 3 All E.R. 523, H.L.(E.)
*Senior v. Holdsworth, Ex parte Independent Television News Ltd.* [1976] Q.B. 23; [1975] 2 W.L.R. 987; [1975] 2 All E.R. 1009, C.A.
*South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1987] A.C. 24; [1986] 3 W.L.R. 398; [1986] 3 All E.R. 487, H.L.(E.)

H    MOTIONS

    The plaintiffs, Georgios Panayiotou, Robobuild Ltd. and Big Geoff Overseas Ltd., brought an action against the defendant, Sony Music Entertainment (U.K.) Ltd., claiming that they were not bound by a

A  written agreement dated 4 January 1988 and made with the defendant, which had since been taken over by the Sony Corporation of Japan.

By a notice of motion dated 2 June 1993 the plaintiffs sought an order against the defendant for discovery; that it file an affidavit stating whether it had or had at any time had in its possession, custody or power any of the documents or classes of documents specified in an attached schedule and, if any such document or class of documents had been but was not now in its possession, custody or power, stating when it parted with and what had become of the same.

B

By a second notice of motion also dated 2 June 1993 the plaintiffs sought against the defendant an order that a letter of request issue to the proper judicial authority of the City of New York, United States of America for the examination on the plaintiffs' behalf of the proper officer of Sony Music Entertainment Inc. ("S.M.E.I.") and requiring the officer to attend and bring with him certain classes of documents specified in an attached schedule and also requiring that the witness be examined on oath in relation to them. On the second day of the hearing the notice of motion was amended so as to seek an order for the production of documents by S.M.E.I.

C

The facts are stated in the judgment.

D

*Mark Cran Q.C.* and *Pushpinder Saini* for the plaintiffs. Each witness examined pursuant to the letter of request should be required to produce all relevant documents in the possession, custody or control of his division of S.M.E.I. and examined on them. He should be asked whether the documents he produces represent the totality of the existing documents which he has been required to produce and, if not, as to the whereabouts of all existing documents which have not been produced and the reason for their non-production; and whether there are any further documents which he was required to produce but which he has not produced because they no longer exist and when S.M.E.I. ceased to have them and what became of them.

E

*Gordon Pollock Q.C.* and *David Unwin* for the defendant. The court has no jurisdiction to order the letter of request in the terms sought by the plaintiffs. R.S.C., Ord. 39, r. 2 authorises the examination of a person as a witness before a foreign court and that person can be required to produce documents. But there is no jurisdiction to issue a letter of request concerned only with the production of documents: *Cape Copper Co. v. Comptoir d'Escompte de Paris* (1890) 38 W.R. 763. [Reference was also made to *Mason & Barry Ltd. v. Comptoir d'Escompte* (1890) 38 W.R. 685 and *British South Africa Co. v. Companhia de Moçambique* [1893] A.C. 602.] Furthermore, the company itself rather than an officer of the company is the proper object of such a letter of request and the company cannot be required to attend for examination: see *Penn-Texas Corporation v. Murat Anstalt* [1964] 1 Q.B. 40.

F

G

Apart from exceptional cases such as *Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. 133, discovery of documents is only obtainable from persons who are parties to the action. [Reference was made to *Lonrho Ltd. v. Shell Petroleum Co. Ltd.* [1980] 1 W.L.R. 627.] Evidence may be obtained from non-parties by means of

H

A  subpoenas or letters of request but neither procedure may be used to produce such a wide range of evidence as may be produced by discovery. [Reference was made to R.S.C., Ord. 38, r. 13(1); *Elder v. Carter* (1890) 25 Q.B.D. 194; *Lee v. Angas* (1866) L.R. 2 Eq. 59, 63; *Burchard v. Macfarlane* [1891] 2 Q.B. 241, 244; *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235* [1978] A.C. 547; *In re Asbestos Insurance Coverage Cases* [1985] 1 W.L.R. 331, 337–338 and
B  *Attorney-General v. Wilson* (1839) 9 Sim. 526.] Letters of request for the examination of witness abroad ought not to be issued unless the evidence which it is proposed to obtain is evidence directly material to an issue in the case and not merely evidence which may be incidentally useful as corrobation of other evidence: *Ehrmann v. Ehrmann* [1896] 2 Ch. 611. As to the ambit of incoming letters of request, see section 2(4) of the Evidence
C  (Proceedings in Other Jurisdictions) Act 1975. [Reference was also made to *Rayner (J.H.) (Mincing Lane) Ltd. v. Department of Trade and Industry* [1990] 2 A.C. 418.] There should be the same standard as regards the permissible width of the request applied to outgoing letters of request. [Reference was made to *Sunderland Steamship P. and I. Association v. Gatoil International Inc.* [1988] 1 Lloyd's Rep. 180, 184 and *Wakefield v. Outhwaite* [1990] 2 Lloyd's Rep. 157, 160, 161.]
D  *Cran Q.C.* in reply. If a company cannot be required to attend by its proper officer to give oral evidence, as was decided in *Penn-Texas Corporation v. Murat Anstalt* [1964] 1 Q.B. 40 (about which misgivings were expressed in *Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647, 662, 665), so that no order for production of documents can be made against the company, it would mean that the letter of request
E  procedure is never available to compel production of documents which belong to a company and are in its possession. This would create an unacceptably wide gap in the ability of the court to control the collection of evidence: see *Bremer Vulkan Schiffbau und Maschinenfabrik v. South India Shipping Corporation Ltd.* [1981] A.C. 909, 977. [Reference was also made to *Amey v. Long* (1808) 9 East 473, 484; *South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1987] A.C. 24
F  and *Senior v. Holdsworth, Ex parte Independent Television News Ltd.* [1976] Q.B. 23.] The United Kingdom is subject to an obligation to provide such evidence by whatever means is appropriate: see section 2(2)(*b*) of the Evidence (Proceedings in Other Jurisdictions) Act 1975. It would be extraordinary if it could not seek comparable assistance from foreign courts in return: see *Mackinnon v. Donaldson, Lufkin and Jenrette Securities*
G  *Corporation* [1986] Ch. 482, 491.

*Cur. adv. vult.*

H  15 July. SIR DONALD NICHOLLS V.-C. handed down the following judgment. In January 1988 George Michael, as he is known professionally, and two of his companies entered into agreements with the defendant, a company carrying on business in this country. The defendant was then known as C.B.S. United Kingdom Ltd. and it was part of the C.B.S. recording group of companies. By the agreements George Michael tied himself to the defendant, in respect of all his performances as a recording

artist, for a substantial period of years. He has now brought proceedings claiming he is not bound by the agreements. Their terms are so unreasonable that the agreements are in unlawful restraint of trade. He is, he claims, not obliged to deliver any further recordings or albums of recordings to the defendant.

The plaintiffs are in the course of obtaining discovery from the defendant. The defendant is obliged to give discovery of the documents which are or have been in its possession, custody or power. Herein lies the difficulty confronting the plaintiffs. The Sony Corporation of Japan has taken over the C.B.S. group, and the defendant is now part of the worldwide Sony group. On some of the issues raised in the action documents in the possession of other companies in the Sony group will be material. For instance, exploitation of George Michael's recordings outside the United Kingdom has been carried out, not by the defendant, but by other companies in the Sony group. To know the full extent and value of the benefits passed by the plaintiffs to the defendant under the recording agreements it is necessary to discover the benefits obtained by the Sony group worldwide, or at least in the other principal markets for George Michael's recordings. The plaintiffs have identified the other major territories as the United States of America, Canada, Australia, Japan, Germany, Italy, Austria and Switzerland. The Sony companies responsible for exploitation in those countries are not parties to this action, and so the plaintiffs cannot obtain discovery from them. The defendant's accountancy experts, Ernst & Young, are in the course of preparing their report on the issues in the action, and the defendant is willing to permit the plaintiffs' expert to inspect the financial documentation used by Ernst & Young in preparing their report. Whether that documentation will include everything the plaintiffs could reasonably expect is not yet clear.

Meanwhile, time is short. The trial has been expedited and is due to start in October. Rightly or wrongly, the plaintiffs' advisers are not confident they can rely on the defendant's whole-hearted co-operation on this important aspect of the plaintiffs' case. So the plaintiffs have applied to the court for the issue of a letter of request, addressed to the New York court, seeking that court's assistance. It seems that a Sony company carrying on business in New York, Sony Music Entertainments Inc. ("S.M.E.I."), operates as a central licensing body for other companies in the Sony group. The defendant has granted a licence to S.M.E.I., and S.M.E.I. has granted sub-licences to other Sony companies throughout the world. The plaintiffs wish the New York court to require S.M.E.I. to produce certain documents held by S.M.E.I. which the plaintiffs believe are material to the issues in this action: for example, each of S.M.E.I.'s sub-licence agreements affecting the exploitation of George Michael's recordings in the major territories. The plaintiffs also seek to have certain individuals orally examined before the New York court on certain issues.

*The jurisdiction issue*

The defendant's primary answer to this application, so far as the documents are concerned, is that the English court has no jurisdiction to issue the letter of request sought. The English court can issue a letter of request pursuant to R.S.C., Ord. 39, r. 2, for the attendance of a person

A   to be examined before the foreign court. He can be required to give oral evidence. At the examination the witness may also be required to produce documents. However, it is said, the English court has no jurisdiction to issue a letter of request concerned only with the production of documents.

If that is correct, it would reveal a serious lacuna. Let me explain this by reference to the present case. The documents sought are the documents of S.M.E.I. Accordingly, if it is to be issued, the letter of request must be
B   directed, not at any individual officer of the company, but at the company itself. But such an order, directed at the company, cannot be made as part of an order for the examination of a witness. That cannot be done, because a letter of request cannot be directed to a company for the examination of a witness. S.M.E.I. can be required to produce, by its proper officer, the documents in question. Under English law, however, it
C   seems that a company cannot be required to attend, by its proper officer, to give oral evidence. That was decided by the Court of Appeal in *Penn-Texas Corporation v. Murat Anstalt* [1964] 1 Q.B. 40. In a sequel to that case, also in the Court of Appeal, neither Lord Denning M.R. nor Pearson L.J. was overly enthusiastic about that decision: see *Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647, 662, 665.
D   Nonetheless the decision is clear and binding authority. Hence the difficulty: an order to produce a company's documents cannot be directed at an individual; the order must be directed at the company. But an order to produce documents pursuant to a letter of request can only be ancillary to an order to attend for examination, and such an order does not lie against a company. If this is correct, it would mean that the letter of request procedure is never available to compel production of documents
E   which belong to a company and are in its possession. A submission having this result calls for the closest examination.

I must go back to the last century. Before 1884, and leaving aside India and British colonies, there were two methods of taking evidence overseas for use at a trial: under a commission pursuant to a writ of commission, and before an examiner pursuant to an order to that effect.
F   The governments of several countries objected to the examination of their subjects in their own countries by examiners appointed by the English court: see *Daniell's Chancery Practice*, 8th ed. (1914), vol. 1, p. 549. So the letter of request procedure was introduced to meet this difficulty. The English court addresses a request to the foreign court, seeking its assistance by conducting an examination of the witness who is within the jurisdiction of the foreign court. To this end R.S.C., Ord. 37, r. 6A was introduced in
G   1884:

> "If in any case the court or a judge shall so order, there shall be issued a request to examine witnesses in lieu of a commission. The Forms 1 and 2 in the Appendix hereto shall be used for such order and request respectively, with such variation as circumstances may require, and may be cited as Forms 37A and 37B in Appendix K."

H
The specimen letter of request in Form 37B requested the foreign court to summon the witness, and to cause him "to be examined upon the interrogatories which accompany this letter of request (or viva voce)." The

court was also asked to identify all books, letters, papers and documents   A
produced upon the examination.

This rule was considered by the Court of Appeal in *Cape Copper Co.
v. Comptoir d'Escompte de Paris* (1890) 38 W.R. 763. The defendants had
obtained an order for the examination of witnesses before a special
examiner in France. They then made an application for an order that a
letter of request should issue, under R.S.C., Ord. 37, r. 6A, to the French
court for the purpose of obtaining production of documents which were   B
in the possession of the French court. The court held that the application
should be refused. The report of the judgment of Lord Esher M.R. reads,
at p. 764:

> "The application was made under Ord. 37, r. 6A, and by that rule
> forms 37A and 37B in Appendix K. were to be followed. According
> to those forms it was clear that the examination of witnesses was the   C
> foundation of the issue of letters of request. The examination of
> witnesses was the necessary essential in an order for the issue of
> letters of request, and upon that examination there might be
> production of documents and copies of those documents taken. In
> the present case the summons did not ask for the examination of any
> witnesses, and therefore the court, upon the present materials, had no
> jurisdiction to issue letters of request."   D

The corresponding rule today is R.S.C., Ord. 39, r. 2. Rule 1 provides
that the court, where it appears necessary for the purpose of justice, may
make an order for the examination of any person on oath before a judge
or examiner or some other person at any place. Such an order may
contain an order for the production of any documents "which appear to
the court necessary for the purposes of the examination." Rule 2(1)   E
provides:

> "Where the person in relation to whom an order under rule 1 is
> required is out of the jurisdiction, an application may be made—
> (a) for an order (in Form No. 34 in Appendix A) under that rule for
> the issue of a letter of request to the judicial authorities of the country
> in which that person is to take, or cause to be taken, the evidence of   F
> that person ..."

The letter of request must be in a prescribed form, Form 35. Form 35
envisages the examination of the witness in accordance with questions or
on topics which are to be set out fully. The form contains a note:
"N.B. Where the witness is required to produce documents these should
be clearly identified."   G

I must mention one further matter. The application before me concerns
an outgoing letter of request, that is, a request emanating from the English
court to the court of another country. It is instructive to see what is the
position of an English court today regarding an incoming letter of request.
The United Kingdom and the United States of America are both
signatories to the Hague Convention on the Taking of Evidence Abroad
in Civil or Commercial Matters (1977) (Cmnd. 6727). The Convention   H
came into force in September 1976. Article 1 provides:

> "In civil or commercial matters a judicial authority of a contracting
> state may, in accordance with the provisions of the law of that state,

> request the competent authority of another contracting state, by means of a letter of request, to obtain evidence, or to perform some other judicial act."

The letter of request is to specify the evidence to be obtained. "Evidence" is not defined but there is no reason to doubt it embraces documentary evidence just as much as oral testimony.

The obligations accepted by the United Kingdom under that Convention are treaty obligations. Accordingly, for them to become part of English law, legislation was needed. That is to be found in the Evidence (Proceedings in Other Jurisdictions) Act 1975. The Act enables the courts of the United Kingdom to give effect to a request issued by a court in a country outside the United Kingdom. Section 2(1) provides that when an application is made pursuant to such a request, the courts of the United Kingdom shall have power by order to make such provision for obtaining evidence as may appear to the court to be appropriate for the purposes of giving effect to the request. The order may require a person to take such steps as the court may consider appropriate for that purpose. In particular, such an order may make provision for the examination of witnesses either orally or in writing (section 2(2)(*a*)), and for the production of documents (section 2(2)(*b*)).

The Act is concerned with incoming letters of request. It is not confined to requests from the courts of countries which are signatories of the Hague Convention. Nevertheless it would be surprising if English courts were not at liberty to request, even from Hague Convention countries, assistance corresponding to the assistance United Kingdom courts may now give to the courts of countries outside the United Kingdom. Indeed, in *Mackinnon v. Donaldson, Lufkin and Jenrette Securities Corporation* [1986] Ch. 482, 491, Hoffmann J. took it for granted that the English court could issue a letter of request to the New York courts seeking the production of documents.

The defendant's answer is that the remedy lies with the Supreme Court Rule Committee. The court's jurisdiction to issue a letter of request is regulated by the rules. R.S.C., Ord. 39, r. 2 does not differ materially from the wording of the old Ord. 37, r. 6A, which was authoritatively construed by the Court of Appeal in the *Cape Copper* case, 38 W.R. 763. Before the English court can issue a letter of request seeking only the production of documents, the rules need amending appropriately.

I cannot accept this contention. The jurisdiction of the High Court to make a request to the court of another country for assistance in obtaining evidence does not derive from statute, or even from the Rules of the Supreme Court. These rules regulate and prescribe "the practice and procedure" to be followed in the Supreme Court: section 84 of the Supreme Court Act 1981. They regulate the exercise by the court of its jurisdiction; they cannot extend the court's jurisdiction or confer a jurisdiction which, in the absence of rules, the court would otherwise lack. In my view the court's power to issue a letter of request stems from the jurisdiction inherent in the court. Inherent in the court is power to do those acts which the court needs must have to maintain its character as a court of justice: see Lord Diplock in *Bremer Vulkan Schiffbau und*

*Maschinenfabrik v. South India Shipping Corporation Ltd.* [1981] A.C. 909, 977. It is important to keep in mind that when a letter of request is issued, the English court is doing no more than make a *request* to a foreign court for assistance. It is not making an order. It is not making an order addressed to a foreign court or to witnesses. Further, the subject matter on which assistance is sought, the obtaining of evidence, is one over which the court has long exercised close control. This is a subject peculiarly within the court's own control. Thus, the process by which the court compels the attendance of witnesses, or compels the production of documents as evidence, is a process whose source is the court's own inherent powers. R.S.C., Ord. 38, rr. 14 to 19 regulate the form of subpoenas, and the way they should be issued and served and so forth; those rules do not create the jurisdiction. Specifically with regard to a subpoena to produce documents (duces tecum), Lord Ellenborough C.J. observed as long ago as 1808 in *Amey v. Long* (1808) 9 East 473, 484:

> "The right to resort to means competent to compel the production of written, as well as oral, testimony seems essential to the very existence and constitution of a court of common law, which receives and acts upon both descriptions of evidence, and could not possibly proceed with due effect without them. And it is not possible to conceive that such courts should have immemorially continued to act upon both, without great and notorious impediments having occurred, if they had been furnished with no better means of obtaining written evidence than what the immediate custody and possession of the party who was interested in the production of it, or the voluntary favour of those in whose custody the required instruments might happen to be, afforded. The courts of common law, therefore, in order to administer the justice they have been in the habit of doing for so many centuries, must have employed the same or similar means to those which we find them to have in fact used from the time of Charles the Second at least . . ."

Against this background there is nothing surprising or remarkable in the idea that the English court should choose to communicate with a foreign court, and seek its assistance in the production of documents which, had they been in England, could properly have been made the subject of a subpoena issued by the English court. The English court would not normally embark on such a course unless there was reason to suppose the foreign court would be receptive to the request. Now there is the Hague Convention. The courts of the United States have obligations to provide assistance to an English court, in the same way as under the Evidence (Proceedings in other Jurisdictions) Act 1975 the English court has obligations to provide assistance to an American court. It cannot be right that, in the absence of legislation or a rule, the English court is unable to take advantage of this situation when necessary for the purpose of doing justice in a case currently before the English court. That really would make no sense at all.

What, then, of the decision in the *Cape Copper* case? That decision is an authority on the interpretation of the old R.S.C., Ord. 37, r. 6A. Even if that decision is to be regarded as equally applicable to the current Ord.

A  39, rr. 1 and 2, I do not think this should be taken to exclude the exercise by the court of its inherent jurisdiction to issue a letter of request to the judicial authorities of a foreign country seeking their aid in the production of documents. The point seems not to have been argued in that case. R.S.C., Ord. 39, rr. 1 and 2 cannot be read as impliedly ousting that jurisdiction if, so read, the consequence would be as unfortunate as mentioned above. Especially now the Hague Convention is in place, there

B  would be obvious advantages in the Rule Committee prescribing a simple form of letter of request to be used when the request is confined to the production of documents. For the time being Form 35 can be adapted without difficulty. Indeed, R.S.C., Ord. 39, r. 3(2) envisages that the form of the letter set out in Form 35 is to be subject to such variations as the court order may require.

C
*The particularity issue*

In accordance with English legal procedures, and leaving aside special cases such as *Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. 133, discovery of documents is obtainable only from persons who are parties to the action. In the normal way, parties are compelled to produce for inspection all their documents relating to matters in issue in

D  the action. Persons who are not parties are not subject to such a wide, far-reaching obligation. They can be compelled to give evidence at the trial, either by way of oral testimony or by being required to produce documents. But it is established that a subpoena to produce documents cannot be drawn so widely as to amount to requiring the witness to give discovery. The object of the subpoena is to compel the witness to produce

E  evidence directly material to the issues in the case. The object is not to require him to produce documents just because they may be useful for the purpose of corroborating or challenging a witness, or because they may lead to a train of inquiry which may result in the discovery of evidence or may, in some other way, advance one party's case or damage the other's. Nor is the witness to be required to undertake an unfairly burdensome search through his records to find this or that document or to see if he

F  has any documents relating to a particular subject matter. All this is well established in relation to a subpoena to produce documents at the trial. The position is the same regarding an order to produce documents before the trial, under R.S.C., Ord. 38, r. 13: see rule 13(2) and *Elder v. Carter* (1890) 25 Q.B. 104.

The English courts apply a similar approach to the production of

G  documents under a letter of request. With regard to incoming letters of request, the matter is the subject of legislation. When ratifying the Hague Convention the United Kingdom Government exercised its right to declare that it would not execute letters of request issued for the purpose of obtaining "pre-trial discovery of documents." That reservation, in which the Government's understanding of what that expression meant, was reflected in section 2(4) of the Act of 1975. This subsection limits the

H  scope of an order the United Kingdom courts may make in response to an incoming letter of request:

    "An order under this section shall not require a person—(*a*) to state what documents relevant to the proceedings to which the

application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

Paragraph (a) excludes discovery. Paragraph (b) narrows the ambit of the order even further.

Before me there was some discussion on whether the particularity required of a subpoena to produce documents is the same as that set out in this paragraph. The plaintiffs contended that a lesser degree of particularity will suffice for a subpoena, and that when issuing a letter of request the English court should apply the less rigorous standard and not, by way of analogy, the standard set by the Act for an incoming letter of request. In my view there is only one standard, applicable alike to subpoenas to produce documents, outgoing letters of request and incoming letters of request. In principle there ought to be only one standard.

I turn to the authorities. In *Lee v. Angas* (1866) L.R. 2 Eq. 59, 63, Sir William Page-Wood V.-C. commented adversely on the subpoena before him being in wide general form, "not for production of any document in particular." The same approach was adopted in *Burchard v. Macfarlane* [1891] 2 Q.B. 241, 244. Lord Halsbury L.C. drew a distinction between what was in substance an order for inspection and discovery and an order that was part of a procedure to examine witnesses in the course of proof for the purpose of establishing the facts. Lord Esher M.R., at p. 247, observed that a subpoena was an order to a person to produce "a document" alleged to be in his possession. Fry L.J., at pp. 249, 251, observed that a subpoena could not be used to call upon a witness to find out whether documents related to a particular matter in controversy, and he noted that in the instant case the order did not "by date or parties or other simple method of identifying, indicate the instrument" required to be produced. In *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235* [1978] A.C. 547 the House of Lords was concerned with incoming letters rogatory and, accordingly, with the interpretation of section 2(4)(b) of the Act of 1975. Lord Diplock drew a distinction between subpoenas and the requirements of the Act, at p. 635:

"Classes of documents provided the description of the class is sufficiently clear, may be required to be produced on subpoena duces tecum. The requirements of subsection (4)(b), however, are not in my view satisfied by the specification of classes of documents. What is called for is the specification of 'particular documents' which I would construe as meaning individual documents separately described."

That statement must now be read in the light of observations by Lord Fraser of Tullybelton in *In re Asbestos Insurance Coverage Cases* [1985] 1 W.L.R. 331, 337–338, another case concerned with incoming letters rogatory:

"I do not think that by the words 'separately described' Lord Diplock intended to rule out a compendious description of several documents provided that the exact document in each case is clearly indicated. If

A    I may borrow (and slightly amplify) the apt illustration given by Slade L.J. in the present case, an order for production of the respondent's 'monthly bank statements for the year 1984 relating to his current account' with a named bank would satisfy the requirements of the paragraph, provided that the evidence showed that regular monthly statements had been sent to the respondent during the year and were likely to be still in his possession. But a general request for

B    'all the respondent's bank statements for 1984' would in my view refer to a class of documents and would not be admissible."

Given this qualification, it is difficult to perceive any significant difference between the established principle applied to subpoenas and the test set out in the Act of 1975. Indeed, the draftsman of section 2(4)(b)

C    was seeking to do no more than reproduce the established test. As already noted, he echoed the language used by the Government, in its reservation when ratifying the Hague Convention, by which the Government had sought to define what was meant by the alien process of pre-trial discovery of documents. When enacting the Act of 1975, Parliament was concerned to provide that the English court should not afford to parties to proceedings abroad a wider right to production of documents from

D    witnesses in this country than the corresponding right enjoyed by parties to proceedings in United Kingdom courts. There is no reason to believe that, when enacting section 2(4)(b), Parliament intended more than this. In this connection I am fortified by noting that in two recent cases Steyn J. and Potter J. both proceeded on the footing that, indeed, there was no difference between the standard prescribed by the Act and the standard appropriate for a subpoena: see *Sunderland Steamship P. and I. Association*

E    *v. Gatoil International Inc.* [1988] 1 Lloyd's Rep. 180, 184 and *Wakefield v. Outhwaite* [1990] 2 Lloyd's Rep. 157, 160, 161.

*The documents sought*

I approach this application, therefore, on the footing that the plaintiffs are not entitled to seek what is in substance discovery. The letter of

F    request must be confined to particular documents, although these may be described compendiously, as with the letters in *Lee v. Angas*, L.R. 2 Eq. 59, 63.

I preface consideration of the documents sought by noting that particularity of identification or description is a matter of degree. The description used, moreover, may be important in another way: it may

G    throw light on the purpose for which the documents in question are sought. The court should be astute to see that what is essentially a discovery exercise, whereby the applicant is seeking production of documents with a view to ascertaining whether they may be useful rather than with a view to adducing them in evidence as proof of some fact, is not disguised as an application to produce particular documents. Where an applicant has not seen the documents sought and does not know what

H    they contain, the application can the more readily be characterised as a discovery exercise. Further, to be the subject of a letter of request a document must be admissible in evidence; it must be directly material to an issue in the action; and the court must be satisfied the document does

exist or did exist, and that it is likely to be in the possession of the person from whom production is being sought. Actual documents are to be contrasted with conjectural documents, which may or may not exist: see Lord Fraser in the *Asbestos* case [1985] 1 W.L.R. 331, 338.

There is no difficulty with two of the items sought. Item 4 relates to each of S.M.E.I.'s matrix or sub-licence agreements affecting the exploitation of George Michael's recordings in any of the major territories. Item 7(i) relates to recording agreements, and variations of them, in force in January 1988 or after 22 July 1990, between S.M.E.I. and certain well known artists. There was some dispute before me over the status of one of them, Robert Halford, but that is an issue to be resolved at the trial, not at this stage. Item 7(ii) relates to an identified agreement between Michael Jackson or his companies and S.M.E.I. I am satisfied that the production of all the documents in items 4 and 7 is necessary for the purposes of justice in this action, and that an order for a letter of request should be made in respect of them.

Item 6 stands on the same footing. This item relates to release schedules showing the dates of release, actual or intended, throughout the world of each of George Michael's recordings delivered to the defendant.

Item 8 relates to exploitation in the major territories outside the U.S.A. The plaintiffs seek (item 8(i)) production of royalty statements received by S.M.E.I. from sub-licensees in the major territories in respect of the exploitation of George Michael's recordings, and (item 8(ii)) invoices or demands sent by S.M.E.I. to sub-licensees in respect of payments for such exploitation. Although the documents covered by these two heads are likely to be numerous, I am satisfied their production is necessary for the purposes of justice in this action. These documents are adequately particularised.

The plaintiffs also seek (item 8(iii)) production of reports rendered to S.M.E.I. by each sub-licensee of payments made by the sub-licensee, either to S.M.E.I. or the defendant or any other company in the Sony group, in respect of the exploitation of George Michael's recordings in the major territories or in respect of the results of such exploitation. This is too wide and general.

Item 9 relates to exploitation within the U.S.A. Under 9(i) the plaintiffs seek, in short, royalty statements or reports prepared by S.M.E.I. showing royalties or other payments due to the defendant, or any other company in the Sony group, in respect of the exploitation of George Michael's recordings. In my view S.M.E.I. should be required to produce these documents.

Item 9(ii) specifies a list of classes of documents evidencing costs incurred by S.M.E.I. in the manufacture, distribution, sale, marketing and promotion of George Michael's recordings: relevant dealer price lists, relevant records of discounts, and relevant stock movement reports. Item 9(iii) reads: "records or summaries showing in sufficient detail the costs of manufacture, storage and distribution." Items 9(iv) and (v) are similarly worded, in respect of certain other heads of cost. In my view, items 9(ii) to (v) are in substance an exercise in discovery. The plaintiffs are seeking information about certain costs. Unlike with royalty statements in respect of income, in respect of costs the plaintiffs are unable to identify

A   particular documents setting out the costs in question. An application for all S.M.E.I. documents relating to the costs would, all too obviously, be an application for discovery. So different language has been adopted; for instance, "records or summaries showing ..." This change in language has not changed the essential nature of the exercise.

B   Likewise with item 1. This comprises the files containing S.M.E.I.'s internal notes and memoranda, and communications with the defendant, concerning the negotiation and conclusion of the recording agreements in 1987 and 1988 and the subsequent variations in October and December 1988 and July 1990. A file is a folder containing one or more documents. Here, the files are likely to contain a wide range of documents: internal memoranda, notes on meetings and telephone discussions, drafts of letters and agreements, correspondence, and so forth. The plaintiffs do not know

C   what the files contain. They seek production of their contents, whatever they may be. This is a discovery exercise.

Item 2 suffers from the same defect. It relates to lists, or computer print-outs, providing reasonably detailed summaries of S.M.E.I.'s marketing, promotion, advertising and selling activities undertaken in the U.S.A., and marketing expenditure incurred in the U.S.A., for several named recordings. The plaintiffs seek, as part of this, a reasonably detailed

D   breakdown of the figures appearing in a schedule which has been prepared by the defendant's accountancy experts. There is no evidence, nor is it self-evident, that documents answering this description exist or have ever done so. This also is discovery on a particular topic, sought to be concealed by naming a type of document S.M.E.I. may or may not have containing the information sought.

E   The same comment applies to item 5. Item 5 relates to "S.M.E.I.'s accounting records, or summaries thereof, sufficient to show in reasonable detail S.M.E.I.'s gross and net income received and receivable" from the exploitation in the U.S.A. of four named recordings, and the costs incurred by S.M.E.I. in connection with those recordings.

The other items in the amended application were abandoned before me.
F

*Examination of witnesses*

As amended on the second day of the hearing before me, the application was for production of documents by S.M.E.I. At that stage the plaintiffs sought, in addition, an order that S.M.E.I. by its proper officer attend to be examined regarding the documents and on certain

G   other specified topics. Later, in the course of his reply, Mr. Cran accepted that the letter of request could not be addressed to S.M.E.I., so far as it related to attending to give oral evidence. He then sought, at that late stage, to amend his application by substituting two individuals for S.M.E.I. He named one of them who, he said, could deal with part of the oral evidence sought. He told me that urgent inquiries were being made in New York to see who would be the appropriate person to deal with the

H   other part of the oral evidence. If I was in the plaintiffs' favour in principle on this part of the application, the other name could be produced in due course. I was not asked to grant an adjournment for the further name to be produced before the parties concluded their submissions. This

is a manifestly unsatisfactory way to proceed. The defendant's advisers must have an opportunity of taking instructions and commenting on the individuals whose examination is being sought. That they have not had. On this short ground this part of the application must fail.

However, in case this may be of assistance, I shall express my views shortly on the substance. The first matter on which evidence is sought is the corporate structure of the Sony group, including the relationship between S.M.E.I. and its sub-licensees in the major territories. In principle I would have directed examination on this subject. Evidence on this is necessary to understand documentary evidence on the benefits received by the different parts of the Sony group from George Michael's recordings. I would have hoped that a letter of request would not be needed to obtain this material. Some information was provided by Mr. Pollock in the course of his submissions. I would have hoped that, if necessary, the defendant would agree to produce at the trial a witness who can give this evidence.

The other principal item on which evidence was sought concerned financial matters: in short, an explanation of the documents produced by S.M.E.I.; and an explanation of the system of payments and financial reporting between S.M.E.I. and its sub-licensees in the major territories. Again, in principle I would have been disposed to make an order, if the evidence sought were suitably confined to matters in issue in the action.

*Further discovery*

There is also before me an application against the defendant for further discovery under R.S.C., Ord. 24, r. 7. The principal item comprises documents relating to the defendant's back catalogue and its exploitation. "Back catalogue" is a reference to recordings deleted from the defendant's current catalogue. It may also include other recordings, depending on how one chooses to define the expression. In the action the plaintiffs rely on the absence of an obligation on the defendant to exploit recordings of George Michael once they become back catalogue. The defendant answers that it is in its commercial interest to exploit the back catalogue. The plaintiffs' reply is that no weight should be attached to this, because in practice the defendant never does exploit the back catalogue, other than passively, that is, in response to requests.

I shall not order discovery to be made of lists or summaries evidencing the size of the defendant's back catalogue. The defendant does not have a list of the contents of its back catalogue, which is of enormous size. There are tens of thousands of items. To require the defendant to sort out all the relevant documents, covering the whole range of the recordings in its back catalogue, would impose a burden altogether disproportionate to the extent to which the documents would assist at the trial. For the plaintiffs' purposes it suffices to note first, that the back catalogue, however defined, is voluminous and, secondly, that the defendant is admittedly not able to produce any sort of list at all readily. Those two facts are adequate for the plaintiffs' purpose on this point.

The plaintiffs also seek discovery of the accounting records showing the income received by the defendant from its exploitation of its back catalogue for the years 1990–1992 and showing also any specific costs

A   incurred in this exploitation. Accounting records in this form do not exist. Here again, sifting through all the records to obtain the information would be an enormous task. I was told by Mr. Pollock that at the trial the defendant will not say it spends any significant sums in seeking to exploit recordings which have been deleted from its current catalogue. That being so, I shall not order discovery of these classes of documents. In the circumstances such discovery would be oppressive.

B   Finally, two last items. The defendant has already disclosed recording agreements made between it and artists it regards as of comparable stature to George Michael. I shall direct disclosure also of the recording agreements made with Robert Halford, for the reason stated above. The other item relates to agreements between artists and so-called "satellite" companies from which the defendant derives rights under sub-licences.

C   I shall not direct disclosure of these agreements. On the basis on which disclosure of these agreements was sought and supported in the evidence, there is on the pleadings no issue of substance. I am not persuaded that a case has been made for disclosure on any other ground.

*Conclusion*

D   I shall make an order directing the issue or a letter of request for the production of documents to the extent indicated above. I shall also make an order for further discovery to the extent I have mentioned.

*Orders accordingly.*

E   Solicitors: *Sheridans; Clintons.*

S. W.

F

G

H