Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, D.C. 20549

# FORM 20-F

**(Mark One)**

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report:

**For the transition period from              to**

Commission file number: **001-38917**

# China Index Holdings Limited

(Exact name of Registrant as specified in its charter)

**N/A**

(Translation of Registrant's name into English)

**Cayman Islands**

(Jurisdiction of incorporation or organization)

**Tower A, No. 20 Guogongzhuang Middle Street**
**Fengtai District, Beijing 100070**
**People's Republic of China**

(Address of principal executive offices)

**Lili Chen, Deputy Chief Financial Officer**
**Telephone: +86-10-5631 9106**
**Tower A, No. 20 Guogongzhuang Middle Street**
**Fengtai District, Beijing 100070**
**People's Republic of China**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| American depositary shares (each representing one share) | CIH | The NASDAQ Global Select Market |
| Class A ordinary shares, par value of US$0.001 per share* | | The NASDAQ Global Select Market |

* Not for trading, but only in connection with the listing on the NASDAQ Global Select Market of American depositary shares

Securities registered or to be registered pursuant to Section 12(g) of the Act.

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

**None**
_____
(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

Class A ordinary shares, par value US$0.001 each          66,787,537
Class B ordinary shares, par value US$0.001 each          23,636,706

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐   No ☒

Note—Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐
Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act.   ☐

†The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.   ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as          Other ☐
                     issued by the International Accounting
                     Standards Board ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.   Item 17 ☐   Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐
No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| INTRODUCTION |  | 1 |
| FORWARD-LOOKING STATEMENTS |  | 3 |
| PART I |  | 6 |
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 6 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | 6 |
| ITEM 3. | KEY INFORMATION | 7 |
| ITEM 4. | INFORMATION ON THE COMPANY | 50 |
| ITEM 4A. | UNRESOLVED STAFF COMMENTS | 73 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 74 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 87 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 96 |
| ITEM 8. | FINANCIAL INFORMATION | 101 |
| ITEM 9. | THE OFFER AND LISTING | 102 |
| ITEM 10. | ADDITIONAL INFORMATION | 102 |
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 109 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 109 |
| PART II |  | 112 |
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 112 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 112 |
| ITEM 15. | CONTROLS AND PROCEDURES | 112 |
| ITEM 16A. | AUDIT COMMITTEE FINANCIAL EXPERT | 113 |
| ITEM 16B. | CODE OF ETHICS | 113 |
| ITEM 16C. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 113 |
| ITEM 16D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 114 |
| ITEM 16E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 114 |
| ITEM 16F. | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 114 |
| ITEM 16G. | CORPORATE GOVERNANCE | 115 |
| ITEM 16H. | MINE SAFETY DISCLOSURE | 115 |
| ITEM 16I. | DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 115 |
| PART III |  | 116 |
| ITEM 17. | FINANCIAL STATEMENTS | 116 |
| ITEM 18. | FINANCIAL STATEMENTS | 116 |
| ITEM 19. | EXHIBITS | 116 |
| SIGNATURES |  | 120 |

i

Table of Contents

## INTRODUCTION

Except where the context otherwise requires and for purposes of this annual report on Form 20-F only:

- "ADRs" refers to the American depositary receipts that evidence our ADSs;

- "ADSs" refers to our American depositary shares, each of which represents one Class A ordinary share;

- "Beijing Zhong Zhi Hong Yuan" refers to Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd.;

- "China" or "PRC" or "Chinese" refers to the People's Republic of China, excluding, for the purpose of this annual report only, the Hong Kong Special Administrative Region, the Macau Special Administrative Region and Taiwan;

- "Class A ordinary shares" refers to our Class A ordinary shares, par value US$0.001 per share;

- "Class B ordinary shares" refers to our Class B ordinary shares, par value US$0.001 per share;

- "Exchange Act" refers to the Securities Exchange Act of 1934, as amended;

- "Fang" refers to Fang Holdings Limited, a company listed on the New York Stock Exchange under the ticker symbol "SFUN," which was our parent company and sole shareholder before the separation and distribution on June 11, 2019;

- "Fang Class A ordinary shares" refers to the Class A ordinary shares issued by Fang, par value HK$1.00 per share;

- "Fang Class B ordinary shares" refers to the Class B ordinary shares issued by Fang, par value HK$1.00 per share;

- "Fang ordinary shares" refers to Fang Class A ordinary shares and Fang Class B ordinary shares, collectively;

- "Hong Kong dollars" or "HK$" refers to the legal currency of the Hong Kong Special Administrative Region;

- "RMB" or "Renminbi" refers to the legal currency of China;

- "SEC" refers to the U.S. Securities and Exchange Commission;

- "Securities Act" refers to the Securities Act of 1933, as amended;

- "shares" or "ordinary shares" refers to our Class A ordinary shares and Class B ordinary shares;

- "U.S. dollars" or "US$" refers to the legal currency of the United States of America;

- "VIEs" refers to Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd., Shouzheng Credit Rating Co., Ltd. and Beijing Zhong Zhi Information Technology Academy;

- "we," "us," "our company," "our," or "CIH" refers to China Index Holdings Limited (formerly known as Selovo Investments Limited) and its subsidiaries and, in the context of describing our operations and consolidated financial information, also include our VIEs; and

- "WFOE" or "Beijing Zhong Zhi Shi Zheng" refers to Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., our wholly-owned subsidiary established under the laws of the PRC.

Names of certain companies provided in this annual report are translated or transliterated from their original Chinese legal names.

Table of Contents

Discrepancies in any table between the amounts identified as total amounts and the sum of the amounts listed therein are due to rounding.

This annual report on Form 20-F includes our audited combined and consolidated financial statements for the 2019, 2020 and 2021 fiscal years.

This annual report contains translations of certain Renminbi amounts into U.S. dollars at specified rates. Unless otherwise stated, the translation of Renminbi into U.S. dollars has been made at RMB6.3726 to US$1.00, the noon buying rate in effect on December 31, 2021 as set forth in the H.10 Statistical Release of the Federal Reserve Board. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, the rates stated below, or at all.

2

Table of Contents

## FORWARD-LOOKING STATEMENTS

This annual report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Exchange Act of 1934, as amended, and the United States Private Securities Litigation Reform Act of 1995, as amended, including with regard to our future operating results and conditions, our prospects and our future financial performance and condition. These statements are subject to known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. All statements other than statements of historical fact in this annual report constitute forward-looking statements. We have used words or phrases such as "may," "would," "will," "expect," "anticipate," "intend," "seek," "estimate," "plan," "believe," "is/are likely to" or other similar expressions in this annual report to identify some of these forward-looking statements. These forward-looking statements, including, among others, those relating to our future business prospects, product development, revenues, profits, costs, capital expenditures, cash flows and working capital, are necessarily estimates reflecting the best judgment of directors and management. As a consequence, these forward-looking statements should be considered in light of various important factors, including those set forth in this annual report.

Actual results may differ materially from information contained in the forward-looking statements as a result of a number of uncertainties and factors, including but not limited to:

- any change in the laws, rules and regulations of the central and local governments in China and the rules, regulations and policies of the relevant government authorities relating to all aspects of our business;

- general economic, market and business conditions in China;

- macroeconomic policies of the PRC government;

- changes or volatility in interest rates, foreign exchange rates, equity prices or other rates or prices;

- the effects of competition in the real estate industry on the demand for and price of our services;

- the length and severity of the COVID-19 pandemic, governmental responses to the pandemic and the impact on our business and industry;

- various business opportunities that we may pursue; and

- the risk factors discussed in this annual report as well as other factors and uncertainties beyond our control.

You should read this annual report and the documents that we refer to in this annual report thoroughly and with the understanding that our actual future results may be materially different from and worse than what we expect. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

Table of Contents

**Risk Factors Summary**

Investing in our securities involves a number of risks. These summary risks provide an overview of many of the risks we are exposed to in the normal course of our business. As a result, the following summary risks do not contain all of the information that may be important to you, and you should read them together with the more detailed discussion of risks that affect our business disclosed in "Item 3. Key Information—D. Risk Factors."

***Risks Relating to Our Business and Industry***

- If our clients reduce or cancel their subscription or marketing spending with us and we are unable to attract new clients, our results of operations would be harmed.

- If we are not able to obtain and maintain comprehensive, accurate or reliable data, our reputation could be damaged and we could experience reduced demand for our services.

- We may not be able to successfully introduce new or upgraded services or combine or shift focus from services with less demand, which could decrease our revenues and profitability.

- We may be subject to legal liability for collecting, displaying or distributing information.

- Our upgrades and improvements to our data systems may not be successful or may fall short of expected results.

- Failure to maintain or enhance client trust in the information or analysis provided by us could damage our reputation, reduce or slow the growth of our user traffic, which could harm our business, financial condition and results of operations.

- We may be unable to increase awareness of our brand, which could materially and adversely affect our business.

- Our business, financial condition and results of operations may be adversely affected by the COVID-19 pandemic.

- Our business depends in part on real estate developers as our clients, and a consolidation in the real estate industry in China may cause our revenues to decline and reduce our profitability.

- Our business depends on retaining and attracting highly capable research, management and operating personnel. Failure to attract and retain qualified talents could jeopardize our competitive position.

- If we are unable to successfully market our data-driven service offerings to our clients, they could choose not to use those services, which could reduce our revenues or increase our expenses.

- We may be involved in legal and other disputes from time to time arising out of our operations, in particular for allegations relating to infringement of intellectual property rights of third parties.

- If we do not invest in technology innovation and provide services that are attractive to our clients, our business could be adversely affected.

- Any failure to compete effectively in the real estate Internet services market in China would have a material adverse effect on our business, financial condition and results of operations.

- If we fail to obtain or keep licenses, permits or approvals applicable to the various online real estate services provided by us, we may incur significant financial penalties and other government sanctions.

4

- Technical problems or disruptions that affect either our clients' ability to access our services, or the software, internal applications, database and network systems underlying our services, could damage our reputation and brands and lead to reduced demand for our services, lower revenues and increased costs.

- If we fail to achieve and maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, which could result in harm to our business, loss of investor confidence in our financial reporting and a lower trading price of our ADSs.

- A severe or prolonged downturn in the global or Chinese economy could materially and adversely affect our business, results of operations and financial condition.

*Risks Relating to Doing Business in China*

- Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.

- Uncertainties with respect to the PRC legal system could adversely affect us.

- The PRC government's significant oversight and discretion over our business operation could result in a material adverse change in our operations and the value of our ADSs.

- We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business.

- PRC regulations on loans to PRC entities by offshore holding companies may affect our ability to capitalize or otherwise fund our PRC operations.

- Our ADSs may be delisted under the Holding Foreign Companies Accountable Act if the U.S. Public Company Accounting Oversight Board, or the PCAOB, is unable to fully inspect or investigate our auditor which has a presence in China. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. Additionally, the inability of the PCAOB to conduct inspections deprives our investors with the benefits of such inspections.

*Risks Relating to the Separation from Fang and Our Relationship with Fang*

- We have a limited operating history as an independent company upon which you can evaluate us.

- Potential indemnification liabilities owing to Fang pursuant to the separation and distribution agreement could materially and adversely affect our business, financial condition and results of operations.

- Fang's creditors may seek to hold us liable for certain of its obligations.

## MARKET AND INDUSTRY DATA

This annual report contains statistical data and estimates that we obtained from internal surveys, market research, publicly available information and industry publications. These industry publications and reports generally indicate that the information contained therein was obtained from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. Similarly, internal surveys and market research, while believed to be reliable, have not been independently verified, and we make no representation as to the accuracy of such information.

Table of Contents

# PART I

China Index Holdings Limited is a Cayman Islands holding company with operations primarily conducted by our directly owned subsidiaries and to a lesser extent through contractual arrangements with our variable interest entities based in China. Our variable interest entities include Beijing Zhong Zhi Hong Yuan, Shouzheng Credit Rating Co., Ltd. and Beijing Zhong Zhi Information Technology Academy, which we refer to collectively as "our VIEs" or "the VIEs" in this annual report. We rely on contractual arrangements among our PRC subsidiaries, our VIEs and their respective nominee shareholders to control the business operations of the VIEs. Investors in our ADSs thus do not directly hold equity interests in our operating entities in China but instead are holding equity interests in a Cayman Islands holding company. As used in this annual report, "we," "us," "our company", "our" or "CIH" refers to China Index Holdings Limited, a Cayman Islands exempted company, its subsidiaries and, in the context of describing our operations and consolidated financial information, also include our VIEs. Our VIEs made insignificant contributions to our revenues in the years ended December 31, 2019, 2020 and 2021 and currently have minimal operations.

We face various legal and operational risks and uncertainties associated with being based in or having our operations primarily in China and the complex and evolving PRC laws and regulations. For example, we face risks associated with regulatory approvals on offerings conducted overseas by and foreign investment in China-based issuers, the use of our VIEs, anti-monopoly regulatory actions, and oversight on cybersecurity and data privacy, as well as the lack of PCAOB inspection on our auditor, which may impact our ability to conduct certain businesses, accept foreign investments, or list on a United States or other foreign exchange. These risks could result in a material adverse change in our operations and the value of our ADSs, significantly limit or completely hinder our ability to offer or continue to offer securities to investors, or cause the value of such securities to significantly decline. For a detailed description of risks related to doing business in China, see "Item 3. Key Information—D. Risk Factors—Risks Relating to Doing Business in China."

Our corporate structure is subject to risks associated with our contractual arrangements with our VIEs. Investors may never directly hold equity interests in our VIEs. If the PRC government finds that the agreements that establish the structure for operating our business do not comply with PRC laws and regulations, or if these regulations or their interpretations change in the future, we could be subject to severe penalties, forced to relinquish our interests in those operations or required to restructure our ownership structure or operations, including terminating the contractual arrangements with the VIEs or deregistering the equity pledge of the VIEs, which in turn would affect our ability to consolidate, derive economic interests from, or exert effective control over the VIEs and thus have an adverse effect on our operations and result in the value of the securities diminishing. Our holding company, our PRC subsidiaries, our VIEs, and investors of our company face uncertainty about potential future actions by the PRC government that could affect the enforceability of the contractual arrangements with our VIEs and, consequently, significantly affect the financial performance of our VIEs and our company as a whole. For a detailed description of the risks associated with our corporate structure, please refer to risks disclosed under "Item 3. Key Information—D. Risk Factors—Risks Relating to Our Corporate Structure."

## ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS

Not applicable.

## ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE

Not applicable.

**ITEM 3. KEY INFORMATION**

Investments in our ADSs involves significant risks. See "Item 3. Key Information—D. Risk Factors" for detailed discussions of these risks. In particular, we face the below risks and uncertainties related to our corporate structure and related to doing business in China:

- We are a Cayman Islands holding company with no equity ownership in our VIEs and we conduct our operations in China primarily through our PRC subsidiaries and to a lesser extent our VIEs, with which we have maintained contractual arrangements. Investors in our ADSs thus are not directly holding equity interest in our operating entities in China but instead are holding equity interest in a Cayman Islands holding company. If the PRC government finds that the agreements that establish the structure for operating our business do not comply with PRC laws and regulations, or if these regulations or their interpretations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations. Our holding company, our PRC subsidiaries, our VIEs, and investors of our company face uncertainty about potential future actions by the PRC government that could affect the enforceability of the contractual arrangements with our VIEs and, consequently, significantly affect the financial performance of our VIEs and our company as a whole;

- PRC government's significant authority in regulating our operations and its oversight and control over offerings conducted overseas by, and foreign investment in, China-based issuers could significantly limit or completely hinder our ability to offer or continue to offer securities to investors. Implementation of industry-wide regulations in this nature may cause the value of such securities to significantly decline. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Relating to Doing Business in China—The PRC government's significant oversight and discretion over our business operation could result in a material adverse change in our operations and the value of our ADSs;" and

- Risks and uncertainties arising from the legal system in China, including risks and uncertainties regarding the enforcement of laws and quickly evolving rules and regulations in China, could result in a material adverse change in our operations and the value of our ADSs. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Relating to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

**Our Holding Company Structure**

China Index Holdings Limited is a holding company with no material operations of its own. We conduct our operations primarily through directly owned subsidiaries and to a lesser extent through our VIEs. Investors in our ADSs are not directly holding equity interest in our operating entities in China but instead are holding equity interest in a holding company incorporated in the Cayman Islands. For a diagram of our main corporate and operating structure as of the date of this annual report, see "Item 4. Information on the Company—C. Organizational Structure".

**The Holding Foreign Companies Accountable Act**

The Holding Foreign Companies Accountable Act, or the HFCA Act, was enacted on December 18, 2020. The HFCA Act states that if the SEC determines that we have filed audit reports issued by a registered public accounting firm that has not been subject to inspection by the PCAOB for three consecutive years beginning in 2021, the SEC shall prohibit our shares or ADSs from being traded on a national securities exchange.

Our financial statements for the year ended December 31, 2021 contained in this annual report on Form 20-F have been audited by MaloneBailey, LLP, an independent public accounting firm that is headquartered in the United States with offices in Beijing and Shenzhen, China. MaloneBailey, LLP is a firm registered with the PCAOB, and is required by the United States laws to undergo regular inspections by the PCAOB to assess its compliance with the laws of the U.S. and professional standards. MaloneBailey, LLP has been subject to PCAOB inspections, and is not among the PCAOB-registered public accounting firms headquartered in the PRC or Hong Kong that are subject to PCAOB's determination on December 16, 2021 of having been unable to inspect or investigate completely.

Table of Contents

While MaloneBailey, LLP has been inspected by the PCAOB on a regular basis, no overseas securities regulator is allowed to directly conduct investigation or evidence collection activities in China according to Article 177 of the PRC Securities Law (last amended in December 2019). Accordingly, without the consent of the competent PRC securities regulators and relevant authorities, MaloneBailey, LLP may not provide the documents and materials relating to securities business activities in China to the PCAOB, an overseas securities regulator under the PRC Securities Law. As a result, the audit working papers of our financial statements may not be inspected by the PCAOB, to the extent that the audit work was carried out by MaloneBailey, LLP with the collaboration of their China-based offices and the PCAOB has not obtained such requisite approval. Given that MaloneBailey, LLP is relying upon support from their China-based offices, the trading of our ADSs may be prohibited and our ADSs may be delisted from the Nasdaq Global Select Market or any other U.S. stock exchange under the HFCA Act if the PCAOB is unable to inspect our auditor. The related risks and uncertainties could cause the value of our ADSs to significantly decline. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Relating to Doing Business in China— Our ADSs may be delisted under the Holding Foreign Companies Accountable Act if the U.S. Public Company Accounting Oversight Board, or the PCAOB, is unable to fully inspect or investigate our auditor which has a presence in China. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. Additionally, the inability of the PCAOB to conduct inspections deprives our investors with the benefits of such inspections."

8

Table of Contents

**Cash Flows through Our Organization**

China Index Holdings Limited is a holding company with no material operations of its own. We conduct our operations primarily through our subsidiaries and to a lesser extent our VIEs in China. As a result, China Index Holdings Limited's ability to pay dividends depends upon dividends paid by our subsidiaries and cash payments from our VIEs in China. If our existing PRC subsidiaries or VIEs or any newly formed ones incur any debt on their own behalf in the future, the instruments governing their debts may restrict their ability to pay dividends or make cash payments to us. In addition, our wholly foreign-owned subsidiaries in China are permitted to pay dividends to us only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC laws, our wholly foreign-owned subsidiaries in China are required to set aside at least 10% of its after-tax profits each year, if any, to fund certain general reserve funds until such reserve funds reach 50% of its registered capital. In addition, each of our subsidiaries and VIEs in China are required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. Our subsidiaries and VIEs in China may allocate a portion of their after-tax profits based on PRC accounting standards to a discretionary surplus fund at their discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. For the years ended December 31, 2019, 2020 and 2021, no profit appropriation to statutory surplus fund or to other reserve funds was made for our entities incorporated in the PRC. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. For the years ended December 31, 2019 and 2020, our PRC subsidiaries did not pay any dividends. In 2021, our PRC subsidiaries paid a total of approximately RMB620 million of dividends to China Index Holdings Limited mainly to fulfill our payment obligations under the settlement deeds in relation to the convertible notes issued by Fang. For details of the convertible notes and settlement deeds, see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources."

Under PRC law, we may provide funding to our PRC subsidiaries only through capital contributions or loans, and to our VIEs only through loans, subject to satisfaction of applicable government registration and approval requirements. For risks relating to the fund flows of our operations in China, see "Item 3. Key Information— D. Risk Factors—Risks Relating to Doing Business in China— We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business."

In the years ended December 31, 2019, 2020 and 2021, China Index Holdings Limited did not extend any loan to our intermediate holding companies or subsidiaries, and our VIEs received nil, RMB5.0 million and RMB3.1 million as capital or investment, respectively, in the same periods. China Index Holdings Limited has not declared or paid any cash dividends, nor has any present plan to pay any dividends on our ordinary shares or ADSs in the foreseeable future. See "Item 8. Financial Information—A. Combined and Consolidated Statements and Other Financial Information—Dividend Policy." For PRC and United States federal income tax considerations of an investment in our ADSs, see "Item 10. Additional Information—E. Taxation."

**A. [Reserved]**

**B. Capitalization and Indebtedness**

Not applicable.

**C. Reasons for the Offer and Use of Proceeds**

Not applicable.

Table of Contents

*D. Risk Factors*

**Risks Relating to Our Business and Industry**

***If our clients reduce or cancel their subscription or marketing spending with us and we are unable to attract new clients, our results of operations would be harmed.***

We depend on the services sold to real estate developers, financial institutions, property managers and owners and other real estate participants in China to generate our revenues. In order to increase our revenues, we must continue to attract new clients, continue to keep our high client retention rate and continue to sell new services to our existing clients. Our ability to attract and retain our clients, and ultimately to generate revenues, depends on, among others, our ability to provide the clients with comprehensive, accurate and reliable data and analytic tools, as well as the ability to provide effective promotion services to promote the brand recognition of our clients. Furthermore, market conditions, clients' decision to forego our services or to use alternative services, clients' pricing and budgetary constraints, consolidation in the real estate and/or financial services industries, technical problems, or competitive pressures may adversely impact our ability to attract and retain clients. We may not succeed in retaining existing clients if we are unable to convince our clients of the effectiveness of our services as compared to alternatives. We typically enter into contracts with our clients on a project-by-project or annual basis, and as the term of our existing contracts expires, we may not be successful in renewing these contracts. If current clients reduce or end their subscription or marketing spending with us and we are unable to attract new clients, our business, results of operations and financial condition could be materially and adversely affected.

***If we are not able to obtain and maintain comprehensive, accurate or reliable data, our reputation could be damaged and we could experience reduced demand for our services.***

Our success depends on our clients' confidence in the comprehensiveness, accuracy and reliability of the data and analysis we provide, which is the foundation of the business we operate, such as information and analytics services as well as our promotion services. However, the task of establishing and maintaining accurate and reliable data and analysis is challenging, especially in light of comprehensive coverage of our database and the limited access to, or availability of, reliable data from third-party vendors or government sources. We also need to update our database frequently to reflect new real estate developments and expand our geographical coverage. The usefulness of our analytics services largely depends on the reliability of the data we employ in our analysis as well as the relative weight we assign to different data points that factor in our analytical model.

To provide our clients with comprehensive, accurate and reliable data, we must continue to collect reliable data by ourselves or through third-party vendors or government authorities and verify the data we collect. To the extent that the data provided by such sources are outdated, inaccurate or incomplete, the information or analysis provided by us may not accurately reflect the current conditions and future movements in the real estate industry or fair appraisal or rating of underlying assets.

We rely on our in-house research team to collect and verify data, and we intend to continue to invest resources in expanding database. We face fierce competition for qualified personnel in a limited pool of high-quality talents. Our competitors include well-capitalized companies that are capable of offering compensation packages more attractive to talents. If we are not able to compete effectively for talents or attract and retain top talents at reasonable costs, our research capabilities would be negatively impacted. Any deterioration in our in-house research capability, inability to attract creative talents at reasonable costs or losses in personnel may materially and adversely affect our business and operating results. We also procure data from third-party vendors and through collaboration with Fang and other platforms. If they fail to generate quality data satisfactory to our demands from third-party vendors or provide services upon terms commercially acceptable to us, or if any of our collaborations with third parties break up, we may be unable to provide high-quality information service offerings to our clients. If our database, including the data we obtain from third-party vendors or government authorities, or our analytical results, are not current, accurate, comprehensive or reliable, our reputation could be damaged and we could experience reduced demand for our services or face legal claims brought by our clients, which could materially and adversely affect our business, results of operations and financial condition.

10

Table of Contents

***We may not be able to successfully introduce new or upgraded services or combine or shift focus from services with less demand, which could decrease our revenues and profitability.***

Our future business and financial success will depend on our ability to continue to anticipate the needs of existing and prospective clients and introduce new and upgraded services. To be successful, we must adapt to changes in the industry, as well as rapid technological changes by continually enhancing our services. Developing new services and upgrades to services, as well as integrating and coordinating current services, imposes heavy burdens on our managerial and technological capabilities. The processes are costly, and our efforts to develop, integrate and enhance our services may not be successful. In addition, successfully launching and selling a new or upgraded service puts pressure on our sales and marketing resources. We launched our services through new media platforms, such as WeChat and Weibo, and implemented extensive marketing campaigns to generate brand awareness and site traffic for our services through such new media platforms. The launch of our services through new media platforms or the marketing campaign may not continue to increase brand awareness, site traffic or revenues. If we are unsuccessful in obtaining greater market share, we may not be able to offset the expenses associated with the launch and marketing campaign, which could have a material adverse effect on our financial performance.

If we are unable to develop new or upgraded services or combine, shift focus from, or phase out a service that overlaps or is redundant with other services we offer, then our clients may choose a competitive service over ours and our revenues may decline and our profitability may be reduced. In addition, if we incur significant costs in developing new or upgraded services or combining and coordinating existing services, if we are not successful in marketing and selling these new services or upgrades, or if our clients fail to accept these new or combined and coordinated services, there could be a material adverse effect on our results of operations due to a decrease of our revenues and profitability.

We ceased to provide listing services from January 2021 due to the change in our business development strategies. See "Item 4. Information on the Company—B. Business Overview—Our Services—Marketplace Services—China Index Listing." Listing services accounted for 11.5%, 4.8% and nil of our revenues for the years ended December 31, 2019, 2020 and 2021, respectively. Our management intends to thoroughly focus our efforts on information and analytics services and promotion services. If we are not successful in shifting our focus, we may not earn enough revenues to offset the impact of the cessation of our listing services business, and our growth, business prospects, revenues and results of operations could be materially and adversely affected.

***We may be subject to legal liability for collecting, displaying or distributing information.***

The content in our database is collected from various sources and distributed to our clients. As a result, we may be subject to claims for breach of contract, unfair competition or copyright or trademark infringement or other claims. We could also be subject to claims based upon the content that is accessible from our website through links to other websites or in our database that is supplied by third parties. We could also be subject to claims that the collection or provision of certain information breached laws and regulations relating to privacy and data protection. Even if these claims do not result in liability to us, we could incur significant costs in investigating and defending against any claims and we could be subject to negative publicity that may affect our reputation in the marketplace. Our potential liability for information distributed by us to others could require us to implement measures to reduce our exposure to such liability, which may require us to expend substantial resources and limit the attractiveness of our information and analytics, promotion services and listing services to clients.

***Our upgrades and improvements to our data systems may not be successful or may fall short of expected results.***

The development and expansion of our information and analytics services and promotion services relies on our data systems. We need to upgrade and improve our real estate data systems to provide new features and functionalities based on the demand of our clients, such as a wider coverage on geographical market and industry subsectors, as well as smarter presentation of relevant information to facilitate our clients' decision-making. However, we cannot assure you that we will be successful in executing these system upgrades and improvement strategies. In particular, our systems may experience interruptions or longer response times during upgrades and new technologies or infrastructures may also not be fully integrated or functional with the existing systems on a timely basis or at all, all of which could have an adverse impact on client experience. In addition, depreciation and amortization of expenses in relation to our real estate data systems may be increased if we purchase new software or hardware to upgrade our data system. As a result, our business, financial condition and results of operations could be materially and adversely affected.

11

***Failure to maintain or enhance client trust in the information or analysis provided by us could damage our reputation, reduce or slow the growth of our user traffic, which could harm our business, financial condition and results of operations.***

Our reputation as a trusted real-estate related information and analytics service provider that provides authentic real estate information and analysis in China is critical to the success of our business. However, we may not be able to maintain or enhance the authenticity and competitiveness of information and analysis provided by us due to various reasons, such as using ineffective analytical models or inaccurate data as well as improvement of analysis by our competitors or other market practitioners. Failure to maintain authenticity and competitiveness of the information and analysis provided by us could lose or reduce client trust in our services, which could damage our reputation, reduce or slow the growth of our user traffic, or harm our business, financial condition and results of operations.

***We may be unable to increase awareness of our brand, which could materially and adversely affect our business.***

We rely heavily on our brand, "CREIS," which we believe is key asset of our company. Awareness and differentiation of our brand are important for attracting and expanding the number of subscribers to our information and analytics services and promotion services. We expect to continue to invest in sales and marketing for our brand as we seek to grow the numbers of subscribers to our services. Our marketing methods may not be successful in increasing brand awareness or, ultimately, be cost-effective. If we are unable to maintain or enhance the awareness of our brand, or if we are unable to recover our marketing costs through increased usage of our services, our business, results of operations and financial condition could be materially and adversely affected.

***Our business, financial condition and results of operations may be adversely affected by the COVID-19 pandemic.***

Beginning in December 2019, a novel strain of coronavirus, or COVID-19, resulted in prolonged mandatory quarantines, lockdown, closures of businesses and facilities and travel restrictions imposed by the Chinese government and many other countries around the world. The COVID-19 pandemic, as well as the restrictions imposed and actions taken by the governments and society as a whole in response to the COVID-19 pandemic, could present significant challenges and uncertainties.

Although the Chinese economy has been recovering steadily from the impact of COVID-19 since the second half of 2020, any recurrence of the COVID-19 outbreak in China, such as the recurrence of COVID-19 toward the end of 2020 and in early 2022, or continuance of the outbreak in other parts of the world with the spread of the highly contagious new variants could adversely impact our company's business operations or the business operations of our company's customers and partners thus in turn having an adverse impact on our business, results of operations and financial condition. In the first quarter of 2022, the Omicron variant has become the dominant variant and led to a new wave of COVID-19 recurrence in China, causing local outbreaks in a number of areas. To achieve "dynamic-zero COVID-19 cases", the PRC government has adopted diversified disease containment measures, including but not limited to, lockdown in certain cities and areas with rapidly rising COVID-19 cases and infection risks (e.g. Shanghai, Shenzhen, Xi'an and a number of cities in Jilin province), epidemiological investigations on infection sources and close contacts, large-scale nucleic acid testing, travel restrictions, and continuous booster vaccination measures. Failure to contain the further spread of COVID-19 will prolong and exacerbate the general economic downturn. Our business operations could be disrupted if any of its employees is suspected of having these or any other epidemic disease, since it could require its employees to be quarantined and/or its offices to be closed for disinfection or other remedial measures. There remains substantial uncertainties about the dynamic of the COVID-19 pandemic, including, but not limited to, with respect to the logistics of distribution and the efficacy of any vaccine program or with respect to new strains or variants of the virus, which may have potential continuing impacts on subsequent periods if the pandemic and the resulting disruption were to extend over a prolonged period.

Our business, results of operations and financial condition may be materially and adversely affected as a result of the changes in the outlook of China's property market, slowdown in China's economic growth, negative business sentiment or other factors that we cannot foresee. In particular, potential impact includes, among others, the following:

- the continuing impacts of COVID-19 may result in a general slowdown in China's real estate industry, adversely affecting the demand for our services;

- our customers may not have sufficient budget or cashflow to pay for our services, or may fail to make the payment in a timely manner, or at all;

- some of our customers may not be well capitalized and may be vulnerable to the COVID-19 pandemic and the slowdown of the macroeconomic conditions, and if they cannot resume their business during a prolonged virus outbreak, the demand for our services may be negatively affected; and

- we may experience lower work efficiency and productivity, which may adversely affect our service quality.

We have taken measures to reduce the impact of the COVID-19 pandemic, including monitoring our employees' health on a daily basis and optimizing our technology system to support remote work arrangements. However, we may still experience lower work efficiency and productivity, which may adversely affect our service quality. Furthermore, we and our customers have experienced business disturbances due to the quarantine measures to contain the spread of COVID-19. We experienced a slowdown in revenue growth and delayed collection of accounts receivables from our customers. We may experience similar delay or even default from our customers should there be any recurrence of the COVID-19 outbreak in China, which could materially and adversely affect our business, results of operations and financial condition. Moreover, if the pandemic persists or escalates, we may be subject to further negative impact on our business operations.

***Any catastrophe, including natural catastrophes and outbreaks of health pandemics and other extraordinary events, could disrupt our business operation.***

We are vulnerable to natural disasters and other calamities. Fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events may give rise to server interruptions, breakdowns, system failures or Internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide our products or services.

Our business could also be adversely affected by the effects of COVID-19, Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or other epidemics. Our business operations could be disrupted if any of our employees has contracted or is suspected of having COVID-19, Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, SARS or another contagious disease or condition, since it could require our employees to be quarantined and/or our offices to be disinfected. In addition, our business, results of operations and financial condition could be adversely affected to the extent that any of these epidemics harms the Chinese economy in general.

***Our business depends in part on real estate developers as our clients, and a consolidation in the real estate industry in China may cause our revenues to decline and reduce our profitability.***

A large portion of our clients were real estate developers. Consolidation within the real estate industry as well as other cost-cutting measures by our clients, may lead to more cancellations of our services, reduce the number of our existing clients, reduce the size of our target market or increase our clients' bargaining power, all of which could cause our revenues to decline and reduce our profitability. The financial difficulties of Chinese real estate developers, for example the distress of Evergrande since 2021, may lead to cancellations of our services or failure to pay services we have provided. If cancellations, reductions of services, and failures to pay increase, and we are unable to offset the resulting decrease in revenues by increasing sales to new or existing clients, our revenues may decline or grow at lower rates.

***Our business depends on retaining and attracting highly capable research, management and operating personnel. Failure to attract and retain qualified talents could jeopardize our competitive position.***

Our success depends in large part on our ability to retain and attract research, management and operating personnel. Our business requires highly skilled technical, sales, management, web product and development, marketing and research personnel, who are in high demand and are often subject to competing offers. To retain and attract key personnel, we use various measures, including employment agreements, awards under a stock incentive plan and incentive bonuses for key employees. These measures may not be enough to retain and attract the personnel we need or to offset the impact on our business of the loss of the services of our key officers or employees.

13

Table of Contents

In order to attract or retain clients and support future revenue growth, we need to continue to attract and retain quality research, sales, technical and other operational personnel in the future. We compete with other companies engaged in online real estate services and Internet-related businesses for qualified personnel and may need to offer higher compensation and other benefits to attract and retain quality personnel. We have, from time to time in the past, experienced, and we expect in the future to continue to experience, difficulty in hiring and retaining highly skilled employees with appropriate qualifications. There may be a limited supply of qualified individuals in some of the cities in China where we have operations and other cities into which we intend to expand. We must hire and train qualified managerial and other employees on a timely basis to keep pace with our rapid growth while maintaining consistent quality of services across our operations in various geographic locations. If we fail to do so, the quality of our services may decline in one or more of the markets where we operate, which in turn, may cause a negative perception of our brand and adversely affect our business. We cannot assure you we will be able to attract or retain the quality personnel that we need to achieve our business objectives.

***Our business could be materially and adversely affected by fluctuations in, and government measures influencing, China's real estate market.***

We conduct our real estate services business in China and serve real estate participants in China. The demand for our information and analytics services as well as marketplace services depends substantially on the number and the spending budgets of our clients, which in turn are affected by the conditions in China's real estate market. China's real estate market has grown rapidly in recent years but such growth is often coupled with volatility and fluctuations in real estate transaction volume and prices. Such volatility and fluctuations are caused by economic, social, political and other factors. Over the years, Chinese government authorities at both national and local levels have announced and implemented various policies and measures aimed to regulate the real estate market.

In recent years, government authorities in China have issued a number of restrictive rules on the real estate market. For example, in January 2011, the State Council issued the "New Eight Policies," pursuant to which all municipalities, all provincial capitals and certain other cities where the local housing prices were deemed to be too high or to have risen too fast, were required to temporarily suspend the sale of housing units to families with registered local permanent residency that already own two or more housing units, families without registered local permanent residency that already own one or more housing units, and families without registered local permanent residency that cannot provide evidence of their local payment of taxes or social insurance premiums for a required period. In early 2013, the State Council issued the "New Five Policies" for the administration of the housing market and detailed implementation rules, which reflected the PRC government's strong determination to curb the increase of housing prices by requiring more stringent implementation of housing price control measures. For example, in the cities where housing unit sales have already been subject to restrictions, if the local housing supply is not sufficient so that the housing prices are rising too fast, local governments are required to take more stringent measures to restrict housing units from being sold to those families who own one or more housing units. Following the request of the central government, Beijing, Shanghai and other major cities in China announced detailed regulations for the New Five Policies in March 2013 to further restrict local real estate markets.

14

Table of Contents

Although certain local governments loosened some of the restrictive measures in 2015 and early 2016 to moderately stimulate the real estate market, such as lowering the minimum percentage of down-payment for housing purchases and relaxing real property-related tax policies, those local governments subsequently retightened certain policies and issued new restrictive policies in late 2016 and 2017. Beginning in March 2017, certain cities, such as Beijing and Guangzhou, further increased the minimum down-payments for second home buyers. In April 2019, Housing Fund Management Center of the Central Government Organs issued Circular on Matters relating to Adjusting the Policy for Individual Housing Loans via the Housing Provident Fund to Further Upgrade Services, which adjusts the proportion of down-payment. Under the circular, if the first house that a loan applicant purchases is not an economically affordable house, the down-payment shall not be lower than 30% of the total purchase price. The circular also adjusts the maximum limit of loan for the second house purchase. The maximum limit of loan for the first house purchase shall be RMB1.2 million, and the benchmark interest rate of loan shall apply; the maximum limit of loan for the second house purchase shall be RMB600,000, and the loan interest rate shall be 1.1 times of the benchmark interest rate of loan for the same period. The circular is only applicable for personal housing loans of the central government agency's employee housing provident fund. These regulatory measures and policies by the government have caused a reduction in transactions in the real estate market. While these measures and policies remain in effect, they may continue to depress the real estate market, dissuade potential purchasers from making purchases, reduce transaction volume, cause a decline in average selling prices, and prevent developers from raising the capital they need and increase developers' costs to start new projects. The general trend of tightening government regulation over real estate industry may result in lower growth rates in the real estate industry. Frequent changes in government policies may also create uncertainties that could discourage investments in real estate and developers from initiating new projects.

On August 23, 2020, Ministry of Housing and Urban-Rural Development of the PRC and the PBOC, on the basis of soliciting opinions widely in the early stage, formulated the "fund monitoring and financing management rules for key real estate enterprises", with the focus on controlling the growth of interest-bearing debts of real estate enterprises. The Notice on The Continuous Rectification and Regulation of the Real Estate Market promulgated by the Ministry of Housing and Urban-Rural Development of the PRC and other eight departments came into effect on July 13, 2021, strengthened the regulation of the legal compliance of real estate development business and construction activities. If a real estate enterprise has the issues such as illegal construction, violation to the construction design document , failing to deliver the house within the time agreed in the house purchase contract and housing quality problems, it will be punished by the regulatory authorities.

Our business and results of operations may be materially and adversely affected as a result of decreased transaction volumes or real estate prices that may result from government policies. A depressed real estate market may have a negative impact on our client base, as companies may implement cost-cutting measures or may consolidate in order to reduce expenses, which may lead to cancellations of our services, reduce the number of our existing clients, or force us to reduce our price. Furthermore, there may be situations in which China's real estate market is so active that our clients see a reduced need for information subscription or marketing initiatives and reduce their spending on such services. To the extent fluctuations in, and government measures influencing, China's real estate market adversely affect the demand for our services, our business, results of operations and financial condition may be materially and adversely affected.

***If we are unable to successfully market our data-driven service offerings to our clients, they could choose not to use those services, which could reduce our revenues or increase our expenses.***

Many real estate participants are used to listing, searching and marketing real estate in traditional and offline methods, such as by distributing print brochures, sharing written lists, placing signs on properties, word-of-mouth and newspaper advertisements. Real estate participants may prefer to continue to use traditional methods or may be slow to adopt and accept our data-based products and services. If we are not able to successfully market our data-based services to our clients, they may choose not to use our database or data-driven promotion services, which could materially and adversely affect our business, results of operations and financial condition.

15

Table of Contents

***We rely on Internet search engines to drive traffic to our websites. If search results do not feature our websites prominently, traffic to our websites would decrease and our business could be materially and adversely affected.***

Baidu, Bing and other Internet search websites drive traffic to our websites, including *3fang.com*. However, our ability to maintain high organic search result rankings is not entirely within our control. Our competitors' search engine optimization efforts may result in their websites receiving a higher search result page ranking than the rankings our websites receive, or Internet search engines could revise their methodologies in a way that would adversely affect our search result rankings, each of which could slow the growth of our user base. Further, search engine providers could align with our competitors, which could adversely affect traffic to our websites. Our websites have experienced fluctuations in search result rankings in the past, and we anticipate similar fluctuations in the future. If we experience a material reduction in the number of users directed to our websites through Internet search engines, our business, results of operations and financial condition could be materially and adversely affected.

***If we are unable to enforce or defend our ownership and use of intellectual property, our business, brands, competitive position and results of operations could be harmed.***

The success of our business depends in large part on our intellectual property, including intellectual property involved in our methodologies, database, services and software. We rely on a combination of trademark, trade secret, patent, copyright and other laws, nondisclosure and noncompetition provisions and other contractual provisions and technical measures to protect our intellectual property rights. However, current law may not provide for adequate protection of our database and the actual data. In addition, legal standards relating to the validity, enforceability and scope of protection of proprietary rights in Internet-related businesses are uncertain and evolving, and changes in these standards may adversely impact the viability or value of our proprietary rights. If we are not successful in protecting our intellectual property, including our database, our brands and our business, results of operations and financial condition could be harmed. The same would be true if a court found that our services infringe upon intellectual property rights held by third parties. Any intellectual property lawsuits or threatened lawsuits in which we are involved, either as a plaintiff or as a defendant, could cost us a significant amount of time and money and distract management's attention from operating our business. In addition, if we do not prevail on an intellectual property claim, this could result in a change to our methodology or information and analytics, promotion and listing services and could reduce our profitability.

We seek to enforce our rights against people and entities that infringe upon our intellectual property, including through legal action. Taking such actions may be costly, and we cannot ensure that such actions will be successful. Any increase in the unauthorized use of our intellectual property could make it more expensive for us to do business and harm our results of operations or financial condition.

***We may be involved in legal and other disputes from time to time arising out of our operations, in particular for allegations relating to infringement of intellectual property rights of third parties.***

We have been and may continue to be involved in legal and other disputes in the ordinary courses of our business, including allegations against us for potential infringement of third-party's copyrights or other intellectual property rights. We may encounter disputes from time to time over rights and obligations concerning intellectual property rights and other legal rights, in particular third-party's intellectual property rights relating to database or software that may be infringed by us in our business operation.

16

Table of Contents

In addition, we cannot assure you that we will not become subject to intellectual property laws in other jurisdictions, such as the United States, by virtue of the ADSs being listed on the NASDAQ, the ability of users to access, download and use our products and services in the United States and other jurisdictions, the ownership of the ADSs by investors in the United States and other jurisdictions, or the extraterritorial application of foreign law by foreign courts or otherwise, among other reasons. If a lawsuit against us is successful, we may be required to pay substantial penalties or other damages and fines, remove relevant content or enter into license agreements which may not be available on commercially reasonable terms, or at all. Even though the allegations or claims could be baseless, defense against any of these allegations or claims would be both costly and time-consuming and could significantly divert the efforts and resources of our management and other personnel or damage our brand, which could have a material adverse effect on our results of operations.

***If we do not invest in technology innovation and provide services that are attractive to our clients, our business could be adversely affected.***

Our success depends on our continued improvements to provide services that make our services useful and attractive for our existing and prospective clients. We are dedicated to further enhancing our data collection and verification capabilities. In addition, we, leveraging machine learning and statistical algorithms, utilize predictive analytics to provide insights into the real estate market. For example, our predictive model that forecasts the potential value of a specific area enables our customers to make informed investment decisions. We are also developing more tools to help improve our customers' operational efficiency and have been continuously upgrading our systems, such as our land investment forecast system and research report automation system. We must continually invest resources in research and development to improve the appeal and comprehensiveness of our services and effectively incorporate new technologies. If we are unable to provide services that clients want to use, then clients may become dissatisfied and use competitors' websites. If we are unable to continue offering innovative services, we may be unable to attract additional clients or retain our current clients, which could harm our business, results of operations and financial condition.

***Any failure to compete effectively in the real estate Internet services market in China would have a material adverse effect on our business, financial condition and results of operations.***

The markets for real estate-related information and analytics services and promotion services in general are highly competitive and rapidly changing. Competition in these markets may increase further if economic conditions or other circumstances cause client bases and client spending to decrease and service providers to compete for fewer client resources. Our existing competitors, or future competitors, may have greater name recognition, larger client bases, better technology or data, lower prices, easier access to data, greater user traffic or greater financial, technical or marketing resources than we have. Our competitors may be able to undertake more effective marketing campaigns, obtain more data, adopt more aggressive pricing policies, make more attractive offers to potential employees, subscribers, advertisers and content providers or may be able to respond more quickly to new or emerging technologies or changes in user requirements. If we are unable to retain existing clients or obtain new clients, our revenues could decline. Increased competition could result in lower revenues and higher expenses, which would reduce our profitability.

The intensive competition has placed additional demands on us to increase the amount of resources we provide to clients and increase the quality of our services in order to retain clients. As the data-based real estate services industry in China is constantly evolving, our current or future competitors may be able to better position themselves to attract funding and to compete as the industry matures.

Any of our current or future competitors may also receive investments from or enter into other commercial or strategic relationships with larger, well-established and well-financed companies and obtain significantly greater financial, marketing and content licensing and development resources than us. Furthermore, some of our competitors receive support from local governments, which may place us at a disadvantage when competing with them in their local markets. We cannot assure you that we will be able to compete successfully against our current or future competitors. Any failure to compete effectively in the real estate Internet services market in China would have a material adverse effect on our business, financial condition and results of operations.

17

Table of Contents

***We may not be able to successfully prevent the operation of websites that aggregate our data, as well as data from other companies, such as copycat websites that may misappropriate our data.***

Third parties may misappropriate our data through website scraping, robots or other means and aggregate this data on their websites with data from other companies. In addition, "copycat" websites may misappropriate data on our website and attempt to imitate our brands or the functionality of our website. We may not be able to detect all such websites in a timely manner and, even if we could, technological and legal measures may be insufficient to stop their operations. Regardless of whether we can successfully enforce our rights against the operators of these websites, any measures that we may take could require us to expend significant financial or other resources.

***If we fail to protect our data or the confidential information of our users and clients, whether due to cyber-attacks, computer viruses, physical or electronic break-ins or other reasons, we may be subject to liabilities imposed by relevant laws and regulations, and our reputation and business may be materially and adversely affected.***

As we conduct our business, we process, store and analyze a large amount of real estate-related data. We are dependent on information technology networks and systems to process, transmit and store electronic information and to communicate between our locations and with our clients. We also possess privacy information submitted by users when they register with our website or mobile application. While we take precautions for secure storage and usage of these data, our security control may not prevent the improper leakage of such data. Anyone may circumvent our security measures and misappropriate proprietary information or cause interruptions in our operations. A security breach, such as hacking or any other attempt to harm our systems, that leads to leakage of these data, could harm our reputation and undermine the competitiveness of our database and services. Any compromise of security that results in the unauthorized release or transfer of personally identifiable information could cause our users and clients to lose trust in us and could expose us to legal claims, which could have a material adverse effect on our business, results of operations, financial condition and prospects.

We are subject to a variety of laws and regulations that apply to the collection, use, retention, protection, disclosure, transfer and other processing of data or confidential information. Laws and regulations related to privacy and data protection are evolving, with new or modified laws and regulations proposed and implemented frequently and existing laws and regulations subject to new or different interpretations. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations relating to Information Security and Confidentiality of User Data." We expect that these areas will receive greater attention and focus from regulators, as well as attract continued or greater public scrutiny and attention going forward, which could increase our compliance costs and subject us to heightened risks and challenges associated with data security and protection. If we are unable to manage these risks, our reputation and results of operations could be materially and adversely affected. In addition, regulatory authorities around the world have recently adopted or are considering a number of legislative and regulatory proposals concerning data protection. Complying with all these laws and regulations may result in additional expenses to us or require us to change our business practices in a manner materially adverse to our business, and any non-compliance may subject us to negative publicity which could harm our reputation and negatively affect the trading price of our ADSs.

***If we fail to obtain or keep licenses, permits or approvals applicable to the various online real estate services provided by us, we may incur significant financial penalties and other government sanctions.***

The Internet and online listing industries in China are still at a relatively early stage of development and are highly regulated by the PRC government. Various regulatory authorities of the PRC government, such as the State Council, Ministry of Industry and Information Technology, or the MIIT, the State Administration for Industry and Commerce, or the SAIC, the National Radio and Television Administration (formerly the State General Administration of Press, Publication, Radio, Film and Television), and the Ministry of Public Security, are empowered to issue and implement regulations governing various aspects of the Internet and advertising industries. Moreover, new laws, rules and regulations may be adopted, or new interpretations of existing laws, rules and regulations may be released, to address issues that arise from time to time. As a result, substantial uncertainties exist regarding the interpretation and implementation of any current and future PRC laws, rules and regulations applicable to the Internet and online advertising industries.

18

We are required to obtain applicable licenses or approvals from various regulatory authorities in order to provide our services via our websites and online database. These licenses or approvals are essential to the operation of our business and are generally subject to annual review by the relevant PRC governmental authorities. For example, Beijing Zhong Zhi Hong Yuan has obtained an ICP license for the provision of Internet information services as required under the applicable PRC laws, rules and regulations to conduct our online listing service business.

We, however, may be required to obtain additional licenses. For example, the release, broadcasting and transmission of graphics, video and audio programs or weblinks to such programs, other websites or data on the websites may be deemed as providing Internet publication services as well as transmission of video and audio programs on the Internet, which could require Internet publication license and license for online transmission of audio-visual programs. Similarly, if we or third parties post information that may be viewed as news information, the release of such information on our websites may be deemed as Internet news information services and therefore require Internet news information license. We, like many other similarly situated business operators, have been operating our businesses without such licenses.

Under the applicable PRC laws, rules and regulations, the failure to obtain and/or maintain requisite business licenses may subject the entity to various penalties, including confiscation of revenues, imposition of fines and/or restrictions on the entity conducting such activities' business operations, or the discontinuation of their operations, which could materially and adversely affect our business, financial condition and results of operations.

***We are subject to certain non-compliance events, which may adversely affect our operations.***

Landlords of certain of the properties we leased for business operations have not registered our lease agreement with related regulatory authorities according to the applicable law and regulations and some of the landlords have not provided us with ownership certificates. We cannot assure you that these landlords have the right to lease the relevant properties to us or we will not be abandoned from the leased properties due to the failure of the landlords to comply with applicable laws and regulations. If ownership of the properties we have leased is disputed and/or the validity of such leases is challenged by third parties, or if we are unable to find alternative places for business operations, we may have to relocate to other places, which could increase our costs and adversely affect our results of operations.

In addition, instead of paying the social insurance payment on their own for their employees, certain of our PRC subsidiaries use third-party agencies to pay in the name of such agency. With respect to the underpaid employee benefits, we may be required to make up the contributions for these plans as well as to pay late fees and fines; with respect to the late social insurance registration and housing fund deposit registration, we may be required to apply for such registration and pay late fees and fines; with respect to using third-party agencies to pay the social insurance for the employees, we may be subject to rectification and late fines. If we are subject to late fees or fines in relation to the above incidents, our financial condition and results of operations may be adversely affected.

***Regulation of the Internet industry in China, including censorship of information distributed over the Internet, may materially and adversely affect our business.***

China has enacted laws, rules and regulations governing Internet access and the distribution of news, information or other content, as well as products and services, through the Internet. In the past, the PRC government has prohibited the distribution of information through the Internet that it deems to be in violation of applicable PRC laws, rules and regulations. In particular, under regulations promulgated by the State Council, the MIIT, the National Radio and Television Administration and the Ministry of Culture, Internet content providers and Internet publishers are prohibited from posting or displaying content over the Internet that, among other things, opposes the fundamental principles of the PRC constitution, compromises state security, divulges state secrets, subverts state power or damages national unity, disseminates rumors, disturbs social order or disrupts social stability, propagates obscenity, pornography, gambling, violence, murder or fear or incites the commission of crimes, or insults or slanders a third party or infringes upon the lawful right of a third party.

If any content we offer via our websites or database were deemed by the PRC government to violate any of such content restrictions, we would not be able to continue such offerings and could be subject to penalties, including confiscation of illegal revenues, fines, suspension of business and revocation of required licenses, which could have a material adverse effect on our business, financial condition and results of operations. We may also be subject to potential liability for any unlawful actions of our clients or affiliates or for content we distribute that is deemed inappropriate. It may be difficult to determine the type of content that may result in liability to us, and if we are found to be liable, we may be forced to cease operation of our websites or database in China.

*If we are unable to increase our revenues or our operating costs are higher than expected, our profitability may decline and our results of operations may fluctuate significantly.*

We may not be able to accurately forecast our revenues or future revenue growth rate. Many of our expenses, particularly personnel costs and rental costs, are relatively fixed. As a result, we may not be able to adjust spending quickly enough to offset any unexpected increase in expenses or revenue shortfall. We may experience higher than expected operating costs, including increased personnel costs, rental costs, selling and marketing costs, investments in geographic expansion, acquisition costs, communications costs, travel costs, software development costs, professional fees and other costs. If operating costs exceed our expectations and cannot be adjusted accordingly, our profitability may be reduced and our results of operations and financial position will be adversely affected. Additionally, we may not be able to sustain our revenue growth rates. Our ability to increase our revenues and operating profit will depend on increased demand for our services. Our sales are affected by, among other things, general economic and commercial property conditions. Reduced demand, whether due to changes in client preference, a weakening of the PRC or global economy, competition or other reasons, may result in decreased revenues and growth, adversely affecting our results of operations.

We may enter new geographical markets in China. Expanding into new markets and investing resources towards increasing the depth of our coverage within existing markets imposes additional burdens on our research, systems development, sales, marketing and general managerial resources. If we are unable to manage our expansion efforts effectively, if our expansion efforts take longer than planned or if our costs for these efforts exceed our expectations, our financial position could be adversely affected. In addition, if we incur significant costs to improve data quality within existing markets, or are not successful in marketing and selling our services in these markets or in new markets, our expansion may have a material adverse effect on our financial position by increasing our expenses without increasing our revenues, adversely affecting our profitability.

*We may be held liable for injuries to individual participants of our themed events, which may adversely affect our reputation and adversely affect our financial conditions and results of operations.*

We take event security seriously, and make every effort to ensure the safety of our participants during our themed events, such as industry conferences and forums. However, we cannot guarantee that no physical injury will occur during our events, for which we could be held liable. Under the PRC laws and regulations, the undertaker of a large-scale group activity shall bear tort liability for damages to a third party arising from such undertakers' failure to fulfill its security obligations. If the act of a third party results in damage to others in a large-scale group activity, the undertaker that failed to fulfill security obligations shall also bear supplementary liability. Therefore, we might face negligence claims alleging that we failed to maintain our facilities or to supervise our employees.

In addition, if any participants of our themed events commit acts of violence, we could also face allegations that we failed to provide adequate security or were otherwise responsible for his or her actions. If we are held liable for the injury or damages, our financial conditions and results of operations may be adversely affected. Additionally, our themed events may be perceived to be unsafe, which may discourage prospective clients, real estate participants and media partners from attending. These negative perceptions might also adversely affect our reputation and results of operations.

Table of Contents

***If we are not able to successfully identify, finance or integrate acquisitions, our business operations and financial position could be adversely affected.***

We may seek to supplement and expand our services through acquisitions of complementary businesses, services, databases and technologies. Our strategy to acquire complementary companies or assets depends on our ability to identify, and the availability of, suitable acquisition candidates. We may incur costs in the preliminary stages of an acquisition, but may ultimately be unable or unwilling to consummate the proposed transaction for various reasons. In addition, acquisitions involve numerous risks, including the ability to realize or capitalize on synergies created through combinations; managing the integration of personnel and products or services; managing the integration of acquired infrastructure and controls; potential increases in operating costs; managing geographically remote operations; the diversion of management's attention from other business concerns and potential disruptions in ongoing operations during integration; the inherent risks in entering markets and sectors in which we have either limited or no direct experience; and the potential loss of key employees, clients or vendors and other business partners of the acquired companies. We may not successfully integrate acquired businesses or assets and may not achieve anticipated benefits of an acquisition, including expected synergies. External factors, such as compliance with laws and regulations, and shifting market preferences, may also impact the successful integration of an acquired business. An acquired business could strain our system of internal controls and diminish its effectiveness. Acquisitions could result in dilutive issuances of equity securities, the incurrence of debt, one-time write-offs of goodwill and substantial amortization expenses of other intangible assets. We may be unable to obtain financing on favorable terms, or at all, if necessary to finance future acquisitions making it impossible or more costly to acquire complementary businesses. If we are able to obtain financing, the terms may be onerous and restrict our operations. Further, certain acquisitions may be subject to regulatory approval, which can be time consuming and costly to obtain or may be denied, and if obtained, the terms of such regulatory approvals may impose limitations on our ongoing operations or require us to divest assets or lines of business.

***Technical problems or disruptions that affect either our clients' ability to access our services, or the software, internal applications, database and network systems underlying our services, could damage our reputation and brands and lead to reduced demand for our services, lower revenues and increased costs.***

Our business, brands and reputation depend on the satisfactory performance, reliability and availability of our websites, the Internet and our service providers. Interruptions in these systems, whether due to system failures, computer viruses, software errors, physical or electronic break-ins, or malicious hacks or attacks on our systems, could affect the security and availability of our services on our websites and prevent or inhibit the ability of users to access our services. Our operations also depend on our ability to protect our database, computers and software, telecommunications equipment and facilities against damage from potential dangers such as fire, flood, power loss, security breaches, computer viruses, telecommunications failures, terrorist attacks, acts of war, electronic and physical break-ins, computer viruses, earthquakes and similar events. Our clients rely on our services when conducting their own businesses. Disruptions in, or reductions in ability to access, our services for whatever reason could damage our clients' businesses, harm our reputation, result in additional costs or result in reduced demand for our services, any of which could harm our business, results of operations and financial condition.

In addition, the software, internal applications and systems underlying our services are complex and may not be error-free. Our careful development and testing may not be sufficient to ensure that we will not encounter technical problems when we attempt to enhance our software, internal applications and systems. Any inefficiencies, errors or technical problems with our software, internal applications and systems could reduce the quality of our services or interfere with our clients' access to our services, which could reduce the demand for our services, lower our revenues and increase our costs.

The majority of the communications, network and computer hardware used to operate our websites and database are located at facilities in Beijing. Our systems and operations are vulnerable to damage or interruption from fire, flood, power loss, security breaches, computer viruses, telecommunications failure, terrorist attacks, acts of war, electronic and physical break-ins, earthquakes and similar events. The occurrence of any of the foregoing events could result in damage to our systems and hardware or could cause them to fail completely, and our insurance may not cover such events or may be insufficient to compensate us for losses that may occur.

Table of Contents

A failure of our systems at any site could result in reduced functionality for our users, and a total failure of our systems could cause our websites to be inaccessible. Problems faced or caused by our information technology service providers, including private network providers, Internet providers and third-party web-hosting providers, or with the systems by which they allocate capacity among their clients (as applicable), could adversely affect the experience of our users. Any financial difficulties, such as bankruptcy reorganization, faced by these third-party service providers or any of the service providers with whom they contract may have negative effects on our business, the nature and extent of which are difficult to predict. If our third-party service providers are unable to keep up with our growing needs for capacity, our business could be harmed.

Our business interruption insurance may not cover certain events or may be insufficient to compensate us for the potentially significant losses, including the potential harm to the future growth of our business, which may result from interruptions in our service as a result of system failures or malicious attacks. Any errors, defects, disruptions or other performance problems with our services could harm our reputation, business, results of operations and financial condition.

***Breaches of security in connection with our websites could expose us to potential liability and harm our reputation.***

Ensuring secured transmission of confidential information through public networks is essential to maintaining the confidence of our clients and users. Our existing security measures may not be adequate to protect such confidential information. In addition, computer and network systems are susceptible to breaches by computer hackers. Any system failure or compromise of our security that results in the unauthorized access to or release of our users' or clients' data could significantly limit the adoption of our products and services, expose us to litigation and potential liability for failing to secure confidential client information, as well as harm our reputation, brand and business operations. We may be required to expend significant capital and other resources to prevent such security breaches or alleviate problems caused by such breaches. We may also lose current or prospective data suppliers that grant us access to their proprietary data due to the impression that we cannot adequately protect the privacy and safety of such data. The risk that these types of events could seriously harm our business is likely to increase as we expand the number of products and services we offer and expand our user base. Any of these circumstances may result in a material adverse effect on our business, financial condition and results of operations.

***Our results of operations and revenues are subject to fluctuations, seasonality and market cyclicality, each of which could cause the market price of the ADSs to be negatively affected.***

Our results of operations do not experience meaningful seasonality. However, the timing of widely observed holidays and vacation periods, and availability of real estate agents and related service providers during these periods, could affect our quarterly results of operations during that period. The first quarter of each year generally contributes the smallest portion of our annual revenues due to reduced real estate transactions, advertising and marketing activities of our clients in the PRC real estate industry during and around the Chinese New Year holiday, which generally occurs in January or February of each year and due to the cold winter weather in northern China. For this reason, our results of operations may not be comparable from quarter to quarter. If we are unable to adequately respond to seasonal or cyclical conditions, our revenues, expenses and operating results may fluctuate from quarter to quarter. Our results of operations, revenues and expenses may fluctuate for many reasons, including but not limited to rates of client acquisition and retention, changes in our pricing strategy and timing of changes, competition and changes or consolidation in the real estate industry.

These fluctuations or seasonality effects could negatively affect our results of operations during the period in question and/or future periods or cause the market price of the ADSs to decline. In addition, changes in accounting policies or practices may affect our level of net income. Fluctuations in our financial results, revenues and expenses may cause the market price of our ADSs to decline.

***Third-party claims, litigation or government investigations to which we may be subject or in which we may be involved may significantly increase our expenses and adversely affect our stock price.***

We may be or may be expected to be a party to various third-party claims, lawsuits, or government investigations from time to time. For example, in February 2019, we were served with a subpoena from a court in Beijing, in which a third-party claimed that a contract we entered into was invalid. Pursuant to such contract, we received certain assets from a debtor's nominee to discharge its indebtedness. The debtor subsequently alleged that such contract was invalid because the transfer price of such assets was below the fair market value. The allegation was dismissed by the trial court and the plaintiff appealed to the appellate court. The appellate court has dismissed the appeal and delivered the final judgment in favor of us. Fang assumed all the rights and obligations with respect to such assets after the separation pursuant to a contract between us and Fang and we successfully transferred the relevant legal titles to Fang in June 2021. Also, our Hong Kong subsidiary, China Index Academy Limited, may give the public an improper impression by its name that we are an institution sponsored by the government. In July 2016, the Ministry of Civil Affairs of China published a list of offshore social organizations, which included us. We do not believe that we committed any wrongdoing by using "China Index Academy" as part of our corporate name in Hong Kong, nor did we claim any government affiliation when doing business. We are not aware of any third-party claim or government investigation launched or threatened against us for the use of "China Index Academy." Any lawsuits or government investigations, whether actual or threatened, in which we may be involved, whether as plaintiff or defendant, could cost us a significant amount of time and money, could distract management's attention away from operating our business, could result in negative publicity and could adversely affect our stock price. In addition, if any claims are determined against us or if a settlement requires us to pay a large monetary amount or take other action that materially restricts or impedes our operations, our profitability could be significantly reduced and our financial position could be adversely affected. Our insurance may not be sufficient to cover any losses we incur in connection with litigation claims.

***If we fail to achieve and maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, which could result in harm to our business, loss of investor confidence in our financial reporting and a lower trading price of our ADSs.***

Effective internal controls are necessary for us to provide accurate and timely financial reports and effectively prevent fraud. We discovered in 2021 and in the past, and may in the future discover, areas of our internal controls involving deficiencies, significant deficiencies or material weaknesses that have required or will require improvements in our procedures on the preparation, review, approval and disclosure of financial reports.

We and our independent registered public accounting firm identified one material weakness in our internal control over financial reporting as of December 31, 2021. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. The material weakness identified is that we did not have sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements.

Though we plan to undertake steps to strengthen our internal control over financial reporting, our system will not prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud will be detected.

A lack of effective internal control over financial reporting could result in the loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. In addition, if we fail to achieve and maintain the adequacy of our internal controls, as such standards are modified, supplemented or amended from time to time or as necessary to correct deficiencies or weaknesses in our controls, we may not be able to provide accurate financial statements, which could cause us to fail to meet our reporting obligations or provide accurate financial statements, and cause investors to lose confidence in our reported financial information and have a negative effect on the trading price of our ADSs.

*We have limited business insurance coverage.*

Insurance companies in China currently do not offer as extensive an array of insurance products as are offered by insurance companies in more developed economies. As a result, we do not have any business disruption insurance or litigation insurance coverage for our operations in China. Any uninsured business disruptions, litigation or natural disaster may result in our incurring substantial costs and diversion of resources, which could have an adverse effect on our results of operations and financial condition.

*A severe or prolonged downturn in the global or Chinese economy could materially and adversely affect our business, results of operations and financial condition.*

The global macroeconomic environment is facing challenges, including the end of quantitative easing by the U.S. Federal Reserve, the economic slowdown in the Eurozone since 2014 and the uncertain impact of the U.K.'s withdrawal from the European Union in January 2020, or "Brexit." The growth of the Chinese economy has slowed since 2012 and such slowdown may continue. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. There have been concerns over unrest and terrorist threats in the Middle East, Europe and Africa, which have resulted in volatility in oil and other markets. There have also been concerns on the relationship between China and other countries, including the surrounding Asian countries, which may potentially result in foreign investors exiting the China market and other economic effects. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. There have also been concerns about the relationship between China and the United States, following rounds of tariffs imposed by the United States. Recently, the United States and China have had disagreements over political and economic issues including trade. Controversies may arise in the future between these two countries and trade policies between the two may change. It is unclear whether these challenges and uncertainties will be contained or resolved, and what effects they may have on the global political and economic conditions in the long term. Any future escalation of the ongoing trade war between the United States and China may negatively impact the growth in both the Chinese economy and the global economy as a whole. Recently, the war in Ukraine and sanctions on Russia increased the uncertainties in the relations between China and the United States, and tensions between two countries could be heightened as a result. The war in Ukraine and the imposition of broad economic sanctions on Russia could raise energy prices and disrupt global markets. There have also been concerns about the economic effect of the tensions in the relationship between China and surrounding Asian countries. In addition, the global COVID-19 pandemic continues to have a severe and prolonged negative impact on the Chinese and the global economy. Any severe or prolonged slowdown or instability in the global or Chinese economy may materially and adversely affect our business, results of operations and financial condition.

24

**Risks Relating to Our Corporate Structure**

***We rely on contractual arrangements with our VIEs and their shareholders to operate our listing service and other business, which may not be as effective as direct ownership in providing operational control and otherwise materially and adversely affect our listing service and other business.***

We rely on contractual arrangements with our VIEs and their shareholders to operate our listing service and other business. Our VIEs include Beijing Zhong Zhi Hong Yuan, Shouzheng Credit Rating Co., Ltd. ("Shouzheng") and Beijing Zhong Zhi Information Technology Academy ("Beijing Zhong Zhi Academy"). Our VIEs made insignificant contributions to our revenues in the years ended December 31, 2019, 2020 and 2021 and currently have minimal operations. As foreign investors are not allowed to own more than a 50% equity interest in any PRC company engaging in value-added telecommunications businesses, we conducted our listing service business in China through Beijing Zhong Zhi Hong Yuan. We ceased to provide listing services from 2021. See "—Risks Relating to Our Business and Industry—We may not be able to successfully introduce new or upgraded services or combine or shift focus from services with less demand, which could decrease our revenues and profitability." and "Item 4. Information on the Company—B. Business Overview—Our Services—Marketplace Services—China Index Listing." Notwithstanding that Beijing Zhong Zhi Academy and Shouzheng are not in the value-added telecommunications business, we entered into contractual arrangements with Beijing Zhong Zhi Academy and Shouzheng, and their respective shareholders to maintain business flexibility. Both Beijing Zhong Zhi Academy and Shouzheng currently have minimal operations. Beijing Zhong Zhi Academy is authorized to engage in activities including engineering and technology research but has yet to conduct any business of scale. Shouzheng's planned business scope includes enterprises credit rating and management consulting but it has yet to complete filing with relevant PRC authorities to carry out its credit rating business. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure—Our Contractual Arrangements." These contractual arrangements may not be as effective as direct ownership in providing us with control over our VIEs. If our VIEs or their shareholders fail to perform their respective obligations under these contractual arrangements, our recourse to the assets held by our VIEs is indirect and we may have to incur substantial costs and expend significant resources to enforce such arrangements in reliance on legal remedies under PRC law. These remedies may not always be effective, particularly in light of uncertainties in the PRC legal system. Furthermore, in connection with litigation, arbitration or other judicial or dispute resolution proceedings, assets under the name of any of record holder of equity interest in our VIEs, including such equity interest, may be put under court custody.

As a consequence, we cannot be certain that the equity interest will be disposed pursuant to the contractual arrangements or ownership by the record holder of the equity interest. All of these contractual arrangements are governed by PRC laws and provide for the resolution of disputes through arbitration in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC laws and any disputes would be resolved in accordance with PRC legal procedures. The legal environment in the PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. In the event that we are unable to enforce these contractual arrangements, or if we suffer significant time delays or other obstacles in the process of enforcing these contractual arrangements, it would be very difficult to exert effective control over our VIEs, and our ability to conduct our listing service and other business may be materially and adversely affected. See "—Risks Relating to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

***Any failure by our VIEs or their shareholders to perform their obligations under our contractual arrangements with them would materially and adversely affect our listing service and other business.***

We, through one of our subsidiaries and a wholly foreign-owned enterprise in the PRC, have entered into a series of contractual arrangements with our VIEs and their shareholders. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure—Our Contractual Arrangements." If our VIEs or their shareholders fail to perform their respective obligations under these contractual arrangements, we may incur substantial costs and expend additional resources to enforce such arrangements. We may also have to rely on legal remedies under PRC laws, including seeking specific performance or injunctive relief, and claiming damages, which we cannot assure you will be effective under PRC laws. For example, if the shareholders of our VIEs were to refuse to transfer their equity interests in our VIEs to us or our designee when we exercise the purchase option pursuant to these contractual arrangements, or if they were otherwise to act in bad faith toward us, then we may have to take legal actions to compel them to perform their contractual obligations.

All the agreements under our contractual arrangements are governed by PRC laws and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC laws and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements.

Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a variable interest entity should be interpreted or enforced under PRC laws. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC laws, rulings by arbitrators are final and parties cannot appeal arbitration results in court unless such rulings are revoked or determined unenforceable by a competent court. If the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delay. In the event that we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our VIEs and relevant rights and licenses held by it which we require in order to operate our listing service and other business, and our ability to conduct our listing service and other business may be negatively affected. See "—Risks Relating to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

***The shareholders of our VIEs may have potential conflicts of interest with us, which may materially and adversely affect our listing service and other business.***

The interests of the shareholders of our VIEs in their capacities as such shareholders may differ from the interests of our company as a whole, as what is in the best interests of our VIEs, including matters such as whether to distribute dividends or to make other distributions to fund our offshore requirement, may not be in the best interests of our company. There can be no assurance that when conflicts of interest arise, any or all of these shareholders will act in the best interests of our company or those conflicts of interest will be resolved in our favor. In addition, these shareholders may breach or cause our VIEs to breach or refuse to renew the existing contractual arrangements with us.

Currently, we do not have arrangements to address potential conflicts of interest the shareholders of our VIEs may encounter, on one hand, and as a beneficial owner of our company, on the other hand. We, however, could, at all times, exercise our option under the exclusive call option agreement to cause the shareholders of our VIEs to transfer all of their equity ownership in our VIEs to a PRC entity or individual designated by us as permitted by the then applicable PRC laws. In addition, if such conflicts of interest arise, we could also, in the capacity of attorney-in-fact of the then existing shareholders of our VIEs as provided under the power of attorney agreements, directly appoint new directors of our VIEs. We rely on the shareholders of our VIEs to comply with PRC laws and regulations, which protect contracts and provide that directors and executive officers owe a duty of loyalty to our company and require them to avoid conflicts of interest and not to take advantage of their positions for personal gains, and the laws of the Cayman Islands, which provide that directors have a duty of care and a duty of loyalty to act honestly in good faith with a view to our best interests. However, the legal frameworks of China and the Cayman Islands do not provide guidance on resolving conflicts in the event of a conflict with another corporate governance regime. If we cannot resolve any conflicts of interest or disputes between us and the shareholders of our VIEs, we would have to rely on legal proceedings, which could result in disruption of our listing service and other business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

***If the PRC government deems that the contractual arrangements in relation to our VIEs do not comply with PRC regulatory restrictions on foreign investment in the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in our listing service and other business.***

The PRC government regulates telecommunications-related businesses through strict business licensing requirements and other government regulations. These laws and regulations also include limitations on foreign ownership of PRC companies that engage in telecommunications-related businesses. Specifically, foreign investors are not allowed to own more than a 50% equity interest in any PRC company engaging in value-added telecommunications businesses. The primary foreign investor must also have experience and a good track record in providing value-added telecommunications services overseas.

26

Table of Contents

Because we are an exempted company with limited liability registered by way of continuation under the laws of the Cayman Islands, we are classified as a foreign enterprise under PRC laws and regulations, and our wholly foreign-owned enterprise in the PRC is a foreign invested enterprise, or FIE. Accordingly, none of these subsidiaries are eligible to operate value-added telecommunication services business in China. We conducted our listing service business in China through one of our VIEs, Beijing Zhong Zhi Hong Yuan. We have entered into a series of contractual arrangements in relation to Beijing Zhong Zhi Hong Yuan, which enable us to (1) exercise effective control over Beijing Zhong Zhi Hong Yuan, (2) receive substantially all of the economic benefits of Beijing Zhong Zhi Hong Yuan, and (3) have an exclusive option to purchase all or part of the equity interests and assets in Beijing Zhong Zhi Hong Yuan when and to the extent permitted by PRC law. As a result of these contractual arrangements, we have control over and are the primary beneficiary of Beijing Zhong Zhi Hong Yuan and hence have consolidated its financial results as Beijing Zhong Zhi Hong Yuan under U.S. GAAP. We have further entered into contractual arrangements in relation to Shouzheng and Beijing Zhong Zhi Academy on terms substantially similar to Beijing Zhong Zhi Hong Yuan's agreements. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure—Our Contractual Arrangements."

We believe that our corporate structure and contractual arrangements comply with the current applicable PRC laws and regulations. Our PRC legal counsel, Jingtian & Gongcheng, based on its understanding of the relevant laws and regulations, is of the opinion that each of the contracts among CIH, WFOE, our VIEs and shareholders of our VIEs, is valid, binding and enforceable in accordance with its terms. However, as there are substantial uncertainties regarding the interpretation and application of PRC laws and regulations, including the Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rules, and the Telecommunications Regulations and the relevant regulatory measures concerning the telecommunications industry, there can be no assurance that the PRC government authorities, such as the MIIT, the Ministry of Commerce, or MOFCOM, or other authorities that regulate Internet content providers and other participants in the telecommunications industry, would agree that our corporate structure or any of the above contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. The Foreign Investment Law was formally passed by the thirteenth National People's Congress on March 15, 2019 and became effective on January 1, 2020. For further details of the Foreign Investment Law, please see "—Substantial uncertainties exist with respect to the implementation and interpretation of the newly enacted Foreign Investment Law and how it may impact the viability of our current corporate structure, our listing service and other business and results of operations."

If our corporate structure and contractual arrangements are deemed by the MIIT or MOFCOM or other regulators having competent authority to be illegal, either in whole or in part, we may lose control of our VIEs and have to modify such structure to comply with regulatory requirements. However, there can be no assurance that we can achieve this without material disruption to our listing service and other business. Further, if our corporate structure and contractual arrangements are found to be in violation of any existing or future PRC laws or regulations, the relevant regulatory authorities would have broad discretion in dealing with such violations, including:

- revoking our business and operating licenses;

- levying fines on us;

- confiscating any of our income that they deem to be obtained through illegal operations;

- shutting down our services;

- discontinuing or restricting our operations in China;

- imposing conditions or requirements with which we may not be able to comply;

- requiring us to change our corporate structure and contractual arrangements;

- restricting or prohibiting our use of the proceeds from overseas offering to finance our VIEs' business and operations; and

- taking other regulatory or enforcement actions that could be harmful to our business.

27

Furthermore, new PRC laws, rules and regulations may be introduced to impose additional requirements that may be applicable to our corporate structure and contractual arrangements. Occurrence of any of these events could materially and adversely affect our business, results of operations and financial condition. In addition, if the imposition of any of these penalties or requirement to restructure our corporate structure causes us to lose the rights to direct the activities of our VIEs or our right to receive its economic benefits, we would no longer be able to consolidate the financial results of our VIEs in our combined and consolidated financial statements. However, we do not believe that such actions would result in the liquidation or dissolution of our company, WFOE or our VIEs. See "Item 4. Information on the Company—C. Organizational Structure—Our Contractual Arrangements."

***Contractual arrangements in relation to our VIEs may be subject to scrutiny by the PRC tax authorities and they may determine that our VIEs owe additional taxes, which could negatively affect our results of operations and financial condition and the value of your investment.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. The PRC enterprise income tax law requires every enterprise in China to submit its annual enterprise income tax return together with a report on transactions with its related parties to the relevant tax authorities. The tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's length principles.

We may face material and adverse tax consequences if the PRC tax authorities determine that the contractual arrangements in relation to our VIEs were not entered into on an arm's length basis in such a way as to result in impermissible reduction in taxes under applicable PRC laws, regulations and rules, and adjust the income of our VIEs in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by our VIEs for PRC tax purposes, which could in turn increase their tax liabilities without reducing their tax expenses. In addition, if our wholly-owned PRC subsidiary, Beijing Zhong Zhi Shi Zheng, requests the shareholders of our VIEs to transfer their equity interests in our VIEs at nominal or no value pursuant to these contractual arrangements, such transfer could be viewed as a gift and subject the relevant subsidiary to PRC income tax. Furthermore, the PRC tax authorities may impose late payment fees and other penalties on our PRC subsidiary, Beijing Zhong Zhi Shi Zheng, and our VIEs for adjusted but unpaid taxes according to applicable regulations. Our financial position could be materially and adversely affected if the tax liabilities of our PRC subsidiary, Beijing Zhong Zhi Shi Zheng, and our VIEs increase, or if they are required to pay late payment fees and other penalties.

***We may lose the ability to use and enjoy assets held by our VIEs that are material to the operation of our listing service and other business if the entity goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

Our VIEs hold a portion of our assets. Under the contractual arrangements, our VIEs may not and their shareholders may not cause them to, in any manner, sell, transfer, mortgage or dispose of their assets or their legal or beneficial interests in the business without our prior consent. However, in the event that the shareholders of our VIEs breach these contractual arrangements and voluntarily liquidate our VIEs, or any of our VIEs declares bankruptcy and all or part of its assets become subject to liens or rights of third-party creditors, or are otherwise disposed of without our consent, we may be unable to continue certain of our business activities, which could materially and adversely affect our business, results of operations and financial condition. If any of our VIEs undergoes a voluntary or involuntary liquidation proceeding, independent third-party creditors may claim rights to some or all of these assets, thereby materially and adversely affecting our listing service and other business.

***If the custodians or authorized users of our controlling non-tangible assets, including chops and seals, fail to fulfill their responsibilities, or misappropriate or misuse these assets, our listing service and other business may be materially and adversely affected.***

Under PRC law, legal documents for corporate transactions, including agreements and contracts that our business relies on, are executed using the chop or seal of the signing entity or with the signature of a legal representative whose designation is registered and filed with the relevant local branch of the SAIC. We generally execute legal documents by affixing chops or seals, rather than having the designated legal representatives sign the documents.

We have three major types of chops—corporate chops, contract chops and finance chops. We use corporate chops generally for documents to be submitted to government agencies, such as applications for changing business scope, directors or company name, and for legal letters. We use contract chops for executing leases and commercial contracts. We use finance chops generally for making and collecting payments, including issuing invoices. Use of corporate chops, contract chops finance chops must be approved by our finance department. The chops of our subsidiaries and our VIEs are generally held by the relevant entities so that documents can be executed locally. Although we usually utilize chops to execute contracts, the registered legal representatives of our subsidiaries or our VIEs have the apparent authority to enter into contracts on behalf of such entities without chops, unless such contracts set forth otherwise.

In order to maintain the physical security of our chops, we generally have them stored in secured locations accessible only to the designated key employees of our legal, administrative or finance departments. Although we have approval procedures in place and monitor our key employees, including the designated legal representatives of our subsidiaries or our VIEs, the procedures may not be sufficient to prevent all instances of abuse or negligence. There is a risk that our key employees or designated legal representatives could abuse their authority, for example, by binding our subsidiaries and our VIEs with contracts against our interests, as we would be obligated to honor these contracts if the other contracting party acts in good faith in reliance on the apparent authority of our chops or signatures of our legal representatives. If any designated legal representative obtains control of the chop in an effort to obtain control over the relevant entity, we would need to have a shareholder or board resolution to designate a new legal representative and to take legal action to seek the return of the chop, apply for a new chop with the relevant authorities, or otherwise seek legal remedies for the legal representative's misconduct. If any of the designated legal representatives obtains and misuses or misappropriates our chops and seals or other controlling intangible assets for whatever reason, we could experience disruption to our normal business operations. We may have to take corporate or legal action, which could involve significant time and resources to resolve while distracting management from our operations, and our listing service and other business may be materially and adversely affected.

***Substantial uncertainties exist with respect to the implementation and interpretation of the Foreign Investment Law and how it may impact the viability of our current corporate structure, our listing service and other business and results of operations.***

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which became effective on January 1, 2020 and replaced the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law. On December 26, 2019, the State Council issued the Implementing Regulations of the Foreign Investment Law, or the Implementing Regulations of the FIL, and the Supreme People's Court issued the Interpretations of the Supreme People's Court on Certain Issues Concerning the Application of the Foreign Investment Law of the PRC, or the Interpretations of the FIL, both of which came into effect since January 1, 2020. The Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. However, since it is relatively new, uncertainties still exist in relation to its interpretation and implementation, and failure to take timely and appropriate measures to cope with the regulatory-compliance challenges could result in material and adverse effect on us. For instance, though the Foreign Investment Law does not explicitly classify contractual arrangements as a form of foreign investment, it contains a catch-all provision under the definition of "foreign investment," which includes investments made by foreign investors in China through means stipulated in laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions promulgated by the Stale Council to provide for contractual arrangements as a form of foreign investment, at which time it will be uncertain whether our contractual arrangements will be deemed to be in violation of the market access requirements for foreign investment in the PRC and if yes, how our contractual arrangements will be dealt with. In addition, if future laws, administrative regulations or provisions prescribed by the State Council mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. In the worst-case scenario, we may be required to unwind our existing contractual arrangements and/or dispose of the relevant business operations, which could have a material adverse effect on our current corporate structure, our listing service and other business and results of operations.

29

**Risks Relating to Doing Business in China**

***Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.***

Substantially all of our operations are located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by political, economic and social conditions in China generally. The Chinese economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the PRC government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the PRC government continues to play a significant role in regulating industry development by imposing industrial policies. The PRC government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy, and the rate of growth has been slowing since 2012. Any adverse changes in economic conditions in China, in the policies of the PRC government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations. In addition, in the past the PRC government has implemented certain measures, including interest rate adjustment, to control the pace of economic growth. These measures may cause decreased economic activity in China, which may adversely affect our business and results of operations.

***Uncertainties with respect to the PRC legal system could adversely affect us.***

The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions under the civil law system may be cited for reference but have limited precedential value. Since these laws and regulations are relatively new and the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and the enforcement of these laws, regulations and rules involves uncertainties.

In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past three decades has significantly enhanced the protections afforded to various forms of foreign investments in China. However, China has not developed a fully integrated legal system, and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, the interpretation and enforcement of these laws and regulations involve uncertainties. Since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory provisions and contractual terms, it may be difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy. These uncertainties may affect our judgment on the relevance of legal requirements and our ability to enforce our contractual rights or tort claims. In addition, the regulatory uncertainties may be exploited through unmerited or frivolous legal actions or threats in attempts to extract payments or benefits from us.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all and may have retroactive effect. As a result, we may not be aware of our violation of any of these policies and rules until sometime after the violation. In addition, any administrative and court proceedings in China may be protracted, resulting in substantial costs and diversion of resources and management attention.

In addition, the PRC government has recently announced its plans to enhance its regulatory oversight of Chinese companies listing overseas. The Opinions on Intensifying Crack Down on Illegal Securities Activities issued on July 6, 2021 called for:

- tightening oversight of data security, cross-border data flow and administration of classified information, as well as amendments to relevant regulation to specify responsibilities of overseas listed Chinese companies with respect to data security and information security;

- enhanced oversight of overseas listed companies as well as overseas equity fundraising and listing by Chinese companies; and

- extraterritorial application of China's securities laws.

As the Opinions on Intensifying Crack Down on Illegal Securities Activities were recently issued, there are great uncertainties with respect to the interpretation and implementation thereof. The Chinese government may promulgate relevant laws, rules and regulations that may impose additional and significant obligations and liabilities on overseas listed Chinese companies regarding data security, cross-border data flow, and compliance with China's securities laws. It is uncertain whether or how these new laws, rules and regulations and the interpretation and implementation thereof may affect us, but among other things, our ability and the ability of our subsidiaries to obtain external financing through the issuance of equity securities overseas could be negatively affected.

The PRC government's significant oversight and discretion over our business operation could result in a material adverse change in our operations and the value of our ADSs.

We conduct our business primarily through our PRC subsidiaries and to a lesser extent our VIEs. Our operations in China are governed by PRC laws and regulations. The PRC government has significant oversight and discretion over the conduct of our business, and it may influence our operations, which could result in a material adverse change in our operation and/or the value of our ADSs. Also, the PRC government has recently indicated an intent to exert more oversight and control over offerings that are conducted overseas and/or foreign investment in China-based issuers. Any such action could significantly limit or completely hinder our ability to offer or continue to offer securities to investors. In addition, implementation of industry-wide regulations directly targeting our operations could cause the value of our securities to significantly decline. Therefore, investors of our company and our business face potential uncertainty from actions taken by the PRC government affecting our business.

***We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business.***

We are a Cayman Islands holding company and we may rely on dividends and other distributions on equity from our PRC subsidiaries for our cash requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and for services of any debt we may incur. Our subsidiaries' ability to distribute dividends is based upon their distributable earnings. Current PRC regulations permit our PRC subsidiaries to pay dividends to their respective shareholders only out of their accumulated profits, if any, determined in accordance with PRC accounting standards and regulations. In addition, each of our PRC subsidiaries and our VIEs is required to set aside at least 10% of its after-tax profits each year, if any, to fund a statutory reserve until such reserve reaches 50% of its registered capital. Each of such entities in China is also required to further set aside a portion of its after-tax profits to fund the employee welfare fund, although the amount to be set aside, if any, is determined at the discretion of its board of directors. These reserves are not distributable as cash dividends. If our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments to us. Any limitation on the ability of our PRC subsidiaries to distribute dividends or other payments to their respective shareholders could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our businesses, pay dividends or otherwise fund and conduct our business.

Table of Contents

In response to the persistent capital outflow and RMB's depreciation against U.S. dollar in the fourth quarter of 2016, the People's Bank of China, or the PBOC, and the State Administration of Foreign Exchange, or SAFE, have implemented a series of capital control measures, including stricter vetting procedures for China-based companies to remit foreign currency for overseas acquisitions, dividend payments and shareholder loan repayments. For instance, the PBOC issued the Circular on Further Clarification of Relevant Matters Relating to Offshore RMB Loans Provided by Domestic Enterprises, or the PBOC Circular 306, on November 22, 2016, which provides that offshore RMB loans provided by a domestic enterprise to offshore enterprises that it holds equity interests in shall not exceed 30% of the domestic enterprise's ownership interest in the offshore enterprise. The PBOC Circular 306 may constrain our PRC subsidiaries' ability to provide offshore loans to us. The PRC government may continue to strengthen its capital controls and our PRC subsidiaries' dividends and other distributions may be subjected to tighter scrutiny in the future. Any limitation on the ability of our PRC subsidiaries to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business. See also "—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

Under China Enterprise Income Tax Law, or the EIT Law, and related regulations, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its foreign non-resident enterprise investors, and proceeds from any such foreign enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to a 10% withholding tax, unless the foreign enterprise investor's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax. Undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 are exempted from any withholding tax. Hong Kong, where China Index Academy Limited, the direct parent company of our PRC subsidiaries is incorporated, has a tax arrangement with China that provides for a 5% withholding tax on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends.

***PRC regulations on loans to PRC entities by offshore holding companies may affect our ability to capitalize or otherwise fund our PRC operations.***

Under PRC laws and regulations, we are permitted to fund our PRC subsidiaries by granting loans or making additional capital contributions, subject to applicable government registration and approval requirements. Any loan to our PRC subsidiaries, which are treated as foreign-invested enterprises under PRC laws, are subject to PRC regulations and foreign exchange loan registrations. According to the Interim Measures on the Management of Foreign Debts promulgated by SAFE, the Ministry of Finance and the National Development and Reform Commission, or the NDRC, on January 8, 2003, the statutory limit for the total foreign debt amount of a foreign-invested enterprise is the difference between the total investment amount as approved by MOFCOM or its local counterparts and the registered capital of such foreign-invested enterprise.

According to the Circular of the People's Bank of China on Matters relating to the Comprehensive Macro-prudential Management of Cross-border Financing issued by the People's Bank of China in January 2017, or Circular 9, the maximum amount of foreign debts that an enterprise may borrow is determined by reference to its so-called risk-weighted balance of cross-border financing, and may not exceed two times of the net assets as indicated in such enterprise's latest audited financial report. The risk-weighted balance of cross-border financing is calculated based on the enterprise's outstanding amounts of cross-border debts in RMB and foreign currency, multiplied by risk conversion factors in accordance with their respective remaining terms, categories and currencies.

According to Notice of the National Development and Reform Commission on Promoting the Administrative Reform of the Recordation and Registration System for Enterprises' Issuance of Foreign Debts issued by the NDRC in September 2015, and the Guide on Enterprises' Issuance of Foreign Debts issued by the NDRC on February 11, 2020, any loan we extend to our PRC subsidiaries or VIEs that are domestic PRC entities with a term of more than one year must be filed with the NDRC or its local counterparts and must be registered with SAFE or its local branches.

Table of Contents

On August 29, 2008, SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign Invested Enterprises, or SAFE Circular 142, regulating the conversion by a foreign-invested enterprise of foreign currency registered capital into RMB by restricting how the converted RMB may be used. SAFE Circular 142 provides that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable governmental authority and may not be used for equity investments within China. In addition, SAFE strengthened its oversight of the flow and use of the RMB capital converted from foreign currency registered capital of a foreign-invested company. The use of such RMB capital may not be altered without SAFE approval, and such RMB capital may not in any case be used to repay RMB loans if the proceeds of such loans have not been used. Violations of SAFE Circular 142 could result in severe monetary or other penalties.

On March 30, 2015, SAFE promulgated the Circular on the Reform of Administration of the Payment and Settlement of Foreign Currency Capital of Foreign Invested Enterprises, or SAFE Circular 19, which became effective on June 1, 2015. SAFE Circular 19 abolishes the SAFE Circular 142, providing that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise shall be used for purposes within its approved business scope, and allows a foreign-invested enterprise to use the RMB capital converted from its foreign currency registered capital for equity investments within China.

On June 9, 2016, SAFE promulgated Circular of the State Administration of Foreign Exchange on Reforming and Regulating Policies on the Control over Foreign Exchange Settlement of Capital Account, or SAFE Circular 16, to further expand and strengthen such reform. Pursuant to SAFE Circular 19 and SAFE Circular 16, foreign-invested enterprises in the PRC are allowed to use their foreign exchange funds under capital accounts and RMB funds from exchange settlement for expenditures under current accounts that are within its business scope or expenditures under capital accounts that are permitted by laws and regulations; except that, such funds shall not be used for (1) expenditures beyond the enterprise's business scope or expenditures prohibited by laws and regulations, (2) investments in securities or investments other than principal-secured products issued by banks, (3) granting loans to non-affiliated enterprises, except where it is expressly permitted in the business license, and (4) construction or purchase of real estate for purposes other than self-use (except for real estate enterprises). Furthermore, SAFE has strengthened its oversight of the flow and use of the capital in RMB that is converted from registered capital of a foreign-invested enterprise in foreign currency. The use of such capital in RMB may not be altered without SAFE's approval, and such capital in RMB may not in any case be used to repay loans in RMB if the proceeds of such loans have not been used. Violations of these circulars could result in severe monetary or other penalties. In addition, theses circulars may significantly limit our ability to use RMB converted from the cash provided by our offshore financing activities to fund the establishment of new PRC entities by our PRC subsidiaries, to invest in or acquire any other PRC enterprise through our PRC subsidiaries, or to establish new variable interest entities in China.

In light of the various requirements imposed by PRC regulations on loans to PRC entities by offshore holding companies, we may not be able to obtain the necessary government approvals with respect to future loans by us to our wholly-owned subsidiaries or our VIEs or with respect to future capital contributions by us to our PRC subsidiaries. If we fail to complete such registrations or obtain such approvals, our ability to capitalize or otherwise fund our PRC operations may be negatively affected, which could adversely affect our liquidity and our ability to fund and expand our business.

*Fluctuations in exchange rates could have a material adverse effect on our results of operations and the value of your investment.*

The value of the Renminbi against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in political and economic conditions in China and by China's foreign exchange policies. On July 21, 2005, the PRC government changed its decade-old policy of pegging the value of the Renminbi to the U.S. dollar, and the Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, the Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. On November 30, 2015, the Executive Board of the International Monetary Fund, or IMF, completed the regular five-year review of the basket of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, Renminbi is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the Renminbi has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. While appreciating approximately by 7% against the U.S. dollar in 2017, the Renminbi in 2018 depreciated approximately by 5% against the U.S. dollar. The Renminbi further depreciated approximately by 1% against the U.S. dollar in 2019. The Renminbi appreciated approximately by 7% against the U.S. dollar in 2020, and further appreciated approximately by 3% against the U.S. dollar in 2021. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and we cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

Significant revaluation of the Renminbi may have a material and adverse effect on your investment. For example, to the extent that we need to convert U.S. dollars we receive into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any material hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

*Increases in labor costs and enforcement of stricter labor laws and regulations in the PRC may adversely affect our business and our profitability.*

China's overall economy and the average wage in China have increased in recent years and are expected to continue to grow. The average wage level for our employees has also increased in recent years. We expect that our labor costs, including wages and employee benefits, will continue to increase. Unless we are able to pass on these increased labor costs to those who pay for our services, our profitability and results of operations may be materially and adversely affected.

In addition, we have been subject to stricter regulatory requirements in terms of entering into labor contracts with our employees and paying various statutory employee benefits, including pensions, housing fund, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to designated government agencies for the benefit of our employees. Pursuant to the PRC Labor Contract Law and its implementation rules, employers are subject to stricter requirements in terms of signing labor contracts, minimum wages, paying remuneration, determining the term of employees' probation and unilaterally terminating labor contracts. In the event that we decide to terminate some of our employees or otherwise change our employment or labor practices, the PRC Labor Contract Law and its implementation rules may limit our ability to effect those changes in a desirable or cost-effective manner, which could adversely affect our business and results of operations. In addition, certain of our employees entered into employment contracts with our affiliates other than our PRC subsidiary hiring them. We could be subject to orders by the competent labor authorities for rectification and may be required to pay two times monthly wages to these employees and indemnify these employees for the loss and damage suffered by them.

Table of Contents

In October 2010, the Standing Committee of the National People's Congress promulgated the PRC Social Insurance Law, effective July 1, 2011 and amended on December 29, 2018. On April 3, 1999, the State Council promulgated the Regulations on the Administration of Housing Funds, which was amended on March 24, 2002 and March 24, 2019. Companies registered and operating in China are required under the Social Insurance Law and the Regulations on the Administration of Housing Funds to, apply for social insurance registration and housing fund deposit registration within 30 days of their establishment and, to pay for their employees different social insurance including pension insurance, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to the extent required by law. However, certain of our PRC subsidiaries did not make adequate social insurances and housing reserve fund contributions for certain employees or have not applied for and obtained such registration, and instead of paying the social insurance payment on their own for their employees, certain of our PRC subsidiaries use third-party agencies to pay in the name of such agency.

As the interpretation and implementation of labor-related laws and regulations are still evolving, we cannot assure you that our employment practices do not and will not violate labor-related laws and regulations in China, which may subject us to labor disputes or government investigations. We cannot assure you that we have complied or will be able to comply with all labor-related law and regulations regarding including those relating to obligations to make social insurance payments and contribute to the housing provident funds. If we are deemed to have violated relevant labor laws and regulations, we could be required to provide additional compensation to our employees and our business, financial condition and results of operations will be adversely affected.

***The M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The M&A Rules, adopted by six PRC regulatory agencies in 2006 and amended in 2009, and some other regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex, including requirements in some instances that MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. Moreover, the Anti-Monopoly Law requires that MOFCOM shall be notified in advance of any concentration of undertaking if certain thresholds are triggered. In addition, the security review rules issued by MOFCOM that became effective in September 2011 specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire *de facto* control over domestic enterprises that raise "national security" concerns are subject to strict review by MOFCOM, and the rules prohibit any activities attempting to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from MOFCOM or its local counterparts may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

35

Table of Contents

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may subject our PRC resident beneficial owners or our PRC subsidiaries to liability or penalties, limit our ability to inject capital into our PRC subsidiaries, limit our PRC subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37, on July 4, 2014, which replaced the former circular commonly known as "SAFE Circular 75" promulgated by SAFE on October 21, 2005. SAFE Circular 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular 37 as a "special purpose vehicle." Pursuant to SAFE Circular 37, "control" refers to the act through which a PRC resident obtains the right to carry out business operation of, to gain proceeds from or to make decisions on a special purpose vehicle by means of, among others, shareholding entrustment arrangement. SAFE Circular 37 further requires amendment to the registration in the event of any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. In the event that a PRC shareholder holding interests in a special purpose vehicle fails to fulfill the required SAFE registration, the PRC subsidiaries of that special purpose vehicle may be prohibited from making profit distributions to the offshore parent and from carrying out subsequent cross-border foreign exchange activities, and the special purpose vehicle may be restricted in its ability to contribute additional capital into its PRC subsidiaries. Moreover, failure to comply with the various SAFE registration requirements described above could result in liability under PRC law for evasion of foreign exchange controls. According to the Notice on Further Simplifying and Improving Policies for the Foreign Exchange Administration of Direct Investment released on February 13, 2015 by SAFE, local banks will examine and handle foreign exchange registration for overseas direct investment, including the initial foreign exchange registration and amendment registration, under SAFE Circular 37 from June 1, 2015.

We are aware that Mr. Vincent Tianquan Mo, controlling shareholder of CIH and a PRC resident, has not completed the registration as of the date of this annual report. We have notified all PRC residents or entities who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents to complete the foreign exchange registrations. However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make, obtain or update any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiaries' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

***PRC regulations on overseas investment by PRC enterprises may limit our outbound investment or otherwise expose us to liabilities and penalties under PRC laws.***

Overseas direct investments by PRC enterprises are under the supervision of MOFCOM, the NDRC and SAFE, and shall be subject to relevant regulatory rules such as the Administrative Measures for the Outbound Investment of Enterprises promulgated by the NDRC on December 26, 2017, the Administrative Measures for Outbound Investment promulgated by the MOFCOM on September 6, 2014 and the Circular of the State Administration of Foreign Exchange on Further Simplifying and Improving the Direct Investment-related Foreign Exchange Administration Policies promulgated by SAFE on February 13, 2015. Where PRC enterprises make overseas direct investment, they shall file with or obtain the approval from MOFCOM and the NDRC, or their local counterparts, and complete the registration with relevant banks. In the event that the PRC enterprise fails to fulfill the procedures prescribed by the relevant authorities, such PRC enterprise may face the risks including the suspension or cessation of the implementation of the outbound projects, corrections within required time limits, warnings to the PRC enterprise and relevant responsible persons and other penalties.

As of the date of this annual report, we have obtained the required approvals in connection to the incorporation of an offshore company by one of our PRC subsidiaries, and are in compliance with the outbound direct investment requirements in the PRC. From time to time, we need to apply for or update our filings with relevant government authorities. However, we may not always be able to make applications or update our filings in compliance with the outbound direct investment requirements, nor can we ensure you that such applications or update of filings will be successful. Moreover, new laws and regulations may be promulgated in China to regulate outbound direct investments. If these new laws and regulations are promulgated, certain registration and/or cost of compliance may be required, and any failure to comply with the relevant outbound direct investment requirements or any delay in the process may prevent our PRC subsidiary from investing in such overseas entity or cause delay in our payment to such overseas entity.

***Any failure to comply with PRC regulations regarding the registration requirements for employee share incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

Pursuant to SAFE Circular 37, PRC residents who participate in share incentive plans in overseas non-publicly-listed companies may submit applications to SAFE or its local branches for the foreign exchange registration with respect to offshore special purpose companies. In the meantime, our directors, executive officers and other employees who are PRC citizens or who are non-PRC residents residing in the PRC for a continuous period of not less than one year, subject to limited exceptions, and who have been granted share-based awards by us, may follow the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, or Circular 7, promulgated by SAFE in 2012. Pursuant to the Circular 7, PRC citizens and non-PRC citizens who reside in China for a continuous period of not less than one year who participate in any stock incentive plan of an overseas publicly listed company, subject to a few exceptions, are required to register with SAFE through a domestic qualified agent, which could be the PRC subsidiaries of such overseas listed company, and complete certain other procedures. In addition, an overseas entrusted institution must be retained to handle matters in connection with the exercise or sale of stock options and the purchase or sale of shares and interests. We, our directors, our executive officers and other employees who are PRC citizens or who reside in the PRC for a continuous period of not less than one year and who have been granted share-based awards are subject these regulations.

From time to time, we need to apply for or update our registration with the SAFE or its local branches on behalf of our employees who receive options or other equity-based incentive grants under our share incentive plans or material changes in our share incentive plan. However, we may not always be able to make applications or update our registration on behalf of our employees who hold any type of share incentive awards in compliance with Circular 7, nor can we ensure you that such applications or update of registration will be successful. If we or the participants of our share incentive plans who are PRC citizens fail to comply with Circular 7, we and/or such participants of our share incentive plans may be subject to fines and legal sanctions, there may be additional restrictions on the ability of such participants to exercise their share options or remit proceeds gained from sale of their shares into the PRC, and we may be prevented from further granting share incentive awards under our share incentive plans to our employees who are PRC citizens.

The State Administration of Taxation, or SAT, has issued certain circulars concerning employee share options and restricted shares. Under these circulars, our employees working in China who exercise share options or are granted restricted shares will be subject to PRC individual income tax. Our PRC subsidiaries have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If our employees fail to pay or we fail to withhold their income taxes according to relevant laws and regulations, we may face sanctions imposed by the tax authorities or other PRC governmental authorities.

***If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.***

Under the EIT Law and its implementation rules, an enterprise established outside of the PRC with its "*de facto* management body" within the PRC is considered a "resident enterprise" and will be subject to PRC enterprise income tax on its global income at the rate of 25%. The implementation rules define the term "*de facto* management body" as the body that exercises full and substantial control and overall management over the business, productions, personnel, accounts and properties of an enterprise. In 2009, SAT issued a circular, known as SAT Circular 82, which provides certain specific criteria for determining whether the "*de facto* management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners, the criteria set forth in the circular may reflect SAT's general position on how the "*de facto* management body" text should be applied in determining the tax resident status of all offshore enterprises. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "*de facto* management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (1) the primary location of the day-to-day operational management is in the PRC; (2) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (3) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (4) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "*de facto* management body." If the PRC tax authorities determine that our company is a PRC resident enterprise for enterprise income tax purposes, we may be required to withhold a 10% withholding tax from dividends we pay to our shareholders that are non-resident enterprises, including the holders of our ADSs. In addition, non-resident enterprise shareholders (including our ADS holders) may be subject to PRC tax at a rate of 10% on gains realized on the sale or other disposition of ADSs or ordinary shares at a rate of 10%, if such income is treated as sourced from within the PRC. Furthermore, if PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, dividends paid to our non-PRC individual shareholders (including our ADS holders) and any gain realized on the transfer of ADSs or ordinary shares by such shareholders may be subject to PRC tax at a rate of 20% (which, in the case of dividends, may be withheld at source by us), if such gains are deemed to be from PRC sources. These rates may be reduced by an applicable tax treaty, but it is unclear whether non-PRC shareholders of our company would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise. Any such tax may reduce the returns on your investment in the ADSs.

***Our ADSs may be delisted under the Holding Foreign Companies Accountable Act if the U.S. Public Company Accounting Oversight Board, or the PCAOB, is unable to fully inspect or investigate our auditor which has a presence in China . The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. Additionally, the inability of the PCAOB to conduct inspections deprives our investors with the benefits of such inspections.***

The Holding Foreign Companies Accountable Act, or the HFCA Act, was enacted on December 18, 2020. The HFCA Act states if the SEC determines that we have filed audit reports issued by a registered public accounting firm that has not been subject to inspection by the PCAOB for three consecutive years beginning in 2021, the SEC shall prohibit our ADSs from being traded on a national securities exchange or in the over the counter trading market in the United States. On December 16, 2021, PCAOB issued a report to notify the SEC of its determination that the PCAOB is unable to inspect or investigate completely registered public accounting firms headquartered in mainland China and Hong Kong.

Our independent registered public accounting firm that issues the audit report included in our annual report filed with the SEC, as auditors of companies that are traded publicly in the United States and a firm registered with the U.S. Public Company Accounting Oversight Board, or the PCAOB, is required by the laws of the United States to undergo regular inspections by the PCAOB to assess its compliance with the laws of the United States and professional standards.

Table of Contents

Our financial statements for the year ended December 31, 2021 contained in the annual report on Form 20-F have been audited by MaloneBailey, LLP, an independent registered public accounting firm that is headquartered in the United States with offices in Beijing and Shenzhen. MaloneBailey, LLP is a firm registered with the PCAOB, and is required by the laws of the U.S. to undergo regular inspections by the PCAOB to assess its compliance with the laws of the U.S. and professional standards. MaloneBailey, LLP has been subject to PCAOB inspections, and is not among the PCAOB-registered public accounting firms headquartered in the PRC or Hong Kong that are subject to PCAOB's determination on December 16, 2021 of having been unable to inspect or investigate completely. However, our audit work was carried out by MaloneBailey, LLP with the collaboration of its China-based offices. According to Article 177 of the PRC Securities Law (last amended in March 2020), no overseas securities regulator is allowed to directly conduct investigation or evidence collection activities in China. Accordingly, without the consent of the competent PRC securities regulators and relevant authorities, no organization or individual may provide the documents and materials relating to securities business activities to overseas parties. Therefore, the audit working papers of our financial statements may not be fully inspected by the PCAOB without the approval of the PRC authorities. Our ADSs could still be delisted from a U.S. exchange and prohibited from being traded over-the-counter under the HFCA Act if PCAOB determines in the future that it is unable to fully inspect or investigate our auditor which has a presence in China.

On March 24, 2021, the SEC adopted interim final rules relating to the implementation of certain disclosure and documentation requirements of the HFCA Act. On December 2, 2021, the SEC adopted amendments to finalize the relevant rules. We will not be required to comply with these rules until the SEC has identified us as having a "non-inspection" year under a process to be subsequently established by the SEC. The SEC is assessing how to implement other requirements of the HFCA Act, including the listing and trading prohibition requirements described above.

On June 22, 2021, the U.S. Senate passed a bill which, if passed by the U.S. House of Representatives and signed into law, would reduce the number of consecutive non-inspection years required for triggering the prohibitions under the HFCA Act from three years to two. On February 4, 2022, the U.S. House of Representatives passed a bill which contained, among other things, an identical provision. If this provision is enacted into law and the number of consecutive non-inspection years required for triggering the prohibitions under the HFCA Act is reduced from three years to two, then our ADSs could be prohibited from trading in the United States as early as 2023.

On September 22, 2021, the PCAOB adopted a new rule related to its responsibilities under the HFCA Act, which provides a framework for the PCAOB to use when determining, as contemplated under the HFCA Act, whether it is unable to inspect or investigate completely registered public accounting firms located in a foreign jurisdiction because of a position taken by one or more authorities in that jurisdiction. The new rule was approved by the SEC on November 5, 2021 and became effective on the same day.

The implications of this possible regulation in addition to the requirements of the HFCA Act are uncertain. Such uncertainty could cause the market price of our ADSs to be materially and adversely affected, and our securities could be delisted or prohibited from being traded "over-the-counter" earlier than would be required by the HFCA Act. If our securities are unable to be listed on a securities exchange outside the jurisdiction of the United States by then, such a delisting would substantially impair your ability to sell or purchase our ADSs when you wish to do so, and the risk and uncertainty associated with a potential delisting would have a negative impact on the price of our ADSs.

The PCAOB's inability to conduct inspections in China prevents it from fully evaluating the audits and quality control procedures of our independent registered public accounting firm. As a result, we and investors in our ADSs are deprived of the benefits of such PCAOB inspections. The inability of the PCAOB to conduct inspections of auditors with presence in China makes it more difficult to evaluate the effectiveness of our independent registered public accounting firm's audit procedures or quality control procedures as compared to auditors outside of China that are subject to the PCAOB inspections, which could cause investors and potential investors in our ADSs to lose confidence in our audit procedures and reported financial information and the quality of our financial statements.

***Proceedings instituted by the SEC against certain China-based accounting firms could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.***

In January 2014, Judge Cameron Elliot, a SEC administrative law judge, issued an initial decision suspending the Chinese member firms of the "Big Four" accounting firms, including our former independent registered public accounting firm, from, among other things, practicing before the SEC for six months. In February 2014, the initial decision was appealed. While under appeal and in February 2015, the Chinese member firms of "Big Four" accounting firms reached a settlement with the SEC. As part of the settlement, each of the Chinese member firms of "Big Four" accounting firms agreed to settlement terms that include a censure; undertakings to make a payment to the SEC; procedures and undertakings as to future requests for documents by the SEC; and possible additional proceedings and remedies should those undertakings not be adhered to. Our former independent registered public accounting firm that issued audit report, which is included in this annual report, is one of the accounting firms named in the SEC's proceedings, and we may be adversely affected by the outcome of the proceedings. In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about the proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If our former independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC, our financial statements could be determined to not be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of our ADSs from the NASDAQ or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States, result in a sharp decline of our market capitalization and materially and adversely affect the value of your investment in our ADSs.

***You may experience difficulties in effecting service of legal process, enforcing foreign judgments or bringing original actions in China based on United States or other foreign laws against us or our management.***

We are an exempted company with limited liability registered by way of continuation under the laws of the Cayman Islands. We conduct our operations in China and substantially all of our assets are located in China. In addition, certain of our directors and executive officers reside in China, and most of the assets of these persons are located within China. As a result, it may not be possible to effect service of process within the United States or elsewhere outside China upon these directors and executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws. Our PRC legal counsel has advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedure Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedure Law based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. Currently, there are no treaties between the United States and China for the recognition or enforcement of U.S. court judgments in China. As a result, recognition and enforcement in China of judgments of a court in the United States or any other jurisdiction in relation to any matter not subject to a binding arbitration agreement may be difficult. Pursuant to the PRC Civil Procedure Law, any matter, including matters arising under U.S. federal securities laws, in relation to assets or personal relationships may be brought as an original action in China, only if the institution of such action satisfies the conditions specified in the PRC Civil Procedure Law. As a result of the conditions set forth in the PRC Civil Procedure Law and the discretion of the PRC courts to determine whether the conditions are satisfied and whether to accept the action for adjudication, there remains uncertainty as to whether an investor will be able to bring an original action in a PRC court based on U.S. federal securities laws. In addition, in the event that foreign judgments contravene the basic principles of laws of China, endanger PRC state sovereignty or security, or are in conflict with the public interest of China, PRC courts will not recognize and enforce such foreign judgments.

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are registered under Cayman Islands law and conduct our operations primarily in China.***

We are an exempted company with limited liability registered by way of continuation under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Act (As Revised) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands have a less developed body of securities laws than the United States. Some states in the United States, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records (other than our memorandum and articles of association, our register of mortgages and charges and special resolutions of our shareholders) or to obtain copies of lists of shareholders of these companies. Our directors have discretion to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder resolution or to solicit proxies from other shareholders in connection with a proxy contest.

Certain corporate governance practices in the Cayman Islands, which is our home country, differ significantly from requirements for companies incorporated in other jurisdictions such as the United States. If we choose to follow home country practice in the future, our shareholders may be afforded less protection than they otherwise would under rules and regulations applicable to U.S. domestic issuers.

In addition, we conduct substantially all of our business operations in China, and substantially all of our directors and senior management are based in China. The SEC, U.S. Department of Justice and other authorities often have substantial difficulties in bringing and enforcing actions against non-U.S. companies and non-U.S. persons, including company directors and officers, in certain emerging markets, including China. Additionally, our public shareholders may have limited rights and few practical remedies in emerging markets where we operate, as shareholder claims that are common in the United States, including class action securities law and fraud claims, generally are difficult or impossible to pursue as a matter of law or practicality in many emerging markets, including China.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

**Risks Relating to the Separation from Fang and Our Relationship with Fang**

***We have a limited operating history as an independent company upon which you can evaluate us.***

We were separated from Fang as an independent company in June 2019. Our limited operating history as a stand-alone entity makes it difficult to accurately assess our business and future prospects. Our ability to satisfy our obligations and achieve profitability will be primarily dependent upon the future performance of our business, and we are not able to rely upon the revenues, capital resources and cash flows of Fang. In addition, we historically cooperated with Fang to operate our commercial property-related business. See "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Separation and Distribution Related Agreements—Business Cooperation Agreement."

***Fang and we may fail to perform under certain transaction agreements that are executed as part of the separation and distribution, and we may not have necessary systems and services in place when these transaction agreements expire.***

In connection with the separation and distribution, Fang and we have entered into several agreements, including separation and distribution agreement and related ancillary agreements. The separation and distribution agreement and related ancillary agreements determine, among other things, the allocation of business, assets and liabilities between us and Fang following the separation and distribution for those respective areas and include any necessary indemnifications related to liabilities and operations. See "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Separation and Distribution Related Agreements" for details of the agreements between Fang and us in connection with the separation and distribution. If Fang is unable to satisfy its obligations under these agreements, we could incur operational difficulties or losses that could have a material and adverse effect on our business, financial condition and results of operations.

***Potential indemnification liabilities owing to Fang pursuant to the separation and distribution agreement could materially and adversely affect our business, financial condition and results of operations.***

The separation and distribution agreement provides for, among other things, indemnification obligations generally designed to make us financially responsible for, among others, certain liabilities associated with our business, certain guarantee, indemnification and tax liabilities, as well as any breach by us of the separation and distribution agreement and related ancillary agreements as well as any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, with respect to all information contained in any disclosure document that describes the separation or the distribution or us and our subsidiaries or primarily relates to the transactions contemplated by the separation and distribution agreement, subject to certain exceptions. If we are required to indemnify Fang under the circumstances set forth in the separation and distribution agreement, we may be subject to substantial liabilities. See "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Separation and Distribution Related Agreements— Separation and Distribution Agreement—Claims and indemnification."

***In connection with the separation and distribution, Fang will indemnify us for certain liabilities. However, we cannot assure you that the indemnity will be sufficient to insure us against the full amount of such liabilities, or that Fang's ability to satisfy its indemnification obligation will not be impaired in the future.***

Pursuant to the separation and distribution agreement and related ancillary agreements, Fang will indemnify us for certain liabilities as discussed further in "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions— Separation and Distribution Related Agreements—Separation and Distribution Agreement—Claims and indemnification." However, third parties could also seek to hold us responsible for any of the liabilities that Fang has agreed to retain, and we cannot assure you that the indemnity from Fang will be sufficient to protect us against the full amount of such liabilities, or that Fang will be able to fully satisfy its indemnification obligations. In addition, Fang's insurers may attempt to deny us coverage for liabilities associated with certain occurrences of indemnified liabilities prior to the separation and distribution. Moreover, even if we ultimately succeed in recovering from Fang or such insurance providers any amounts for which we are held liable, we may be temporarily required to bear these losses. Each of these risks could negatively affect our business, financial position, results of operations and cash flows.

***Fang's creditors may seek to hold us liable for certain of its obligations.***

We may continue to be liable for certain obligations of Fang that exist at the time of the separation and distribution, but only to the extent that Fang fails to satisfy such liabilities. For example, in connection with our separation from Fang, we issued a warrant to each of the holders of certain convertible notes issued by Fang, and provided a guarantee for the benefit of such holders, under which we would be liable to the payment obligations under the convertible notes. On November 13, 2020, a winding-up petition was presented to the Grand Court of the Cayman Islands against Fang by certain shareholders of Fang. As a result of the winding-up petition and pursuant to the terms of the convertible notes, the outstanding principal of, and accrued and unpaid interest on the convertible notes, which were originally due in 2022, became due and payable on December 13, 2020. We were liable for the payment obligations under the convertible notes pursuant to the guarantee we provided to the convertible notes holders in connection with our separation from Fang. In 2021, we entered into settlement deeds with Fang and the convertible notes holders. Pursuant to the settlement deeds, Fang and we each agreed to repay 50% of the outstanding principal and unpaid interest by installment in 2021 to the convertible notes holders. The convertible notes were fully repaid in November 2021. For details of the convertible notes and settlement deeds, see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources."

In addition, in the event that Fang fails to satisfy obligations to its creditors existing at the time of the separation and distribution, it is possible that those creditors may seek to recover from us, claiming that we remain liable to satisfy such obligations. While we believe we would prevail against any such claim, litigation is inherently costly and uncertain and could have an adverse effect on our financial position.

***We may be subject to liabilities under contracts entered into by Fang as a result of the separation and distribution.***

Fang has entered into various business, financing and other contracts in the ordinary course of business. Some of the contracts require Fang to notify or seek prior consent from the counterparties in connection with material changes to Fang's business operations or corporate structure. Fang has notified us that they believe that they have carried out their contractual obligations and are not otherwise in material default or violation of those contracts. If any contractual counterparties find Fang in default or violation due to failure to notify them or seek their prior consent in connection with the separation and distribution or otherwise, they may terminate their business relationship with Fang or us, declare any repayment obligations immediately due and/or pursue legal actions against Fang or us, which may materially and adversely affect our business operations, financial condition and results of operations.

***A court could require that we assume responsibility for obligations allocated to Fang under the separation and distribution agreement.***

Under the separation and distribution agreement and related ancillary agreements, each of Fang and our company is generally responsible for the debts, liabilities and other obligations related to the business or businesses which we own and operate. Although we do not expect to be liable for any obligations that are not allocated to us under the separation and distribution agreement, a court could disregard the allocation agreed to between the parties, and require that we assume responsibility for obligations allocated to Fang (for example, tax liabilities), particularly if Fang were to refuse or were unable to pay or perform the allocated obligations.

***Certain of our directors and executive officers may have actual or potential conflicts of interest because of their previous or continuing positions at Fang.***

Effective from February 28, 2022, our former chairman, Mr. Vincent Tianquan Mo, has stepped down from the board. Mr. Richard Jiangong Dai assumed the position of our director and chairman of the board effective from February 28, 2022. Our chairman, Mr. Richard Jiangong Dai, is also the chairman of Fang. This relationship could create, or appear to create, conflicts of interest when Mr. Richard Jiangong Dai is faced with decisions with potentially different implications for Fang and us, especially with regarding to our business cooperation with Fang. Directors of our company are required by law to act honestly and in what they consider in good faith to be in our best interests and to disclose any interest that they may have in any of our projects or opportunities. In addition, we have adopted a code of ethics and an audit committee charter. The code of ethics provides that an interested director needs to refrain from participating in any discussion among senior officers of our company relating to an interested business and may not be involved in any proposed transaction with such interested business. Furthermore, the audit committee charter provides that most related party transactions must be pre-approved by the audit committee, which consists entirely of independent directors. Our audit committee charter, however, exempts the pre-approval requirement for related party transactions that are immaterial to us or not unusual by nature. In the event of such transactions with Fang, Mr. Dai will still be entitled to vote in our board meeting, and we cannot assure you that Mr. Dai's decision will not be impacted by any potential conflict of interest arising from his relationship with Fang.

Because of their current or former positions with Fang, certain of our directors and executive officers own Fang ordinary shares or hold Fang's equity awards. Even though our board of directors currently consists of a majority of directors who are independent, and our executive officers had ceased to be employees of Fang, some of our directors and executive officers will continue to have a financial interest in Fang's ordinary shares or equity awards.

43

**Risks Relating to the ADSs**

*The trading price of the ADSs may be volatile, which could result in substantial losses to you.*

The trading price of the ADSs are likely to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, like the performance and fluctuation in the market prices or the underperformance or deteriorating financial results of other listed companies based in China. The securities of some of these companies have experienced significant volatility since their listing, including, in some cases, substantial price declines in the trading prices of their securities. The trading performances of other Chinese companies' securities after their listing may affect the attitudes of investors toward Chinese companies listed in the United States, which consequently may impact the trading performance of the ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or matters of other Chinese companies may also negatively affect the attitudes of investors towards Chinese companies in general, including us, regardless of whether we have conducted any inappropriate activities. Furthermore, securities markets may from time to time experience significant price and volume fluctuations that are not related to our operating performance, such as the large decline in share prices in the United States, China and other jurisdictions in late 2008, early 2009, the second half of 2011, 2015 and in early 2020, which may have a material and adverse effect on the trading price of our ADSs. In addition to the above factors, the price and trading volume of the ADSs may be highly volatile due to multiple factors, including the following:

- regulatory developments affecting us or our industry;

- announcements of studies and reports relating to the quality of our credit offerings or those of our competitors;

- changes in the economic performance or market valuations of other similar companies or real estate related companies;

- actual or anticipated fluctuations in our results of operations and changes or revisions of our expected results;

- changes in financial estimates by securities research analysts;

- publication of research reports about us or our industry, or the failure of securities analysts to cover our ADSs after the separation;

- announcements by us or our competitors of new product and service offerings, acquisitions, strategic relationships, joint ventures, capital raising or capital commitment;

- additions to or departures of our senior management or key employees;

- fluctuations of exchange rates between the Renminbi and the U.S. dollar;

- adverse market reaction to any indebtedness we may incur or securities we may issue in the future;

- actions by shareholders;

- changes or proposed changes in laws, regulations or polices, or differing interpretations thereof, affecting our business or industry or real estate related business and industries, or enforcement of these laws, regulations and policies, or announcements relating to these matters;

- adverse publicity about our industry or real estate related industries generally, or particularly scandals relating to the industry, specifically;

- litigation and governmental investigations;

- general market and economic conditions;

44

Table of Contents

- release or expiry of lock-up or other transfer restrictions on our outstanding shares or ADSs; and

- sales or perceived potential sales of additional ordinary shares or ADSs.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade. This volatility could prevent a shareholder seeking to sell the ADSs from being able to sell the ADSs at or above the price at which the ADSs were purchased.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***Because we do not currently expect to pay cash dividends in the foreseeable future, you may not receive any return on your investment unless you sell your ADSs.***

We do not have any present plan to pay any dividends on our ordinary shares or ADSs in the foreseeable future. See "Item 8. Financial Information—A. Combined and Consolidated Statements and Other Financial Information— Dividend Policy." Therefore, you should not rely on owning our ordinary shares or ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends. Our shareholders may declare dividends, but the amount of such dividends may not exceed the amount recommended by our board of directors. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your ownership of our ordinary shares or ADSs will likely depend entirely upon any future price appreciation of the ADSs or ordinary shares. There is no guarantee that the ADSs or ordinary shares will appreciate in value or even maintain the price at which you being distributed our ordinary shares or ADSs.

***Your percentage of ownership in our company may be diluted in the future. Substantial future sales or perceived potential sales of the ADSs in the public market could cause the price of the ADSs to decline.***

Sales of the ADSs in the public market, or the perception that these sales could occur, could cause the market price of the ADSs to decline significantly. All of our outstanding ADSs are freely transferable by persons other than our "affiliates" without restriction or additional registration under the Securities Act. If any existing shareholder or shareholders sell a substantial amount of ADSs, the prevailing market price for our ADSs could be adversely affected. Such sales also might make it more difficult for us to sell in the future at a time and price that we deem appropriate.

In the future, your percentage ownership in our company may be diluted because of equity awards that we will be granting to our directors, officers and employees or otherwise as a result of equity issuance for acquisitions or capital market transactions. Such awards will have a dilutive effect on our earnings per share, which could adversely affect the market price of the ADSs. These sales, or the possibility that these sales may occur, also may make it more difficult for us to raise additional capital by selling equity securities in the future, at a time and price that we deem appropriate.

45

In addition, our memorandum and articles of association authorize us to issue, without the approval of the our shareholders, one or more classes or series of preferred shares that have such designation, powers, preferences and relative, participating, optional and other special rights, including preferences over our ordinary shares respecting dividends and distributions, as our board of directors generally may determine. The terms of one or more classes or series of preferred shares could dilute the voting power or reduce the value of our ordinary shares. For example, in connection with the separation and distribution, we have issued a warrant to each of the holders of the convertible notes issued by Fang, which entitles them to purchase for nominal consideration such number of our Class A ordinary shares as calculated based on the number of Fang Class A ordinary shares upon the assumed conversion of the convertible notes immediately prior to or on the record date, being May 28, 2019, the day immediately prior to the distribution, if and only if such holders subsequently decide to convert the convertible notes. We cannot predict the timing or size of any future issuance of our shares or the effect, if any, that future issuance and sales of our shares may have on the market price of our shares. Sales or distributions of substantial amounts of our shares, or the perception that such sales could occur, may cause the market price of our shares to decline.

***We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempted from certain provisions applicable to U.S. domestic public companies.***

Because we are a foreign private issuer under the Exchange Act, we are exempted from certain provisions of the securities rules and regulations in the United States that are applicable to United States domestic issuers, including: (1) the rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q or current reports on Form 8-K; (2) the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act; (3) the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and (4) the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

We are required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis as press releases, distributed pursuant to the rules and regulations of the NASDAQ. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by United States domestic issuers. As a result, you may not be afforded the same protections or information that would be made available to you were you investing in a U.S. domestic issuer.

***We are an emerging growth company and may take advantage of certain reduced reporting requirements.***

We are an "emerging growth company," as defined in the JOBS Act, and we may take advantage of certain exemptions from various requirements applicable to other public companies that are not emerging growth companies including, most significantly, not being required to comply with the auditor attestation requirements of Section 404 of Sarbanes-Oxley Act of 2002 for so long as we are an emerging growth company. As a result, if we elect not to comply with such auditor attestation requirements, our investors may not have access to certain information they may deem important.

The JOBS Act also provides that an emerging growth company does not need to comply with any new or revised financial accounting standards until such date that a private company is otherwise required to comply with such new or revised accounting standards. As a result, while we are an emerging growth company, we will not be subject to new or revised accounting standards at the same time that they become applicable to other public companies that are not emerging growth companies.

***We are a "controlled company" under the rules of the NASDAQ and, as a result, qualify for exemptions from certain corporate governance requirements that provide protection to shareholders of other companies.***

Mr. Vincent Tianquan Mo controls approximately 62.2% of the voting rights of our company as of March 31, 2022. As a result, we qualify as a "controlled company" within the meaning of applicable corporate governance standards. Under the NASDAQ Stock Market Rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance requirements, including the requirement that we have a majority of independent directors on our board of directors. We have elected to rely on such exemptions under the NASDAQ Stock Market Rules available to controlled companies. Accordingly, you may not have the same protections afforded to shareholders of companies that are subject to all of the applicable corporate governance requirements.

***As a company registered in the Cayman Islands, we are permitted to adopt certain home country practices in relation to corporate governance matters that differ significantly from the NASDAQ corporate governance requirements; these practices may afford less protection to shareholders than they would enjoy if we complied fully with the NASDAQ corporate governance requirements.***

As a Cayman Islands exempted company listed on the NASDAQ, we are subject to the NASDAQ corporate governance requirements. The NASDAQ market rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NASDAQ corporate governance requirements.

For instance, we are not required to: (1) have a majority of the board be independent; (2) have a compensation committee or a nominating and corporate governance committee consisting entirely of independent directors; (3) have regularly scheduled executive sessions with only independent directors each year; or (4) hold annual meeting of shareholders within one year after the end of a fiscal year.

We have elected to follow home country practice with respect to some of the NASDAQ corporate governance requirements. See "Item 16G. Corporate governance." As a result, you may not be provided with the benefits of certain corporate governance requirements of the NASDAQ.

***Concentration of voting power in Mr. Vincent Tianquan Mo, our ultimate controlling shareholder, may prevent new investors from influencing significant corporate decisions. The interests of Mr. Vincent Tianquan Mo may differ from the interests of our other shareholders.***

As of March 31, 2022, Mr. Vincent Tianquan Mo, our ultimate controlling shareholder, ultimately controls approximately 62.2% of our voting power. As a result, Mr. Vincent Tianquan Mo has a controlling influence in matters submitted to a vote of our shareholders, including matters such as adoption of the annual financial statements, declarations of annual dividends, the election and removal of the members of our Board, capital increases and amendments to our articles of association. This control could also have the effect of delaying or preventing a change of control of our company or changes in management and will make the approval of certain transactions difficult or impossible without the support of Mr. Vincent Tianquan Mo. The interests of Mr. Vincent Tianquan Mo may also in certain cases differ from those of other shareholders.

***Holders of ADSs may have fewer rights than holders of our Class A ordinary shares and must act through the depositary to exercise those rights.***

Holders of ADSs do not have the same rights of our shareholders and may only exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement. Under our articles of association, the minimum notice period required to convene a general meeting is seven days. When a general meeting is convened, holders of ADSs may not receive sufficient notice of a shareholders' meeting to permit the holders to withdraw their Class A ordinary shares to allow them to cast their vote with respect to any specific matter. In addition, the depositary and its agents may not be able to send voting instructions to the holders of ADSs or carry out their voting instructions in a timely manner. We will make all reasonable efforts to cause the depositary to extend voting rights to the holders of ADSs in a timely manner, but there can be no assurance that they will receive the voting materials in time to ensure that they can instruct the depositary to vote their ADSs. Furthermore, the depositary and its agents will not be responsible for any failure to carry out any instructions to vote, for the manner in which any vote is cast or for the effect of any such vote. As a result, holders of ADSs may not be able to exercise their right to vote and may lack recourse if their ADSs are not voted as they requested. In addition, in their capacity as an ADS holder, they will not be able to call a shareholders' meeting.

47

***Rights to pursue claims against the depositary as a holder of ADSs are limited by the terms of the deposit agreement and the deposit agreement may be amended or terminated without consent of the holders of ADSs.***

Under the deposit agreement, any action or proceeding against or involving the depositary, arising out of or based upon the deposit agreement or the transactions contemplated thereby or by virtue of owning the ADSs may only be instituted in a state or federal court in New York, New York, and holders of the ADSs will have irrevocably waived any objection which they may have to the laying of venue of any such proceeding, and irrevocably submitted to the exclusive jurisdiction of such courts in any such action or proceeding. Notwithstanding the foregoing, the depositary may, in its sole discretion, elect to institute any action, controversy, claim or dispute directly or indirectly based on, arising out of or relating to the deposit agreement or the ADRs or the transactions contemplated thereby in any competent court in the Cayman Islands, Hong Kong, China and/or the United States, or, by having such disputes referred to and finally resolved by an arbitration either in New York, New York or in Hong Kong, subject to certain exceptions solely related to the aspects of such claims that are related to U.S. federal securities law, in which case the resolution of such aspects may, at the option of such registered holder of the ADSs, remain in state or federal court in New York, New York. Also, we may amend or terminate the deposit agreement without consent of the holders of ADSs. If holders of ADSs continue to hold their ADSs after an amendment to the deposit agreement, they agree to be bound by the deposit agreement as amended.

***Rights of holders of ADSs to participate in any future rights offerings may be limited, which may cause dilution to your holdings.***

We may from time to time distribute rights to our shareholders, including rights to acquire our securities. However, we cannot make rights available to holders of ADSs in the United States unless we register both the rights and the securities to which the rights relate under the Securities Act or an exemption from the registration requirements is available. Under the deposit agreement, the depositary will not make rights available to holders of ADSs unless both the rights and the underlying securities to be distributed to ADS holders are either registered under the Securities Act or exempt from registration under the Securities Act. We are under no obligation to file a registration statement with respect to any such rights or securities or to endeavor to cause such a registration statement to be declared effective and we may not be able to establish a necessary exemption from registration under the Securities Act. Accordingly, holders of ADSs may be unable to participate in our rights offerings in the future and may experience dilution in their holdings.

***Holders of ADSs may not receive cash dividends if the depositary decides it is impractical to make them available to them.***

The depositary will pay cash dividends on the ADSs only to the extent that we decide to distribute dividends on our Class A ordinary shares or other deposited securities, and we do not have any present plan to pay any cash dividends in the foreseeable future. See "Item 8. Financial Information—A. Combined and Consolidated Statements and Other Financial Information— Dividend Policy." To the extent that there is a distribution, the depositary of our ADSs has agreed to pay to holders of ADSs the cash dividends or other distributions it or the custodian receives on our Class A ordinary shares or other deposited securities after deducting its fees and expenses. Holders of ADSs will receive these distributions in proportion to the number of Class A ordinary shares their ADSs represent. However, the depositary may, at its discretion, decide that it is inequitable or impractical to make a distribution available to any holders of ADSs. For example, the depositary may determine that it is not practicable to distribute certain property through the mail, or that the value of certain distributions may be less than the cost of mailing them. In these cases, the depositary may decide not to distribute such property to holders of ADSs.

***Holders of ADSs may be subject to limitations on transfer of their ADSs.***

The ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

Table of Contents

***Our memorandum and articles of association contain anti-takeover provisions that could discourage a third party from acquiring us, which could limit our shareholders' opportunity to sell their shares, including Class A ordinary shares represented by our ADSs, at a premium.***

Our memorandum and articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. For example, our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our Class A ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our Class A ordinary shares and ADSs may be materially and adversely affected.

***ADSs holders may not be entitled to a jury trial with respect to claims arising under the deposit agreement, which could result in less favorable outcomes to the plaintiff(s) in any such action.***

The deposit agreement governing the ADSs representing our ordinary shares provides that, to the fullest extent permitted by applicable law, ADSs holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our shares, the ADSs or the deposit agreement, including any claim under the U.S. federal securities laws.

If we or the depositary opposed a jury trial demand based on the waiver, the court would determine whether the waiver was enforceable based on the facts and circumstances of that case in accordance with the applicable state and federal law. The enforceability of a contractual pre-dispute jury trial waiver in connection with claims arising under the federal securities laws has not been finally adjudicated by the United States Supreme Court. However, we believe that a contractual pre-dispute jury trial waiver provision is generally enforceable, including under the laws of the State of New York, which govern the deposit agreement, by a federal or state court in the City of New York, which has exclusive jurisdiction over matters arising under the deposit agreement. In determining whether to enforce a contractual pre-dispute jury trial waiver provision, courts will generally consider whether a party knowingly, intelligently and voluntarily waived the right to a jury trial. We believe that this is the case with respect to the deposit agreement and the ADSs. It is advisable that you consult legal counsel regarding the jury waiver provision before entering into the deposit agreement.

Nevertheless, if this jury trial waiver provision is not permitted by applicable law, an action could proceed under the terms of the deposit agreement with a jury trial. No condition, stipulation or provision of the deposit agreement or ADSs serves as a waiver by any holder or beneficial owner of ADSs or by us or the depositary of compliance with any substantive provision of the U.S. federal securities laws and the rules and regulations promulgated thereunder.

***Certain judgments obtained against us by our shareholders may not be enforceable.***

We are an exempted company registered by way of continuation under the laws of the Cayman Islands. All of our assets are located outside the United States. In addition, most of our directors and executive officers and the experts named in this annual report reside outside the United States. As a result, it may be difficult or impossible for you to bring an action against us or against them in the United States, in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands, China or other relevant jurisdiction may render you unable to enforce a judgment against our assets or the assets of our directors and officers and/or their assets.

49

***Our dual-class voting structure will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares (with a third class of undesignated shares). Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. Due to the disparate voting powers attached to these two classes of ordinary shares, as of March 31, 2022, Mr. Vincent Tianquan Mo beneficially owned approximately 27.2% of our total ordinary shares and approximately 62.2% of the voting power of our outstanding shares. Therefore, Mr. Vincent Tianquan Mo has decisive influence over matters requiring shareholders' approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control will limit your ability to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A ordinary shares and ADSs may view as beneficial.

***We may be classified as a passive foreign investment company for United States federal income tax purposes, which could result in adverse United States federal income tax consequences to United States investors in the ADSs or ordinary shares.***

We will be classified as a "passive foreign investment company," or PFIC, if, in the case of any particular taxable year, either (1) 75.0% or more of our gross income for such year consists of certain types of passive income, or (2) 50.0% or more of the average quarterly value of our assets during such year produce or are held for the production of passive income. Although the law in this regard is unclear, we treat our VIEs as being owned by us for United States federal income tax purposes, not only because we exercise effective control over the operation of our VIEs but also because we are entitled to substantially all of its economic benefits, and, as a result, we consolidate its results of operation in our financial statements. Assuming that we are the owner of our VIEs for United States federal income tax purposes and further assuming that we can rely on certain proposed U.S. Treasury regulations described in "Item 10. Additional Information—E. Taxation—U.S. Federal Income Taxation—Status as a PFIC," and based upon our current income and assets, we do not believe that we were classified as a PFIC for the taxable year ended December 31, 2021, and at this time we are unable to determine whether we will be classified as a PFIC for the taxable year ending December 31, 2022 or any future taxable year.

The determination of whether we are or will be a PFIC may also depend, in part, on the quarterly market value of our ADSs, which is subject to change, and on how, and how quickly, we use our liquid assets. Under circumstances where the market value of our ADSs declines significantly or we retain significant amounts of liquid assets, or if our affiliated entities were not treated as owned by us for United States federal income tax purposes or we were unable to rely on the proposed U.S. Treasury regulations referenced above, our risk of being classified as a PFIC may substantially increase. The application of the proposed U.S. Treasury regulations is not entirely clear at this time. Accordingly, whether the assumption that we can rely on the proposed U.S Treasury regulations holds is uncertain. Because there are uncertainties in the application of the relevant rules and PFIC status is a factual determination made annually after the close of each taxable year, we cannot assure you that we will not be a PFIC for the taxable year ending December 31, 2022 or any future taxable year.

If we are a PFIC for any taxable year during a U.S. Holder's holding period for our ordinary shares or ADSs, such status could result in adverse U.S. federal income tax consequences to such U.S. Holder. For example, if we are or become a PFIC, a U.S. Holder may become subject to increased tax liabilities under U.S. federal income tax laws and regulations, as noted above, and will become subject to burdensome reporting requirements. See "Item 10. Additional Information—E. Taxation—U.S. Federal Income Taxation." There can be no assurance that we will not be a PFIC for our current or any future taxable year.

### ITEM 4. INFORMATION ON THE COMPANY

*A. History and Development of the Company*

We were incorporated on August 10, 2007 as Selovo Investments Limited under the laws of British Virgin Islands as a wholly-owned subsidiary of Fang. On July 26, 2018, we re-domiciled to the Cayman Islands and registered by way of continuation as an exempted company with limited liability registered under the laws of the Cayman Islands and changed our name to China Index Holdings Limited.

Table of Contents

We conduct our business primarily through our subsidiaries and to a lesser extent our VIEs in China. In June 2018, we, through Beijing Zhong Zhi Shi Zheng, or WFOE, entered into contractual arrangements with Beijing Zhong Zhi Hong Yuan, and shareholders of Beijing Zhong Zhi Hong Yuan. Pursuant to these arrangements, our company, through WFOE, has effective control of Beijing Zhong Zhi Hong Yuan and its listing service business.

On May 24, 2019, we entered into a separation and distribution agreement and related ancillary agreements to separate our business and relevant assets and liabilities from Fang, in order to focus on the development of our business, comprising (1) certain information and analytics services, initially operated as part of Fang's value-added services, and (2) certain marketplace services, initially operated as part of Fang's listing services. See "Item 7. Major Shareholders and Related Party Transactions—Related Party Transactions—Separation and Distribution Related Agreements." The separation was completed on June 11, 2019 via a dividend distribution of all our ordinary shares owned by Fang to Fang's equity holders. Following the separation, Fang has retained its business operating a real estate Internet portal focusing primarily on serving the residential property sector, while we strategically focus on serving the commercial property sector in China, allowing each company to more effectively pursue its own distinct operating priorities and strategies.

Our ADSs have been listed for trading on the NASDAQ Global Select Market under the symbol "CIH" since June 11, 2019.

Our principal executive offices are located at Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, People's Republic of China. Our telephone number at this address is +8610 5631 9106. Our registered office in the Cayman Islands is located at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

Our website is *www.chinaindexholdings.com*. The information contained on our website is not a part of, and will not be incorporated by reference into, this annual report. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC.

See "Item 4. Information on the Company-C. Organizational Structure-Our Contractual Arrangements," "Item 5. Operating and Financial Review and Prospects-B. Liquidity and Capital Resources-Capital Expenditures," and "Item 7. Major Shareholders and Related Party Transactions-B. Related Party Transactions-Other Transactions with Companies Controlled by or Affiliated with Mr. Vincent Tianquan Mo," for a detailed discussion of our capital expenditures and divestitures.

***B. Business Overview***

We empower China's commercial property market with big data and innovative technologies. We operate a leading real estate information and analytics service platform in China in terms of geographical coverage and volume of data points as of December 31, 2021. Our services span across data services, analytics services, promotion services and listing services for China's real estate markets. We ceased to provide listing services from January 2021. See "Item 4. Information on the Company-B. Business Overview-Our Services-Marketplace Services-China Index Listing." We serve a substantial base of real estate participants in China, including industry professionals and business communities, with a reliable, comprehensive and seasonable collection of real estate data, complemented by a variety of powerful analytical and marketing tools. We currently focus more on the enormous market opportunity within China's commercial property sector through our commercial property online marketing portals and mobile applications.

Over a span of over 20 years, we have developed a leading proprietary real estate information and analytics service platform in China based on our China Real Estate Index System, or CREIS, a comprehensive set of benchmarks and data points widely adopted by industry participants to track, understand and analyze the real estate industry in China. Our service platform consists of various integrated data-driven information and analytics service modules that are subscription-based online solutions similar to SaaS. As of December 31, 2021, the China Index Database encompassed detailed real estate information of over 2,300 cities, 2,300,000 plots of land, 420,000 residential property projects and 58,000 commercial property projects in China, which renders it among the top real estate-related databases in China in terms of geographical coverage and volume of data points. Our service platform delivers significant value to our clients due to the richness of associated analytic functionalities, including fair market value appraisals, property and district ratings, interactive analytics and reporting tools, property price indices and investment decision-making analyses. As one of the most recognized information, analytics and marketing service platform brands among real estate participants in China, we were selected by China's National Bureau of Statistics as a key data source for real estate industry from 2014 to 2017.

Leveraging our comprehensive information access and robust data analytics capabilities as well as our leadership in the market, we also offer promotion services to China's real estate participants. We disseminate influential industry reports on select key topics and help our clients promote their brand names and development projects through an integrated suite of customized, omni-channel solutions consisting of promotion campaigns across various online channels and themed events.

As commercial property-related business requires a sophisticated level of expertise and industry experience, we believe that we are in a unique position to operate online marketing portals for China's commercial property market and empower it with big data and innovative technologies. We are also exploring other commercial property-related services to capture the enormous market opportunity arising from the rapid development of China's commercial property sector.

**Our Services**

We offer a comprehensive suite of services to real estate participants in China through our proprietary data-driven platform and a combination of various online channels and themed events. The following diagram illustrates our principal service offerings.



*Note:*

(1)  We discontinued our listing services business from January 2021. See "Item 4. Information on the Company-B. Business Overview-Our Services-Marketplace Services-China Index Listing."

*Information and Analytics Services*

We offer a wide spectrum of information and analytics services primarily through our proprietary platform, based on our CREIS, a comprehensive set of benchmarks and databases widely adopted by industry participants to track, understand and analyze the real estate industry in China. It covers a vast inventory of residential and commercial properties and land plots data across China.

Table of Contents

*China Index Database*

The core value of CREIS lies with the underlying proprietary database we operate. The China Index Database is a leading real estate data platform in China with profound data collection history in China, delivering real estate information and research reports regarding properties, land plots as well as real estate industrial regulations and policies in China. We employ various advanced technologies to power our database, including geographic information system, artificial intelligence-based search, data mining and cloud computing. The China Index Database is held in high esteem by industry participants in China, such as real estate developers and financial institutions. The following table sets forth the information of the China Index Database's coverage and comprehensiveness as of the dates indicated.

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | 2019 | 2020 | 2021 |
| ***Land*** |  |  |  |
| Number of cities | 2,155 | 2,320 | 2,320 |
| Number of plots* | 1,003,436 | 2,070,000 | 2,300,000 |
| ***Residential Property*** |  |  |  |
| Number of cities | 660 | 660 | 660 |
| Number of property projects | 339,133 | 372,000 | 420,000 |
| ***Commercial Property*** |  |  |  |
| Number of cities | 372 | 372 | 372 |
| Number of property projects | 51,813 | 51,500 | 58,000 |

\* The number of plots of land covered by the China Index Database increased from 1,003,436 as of December 31, 2019 to 2,070,000 as of December 31, 2020 because the China Index Database covered land for industrial and other uses in 2020 in addition to land for residential and mixed uses in 2019.

As of December 31, 2021, the China Index Database encompassed detailed real estate information of over 2,300 cities, 2,300,000 plots of land, 420,000 residential property projects and 58,000 commercial property projects in China, which renders it among the top real estate related databases in China in terms of geographical coverage and volume of data points. It also covers a wide spectrum of information, including location, site and zoning information, building characteristics, space and unit availability, tax assessments, ownership, sales and lease comparables, number of retail stores, number of listings, mortgage information, for-sale and for-lease listings, income and expense histories, contact information, historical trends, demographic information, as well as government policies and macro-economic environment and government planning. Our database presents information in a variety of ways, including documentations, site photographs, aerial photographs, 3D photographs and videos.

Table of Contents

We have developed the China Index Database into various editions with different focuses and functions to cater to diversified client needs. We have special editions that focus on select subject matters, including the land edition, which covers land auction, sales, supply and other related information, the city edition, which covers location-based market, development project, urban planning and transaction information, and several other special editions. We also offer customized editions of our database that cater to specific client needs, such as price, transaction and other information often required by sales and marketing personnel and brokers. Below is a screenshot of the interface of our China Index Database.



Our database services are subscription-based online solutions. To encourage clients to use our database regularly, we typically offer a subscription fee package to our clients rather than charging them fees based on their actual use of our services. Our subscription fee package varies based on, among others, the number of editions, the number of accounts and types of services to which a client subscribes. Our clients can also elect to upgrade to a premium product module for more data coverage and analytical functions. Our subscribers generally pay us on an annual basis.

*China Index Land*

Launched in 2017, our China Index Land is an innovative analytical online solution designed to assist real estate developers and other real estate participants in making informed and more efficient investment decisions. Our China Index Land offers comprehensive and user-friendly site selection analysis, based on multiple attributes, such as location, surrounding education resources, quality of property management services and popularity in the local market. It allows our clients to select and evaluate cities, areas and lands that they plan to invest in as well as to build their own model through our imbedded analytical tools to satisfy their special needs without having to download a massive amount of data. We charge our clients a subscription fee based on the length of their subscription periods for our China Index Land.

54

Table of Contents

Leveraging our advanced information technology, our China Index Land delivers various types of analytic results, including research reports and 3D photographs. Our China Index Land utilizes artificial intelligence technology to process and analyze voluminous real estate-related data. We have also applied 3D data visualization technology to more clearly and efficiently present information to our clients. Below is a screenshot of the interface of China Index Land.



*China Index Appraisal and Rating*

In addition to the China Index Database, we offer a number of integrated data-driven information and analytics service modules, including China Index Appraisal and China Index Rating, both designed to support commercial banks and other financial institutions with their property mortgage business. The China Index Appraisal Module and the China Index Rating Module in aggregate currently covers real estates in more than 155 selected cities and approximately 70 million properties in China. Below are screenshots of the interfaces of our China Index Appraisal and Rating, respectively.

**China Index Appraisal**                    **China Index Rating**

 

Our China Index Appraisal and Rating services are subscription-based and the subscription fee depends on the number of properties to be evaluated and their actual use of our services.

- China Index Appraisal Module

55

Table of Contents

Launched in 2015, our China Index Appraisal Module is an appraisal platform that provides analytical online solutions for clients to perform sophisticated appraisals of the fair market value of properties and their movements in different scenarios, such as different construction areas, floors and facade directions. Leveraging our big-data analytics technology, property appraisal model and a large volume of authentic real estate transaction data from third-party data providers, our China Index Appraisal Module provides clients with more efficient and fair appraisal of properties, better assisting them in making investment, leasing and other decisions in connection with such properties.

We provide both standardized and customized appraisal services to meet the diverse needs of our clients. Our standardized appraisal services evaluate the fair market value of properties using our proprietary property appraisal model, which is widely accepted and used by commercial banks and other financial institutions in assessing the fair market value of standardized mortgages. We also offer a premium version of our appraisal services through our online appraiser recommendation system, where our clients can locate qualified appraisers to satisfy their special evaluation needs. This is primarily used by commercial banks and other financial institutions to evaluate the market value of non-standardized mortgages. In addition, we also provide regular re-appraisal services to assist our clients in timely monitoring the market value of properties and managing financial risks.

- China Index Rating Module

Launched in 2017, our China Index Rating Module is a multi-dimensional analytical online solution designed to assess the ratings of residential and commercial properties and districts in China. Our China Index Rating Module scores and rates a residential and commercial development primarily based on a multi-dimensional analysis of data from four key attributes, including location, surrounding education resources, quality of property management services and popularity in the local market. Based on the scoring results, we provide property ratings from "AAA" grade with the lowest depreciation risk to "D" grade with the highest depreciation risk. In addition to rating residential and commercial development, our China Index Rating Module also provides rating services for residential and commercial districts. It scores a district based on a variety of factors, including its economic environment and transportation conditions and provides district ratings from "A" grade indicating the highest development level of the surveyed district to "D" grade indicating the need for further development.

Our China Index Rating Module is widely used by financial institutions to improve their risk management, such as compiling their internal short list of mortgageable properties and monitoring default risks associated with the underlying assets on a timely basis.

*China Index Analytics*

We offer our clients real estate analytics services such as online client satisfaction survey services tailored to meet their needs and address specific issues encountered by them.

Leveraging cloud computing and big data technologies, we have developed a one-stop self-service online survey platform, which allows our clients to create survey questionnaires, circulate survey requests, administer survey process and analyze survey results in a cost-effective manner. We apply our proprietary research models and methodologies to help our clients understand and analyze survey results and formulate improvement measures to address the issues identified in the surveys. We have accumulated a comprehensive question bank and proven industry-wide survey standards from the experience and expertise we gained since we initiated this service in 2007.

We also provide customized analytics services to real estate participants, including primarily real estate developers, based on their specific circumstances and strategic development goals. Guided by the massive volume of industry information from China Index Database, we utilize a combination of effective analytical methodologies and investigative methods to advise our clients on development project feasibilities and investment decisions. We also formulate detailed business development plans and research reports per specific client requests.

56

We also offer analytics services based on our CREIS Index, launched in 1994. Our CREIS Index provides diversified indices of price movements and forecasts of real estate markets in China, particularly in major cities. We have developed a wide spectrum of influential real estate price-related indices under our CREIS Index, including, among others, new residential property, for-sale residential property, rental property, property service and listed real estate company stock. Through our CREIS Index, we provide insightful guidance for investment activities in real estate markets and real estate-related businesses. Our "CREIS 100 Cities Residential Property Price Index," a price index indicating movements and forecasts of residential property price in selected 100 major cities in China, has been widely recognized as one of the most influential real estate price indices in China with broad geographical coverage and large number of cities included. We have participated in the creation of the first real estate big data stock index in China, launched in 2015.

*Marketplace Services*

We offer promotion services and listing services to our clients as marketing tools to supplement our database and its associated analytical tools.

*China Index Promotion*

Leveraging our comprehensive information access and robust data analytics capabilities as well as our leadership in the market, we offer promotion services based on influential industry reports on select key topics we disseminate to China's real estate participants and consumers. We help our clients promote their brand names and development projects through an integrated suite of customized, omni-channel solutions consisting of marketing campaigns through various online channels and themed events.

We have established an authoritative rating system to publish annually since 2003 influential industry reports, including Top 100 Real Estate Developers, Top 10 Listing Companies, Top 10 Brands and Top 100 Property Management Companies in China. We generate our reports on a comprehensive, objective and independent basis. We obtain the supporting data for our research from a variety of sources, including our proprietary China Index Database, information published by the relevant government agencies and the information submitted by candidates. We cross-check the supporting data and utilize sophisticated analytic methods, including factor analysis, to compile and analyze such data. Our China Index Database allows us to more accurately generate these reports, which in turn defines the objective and scope of our promotion services.

*China Index Listing*

We also offered listing services to allow our clients to list commercial properties in China and utilized advanced marketing and search tools. We had historically operated such business through Fang.com and its mobile applications, a comprehensive set of web portals and mobile applications owned by Fang. We also offered various forms of advertisement placements on our online marketing portal that target our site visitors and mobile application users.

We discontinued our listing service business from January 2021 due to the change in our business development strategies. We did not derive any revenue from listing services in 2021. We will thoroughly focus our efforts on our core businesses including information and analytics services and promotion services with an aim to improve our operating efficiencies.

**Our Data**

Our data are the foundation of our real estate information and analytic services. Over a span of over 20 years, we have accumulated abundant industry experience in developing the real estate-related database in China. As of December 31, 2021, the China Index Database encompassed detailed real estate information of over 2,300 cities, 2,300,000 plots of land, 420,000 residential property projects and 58,000 commercial property projects in China, which renders it among the top real estate related databases in China in terms of geographical coverage and volume of data points.

Table of Contents

*Data Collection*

We are committed to maintaining and improving the timeliness and comprehensiveness of our database. We have built our database primarily through our internal professional data collection team with over 20 years of experience in data collection. Our data collection team is divided functionally and geographically to cover data canvassing the entire industry value chain in more than 2,320 cities for land data, 194 cities for residential property data, and 350 cities for newly developed property data across substantially all the provinces in China as of December 31, 2021, representing an industry-leading geographic coverage. Our data collection team is primarily responsible for collecting, verifying and recording real estate-related data and adopts a multi-faceted research process to collect data, including phone calls, e-mails, Internet updates, field inspections, public records review, news monitoring, as well as interviews of real estate participants. We regularly undergo extensive training programs so that we can maintain consistent data collection methods and processes throughout our data collection team.

We enrich our database through procuring and assimilating databases from third-party suppliers. We have obtained a license from Fang to use its voluminous transaction information it has accumulated since 2005. We have also purchased or been licensed to use industry and market data from government authorities and professional parties, such as China Unicom. Leveraging our industry leadership, we have also integrated industry resources. In collaboration with major real estate developers, property managers and other industry participants, we co-founded China Real Estate Big Data Alliance in 2016, which has increasingly become an important and reliable source to our real estate database. We believe that our strong data collection capability is sufficient to support our business development and expansion.

*Data Verification*

Authenticity of our data is crucial to the quality of our database and our client experience. We adopt a combination of automated and non-automated control process to ensure the integrity of the data collection process. We use mathematical and statistical models and methodologies to identify and consolidate repetitive data and eliminate abnormal and incorrect data. A large number of our proprietary data wash models automatically verify errors and repetitive data, including occupancy date conflicts, available square footage greater than building area, typical floor space greater than land area and expired leases. We also monitor changes to critical fields of information to ensure all information is kept in compliance with our standard definitions and methodology. To supplement the automated control process, we also apply non-automated quality control procedures, such as calling our information sources to verify information, performing periodic research audits and field checks and timely adjust the models used in the automated-control process. Finally, we also actively treasure the feedback provided by real estate participants using our data every day as one of the most important and effective quality control measures.

**Our Clients**

In 2021, we had over 2,800 clients subscribing to our information and analytics services and over 900 clients for our promotion services, primarily consisting of institutional clients. We draw clients from across the real estate and related business community, including real estate developer, commercial banks and other financial institutions, academic institutions, property managers, brokers, agents, consultants and other participants in real estate related business. In 2021, our clients primarily consisted of real estate developers, brokers, and financial institutions, accounting for an aggregate of more than 70% of the total number of our clients in the same period.

We have built a robust client composition, evidenced by low client concentration and high client retention. In 2021, the top five clients contributed to less than 10% of our total revenues, and more than 90% of our existing clients among the Top 100 Real Estate Developers in China as ranked by the Top Ten Research Committee of China's Real Estate Industry renewed service contracts with us.

**Research and Technology**

We are committed to continually enhancing our services through innovation. Our research and development process involves collaborative efforts across multiple departments, including our research team and information technology development team.

Our research team has strong theoretical research and development capabilities, primarily responsible for analyzing and developing mathematical and statistical models and theories in connection with our information and analytics services. Our research team has developed a number of real estate-related theoretical models, such as real estate supply model and real estate price model, that have been widely applied in our information and analytics services. In addition, we have also maintained long-term strategic cooperation relationship with a number of internationally reputable research institutions, such as Tsinghua University.

We have a sophisticated information technology development team, responsible for developing, improving and maintaining our services, including developing the infrastructure necessary to support our business processes, comprehensive database, analytical tools, marketing channels and extensive image library. The team implements technologies and systems that introduce efficient workflows and controls designed to increase the production capacity of our research teams and improve the quality of our data. Over the years, the team has developed advanced data collection and quality control technologies that we believe are unique within the commercial property sector. See "—Our Data." Our information technology team has also developed our online solutions, data centers and websites and mobile application for our information and analytics services. We are dedicated to further enhancing our data collection and verification capabilities. In addition, we, leveraging machine learning and statistical algorithms, utilize predictive analytics to provide insights into the real estate market. For example, our predictive model that forecasts the potential value of a specific area enables our customers to make informed investment decisions. We are also developing more tools to help improve our customers' operational efficiency, such as land investment forecast system and research report automation system.

Our information technology professionals maintain the servers and network components necessary to support our services and research systems. Our core services are served from multiple data centers to ensure uninterrupted service for our clients. Our services are continually monitored for fast and reliable client access.

We have adopted a comprehensive data protection policy which provides for use of secure networks, strong passwords, encrypted data fields, off-site storage and other protective measures in an effort to ensure the security of our proprietary data as well as the availability and security of all core systems. We strictly control and manage the use of data within our various departments and do not share data with external third parties.

**Sales and Marketing**

We have built a sales and marketing team that is experienced in the online database and real estate sectors. As of December 31, 2021, our sales and marketing team was stationed in 40 regional centers strategically located across China. Our sales and marketing team prospect for new clients and work closely with our existing clients in local markets, allowing us to gain insight into developments in these local markets, the competitive landscape and new market opportunities, which helps us set our prices and strategies for each locality.

Our regional centers typically serve as the platform for our in-market sales, client support and field research operations for their respective regions. The sales force is responsible for selling to prospective clients, training new and existing clients, providing ongoing client support, renewing existing client contracts and identifying cross-selling opportunities. In addition, the sales force serves as the front line for customer care. The client relationship managers resident at our regional centers are responsible for training existing clients, sharing market specific research with clients and ensuring client driven product enhancement ideas are shared with our product development team.

Our sales strategy is to aggressively attract new clients, while providing ongoing incentives for existing clients to subscribe to additional products and services in order to achieve high renewal rates. We actively communicate with our clients in order to retain clients by providing frequent service demonstrations as well as company-client contact and communication. We place a premium on training new and existing client personnel on the use of our services to promote maximum client utilization and satisfaction with our services. We also provide complimentary industry update and summary reports to our clients to foster trustworthy and collegial business relationships.

Our primary marketing methods include client referrals, web-based marketing, direct marketing and industry events. Client referrals are effective means for us to identify prospective clients. Leveraging our reputation, service quality and market position in China, our existing clients often refer us to their professional contacts, which saves us a great amount of time and expenses in advertising and marketing. Web-based marketing efforts include search engine optimization, paid advertising with major search engines, social media and display advertising on commercial property news and business websites and mobile applications.

Table of Contents

**Competition**

The market for real estate-related information, analytics and marketing services is competitive and rapidly changing in China. We believe the principal competitive factors affecting these services and providers are:

- breadth, depth, timeliness and quality of data;

- ease of use, flexibility and functionality of the software;

- proprietary nature of methodologies, databases and technical resources;

- client service and support;

- effectiveness of marketing and sales efforts;

- pricing; and

- brand loyalty among clients.

We compete directly and indirectly for clients with the following categories of companies:

- database services providers, such as CRIC, offering data support for in-depth industry research targeted to real estate developers, commercial and investment banks, securities companies, funds in China;

- regional and national publishers and distributors of information, analytics and marketing services, including individual publishers and new-media branches of traditional real estate service providers;

- online listing services featuring commercial property and land for sale or lease;

- locally controlled real estate boards, exchanges or associations sponsoring property listing services for commercial property and land for sale or lease;

- real estate portfolio management companies; and

- public record providers.

Some of our competitors may have greater access to capital markets, and more financial and other resources than us. Additional competitors may enter the market of real estate-related information, analytics and marketing services and competition may intensify.

**Intellectual Property**

To protect our proprietary rights in our methodologies, database, software, patents, trademarks and other intellectual property, we depend upon a combination of trade secret, misappropriation, copyright, patent, trademark, computer fraud, database protection and other laws; registration of patents, copyrights and trademarks; nondisclosure, noncompetition and other contractual provisions with employees and consultants; and technical measures.

We seek to protect our software's source code, our database and our photography as trade secrets and under copyright law. Although copyright registration is not a prerequisite for copyright protection, we have filed for copyright registration for many of our database, photographs, software and other materials. Under current PRC copyright law, the arrangement and selection of data may be protected, but the actual data itself may not be. We license our services under license agreements that grant our clients non-exclusive, non-transferable rights. These agreements restrict the disclosure and use of our information and prohibit the unauthorized reproduction or transfer of any of our proprietary information, methodologies or analytics.

Table of Contents

We also attempt to protect our proprietary database, our trade secrets and our proprietary information through confidentiality and noncompetition agreements with our employees and consultants. Our services also include technical measures designed to detect, discourage and prevent unauthorized copying of our intellectual property.

We are the registered holder of 151 software copyrights and one patent in the PRC as of December 31, 2021. As of the same date, we owned or licensed 136 registered trademarks and 70 registered domain names, including our website, *3fang.com*, in the PRC.

**Facilities**

Our principal executive offices are located in Beijing, China with approximately 2,500 square meters of office space leased from Fang as of December 31, 2021. We believe our existing leased premises are adequate for our current business operations and that additional space can be obtained on commercially reasonable terms to accommodate our future expansion plans.

**Insurance**

We provide social security insurance including pension insurance, unemployment insurance, work-related injury insurance and medical insurance for our employees. We do not maintain property insurance policies covering our equipment, systems and other property that are essential to our business operation to safeguard against risks and unexpected events. We do not maintain business interruption insurance or general third-party liability insurance, nor do we maintain product liability insurance or key-man insurance. We consider our insurance coverage to be sufficient for our business operations in China.

**Legal and Other Proceedings**

From time to time, we may become a party to various legal or administrative proceedings arising in the ordinary course of our business, including actions with respect to intellectual property infringement, violation of third-party licenses or other rights, breach of contract and labor and employment claims. See "Item 3. Key Information—D. Risk Factors—Risks Relating to Our Business and Industry—Third-party claims, litigation or government investigations to which we may be subject or in which we may be involved may significantly increase our expenses and adversely affect our stock price." Other than the foregoing, we are currently not a party to, and are not aware of any threat of, any other legal or administrative proceedings that, in the opinion of our management, are likely to have any material and adverse effect on our business, financial condition, cash flow or results of operations.

**Regulations**

Our business is subject to substantial regulation by the PRC government. This section sets forth a summary of certain significant PRC regulations that affect our business and the industries within which we operate.

*General*

The telecommunications industry, is highly regulated by the PRC government. Regulations issued or implemented by the State Council, the MIIT and other relevant government authorities cover virtually every aspect of telecommunications network operations, including the qualifications required to enter into the telecommunications industry, the scope of permissible business activities and the restrictions on foreign investment.

The MIIT, under the leadership of the State Council, is responsible for, among other things:

- formulating and enforcing policies, regulations and standards for telecommunications industry;

- granting licenses for the provision of telecommunications and Internet services;

- formulating tariff and service charge policies for telecommunications and Internet services;

- supervising the operations of telecommunications and Internet service providers; and

- maintaining fair and orderly market competition among telecommunications and Internet service providers.

In addition to the regulations promulgated by the national government, some local governments have also promulgated local rules applicable to Internet companies operating within their respective jurisdictions.

***Restrictions on Foreign Ownership in the Value-Added Telecommunications Services***

The Telecommunications Regulations of PRC promulgated in September 2000 and amended in July 2014 and February 2016, respectively, by the State Council, categorize various telecommunications businesses in China into basic or value-added telecommunications businesses.

In order to comply with China's commitments with respect to its entry into the World Trade Organization, the State Council promulgated the Administrative Rules on Foreign-invested Telecommunications Enterprises in December 2001, as amended in September 2008 and February 2016. The Administrative Rules on Foreign-invested Telecommunications Enterprises set forth detailed requirements with respect to capitalization, investor qualifications and application procedures in connection with the establishment of a foreign-invested telecommunications enterprise. Pursuant to these administrative rules, the ultimate capital contribution ratio of the foreign investor or investors in a foreign-invested telecommunications enterprise that aims to provide value-added telecommunications services may not exceed 50.0%. In addition, pursuant to the Special Administrative Measures (Negative List) for the Access of Foreign Investment (2021) issued by the PRC government, the permitted foreign investment in value-added telecommunications service providers may not be more than 50.0%. However, for a foreign investor to acquire any equity interest in a value-added telecommunications business in China, it must satisfy a number of stringent performance and operational experience requirements, including demonstrating a track record and experience in operating a value-added telecommunications business overseas. Moreover, foreign investors that meet these requirements must obtain approvals from the MIIT and MOFCOM or their authorized local counterparts, which retain considerable discretion in granting such approvals.

In July 2006, the MIIT publicly issued the Circular on Strengthening the Administration of Foreign Investment in Value-Added Telecommunications Services, or the MIIT Notice. According to the MIIT Notice, if a foreign investor intends to invest in a PRC telecommunications business, the foreign investor in must establish a foreign invested enterprise and apply for a telecommunications service license. Under the MIIT Notice, domestic telecommunications enterprises may not lease, transfer or sell a telecommunication service license to a foreign investor in any form, nor may they provide any resources, premises, facilities and other assistance in any form to a foreign investors for their illegal operation of any telecommunications business in China.

The MIIT Notice requires that value-added telecommunications enterprises or their shareholders must directly own domain names and trademarks used by such enterprises in their provision of value-added telecommunications services, and each value-added telecommunications enterprise must have premises and facilities appropriate for its business operations.

As a result of current PRC laws, rules and regulations that impose substantial restrictions on foreign investment in the Internet industry in China, we conducted listing service business through a series of contractual arrangements among our PRC subsidiaries and Beijing Zhong Zhi Hong Yuan.

***Regulations relating to Foreign Investment***

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which came into effect on January 1, 2020 and replaced the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law. The existing foreign-invested enterprises established prior to the effective of the Foreign Investment Law may keep their corporate forms within five years. The implementing rules of the Foreign Investment Law will be stipulated separately by State Council. Pursuant to the Foreign Investment Law, "foreign investors" means natural person, enterprise, or other organization of a foreign country; "foreign-invested enterprises" means any enterprise established under PRC law that is wholly or partially invested by foreign investors and "foreign investment" means any foreign investor's direct or indirect investment in mainland China, including: (1) establishing FIEs in mainland China either individually or jointly with other investors; (2) obtaining stock shares, stock equity, property shares, other similar interests in Chinese domestic enterprises; (3) investing in new projects in mainland China either individually or jointly with other investors; and (4) making investment through other means provided by laws, administrative regulations, or State Council provisions.

On December 26, 2019, the State Council promulgated the Implementation Rules to the Foreign Investment Law, which became effective on January 1, 2020. The Implementation Rules to the Foreign Investment Law further clarifies that the state encourages and promotes foreign investment, protects the lawful rights and interests of foreign investors, regulates foreign investment administration, continues to optimize foreign investment environment, and advances a higher-level opening. Competent investment department and commerce department of the State Council shall be responsible for proposing the Negative List for the State Council's approval. The Negative List will be promulgated by the State Council or its investment department and commerce department, and will be amended in accordance with the social development and the wide-ranging opening up.

The Foreign Investment Law stipulates that China implements the management system of pre-establishment national treatment plus a negative list to foreign investment and the government generally will not expropriate foreign investment, except under special circumstances, in which case it will provide fair and reasonable compensation to foreign investors. Foreign investors are barred from investing in prohibited industries on the negative list and must comply with the specified requirements when investing in restricted industries on that list. When a license is required to enter a certain industry, the foreign investor must apply for one, and the government must treat the application the same as one by a domestic enterprise, except where laws or regulations provide otherwise. In addition, foreign investors or foreign-invested enterprises are required to file information reports and foreign investment which affects or is likely to have effect on the national security shall be subject to the national security review.

According to the Measures for the Security Review of Foreign Investment promulgated by the National Development and Reform Commission, or the NDRC, and the Ministry of Commerce on December 19, 2020 and became effective on January 18, 2021, any foreign investment that has or possibly has an impact on state security shall be subject to security review in accordance with the provisions hereof. A foreign investor or a party concerned in the PRC shall take the initiative to make a declaration to the working mechanism office prior to making the investment in any important infrastructure, important transportation services and other important fields that concern state security while obtaining the actual control over the enterprises invested in.

*Regulations relating to Provision of Online Real-estate Services*

Pursuant to the Administrative Measures on Internet Information Services, as amended in 2011, profitable Internet information service providers in China shall obtain an ICP license for the provision of value-added telecommunication services, including the online real-estate services, from local telecommunication administrative authorities under the direct control of the national government or the MIIT. Those who violate the Administrative Measures on Internet Information Services by providing profitable Internet information service without obtaining the ICP license or by providing services not contained in the ICP license will be ordered to redress their violations and their illegal income will be confiscated. In addition, a penalty between three times and five times of the illegal income will be imposed. If there is no illegal income or it is lower than RMB50,000, a penalty between RMB100,000 and RMB1,000,000 will be imposed. In the worst case scenario, the website may be forced to close.

*Regulations relating to Information Security and Confidentiality of User Data*

The PRC government has adopted regulations governing internet access and the distribution of news and other information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China, or is reactionary, obscene, superstitious, fraudulent or defamatory. Based on the Decision of the Standing Committee of the National People's Congress on Internet Security Protection enacted by the Standing Committee of the National People's Congress, any effort to undertake the following actions may result in criminal punishments in China:

- improperly enter into a computer or system of national strategic importance;

- disseminate politically disruptive information;

- leak government secrets;

- spread false commercial information; or

- infringe intellectual property rights.

63

The Ministry of Public Security has also promulgated measures that prohibit the use of the Internet in ways that, among other things, result in the leakage of government secrets or the spread of socially destabilizing content. The Ministry of Public Security has supervision and inspection powers in this regard, and we may be subject to the jurisdiction of local security bureaus. Failure to comply with these requirements may result in the revocation of licenses to provide internet content and other licenses, and the closure of the concerned websites.

The security and confidentiality of information on the identity of Internet users are also regulated in China. The Administrative Measures on Internet Information Service promulgated by the PRC State Council in September 2000 and revised in January 2011 require Internet content service providers to maintain an adequate system to protect the security of user information. In January 2006, the Ministry of Public Security promulgated the Regulations on Technical Measures of Internet Security Protection, requiring Internet service providers to utilize standard technical measures for Internet security protection.

In addition, the Standing Committee of the National People's Congress promulgated the Cyber Security Law of the People's Republic of China, or the Cyber Security Law, effective June 2017, to protect cyberspace security and order. Pursuant to the Cyber Security Law, any individual or organization using the network must comply with the constitution and the applicable laws, follow the public order and respect social moralities, and must not endanger cyber security, or engage in activities by making use of the network that endanger the national security, honor and interests, or infringe on the fame, privacy, intellectual property and other legitimate rights and interests of others. The Cyber Security Law sets forth various security protection obligations for network operators, which are defined as "owners and administrators of networks and network service providers," including, among others, complying with a series of requirements of tiered cyber protection systems, verifying users' real identity, localizing the personal information and important data gathered and produced by key information infrastructure operators during operations within the PRC, and providing assistance and support to government authorities where necessary for protecting national security and investigating crimes. Furthermore, MIIT's Regulations on Protection of Personal Information of Telecommunications and Internet Users, effective September 2013, contain detailed requirements on the use and collection of personal information as well as security measures required to be taken by telecommunications business operators and internet information service providers. Furthermore, on August 22, 2019, Cyberspace Administration of China issued the Provisions on the Cyber Protection of Personal Information of Children, effective from October 1, 2019, to protect the security of personal information of children and promote the healthy growth of children.

On May 28, 2020, the National People's Congress adopted the Civil Code, which came into effect on January 1, 2021. Pursuant to the Civil Code, the personal information of a natural person shall be protected by the law. Any organization or individual shall legally obtain such personal information of others when necessary and ensure the safety of such information, and shall not illegally collect, use, process or transmit personal information of others, or illegally purchase or sell, provide or make public personal information of others.

On June 10, 2021, the Standing Committee of the National People's Congress issued the Data Security Law to regulate data processing activities and security supervision in the PRC, which came into effect on September 1, 2021. According to the Data Security Law, data processing activities shall be carried out in accordance with PRC laws and regulations, establishing and improving the data security management system of the whole process, organizing and carrying out data security education and training, and taking corresponding technical measures and other necessary measures to guarantee data security. Where data processing activities are carried out through the Internet and other information networks, the above-mentioned data security protection obligations shall be fulfilled on the basis of the hierarchical network security protection system. In carrying out data processing activities, risk monitoring shall be strengthened, and remedial measures shall be taken immediately when data security defects, loopholes and other risks are found. In the event of a data security incident, the processors of data shall take immediate measures to deal with it, inform the user in time and report to the competent authorities in accordance with relevant provisions. The processors of important data shall, in accordance with relevant provisions, carry out regular risk assessments of their data processing activities and submit risk assessment reports to the competent authorities. The Data Security Law provides a national data security review system, under which data processing activities that affect or may affect national security shall be reviewed. Any organization or individual carrying out data processing activities that violates the Data Security Law shall bear the corresponding civil, administrative or criminal liability depending on the specific circumstances.

On August 17, 2021, the State Council promulgated the Regulations on Protection of Critical Information Infrastructure, which became effective on September 1, 2021. Pursuant to the Regulations on Protection of Critical Information Infrastructure, a critical information infrastructure refers to an important network facilities or information systems in important industries or fields such as public communication and information service, energy, communications, water conservation, finance, public services, e-government affairs and national defense science, which may endanger national security, people's livelihood and public interest in case of damage, function loss or data leakage. In addition, competent departments and administration departments of each important industry and field, or Protection Departments, shall be responsible to formulate determination rules and determine the critical information infrastructure operator in the respective important industry or field. The result of the determination of critical information infrastructure operator shall be informed to the operator, and notify the public security department of the State Council.

On August 20, 2021, the Standing Committee of the National People's Congress promulgated the Personal Information Protection Law, effective on November 1, 2021. It comprehensively and systematically integrates the requirements of personal information protection previously scattered in the Civil Code, the Cyber Security Law, the Information Security Technology - Personal Information Security Specification and other laws, regulations and standards. It further specifies the obligations, regulatory measures and responsibilities for personal information protection that are applicable to apps, including: (a) the collection of personal information shall not be excessive; (b) the personal information protection authorities shall organize the testing and evaluation of apps for personal information protection, and publish the results; and (c) any app that illegally processes personal information will be ordered to suspend or terminate its services. The Personal Information Protection Law becomes an important part of the national security legal system represented by the State Security Law, and will, together with the Cyber Security Law and the Data Security Law, further completes China's legal infrastructure in the field of cyber security.

On November 14, 2021, the Cyberspace Administration of China published the Regulations on the Management of Network Information Security (a Consultation Draft for Public Comments). Based on the Data Security Law of the PRC, the Regulations on Network Information Security sets data classification and hierarchical protection system with dividing data into general data, important data, core data, and data processors are required to protect data in different degrees according to the importance of the data. The Regulations on Network Information Security stipulates that a company shall report a network security review if one of the following conditions is satisfied: i) internet platform operators who bring together a large number of data resources related to national security, economic development and public interests are intending to merge, reorganize, separate, or may affect national security; ii) data processors who process more than one million personal information are intending to be listed abroad; iii) data processors are intending to be listed in Hong Kong, which might affect or potentially affect national security; iv) other data processing activities that affect or may affect national security. However, the Regulations on Network Information Security does not clarify the scope and criteria for identifying "affect or may affect national security". The Regulations on Network Information Security further emphasizes that data processors should establish rules for the processing of personal information, that is, with the consent of the individual, take the least impact on the rights and interests of the individual, and in the case of the purpose for processing personal information has been fulfilled and the services of processing personal information have been terminated, the data processors shall delete or anonymize personal information. The Regulations on Network Information Security requires the data processors to entrust the professional data security audit institutions to conduct compliance audits, important data processors or data processors listed overseas are required to conduct annual data security assessment. As of the date of this annual report, the Regulations on Network Information Security has not come into effect.

Furthermore, pursuant to the Measures for Cyber Security Review promulgated by the Cyberspace Administration of China and certain other PRC regulatory authorities in December 2021, which took effect in February 2022, critical information infrastructure operators or a network platform operator must pass a cybersecurity review when purchasing network products and services or conducting of data processing activities that affect or may affect national security. Pursuant to the Measures, operators of critical information infrastructure purchasing network products and services, and data processors (together with the operators of critical information infrastructure, the "Operators") carrying out data processing activities that affect or may affect national security, shall conduct cyber security review. According to the Measures, an Operator who controls more than 1 million users' personal information must report to the cyber security review office for a cyber security review if it intends to be listed in a foreign country.

*Regulations relating to Trademarks*

Both the PRC Trademark Law and the Implementation Regulation of the PRC Trademark Law, which are currently in effect, provide protection to the holders of registered trademarks and trade names. The PRC Trademark Office handles trademark registrations and grants a renewable term of ten years to registered trademarks. In addition, trademark license agreements must be filed with the PRC Trademark Office.

After receiving a trademark registration application, the PRC Trademark Office will make a public announcement with respect to the proposed trademark registration application if the relevant trademark passes the preliminary examination. Any person may, within three months after such public announcement, object to such trademark application. The PRC Trademark Office will then decide who is entitled to the trademark registration, and its decisions may be appealed to the PRC Trademark Review and Adjudication Board, whose decision may be further appealed through judicial proceedings. If no objection is filed within three months after the public announcement or if the objection has been overruled, the PRC Trademark Office will approve the registration and issue a registration certificate, upon which the trademark is registered and will be effective for a renewable ten-year period, unless otherwise revoked.

*Regulations relating to Patents*

According to the Patent Law of the PRC promulgated by the Standing Committee of the National People's Congress on March 12, 1984, as last amended on October 17, 2020, and effective from June 1, 2021, and the Implementation Rules of the Patent Law of the PRC, promulgated by the State Council on June 15, 2001 and as last amended on January 9, 2010, there are three types of patents in the PRC, including invention patents, utility model patents and design patents. The protection period is 20 years for an invention patent and 10 years for a utility model patent and a design patent, commencing from their respective application dates. Any individual or entity that utilizes a patent or conducts any other activity in infringement of a patent without prior authorization of the patent holder shall pay compensation to the patent holder and is subject to a fine imposed by relevant administrative authorities, and, if constituting a crime, shall be held criminally liable in accordance with the law. According to the PRC Patent Law, for public health purposes, the State Intellectual Property Office of the PRC may grant a compulsory license for manufacturing patented drugs and exporting them to countries or regions covered under relevant international treaties to which PRC has acceded. In addition, according to the Patent Law, any organization or individual that applies for a patent in a foreign country for an invention or utility model patent established in China is required to report to the State Intellectual Property Office for confidentiality examination.

*Regulations relating to Copyrights*

According to the Copyright Law of the PRC, which took effect on June 1, 1991, and was last amended on November 11, 2020 and subsequently enforced on June 1, 2021, copyright includes computer software, and the Copyright Protection Centre of China provides a voluntary register system for copyright.

According to the Regulation on Computer Software Protection, which took effect on October 1, 1991 and was last amended on January 30, 2013 and subsequently enforced on March 1, 2013, the software copyright shall exist from the date on which its development has been completed, and software copyright owner may register with the software registration institution recognized by the copyright administration department of the State Council. On February 20, 2002, the National Copyright Administration of the PRC issued the Measures on Computer Software Copyright Registration, which outlines the operational procedures for registration of software copyright, as well as registration of the license for the software copyright and software copyright transfer contracts. The Copyright Protection Center of the PRC is mandated as the software registration agency under the regulations.

*Regulations relating to Domain Names*

Domain names are protected under the Administrative Measures on the Internet Domain Names issued by the MIIT, on August 24, 2017 and effective from November 1, 2017, and the Implementing Rules on Registration of Country Code Top Level Domain issued by China Internet Network Information Center on June 18, 2019. The MIIT is the main regulatory body responsible for the administration of PRC internet domain names. Domain name registrations are handled through domain name service agencies established under the relevant regulations, and the applicants become domain name holders upon successful registration.

Table of Contents

*Regulations relating to Employees*

The principal PRC laws and regulations that govern employment include:

- the PRC Labor Law which became effective on January 1, 1995 and was amended on August 27, 2009 and December 29, 2018; and

- the PRC Labor Contract Law which became effective on January 1, 2008, and its amendments which became effective on July 1, 2013.

Pursuant to the PRC Labor Law and the PRC Labor Contract Law, employers must execute written labor contracts with full-time employees. All employers must compensate their employees with wages equal to an amount at least satisfying the local minimum wage standards. All employers are required to establish a system for labor safety and sanitation, strictly abide by state rules and standards and provide employees with workplace safety training. Violations of the PRC Labor Contract Law and the PRC Labor Law may result in the imposition of fines and other administrative liabilities, and serious violations may result in criminal liabilities.

In addition, employers in China are obliged to provide employees with welfare schemes covering pension insurance, unemployment insurance, maternity insurance, work-related injury insurance, medical insurance and housing funds.

*Foreign Exchange Administration*

The principal regulation governing foreign currency exchange in China is the Regulations of the PRC on Foreign Exchange Administration, as amended in August 2008. Under the Regulations of the PRC on Foreign Exchange Administration and other relevant PRC regulations and rules, the Renminbi is convertible into other currencies for the purpose of current account transactions, including the distribution of dividends, interest payments, trade and service-related foreign exchange transactions. The conversion of the Renminbi into other currencies and remittance of the converted foreign currency outside China for capital account transactions, such as capital injections, loans, repatriation of investments and investments in securities outside China, requires the prior approval from, or registration with, SAFE or its local branches.

As an offshore holding company with PRC subsidiaries, we may (1) make additional capital contributions to our PRC subsidiaries, (2) establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, (3) make loans to our PRC subsidiaries or consolidated variable interest entities, or (4) acquire offshore entities with business operations in China in an offshore transaction. However, most of these uses are subject to PRC regulations and approvals.

Under SAFE Circular 19, which became effective on June 2015, a foreign-invested enterprise may choose to convert its registered capital from foreign currency to Renminbi on a self-discretionary basis, and the Renminbi capital converted can be used for equity investments within China, which will be regarded as the reinvestment of foreign-invested enterprise. In addition, SAFE Circular 19 prohibits a foreign-invested enterprise from using Renminbi funds converted from its foreign currency registered capital to provide entrustment loans or repay loans borrowed from non-financial enterprises. Violation of these circulars may result in severe penalties, including heavy fines. These circulars may limit our ability to transfer funds to our VIEs and subsidiaries in China. On June 9, 2016, SAFE promulgated SAFE Circular 16 to further expand and strengthen such reform. Pursuant to SAFE Circular 19 and SAFE Circular 16, foreign-invested enterprises in the PRC are allowed to use their foreign exchange funds under capital accounts and RMB funds from exchange settlement for expenditures under current accounts that are within its business scope or expenditures under capital accounts that are permitted by laws and regulations, with certain exceptions.

In November 2012, SAFE promulgated the Circular of Further Improving and Adjusting Foreign Exchange Administration Policies on Foreign Direct Investment, or SAFE Circular 59, as amended in May 2015, October 2018 and December 2019, which substantially amends and simplifies the then current foreign exchange procedures. Under SAFE Circular 59, the opening of various special purpose foreign exchange accounts, such as pre-establishment expenses accounts, foreign exchange capital accounts and guarantee account, no longer requires approval from SAFE. Reinvestment of Renminbi proceeds by foreign investors in China no longer requires approval from or verification by SAFE.

In May 2013, SAFE promulgated the Circular on Printing and Distributing the Provisions on Foreign Exchange Administration over Domestic Direct Investment by Foreign Investors and the Supporting Documents, as amended in October 2018, which specifies that the administration by SAFE or its local branches over direct investment by foreign investors in China shall be conducted by way of registration. Institutions and individuals shall register with SAFE and/or its local branches for their direct investments in China. Banks shall process foreign exchange business relating to the direct investment in China based on the registration information provided by SAFE and/or its branches.

In February 2015, SAFE promulgated the Circular of Further Simplifying and Improving the Policies of Foreign Exchange Administration Applicable to Direct Investment, or SAFE Circular 13, which became effective on June 2015. Under SAFE Circular 13, the current foreign exchange procedures will be further simplified, and foreign exchange registrations on direct investment will be handled by banks instead of SAFE and its branches.

In January 2017, SAFE promulgated Circular of the State Administration of Foreign Exchange on Further Advancing the Reform of Foreign Exchange Administration and Improving Examination of Authenticity and Compliance, or SAFE Circular 3, which stipulates several capital control measures on the outbound remittance of profit from domestic entities to offshore entities, including: (1) under the principle of genuine transaction, banks must check board resolutions regarding profit distribution, original version of tax filing records and audited financial statements, and (2) domestic entities must hold income to account for previous years' losses before remitting the profits.

*Regulations relating to the Establishment of Offshore Special Vehicle by PRC Residents*

Pursuant to SAFE Circular 37, which became effective on July 4, 2014, a PRC resident, including a PRC individual or a PRC company, shall register with the local SAFE branch before it contributes assets or its equity interests into an overseas special purpose vehicle established or controlled by the PRC resident for the purpose of investment and financing. When the overseas special purpose vehicle that fulfilled the initial registration formalities undergoes certain major changes, including but not limited to, the change in the PRC-resident shareholder of the overseas special purpose vehicle, name of the overseas special purpose vehicle, term of operation, or any increase or reduction of the registered capital of the overseas special purpose vehicle, share transfer or swap, and merger or division, the PRC resident shall timely register such change with the local SAFE branch.

We have requested our beneficial owners who are PRC residents to make the necessary applications, filings and amendments required by SAFE. However, we cannot provide any assurances that all of our beneficial owners who are PRC residents will continue to make, obtain or amend any applicable registrations or approvals required by these SAFE regulations. The failure or inability of our PRC resident beneficial owners to comply with the registration procedures set forth therein may subject us to fines and legal sanctions, restrict our cross-border investment activities, or limit our ability to contribute additional capital into our PRC subsidiaries, or limit our PRC subsidiaries' ability to pay dividends or make other distributions to our company or otherwise adversely affect our business. Moreover, failure to comply with the SAFE registration requirements could result in liability under PRC laws for evasion of foreign exchange restrictions.

*Regulations on Loans to and Direct Investment in PRC Entities by Offshore Holding Companies*

According to the Implementation Rules for the Provisional Regulations on Statistics and Supervision of Foreign Debt promulgated by SAFE on September 24, 1997 and the Interim Provisions on the Management of Foreign Debts promulgated by SAFE, the NDRC and the Ministry of Finance and effective from March 1, 2003, loans by foreign companies to their subsidiaries in China, which accordingly are foreign-invested enterprises, are considered foreign debt, and such loans must be registered with the local branches of SAFE. Under the provisions, the total amount of accumulated medium-term and long-term foreign debt and the balance of short-term debt borrowed by a foreign-invested enterprise is limited to the difference between the total investment and the registered capital of the foreign-invested enterprise.

According to the Measures for the Administration of Foreign Debt Registration issued by SAFE on April 28, 2013, as amended in May 2015, the statutory limit on the amount of loans from an overseas shareholder to a foreign-invested enterprise is the difference between the total investment amount and the registered capital of the foreign-invested enterprise.

Table of Contents

According to Circular 9 issued by the People's Bank of China in January 2017, the maximum amount of foreign debts that an enterprise may borrow is determined by reference to its so-called risk-weighted balance of cross-border financing, and may not exceed two times of the net assets as indicated in such enterprise's latest audited financial report. The risk-weighted balance of cross-border financing is calculated based on the enterprise's outstanding amounts of cross-border debts in RMB and foreign currency, multiplied by risk conversion factors in accordance with their respective remaining terms, categories and currencies.

According to Notice of the National Development and Reform Commission on Promoting the Administrative Reform of the Recordation and Registration System for Enterprises' Issuance of Foreign Debts issued by the NDRC in September 2015, and the Guide on Enterprises' Issuance of Foreign Debts issued by the NDRC on February 11, 2020, any loan we extend to our PRC subsidiaries or VIEs that are domestic PRC entities with a term of more than one year must be filed with the NDRC or its local counterparts and must be registered with SAFE or its local branches.

According to applicable PRC regulations on foreign-invested enterprises, capital contributions from a foreign holding company to its PRC subsidiaries, which are considered foreign-invested enterprises, may only be made when approval by or registration with MOFCOM or its local counterpart is obtained.

69

*C. Organizational Structure*

We are a holding company that does not have any substantive operations. We primarily conduct our business and operations through our subsidiaries and VIEs in China. For more information, see "—Our Contractual Arrangements."

The following diagram illustrates our main corporate and operating structure as of the date of this annual report.



Note:

(1) Wall Street Index Research Center LLC, Tianjin Zhong Zhi Data Information Technology Co., Ltd., Beijing Zhong Zhi Information Technology Academy, Shouzheng Credit Rating Co., Ltd. and Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd. currently have minimal operations.

**Our Contractual Arrangements**

In order to comply with PRC regulatory requirements restricting foreign ownership of value-added telecommunications, and certain other businesses in China, in June 2018, we, through WFOE, which is our PRC subsidiary and a wholly foreign-owned enterprise, entered into a series of contractual arrangements with (1) Beijing Zhong Zhi Hong Yuan, and (2) the shareholders of Beijing Zhong Zhi Hong Yuan, namely Mr. Vincent Tianquan Mo and Ms. Yu Huang, which enables us to:

● exercise effective control over Beijing Zhong Zhi Hong Yuan;

● receive substantially all of the economic benefits of Beijing Zhong Zhi Hong Yuan; and

● have exclusive options to purchase all or part of the equity interests in Beijing Zhong Zhi Hong Yuan when and to the extent permitted by PRC law.

In December 2019 and September 2020, our WFOE further entered into a series of contractual arrangements with Beijing Zhong Zhi Academy and Shouzheng, as well as their respective majority shareholders, which enable us to exercise effective control over, receive substantially all of the economic benefits of, and when and to the extent permitted by PRC law, have exclusive options to purchase all or part of the equity interests in Beijing Zhong Zhi Academy and Shouzheng. The terms of these contractual agreements are substantially similar to the agreements of Beijing Zhong Zhi Hong Yuan. Both Beijing Zhong Zhi Academy and Shouzheng currently have minimal operations. Beijing Zhong Zhi Academy is authorized to engage in activities including engineering and technology research but has yet to conduct any business of scale. Shouzheng's planned business scope includes enterprises credit rating and management consulting but it has yet to complete filing with relevant PRC authorities to carry out its credit rating business.

As a result of our direct ownership in WFOE and the contractual arrangements relating to our VIEs, we are regarded as the primary beneficiary of VIEs, and we consolidate the financial results of VIEs in our combined and consolidated financial statements in accordance with U.S. GAAP. We ceased to provide listing services from 2021 and did not receive revenue from listing services business from Beijing Zhong Zhi Hong Yuan starting from 2021. We did not derive any revenues from Beijing Zhong Zhi Academy in 2019, 2020 and 2021. We derived nil, nil and RMB243,024 (US$38,136) of revenue from Shouzheng in 2019, 2020 and 2021, respectively.

The following is a summary of the currently effective contractual arrangements by and among WFOE, each of our VIEs and their respective shareholders.

*Agreements that Provide Us with Effective Control over our VIEs*

*Equity Pledge Agreements.* On June 11, 2018, pursuant to an equity pledge agreement, each shareholder of Beijing Zhong Zhi Hong Yuan pledged all of his or her equity interest in Beijing Zhong Zhi Hong Yuan to guarantee the shareholder's and Beijing Zhong Zhi Hong Yuan's performance of their obligations under the exclusive technical consultancy and services agreement in connection with the contractual arrangements. If Beijing Zhong Zhi Hong Yuan or its shareholders breach their contractual obligations under this agreement, WFOE, as pledgee, will be entitled to certain rights regarding the pledged equity interests, including receiving proceeds from the auction or sale of all or part of the pledged equity interests of Beijing Zhong Zhi Hong Yuan in accordance with the law. Each shareholder of Beijing Zhong Zhi Hong Yuan agrees that, during the term of the equity pledge agreement, he or she will not dispose of the pledged equity interests or create or allow any encumbrance on the pledged equity interests without the prior written consent of WFOE. WFOE also has the right to collect dividends of Beijing Zhong Zhi Hong Yuan from its shareholders. The equity pledge agreement remains effective for ten years commencing from June 11, 2018 and can be extended at the sole discretion of WFOE. We have registered the above equity pledge with the local branches of the Administration for Industry and Commerce in accordance with the PRC Property Rights Law in July 2018. The pledge will remain binding until Beijing Zhong Zhi Hong Yuan and its shareholders discharge all their obligations under the contractual arrangements. The registration of the equity pledge enables the WFOE to enforce the equity pledge against third parties who acquire the equity interests of Beijing Zhong Zhi Hong Yuan in good faith.

On December 9, 2019 and September 3, 2020, WFOE further entered into separate equity pledge agreements with Mr. Jianning Dai ("Mr. Dai"), holder of 56% of Beijing Zhong Zhi Academy's equity interest and Jiatianxia Credit Management Co., Ltd. ("Jiatianxia Credit"), holder of 67% of Shouzheng's equity interest, respectively, the terms of which are substantially similar to the agreement of Beijing Zhong Zhi Hong Yuan summarized above. The equity pledge agreements in relation to Beijing Zhong Zhi Academy and Shouzheng remain effective for ten years commencing from December 9, 2019 and September 3, 2020, respectively, and each can be extended at the sole discretion of WFOE. As of the date of this annual report, Mr. Dai and Jiatianxia Credit are still in the process of completing the registration of the equity pledges in accordance with the equity pledge agreements.

*Shareholders' Proxy Agreements.* On June 11, 2018, pursuant to a shareholders' proxy agreement, the shareholders of Beijing Zhong Zhi Hong Yuan agreed to irrevocably entrust WFOE to exercise their rights as the registered shareholders of Beijing Zhong Zhi Hong Yuan to attend shareholders' meetings, cast votes on all matters of Beijing Zhong Zhi Hong Yuan requiring shareholder approval. WFOE may assign part or all of these proxy rights to its designated employees. WFOE will be indemnified for any loss under this agreement. This agreement will also be binding upon successors of the parties or transferees of the parties' equity interests. This agreement will remain in effect until terminated upon written consent by all the parties to the agreement or by their successors.

71

On December 9, 2019 and September 3, 2020, Mr. Dai and Jiatianxia Credit each agreed to irrevocably entrust WFOE to exercise their rights as the registered shareholder of Beijing Zhong Zhi Academy and Shouzheng, respectively, pursuant to the shareholder's proxy agreement executed by them, the terms of which are substantially similar to the agreement of Beijing Zhong Zhi Hong Yuan summarized above.

*Agreements that Allows us to Receive Economic Benefits from our VIEs*

*Exclusive Technical Consultancy and Services Agreements.* On June 11, 2018, pursuant to an exclusive technical consultancy and services agreement between WFOE and Beijing Zhong Zhi Hong Yuan, WFOE obtained the exclusive right to provide Beijing Zhong Zhi Hong Yuan with technical services relating to its business. In exchange for these services, Beijing Zhong Zhi Hong Yuan has agreed to make monthly payments to the service provider for such services at an amount determined by the time consumed, the seniority of employees of WFOE providing services to Beijing Zhong Zhi Hong Yuan as well as amounts agreed by WFOE and Beijing Zhong Zhi Hong Yuan for services provided overtime. Without WFOE's prior written consent, Beijing Zhong Zhi Hong Yuan agrees not to accept the same or any similar services provided by any third party. WFOE owns the intellectual property rights arising out of the performance of this agreement. The agreement has an original term of ten years commencing from June 11, 2018 which can be extended by WFOE at its sole discretion, or can be terminated by WFOE upon 30 days' advance notice.

On December 9, 2019 and September 3, 2020, WFOE entered into separate exclusive technical consultancy and services agreements with Beijing Zhong Zhi Academy and Shouzheng, respectively, the terms of which are substantially similar to the agreement of Beijing Zhong Zhi Hong Yuan summarized above. The agreements in relation to Beijing Zhong Zhi Academy and Shouzheng have an original term of ten years commencing from December 9, 2019 and September 3, 2020, respectively, which can be extended by WFOE at its sole discretion, or can be terminated by WFOE upon 30 days' advance notice.

*Operating Agreements.* On June 11, 2018, pursuant to an operating agreement, WFOE undertook to enter into guarantee contracts with third parties, as required by third parties, to guarantee the performance of Beijing Zhong Zhi Hong Yuan under its business contracts with third parties. In return, Beijing Zhong Zhi Hong Yuan is required to pledge its accounts receivable and mortgage all of its assets as counter-security to WFOE. Each of Beijing Zhong Zhi Hong Yuan and the nominee shareholders has agreed not to enter into any transaction that would substantially affect the assets, rights, obligations or operations of Beijing Zhong Zhi Hong Yuan without the prior written consent of WFOE. The agreement has an original term of ten years which can be extended prior to the expiration with written confirmation from WFOE, or can be terminated by WFOE upon 30 days' advance notice.

On December 9, 2019 and September 3, 2020, WFOE entered into separate operating agreements with Beijing Zhong Zhi Academy and Shouzheng, and the respective nominee shareholder, Mr. Dai and Jiatianxia Credit, the terms of which are substantially similar to the agreement of Beijing Zhong Zhi Hong Yuan summarized above.

*Agreements that Provide Us with the Option to Purchase the Equity Interest in our VIEs*

*Exclusive Call Option Agreements.* On June 11, 2018, pursuant to an exclusive call option agreement, as amended by a supplementary agreement on October 1, 2018, each shareholder of Beijing Zhong Zhi Hong Yuan irrevocably granted us and WFOE an exclusive option to purchase, or have its designated person or persons to purchase, at its discretion, to the extent permitted under PRC law, all or part of the shareholder's equity interests in Beijing Zhong Zhi Hong Yuan. The purchase price shall be the minimum price permitted under PRC law. Without prior written consent of us and WFOE, Beijing Zhong Zhi Hong Yuan shall not amend its articles of association, increase or decrease the registered capital, sell or otherwise dispose of its assets or beneficial interest, create or allow any encumbrance on its assets or other beneficial interests, provide any loans to any third parties, enter into any material contract with a value of more than RMB100,000 (except those contracts entered into in the ordinary course of business), conduct mergers or acquisitions or make any investments, or distribute dividends to the shareholders. Each shareholder of Beijing Zhong Zhi Hong Yuan has agreed that, without prior written consent of us and WFOE, he or she will not dispose his or her equity interests in Beijing Zhong Zhi Hong Yuan or create or allow any encumbrance on their equity interests. Moreover, without prior written consent of us and WFOE, no dividend will be distributed to Beijing Zhong Zhi Hong Yuan's shareholders, and if any of the shareholders receives any profit, interest, dividend or proceeds of share transfer or liquidation, the shareholder must give such profit, interest, dividend and proceeds to us and WFOE or their designated person(s). The agreement has an original term of ten years commencing from June 11, 2018 which can be extended at the sole discretion of us and WFOE.

72

Table of Contents

On December 9, 2019 and September 3, 2020, we and WFOE entered into separate exclusive call option agreements with Beijing Zhong Zhi Academy and Shouzheng, and their respective majority shareholder, Mr. Dai and Jiatianxia Credit, the terms of which are substantially similar to the agreement of Beijing Zhong Zhi Hong Yuan summarized above. The agreements in relation to Beijing Zhong Zhi Academy and Shouzheng have an original term of ten years commencing from December 9, 2019 and September 3, 2020, respectively, which can be extended at the sole discretion of us and WFOE.

*Loan Agreements.* On June 11, 2018, pursuant to a loan agreement between WFOE and the shareholders of Beijing Zhong Zhi Hong Yuan, WFOE made loans in an aggregate amount of RMB1.5 million to the shareholders of Beijing Zhong Zhi Hong Yuan solely for making contributions to the business development of Beijing Zhong Zhi Hong Yuan. Pursuant to the loan agreement, the shareholders of Beijing Zhong Zhi Hong Yuan shall repay the loan by transfer of all his or her equity interest in Beijing Zhong Zhi Hong Yuan to WFOE or its designated person(s). The shareholders of Beijing Zhong Zhi Hong Yuan must pay all of the proceeds from sale of such equity interests to WFOE. The loan must be repaid immediately under certain circumstances, including, among others, if a foreign investor is permitted to operate the value-added telecommunication service business, and us and WFOE elect to exercise their exclusive equity purchase option. The loan agreement has an original term of 10 years commencing from June 11, 2018 which will be automatically extended until WFOE agrees and is permitted to directly hold the equity interest of Beijing Zhong Zhi Hong Yuan under applicable laws of the PRC. The shareholders of Beijing Zhong Zhi Hong Yuan shall not repay such loans in advance unless it is otherwise provided in this agreement.

On December 9, 2019 and September 3, 2020, WFOE entered into separate loan agreements with Beijing Zhong Zhi Academy's and Shouzheng's respective majority shareholder, Mr. Dai and Jiatianxia Credit, the terms of which are substantially similar to the agreement of Beijing Zhong Zhi Hong Yuan summarized above except the followings. WFOE agreed to make loans in the amount of RMB560 thousand and RMB33.5 million to Mr. Dai and Jiatianxia Credit, respectively, solely for making contributions to the respective business development of Beijing Zhong Zhi Academy and Shouzheng. The agreements in relation to Beijing Zhong Zhi Academy and Shouzheng have an original term of 10 years commencing from December 9, 2019 and September 3, 2020, respectively, which will be automatically extended until WFOE agrees and is permitted to directly hold the equity interest of Beijing Zhong Zhi Academy and Shouzheng, respectively, under applicable laws of the PRC.

In the opinion of Jingtian & Gongcheng, our PRC legal counsel:

- the ownership structures of our VIEs in China and WFOE that have entered into contractual arrangements with the VIEs do not and will not result in any violation of PRC laws or regulations currently in effect; and

- the contractual arrangements among WFOE, the VIEs and the shareholders of the VIEs governed by PRC law are valid, binding and enforceable, and do not and will not result in any violation of PRC laws or regulations currently in effect.

However, there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. In respect of Beijing Zhong Zhi Hong Yuan, if the PRC government finds that the agreements that establish the structure for operating our listing service business do not comply with PRC government restrictions on foreign investment in value-added telecommunications services businesses, such as internet content provision services and online data processing and transaction processing businesses (operating e-commerce business), we could be subject to penalties, including being prohibited from continuing operations. See "Item 3. Key Information—D. Risk Factors—Risks Relating to Our Corporate Structure," "Item 3. Key Information—D. Risk Factors—Risks Relating to Our Business and Industry—If we fail to obtain or keep licenses, permits or approvals applicable to the various online real estate services provided by us, we may incur significant financial penalties and other government sanctions," and "Item 3. Key Information—D. Risk Factors—Risks Relating to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

### D. Property, Plant and Equipment

See "—B. Business Overview—Facilities."

### ITEM 4A. UNRESOLVED STAFF COMMENTS

None.

**ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS**

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the combined and consolidated financial statements and related notes that appear in this annual report. In addition to historical combined and consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and in this annual report, particularly in the section titled "Item 3. Key Information—D. Risk Factors."

*A. Operating Results*

**Overview**

We operate a leading real estate information and analytics service platform in China in terms of geographical coverage and volume of data points as of December 31, 2021. Our services span across data services, analytics services and promotion services for China's real estate markets. We discontinued our listing services business from January 2021. See "Item 4. Information on the Company —B. Business Overview—Our Services—Marketplace Services—China Index Listing." We serve a substantial base of real estate participants in China, including industry professionals and business communities, with a reliable, comprehensive and seasonable collection of real estate data, complemented by a variety of powerful analytical and marketing tools. We currently focus more on the enormous market opportunity within China's commercial property sector through our commercial property online marketing portals and mobile applications.

Our service platform, developed based on our CREIS, consists of various integrated data-driven information and analytics service modules that are subscription-based online solutions similar to SaaS. Our data are the foundation of our service offerings. As of December 31, 2021, the China Index Database encompassed detailed real estate information of over 2,300 cities, 2,300,000 plots of land, 420,000 residential property projects and 58,000 commercial property projects in China, which renders it among the top real estate related databases in China in terms of geographical coverage and volume of data points.

Leveraging our comprehensive information access and robust data analytics capabilities as well as our leadership in the market, we also offer promotion services to China's real estate participants. We disseminate influential industry reports on select key topics, and help our clients promote their brand names and development projects through an integrated suite of customized, omni-channel solutions consisting of promotion campaigns across various online channels and themed events.

As commercial property-related business requires a sophisticated level of expertise and industry experience, we believe that we are in a unique position to operate online marketing portals for China's commercial property market and empower it with big data and innovative technologies. We are also exploring other commercial property-related services to capture the enormous market opportunity arising from the rapid development of China's commercial property sector.

Our revenues have experienced fluctuations in recent years. Our revenues increased by 9.7% from RMB579.7 million in 2019 to RMB635.9 million in 2020. Our revenues decreased slightly by 2.4% to RMB621.0 million (US$97.4 million) in 2021. Information and analytics services accounted for 46.3%, 47.7% and 50.2%, respectively, of our revenues in 2019, 2020 and 2021. Marketplace services accounted for 53.7%, 52.3% and 49.8%, respectively, of our revenues in 2019, 2020 and 2021. Our net income in 2019 was RMB245.5 million. Our net loss in 2020 was RMB318.4 million, primarily due to bad debt expense. We recorded a net income of RMB279.2 million (US$43.8 million) in 2021.

**Major Factors Affecting Our Results of Operations**

*General Factors Affecting Our Results of Operations*

We operate in China's real estate industry, especially China's commercial property market going forward, and our results of operations and financial conditions have been, and are expected to continue to be, significantly affected by the following general factors driving this industry.

74

*Growth in China's real estate industry.* China's real estate industry has experienced rapid growth marked by periods of volatility and price fluctuations in recent years. With the considerable development of China's real estate industry, we believe demand for real estate information, analytics and marketing services will continue to increase. In particular, driven by the continuous economic growth and urbanization in China in recent years, the focus of real estate investors and developers is gradually shifting towards the commercial property market, which presents significant growth potential as we continue to expand our commercial property-related services.

*Governmental policies affecting China's real estate industry.* The PRC government exercises considerable direct and indirect influence over the real estate industry through its policies and other economic measures. The imposition of new policies, laws and regulations, or changes in current polices, laws and regulations, could have a material impact on the real estate market in China, which in turn would affect our business, financial condition and results of operations.

Unfavorable changes in any of these general industry conditions could negatively affect the demand for our services and products and materially and adversely affect our business, financial condition and results of operations.

**Specific Factors Affecting Our Results of Operations**

While our business is influenced by general factors affecting China's real estate industry, we believe our results of operations are more directly affected by company specific factors, including the following:

*Our Services and Products*

Our business and results of operations depend substantially on our ability to maintain and enhance our existing services and products and introduce new services and products that meet the evolving needs of real estate participants in China. The attractiveness of our information and analytics services depends on our ability to expand our data sources and coverage while maintaining our data quality and provide more advanced analytical tools. As we are developing a suite of commercial property-related services and products, our future performance will also depend on the market acceptance of these new services and products.

*Our Operational Efficiency*

We commenced our business as a data-driven platform providing information and analytics services and have developed the promotion services leveraging our proprietary database. We will continue to expand our service offerings targeting the fast-developing commercial property market in China. As we scale up our database and promotion services and expand our commercial property-related services, our ability to enhance our overall operational efficiency by cross-promoting our services, sharing our talents and technologies across business lines and standardizing our operational procedures will be critical in controlling our cost of revenues and improving our gross margin. Our ability to streamline our corporate functions and improve our administrative efficiency will also contribute to a slower growth rate in our operating expenses. Our ability to enhance operational synergies will enable us to establish an extensive network of clients, which is critical to our ability to expand the variety of services we offer and solidify our market leadership.

*Our Ability to Compete Effectively*

Our competition may intensify. Our competitors may have greater name recognition, larger client bases, better technology or data, lower prices, easier access to data, greater user traffic or greater financial, technical or marketing resources than we have. Although the barriers to entry are relatively high, new entrants may continue to emerge and rapidly scale up their operations leveraging the fast technological advancement. To compete effectively, we may need to incur substantial expenses in our efforts to develop and introduce new features, functions or services, as well as to attract and retain talents in the future by offering higher compensation and other benefits.

Table of Contents

**Taxation**

*Cayman Islands*

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution, brought within the jurisdiction of the Cayman Islands. In addition, the Cayman Islands does not impose withholding tax on dividend payments.

*BVI*

Under the current laws of the BVI, our subsidiaries incorporated in the BVI are not subject to tax on income or capital gains. In addition, upon payments of dividends by the entity to their shareholders, no BVI withholding tax will be imposed.

*Hong Kong*

Our Hong Kong subsidiaries are subject to an income tax rate of 16.5% for taxable income earned in Hong Kong. Hong Kong does not impose a withholding tax on remittance of dividends. A two-tiered profits tax rates regime was introduced in 2018 where the first HK$2 million of assessable profits earned by a company will be taxed at half of the current tax rate (8.25%) whilst the remaining profits will continue to be taxed at 16.5%. There is an anti-fragmentation measure where each group will have to nominate only one company in the group to benefit from the progressive rates.

*USA*

Our subsidiaries incorporated in the USA are subject to profits tax at 21% statutory tax rate with respect to the profit generated from the USA.

*China*

Generally, our subsidiaries and VIEs in China are subject to enterprise income tax on their taxable income at a rate of 25%. The enterprise income tax is calculated based on the entity's global income as determined under PRC tax laws and accounting standards.

Beijing Zhong Zhi Shi Zheng, a PRC subsidiary, obtained the High and New Technology Enterprise certificate in November 2015 and renewed it in October 2018 and December 2021, entitling it to a preferential enterprise income tax rate of 15% from 2015 to 2023.

Xinjiang Zhong Zhi Data Information Technology Co., Ltd., a PRC subsidiary, was entitled to a tax holiday for five years starting from 2017.

Xinjiang Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Xinjiang Zhong Zhi Shi Zheng Big Data Co., Ltd, each a PRC subsidiary, were entitled to a tax holiday for five years starting from 2020.

Beijing Zhong Zhi Xun Bo Data Information Technology Co., Ltd., a PRC subsidiary, was entitled to a reduced enterprise income tax rate of 12.5% for 2017. In October 2018, Beijing Zhong Zhi Xun Bo Data Information Technology Co., Ltd. obtained the High and New Technology Enterprise certificate and renewed it in October 2021, entitling it to a preferential enterprise income tax rate of 15% from 2018 to 2023.

The PRC tax laws and its implementation rules impose a withholding income tax at 10%, unless reduced by a tax treaty or arrangement, on the amount of dividends distributed by a PRC-resident enterprise to its immediate holding company outside the PRC that are related to earnings accumulated beginning on January 1, 2008. As of December 31, 2020, we have accrued withholding income tax of RMB62 million on undistributed earnings of RMB620 million generated by our PRC subsidiaries and VIEs. During the year ended December 31, 2021, we paid the withholding income tax of RMB62 million (US$9.7 million). As of December 31, 2020 and 2021, we have not provided for income taxes on earnings generated by the our PRC subsidiaries and VIEs of RMB336.5 million and RMB620.1 million (US$97.3 million), respectively, as we planned to reinvest these earnings indefinitely in the PRC. The unrecognized deferred income tax liability related to these earnings was RMB33.6 million and RMB62 million (US$9.7 million), respectively.

If our holding company in the Cayman Islands or any of our subsidiaries outside of China were deemed to be a "resident enterprise" under the PRC Enterprise Income Tax Law, it would be subject to enterprise income tax on its worldwide income at a rate of 25%. See "Item 3. Key Information—D. Risk Factors—Risks Relating to Doing Business in China—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

## Key Components of Our Results of Operations

### Revenues

We generate most of our revenues from information and analytics services and marketplace services. We discontinued our listing services business from January 2021 and we did not receive additional revenues from listing services from 2021. The following table sets forth a breakdown of our revenues for the periods indicated.

| | Year ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | | | (in thousands, except for percentages) | | | | |
| **Information and analytics services** | **268,548** | **46.3** | **303,352** | **47.7** | **311,855** | **48,937** | **50.2** |
| Data services | 138,643 | 23.9 | 166,264 | 26.1 | 187,353 | 29,400 | 30.2 |
| Analytics services | 129,905 | 22.4 | 137,088 | 21.6 | 124,502 | 19,537 | 20.0 |
| **Marketplace services** | **311,102** | **53.7** | **332,558** | **52.3** | **309,098** | **48,504** | **49.8** |
| Promotion services | 244,154 | 42.2 | 301,962 | 47.5 | 309,098 | 48,504 | 49.8 |
| Listing services [1] | 66,948 | 11.5 | 30,596 | 4.8 | — | — | — |
| **Total** | **579,650** | **100.0** | **635,910** | **100.0** | **620,953** | **97,441** | **100.0** |

*Note:*

(1)   We discontinued our listing services business from January 2021. See "Item 4. Information on the Company—B. Business Overview —Our Services—Marketplace Services—China Index Listing."

*Information and Analytics Services*

Our revenues from information and analytics services include revenues from data services and analytics services.

*Data services.* Our proprietary data service platform, including the China Index Database and a number of integrated analytical modules based on our proprietary database, such as China Index Appraisal, China Index Rating and China Index Land, allows our data services subscribers to track, understand and analyze the real estate industry and real estate information in China, in exchange for a fixed monthly fee. Revenues from data services are recognized on a straight-line basis over the subscription period.

*Analytics services.* We also generate fees from producing customized industry research reports, data monitoring and survey services provided through our China Index Analytics modules to our clients.

*Marketplace Services*

*Promotion services.* Leveraging our comprehensive information access and robust data analytics capabilities as well as our leadership in the market, we offer promotion services to China's real estate participants. We disseminate influential industry reports on select key topics and help our clients promote their brand names and development projects through an integrated suite of customized, omni-channel solutions consisting of promotion campaigns across various online channels and themed events. Revenues of promotion services are recognized on a straight-line basis over the service period, which is typically one year.

*Listing services.* Listing services comprise of commercial property listing services and agent services in respect of commercial properties. We cooperated with Fang in the provision of listing services. Commercial property listing services allow our clients to post listings of commercial properties, access comprehensive leads lists and utilize advanced marketing and search tools for a specified period of time, which typically range from one to three months, in exchange for a fixed fee. We also acted as an agent on behalf of Fang on listing services in respect of commercial properties prior to 2020. We ceased to provide listing services from January 2021.

### Cost of Revenues

The following table sets forth the components of our cost of revenues by nature, both in absolute amount and as a percentage of our revenues, for the periods indicated.

| | Year ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| Staff costs | 56,881 | 9.8 | 44,704 | 7.0 | 41,150 | 6,457 | 6.6 |
| Campaign costs | 19,500 | 3.4 | 11,555 | 1.8 | 16,188 | 2,540 | 2.6 |
| Office and rental expenses | 11,008 | 1.9 | 9,767 | 1.5 | 10,034 | 1,575 | 1.6 |
| Value-added taxes and surcharges | 3,708 | 0.6 | 3,274 | 0.5 | 3,605 | 566 | 0.6 |
| Others | 19,395 | 3.3 | 36,228 | 5.8 | 39,141 | 6,142 | 6.3 |
| **Total** | **110,492** | **19.0** | **105,528** | **16.6** | **110,118** | **17,280** | **17.7** |

Our cost of revenues mainly consists of staff costs, campaign costs and office and rental expenses. Campaign costs are primarily the fees we paid for rental of conference venues and brochures printing. Other costs include traveling expenses, technology service fees and others. We expect that our cost of revenues will increase as we continue to expand our services and our client base over time.

### Operating Expenses

The following table sets forth our operating expenses, both in absolute amount and as a percentage of our revenues, for the periods indicated.

| | Year ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| Selling and marketing expenses | 99,020 | 17.1 | 112,414 | 17.7 | 113,626 | 17,830 | 18.3 |
| General and administrative expenses | 77,773 | 13.4 | 85,700 | 13.5 | 81,667 | 12,815 | 13.2 |
| Bad debt expense | 4,842 | 0.8 | 559,445 | 87.9 | 8,767 | 1,376 | 1.4 |
| **Total** | **181,635** | **31.3** | **757,559** | **119.1** | **204,060** | **32,021** | **32.9** |

*Selling and Marketing Expenses.* Selling and marketing expenses consist primarily of salaries and benefits for, and incentive payments to, our sales and marketing personnel as well as other related expenses associated with sales and marketing. We expect our selling and marketing expenses to increase as we plan to engage in more selling and marketing activities to enhance our existing service offerings, broaden our client base as well as expand our commercial property-related services.

78

*General and Administrative Expenses.* Our general and administrative expenses consist primarily of salaries and benefits for our administrative staff and research and development personnel, rental expenses, and other related expenses. We expect our general and administrative expenses to increase due to the anticipated growth of our business, increased investment in technology innovation and costs related to operating as a public company and complying with our reporting obligations under the U.S. securities laws.

*Bad Debt Expense.* Our bad debt expense consists primarily of (1) provisions for bad debt associated with our accounts receivable and (2) the provision for amounts due from Fang for the amount borne by us under the settlement deeds and we made a 100% provision for such amount in 2020. For details of the convertible notes and settlement deeds, see "Item 5.Operating and Financial Review and Prospects - B. Liquidity and Capital Resources." We expect our bad debt expense in relation to our accounts receivable to increase along with our business growth.

**Results of Operations**

The following table sets forth a summary of our combined and consolidated results of operations both in absolute amount and as a percentage of our revenues for the periods indicated.

| | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | | | (in thousands, except for percentages) | | | | |
| Revenues | 579,650 | 100.0 | 635,910 | 100.0 | 620,953 | 97,441 | 100.0 |
| Information and analytics services | 268,548 | 46.3 | 303,352 | 47.7 | 311,855 | 48,937 | 50.2 |
| Marketplace services | 311,102 | 53.7 | 332,558 | 52.3 | 309,098 | 48,504 | 49.8 |
| Cost of revenues | (110,492) | (19.0) | (105,528) | (16.6) | (110,118) | (17,280) | (17.7) |
| **Gross profit** | **469,158** | **81.0** | **530,382** | **83.4** | **510,835** | **80,161** | **82.3** |
| **Operating expenses** | | | | | | | |
| Selling and marketing expenses | (99,020) | (17.1) | (112,414) | (17.7) | (113,626) | (17,830) | (18.3) |
| General and administrative expenses | (77,773) | (13.4) | (85,700) | (13.5) | (81,667) | (12,815) | (13.2) |
| Bad debt expense | (4,842) | (0.8) | (559,445) | (87.9) | (8,767) | (1,376) | (1.4) |
| **Operating income (loss)** | **287,523** | **49.7** | **(227,177)** | **(35.7)** | **306,775** | **48,140** | **49.4** |
| Interest income | 2,200 | 0.4 | 1,625 | 0.3 | 9,750 | 1,530 | 1.6 |
| Change in fair value of the warrants | (1,152) | (0.2) | 1,359 | 0.2 | - | - | - |
| Investment income | 714 | 0.1 | 9,294 | 1.5 | 8,458 | 1,327 | 1.4 |
| Government grants | 903 | 0.2 | 5,997 | 0.8 | 765 | 120 | 0.1 |
| **Income (loss) before income taxes** | **290,188** | **50.2** | **(208,902)** | **(32.9)** | **325,748** | **51,117** | **52.5** |
| Income tax expense | (44,737) | (7.7) | (109,454) | (17.2) | (46,500) | (7,297) | (7.5) |
| **Net income (loss)** | **245,451** | **42.5** | **(318,356)** | **(50.1)** | **279,248** | **43,820** | **45.0** |

*Year Ended December 31, 2021 Compared to Year Ended December 31, 2020*

*Revenues.* Our revenues, consisting of those generated from information and analytics services and marketplace services, decreased by 2.4% from RMB635.9 million in 2020 to RMB621.0 million (US$97.4 million) in 2021.

*Information and Analytics Services*

- *Data services.* Our revenues from data services increased by 12.7% from RMB166.3 million in 2020 to RMB187.4 million (US$29.4 million) in 2021, primarily due to (1) the continued increase in the number of clients that subscribed to our database, and (2) the increase in the average selling price due to the upgrading of our services.

  - *Analytics services.* Our revenues from analytics services decreased by 9.2% from RMB137.1 million in 2020 to RMB124.5 million (US$19.5 million) in 2021, primarily due to (1) the decrease in the number of clients that purchased our analytics services, and (2) the decrease in the average selling price, both further due to the broad macro environment challenges the industry was facing.

79

*Marketplace Services*

- *Promotion services.* Our revenues from promotion services remained relatively stable with a slight increase of 2.4% from RMB302.0 million in 2020 to RMB309.1 million (US$48.5 million) in 2021.

- *Listing services.* Our revenues from listing services decreased by 100.0% from RMB30.6 million in 2020 to nil in 2021, primarily because we ceased to provide listing services from January 2021.

*Cost of revenues.* Our cost of revenues increased by 4.3% from RMB105.5 million in 2020 to RMB110.1 million (US$17.3 million) in 2021 primarily due to an increase of RMB4.6 million (US$0.7 million) in campaign costs as we resumed in-person themed events and campaigns as a result of the easing of the COVID-19 pandemic in China in the second half of 2020.

*Gross profit.* As a result of the foregoing, our gross profit decreased by 3.7% from RMB530.4 million in 2020 to RMB510.8 million (US$80.2 million) in 2021. Our gross margin was 83.5% and 82.3% in 2020 and 2021, respectively.

*Operating expenses.* Our total operating expenses decreased by 73.1% from RMB757.6 million in 2020 to RMB204.1 million (US$32.0 million) in 2021, primarily due to a decrease in bad debt expense.

- *Selling and marketing expenses.* Our selling and marketing expenses remained relatively stable with a slight increase of 1.1% from RMB112.4 million in 2020 to RMB113.6 million (US$17.8 million) in 2021.

- *General and administrative expenses.* Our general and administrative expenses remained relatively stable with a slight decrease of 4.7% from RMB85.7 million in 2020 to RMB81.7 million (US$12.8 million) in 2021.

- *Bad debt expense.* Our bad debt expense decreased by 98.4% from RMB559.4 million in 2020 to RMB8.8 million (US$1.4 million) in 2021, primarily due to bad debt expense of RMB547.1 million in relation to the provision for amounts due from Fang for the amount borne by us under the settlement deeds and we made a 100% provision for such amount in 2020. For details of the convertible notes and settlement deeds, see "Item 5. Operating and Financial Review and Prospects - B. Liquidity and Capital Resources."

*Income tax expenses.* We had income tax expenses of RMB109.5 million in 2020 and RMB46.5 million (US$7.3 million) in 2021. The effective income tax rate was 52.4% for 2020 which was higher than the statutory enterprise income tax rate, primarily due to the effect of the tax rate differential for non-PRC entities and the withholding tax for undistributed earnings from PRC subsidiaries, partially offset by the effect of the preferential tax rates and the research and development bonus deduction. The effective income tax rate was 14.3% for 2021 which was lower than the statutory enterprise income tax rate, primarily due to the effect of preferential tax rates and research and development bonus deduction.

*Net income.* As a result of the foregoing, we recorded a net loss of RMB318.4 million in 2020 and a net income of RMB279.2 million (US$43.8 million) in 2021.

**Year Ended December 31, 2020 Compared to Year Ended December 31, 2019**

*Revenues.* Our revenues, consisting of those generated from information and analytics services and marketplace services, increased by 9.7% from RMB579.7 million in 2019 to RMB635.9 million in 2020.

*Information and Analytics Services*

- *Data services.* Our revenues from data services increased by 20.0% from RMB138.6 million in 2019 to RMB166.3 million in 2020, primarily due to (1) the continued increase in the number of clients that subscribed to our database, and (2) the increase in the average selling price due to the upgrading of our services.

- *Analytics services.* Our revenues from analytics services increased by 5.5% from RMB129.9 million in 2019 to RMB137.1 million in 2020, primarily due to the continued increase in the number of clients that purchased our analytics services along with our business growth.

*Marketplace Services*

- *Promotion services.* Our revenues from promotion services increased by 23.6% from RMB244.3 million in 2019 to RMB302.0 million in 2020, primarily driven by (1) the continued increase in the number of clients that purchased our promotion services, and (2) the increase in the average selling price of our promotion services.

- *Listing services.* Our revenues from listing services decreased by 54.3% from RMB66.9 million in 2019 to RMB30.6 million in 2020, primarily due to the termination of our cooperation agreement with Fang to provide listing agent services for commercial properties to Fang from January 1, 2020 and the decrease in the number of customers.

*Cost of revenues.* Our cost of revenues decreased by 4.5% from RMB110.5 million in 2019 to RMB105.5 million in 2020 primarily due to (1) a decrease of RMB12.2 million in staff costs as a result of the termination of our cooperation agreement with Fang to provide listing agent services for commercial properties to Fang from January 1, 2020 and (2) a decrease of RMB8.0 million in campaign costs as in-person themed events and campaigns were restricted or prohibited as a result of the social distancing measures implemented in China in response to the COVID-19 pandemic, partially offset by an increase in technology fees.

*Gross profit.* As a result of the foregoing, our gross profit increased by 13.0% from RMB469.2 million in 2019 to RMB530.4 million in 2020. Our gross margin was 81.0% and 83.5% in 2019 and 2020, respectively.

*Operating expenses.* Our total operating expenses increased by 317.2% from RMB181.6 million in 2019 to RMB757.6 million in 2020, primarily due to bad debt expense.

- *Selling and marketing expenses.* Our selling and marketing expenses increased by 13.5% from RMB99.0 million in 2019 to RMB112.4 million in 2020, primarily due to (1) an increase of RMB13.3 million in salaries and benefits paid to our sales and marketing personnel as a result of increase in headcounts, (2) an increase of RMB4.0 million in promotion fees due to increasing marketing needs, partially offset by a decrease of RMB5.0 million in transportation and travelling fees during the COVID-19 pandemic.

- *General and administrative expenses.* Our general and administrative expenses increased by 10.2% from RMB77.8 million in 2019 to RMB85.7 million in 2020, primarily due to an increase of RMB5.2 million in foreign exchange loss as a result of the fluctuation in exchange rate of U.S. dollar against RMB.

- *Bad debt expense.* Our bad debt expense increased by 115 folds from RMB4.8 million in 2019 to RMB559.4 million in 2020, primarily due to bad debt expense of RMB547.1 million of provision for amounts due from Fang for the amount borne by us under the settlement deeds and we made a 100% provision for such amount. For details of the convertible notes and settlement deeds, see "Item 5. Operating and Financial Review and Prospects - B. Liquidity and Capital Resources."

*Income tax expenses.* We had income tax expenses of RMB44.7 million in 2019 and RMB109.5 million in 2020. The effective income tax rate was 15.4% for 2019 which was lower than the statutory enterprise income tax rate, primarily due to the effect of the preferential tax rates, and the research and development expenses bonus deduction, partially offset by effect of the unrecognized tax benefits and non-deductible share-based compensation expense. The effective income tax rate was 52.4% for 2020 which was higher than the statutory enterprise income tax rate, primarily due to the effect of the tax rate differential for non-PRC entities and the withholding tax for undistributed earnings from PRC subsidiaries, partially offset by the effect of the preferential tax rates and the research and development bonus deduction.

*Net income.* As a result of the foregoing, we recorded a net income of RMB245.5 million in 2019 and a net loss of RMB318.4 million in 2020.

81

*B. Liquidity and Capital Resources*

Our primary sources of liquidity have been capital contribution from Fang prior to our separation from Fang and cash generated from operating activities, which have historically been sufficient to meet our working capital and capital expenditure requirements. As of December 31, 2019, 2020 and 2021, our cash and cash equivalents were RMB214.1 million, RMB280.4 million and RMB361.5 million (US$56.7 million), respectively.

We believe that our current cash and cash equivalents and anticipated cash flows from operating activities will be sufficient to meet our anticipated working capital requirements, and capital expenditures in the ordinary course of business for the next 12 months. We may, however, need additional cash resources in the future if we experience changes in business condition or other developments, or if we find and wish to pursue opportunities for investments, acquisitions, capital expenditures or similar actions. If we determine that our cash requirements exceed the amount of cash and cash equivalents we have on hand at the time, we may seek to issue equity or debt securities or obtain credit facilities. See "Item 3. Key Information—D. Risk Factors—Risks Relating to the ADSs—Your percentage of ownership in our company may be diluted in the future. Substantial future sales or perceived potential sales of the ADSs in the public market could cause the price of the ADSs to decline."

Fang issued convertible notes to certain institutional investors in 2015. These convertible notes bore an interest rate of 1.5% per annum until due in 2022 (the "2022 Notes"). The holders had the right, from time to time, to convert all or any portion of the convertible notes into Fang Class A ordinary shares at an initial conversion rate of 27.9086 Fang Class A ordinary shares per US$1,000 principal amount, subject to adjustment under the terms of the convertible notes. In connection with our separation from Fang, taking into consideration of the outstanding aggregate principal amount of US$250 million at that time, we issued a warrant to each of the holders of such convertible notes, which entitled them to purchase for nominal consideration up to 6,977,150 Class A ordinary shares in the aggregate. In the event that holders subsequently decide not to convert the convertible notes, and instead, demand payment of principal and accrued interest upon maturity of the convertible notes, the warrant would be canceled and the right to purchase our Class A ordinary shares would be forfeited. In addition, we also provided a guarantee for the benefit of the holders, under which we would be liable to the payment obligations under the convertible notes if a demand thereunder may be made or there have been certain circumstances relating to our company, including, among others, change-in-control transactions or certain fundamental changes to our share capital. In October 2019 and December 2019, Fang repurchased from certain holders of the 2022 Notes in an aggregate principal amount of US$82.94 million for a total consideration of US$83.78 million. As a result of the winding-up petition against Fang and pursuant to the terms of the 2022 Notes, the outstanding principal of, and accrued and unpaid interest on the 2022 Notes, which were originally due in 2022, became due and payable on December 13, 2020. In 2021, we entered into settlement deeds with Fang and the holders of the 2022 Notes. Pursuant to the settlement deeds, Fang and we each agreed to repay 50% of the total amount of US$168.0 million by installment in 2021 to the holders of the 2022 Notes, including the outstanding principal of US$167.2 million and unpaid interest of US$0.8 million as of December 31, 2020. Accordingly, we accrued a guarantee liability in the amount of US$84.0 million (equivalent to RMB547.1 million) as of December 31, 2020. We repaid to the holders of the 2022 Notes on behalf of Fang (1) US$42.4 million (including US$0.2 million of interest expenses in 2021) on September 24, 2021 and (2) US$41.8 million on November 10, 2021. In addition, Fang repaid to the holders of the 2022 Notes (1) US$42.4 million on September 28, 2021 (including US$0.2 million of interest expenses in 2021) and (2) US$41.8 million on November 15, 2021.

The 2022 Notes were fully repaid in November 2021. Separately, we entered into a supplemental agreement with Fang on September 24, 2021, pursuant to which Fang has agreed to repay us the amount borne by us under the settlement deeds by December 31, 2023. Notwithstanding our ongoing effort to collect the amounts due from Fang, based on our credit assessment on the collectability of the amounts due from Fang, taking into consideration current market conditions and Fang's financial condition, as well as that (1) Fang is subject to a winding-up petition by a non-controlling shareholder in the Cayman Court; (2) Fang was late in the filing of its annual report on form 20-F for the year ended December 31, 2020; (3) Fang had to rely on us as the guarantor to settle the 2022 Notes; and (4) we do not have any collateral placed by Fang against the amounts due from Fang, we have accrued 100% provision against the amounts due from Fang in the amount of RMB547.1 million as of December 31, 2020, which was recorded as bad debt expense in 2020.

Our ability to manage our working capital, including receivables and other assets and liabilities and accrued liabilities, may materially affect our financial condition and results of operations.

Table of Contents

**Cash Flow**

The following table sets forth a summary of our cash flows for the periods indicated.

| | Year Ended December 31, | | | |
| | 2019 | 2020 | 2021 | |
| | RMB | RMB | RMB | US$ |
| | | | (in thousands) | |
|---|---|---|---|---|
| Net cash provided by operating activities | 334,039 | 327,544 | 214,820 | 33,710 |
| Net cash provided by (used in) investing activities | (124,348) | (257,750) | 384,613 | 60,354 |
| Net cash used in financing activities | (160,194) | — | (522,234) | (81,950) |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | 377 | (3,515) | 3,967 | 623 |
| Net increase in cash and cash equivalents | 49,874 | 66,279 | 81,166 | 12,737 |
| Cash and cash equivalents as of the beginning of the year | 164,202 | 214,076 | 280,355 | 43,994 |
| Cash and cash equivalents as of the end of the year | 214,076 | 280,355 | 361,521 | 56,731 |

*Operating Activities*

Net cash provided by operating activities was RMB214.8 million (US$33.7 million) in 2021, primarily due to net income of RMB279.2 million (US$43.8 million), adjusted for (1) investment income of RMB8.5 million (US$1.3 million), (2) allowance for doubtful accounts of RMB6.8 million (US$1.1 million), (3) reduction in the carrying amount of right of use assets of RMB5.5 million (US$0.9 million), (4) share-based compensation expense of RMB4.9 million (US$0.8 million), (5) allowance for amounts due from a related party of RMB2.0 million (US$0.3 million), (6) depreciation of RMB1.4 million (US$0.2 million), and (7) changes in working capital. Negative changes in working capital primarily consisted of (1) a decrease of RMB42.6 million (US$6.7 million) in other non-current liabilities due to a decrease in deferred income tax liabilities, (2) an increase of RMB26.3 million (US$4.1 million) in accounts receivable, (3) a decrease of RMB7.9 million (US$1.2 million) in deferred revenues mainly due to a decrease in cash received in advance from clients, (4) a decrease of RMB7.1 million (US$1.1 million) in accrued expenses and other current liabilities due to a decrease in wage payable, and (5) an increase of RMB4.8 million (US$0.8 million) in prepaid expenses and other current assets mainly due to a loan to a third party, partially offset by (1) a decrease of RMB2.0 million (US$0.3 million) in amounts due from a related party as the related party repaid the cash advance to us in 2021, and (2) an increase of RMB12.2 million (US$1.9 million) in amounts due to a related party because we did not timely settle the net amount due to Fang in 2021.

Net cash provided by operating activities was RMB327.5 million in 2020, primarily due to net loss of RMB318.4 million, adjusted for (1) allowance for amounts due from a related party of RMB547.1 million, (2) deferred income tax expense of RMB60.5 million, (3) allowance for doubtful accounts of RMB12.4 million, (4) investment income of RMB9.3 million, (5) share-based compensation expense of RMB8.6 million, (6) reduction in the carrying amount of right of use assets of RMB5.2 million, (7) change in fair value of the warrants of RMB1.4 million, and (8) changes in working capital. Changes in working capital primarily consisted of (1) an increase of RMB557.6 million in accrued expenses and other liabilities due to our guarantee liability in relation to the convertible notes issued by Fang, (2) an increase of RMB20.6 million in deferred revenues due to cash received in advance from clients, and (3) an increase of RMB17.6 million in other non-current liabilities due to unrecognized tax benefits, partially offset by (1) an increase of RMB547.1 million in amounts due from a related party as we accrued a guarantee liability, which should be repaid by Fang to us no later than December 31, 2023 according to the agreement between Fang and us, (2) an increase of RMB17.7 million in accounts receivable, (3) a decrease of RMB7.3 million in amounts due to related parties due to timely settlement, and (4) a decrease of RMB10.3 million in long-term lease liabilities primarily due to our cash payments related to operating lease liabilities.

Net cash provided by operating activities was RMB334.0 million in 2019, primarily due to net income of RMB245.5 million, adjusted for (1) share-based compensation expense of RMB8.2 million, (2) reduction in the carrying amount of right of use assets of RMB5.0 million, (3) allowance for doubtful accounts of RMB4.8 million, (4) change in fair value of the warrants of RMB1.2 million, and (5) changes in working capital. Changes in working capital primarily consisted of (1) an increase of RMB60.3 million in deferred revenues due to cash received in advance from clients, and (2) an increase of RMB22.9 million in other non-current liabilities due to unrecognized tax benefits, and (3) an increase of RMB8.9 million in income tax payable, partially offset by (1) a decrease of RMB14.9 million in long-term lease liabilities primarily due to our cash payments related to operating lease liabilities, and (2) an increase of RMB13.6 million in accounts receivable.

*Investing Activities*

Net cash provided by investing activities was RMB384.6 million (US$60.4 million) in 2021, primarily due to proceeds from sales of short-term investments of RMB2,599.2 million (US$407.9 million) in wealth management products, partially offset by (1) purchase of short-term investments of RMB2,199.1 million (US$345.1 million) in wealth management products and (2) advance to a third party of RMB18.2 million (US$2.8 million).

Net cash used in investing activities was RMB257.8 million in 2020, primarily due to purchase of short-term investments of RMB4,084.4 million in wealth management products, partially offset by proceeds from sales of short-term investments of RMB3,827.1 million in wealth management products.

Net cash used in investing activities was RMB124.4 million in 2019, primarily due to purchase of short-term investments of RMB340.0 million in wealth management products, partially offset by proceeds from sales of short-term investments of RMB215.7 million in wealth management products.

*Financing Activities*

Net cash used in financing activities was RMB522.2 million (US$81.9 million) in 2021, primarily due to settlement of guarantee liability in relation to convertible notes issued by a related party of RMB540.4 million (US$84.8 million).

Net cash used in financing activities was nil in 2020.

Net cash used in financing activities was RMB160.2 million in 2019, primarily due to net transfers of RMB160.2 million to Fang, which occurred prior to our separation from Fang.

**Capital Expenditures**

Our capital expenditures were RMB62,227, RMB584,443 and RMB490,577 (US$76,982), in 2019, 2020 and 2021, respectively. Our capital expenditures were mainly used for purchases of electronic equipment relating to the operation of our database, office furniture and leasehold improvement for our office facilities. We will continue to make capital expenditures to meet the expected growth of our business.

**Inflation**

In recent years, China has not experienced significant inflation. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for 2019, 2020 and 2021 were increases of 2.9%, 2.5% and 0.9%, respectively. Although we have not been materially affected by inflation in recent years, we may be affected if China experiences higher rates of inflation in the future.

**Holding Company Structure**

China Index Holdings Limited is a holding company with no material operations of its own. We conduct our operations through our subsidiaries and VIEs in China. As a result, China Index Holdings Limited's ability to pay dividends depends upon dividends paid by our subsidiaries and cash payments from our VIEs in China. If our existing PRC subsidiaries or VIEs or any newly formed ones incur any debt on their own behalf in the future, the instruments governing their debts may restrict their ability to pay dividends or make cash payments to us. In addition, our wholly foreign-owned subsidiaries in China are permitted to pay dividends to us only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC laws, our wholly foreign-owned subsidiaries in China are required to set aside at least 10% of its after-tax profits each year, if any, to fund certain general reserve funds until such reserve funds reach 50% of its registered capital. In addition, each of our subsidiaries and VIEs in China are required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. Our subsidiaries and VIEs in China may allocate a portion of their after-tax profits based on PRC accounting standards to a discretionary surplus fund at their discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. For the years ended December 31, 2019, 2020 and 2021, no profit appropriation to statutory surplus fund or to other reserve funds was made for our entities incorporated in the PRC. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. For the years ended December 31, 2019 and 2020, our PRC subsidiaries did not pay any dividends. In 2021, our PRC subsidiaries paid a total of approximately RMB620 million of dividends to China Index Holdings Limited mainly to fulfill our payment obligations under the settlement deeds in relation to the convertible notes issued by Fang.

**C. Research and Development, Patents and Licenses, etc.**

See "Item 4. Information on the Company—B. Business Overview—Research and Technology" and "Item 4. Information on the Company—B. Business Overview—Intellectual Property."

**D. Trend Information**

The COVID-19 pandemic has resulted in quarantines, travel restrictions, and temporary closure of facilities in China and many other countries since early 2020. In the first quarter of 2022, the Omicron variant has become the dominant variant and led to a new wave of COVID-19 recurrence in China, causing local outbreaks in a number of areas. To achieve "dynamic-zero COVID-19 cases", the PRC government has adopted diversified disease containment measures, including but not limited to, lock-down in certain cities and areas with rapidly rising COVID-19 cases and infection risks (e.g. Shanghai, Shenzhen, Xi'an and a number of cities in Jilin province), epidemiological investigations on infection sources and close contacts, large-scale nucleic acid testing, travel restrictions, and continuous booster vaccination measures. Consequently, the COVID-19 pandemic has, and may continue to, materially adversely affect our business, results of operations and financial condition for the current fiscal year and beyond, including but not limited to business disturbances, slowdown in revenue growth and delayed collection of accounts receivables from our customers. Because of the significant uncertainties surrounding the COVID-19 pandemic, the extent of business disturbances and related financial impact cannot be reasonably estimated at this time. In addition, the recent war in Ukraine and the imposition of broad economic sanctions on Russia could raise energy prices and disrupt global markets. Due to the continuous development and complexity of the situation, the impact on the Chinese economy and our business going forward is uncertain. See "Item 3. Key Information— D. Risk Factors" of this annual report.

Other than as disclosed in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year of 2021 that are reasonably likely to have a material adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that caused the disclosed financial information to be not necessarily indicative of future operating results or financial condition.

*E. Critical Accounting Policies and Estimates*

We prepare our combined and consolidated financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experiences and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from our expectations as a result of changes in our estimates. Some of our accounting policies require a higher degree of judgment than others in their application and require us to make significant accounting estimates. We believe critical accounting policies as disclosed in this annual report reflect the more significant judgements and estimates used in preparation of our combined and consolidated financial statements.

The following descriptions of critical accounting policies and estimates should be read in conjunction with our combined and consolidated financial statements and other disclosures included in this annual report. When reviewing our combined and consolidated financial statements, you should consider our selection of critical accounting policies, the judgments and other uncertainties affecting the application of such policies and the sensitivity of reported results to changes in conditions and assumptions.

*Revenue Recognition*

We adopted the new revenue recognition standards, or ASC 606, effective January 1, 2018 using the modified retrospective method for contracts which were not completed at the date of initial adoption. Our contracts with customers often include promises to transfer multiple products and services. For these contracts, we account for individual performance obligations separately if they are capable of being distinct and distinct within the context of the contract. Determining whether products and services are considered distinct performance obligations may require significant judgment. Judgment is also required to determine the stand-alone selling price, or the SSP, for each distinct performance obligation. In instances where SSP is not directly observable, such as when we do not sell the product or service separately, we determine the SSP using information that may include market conditions and other observable inputs. In making these judgments, we analyze various factors, including our pricing methodology and overall market and economic conditions.

*Uncertain Tax Position*

We assess uncertain tax positions to determine whether the position will more likely than not be sustained upon examination by taxing authorities. If we cannot reach a more-likely-than-not determination, no benefit is recorded. If we determine that the tax position is more likely than not to be sustained, we record the largest amount of benefit that is more likely than not to be realized when the tax position is settled. We recognize interest and penalties, if any, related to uncertain tax positions in income tax expense. Judgment is required in assessing the future tax consequences of events that have been recognized on our combined and consolidated financial statements or tax returns. Variations in the actual outcome of these future tax consequences could materially impact our combined and consolidated financial statements.

*Allocation of Corporate Expenses*

Fang historically performed centralized functions on behalf of us prior to our separation from Fang in June 2019. The allocation of expenses requires judgment to determine a reasonable allocation methodology to be used to appropriately reflect the historical Fang's expenses attributable to us.

Expense allocation primarily relates to centralized functions, including finance, accounting, treasury, tax, legal, internal audit and human resources functions. In addition, expense allocations include, among other costs, IT maintenance and professional fees. The allocations of expenses were based on the number of our staff relative to Fang's total number of staff, or our revenues relative to Fang's total revenues, where appropriate. We believe the methodology used to allocate a particular shared cost provides the best reflection of the activity and cost in the historical periods.

86

*Leases*

We lease our offices primarily from Fang. Our lease agreements with Fang do not provide information on how to determine the implicit interest rate in the agreements. This requires us to make significant judgments in determining the incremental borrowing rate to be used in calculating operating lease liabilities as of the adoption date. We estimate the incremental borrowing rate primarily by reference to the risk-free interest rate of China, our credit rating and lease term.

*Allowance for amounts due from Fang*

We had an amount due from Fang in the amount of US$84.0 million (equivalent to RMB547.1 million) relating to our guarantee for the payment obligations of Fang under the convertible notes agreements as of December 31, 2020. Based on our credit assessment on the collectability of amounts due from Fang, taking into consideration of current market conditions and Fang's financial condition, as well as (1) Fang is subject to a winding-up petition by a noncontrolling shareholder in Cayman Court; (2) Fang is late in the filing of its annual 20-F for the year ended December 31, 2020; (3) Fang had to rely on us as the guarantor to settle the convertible notes agreements; and (4) we do not have any collateral placed by Fang against the amounts due from Fang, we have accrued 100% provision against the amounts due from Fang in the amount of RMB547.1 million (US$84.0 million) as of December 31, 2020, which was recorded as bad debt expense on the combined and consolidated statements of comprehensive income (loss) for the year ended December 31, 2020.

*Recently Adopted Accounting Pronouncement*

In December 2019, the FASB issued ASU No. 2019-12, Income Taxes (Topic 740), Simplifying the Accounting for Income Taxes. ASU No. 2019-12 removes certain exceptions to the general principles in Topic 740 and provides for consistent application of and simplifies generally accepted accounting principles for other areas of Topic 740 by clarifying and amending existing guidance. The guidance is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020. The method of adoption varies depending on the component of the new rule that is being adopted. Early application is permitted. On January 1, 2021, the Company adopted ASU No. 2019-12. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

## ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

*A. Directors and Executive Officers*

The following table sets forth certain information relating to our directors and executive officers as of the date of this annual report.

| Name | Age | Position |
|---|---|---|
| Richard Jiangong Dai | 48 | Chairman of the board of directors |
| Yu Huang | 55 | Director, chief executive officer and president |
| Jie Jiao | 42 | Independent director |
| Robert Ciemniak | 47 | Independent director |
| Jeff Xuesong Leng | 53 | Independent director |
| Lili Chen | 33 | Deputy chief financial officer |
| Can Xie | 38 | Chief technology officer |
| Yong Wang | 52 | Vice president |

*Richard Jiangong Dai* has served as our director and chairman of the board of directors since February 2022. Mr. Dai also serves as the chairman of the board of directors of Fang Holdings Limited (NYSE: SFUN). Mr. Dai joined Fang in 1999 and served multiple positions in Fang including Fang's president and chief executive officer from 1999 to 2014 and Fang's director from September 2010 to February 2016. Mr. Dai co-founded Yiyi Technology in 2015 and Xiangshui Technology in 2018 and served as chief executive officer for the two companies. Mr. Dai received a master's degree from Stanford University and a bachelor's degree from Guangxi University.

87

*Yu Huang* has served as our chief executive officer and president since January 2019, responsible for overall management of our company, and has served as our director since May 30, 2019. Prior to joining our company in 2000, Ms. Huang served as a senior investment consultant at Weiningxie Company Limited (China) from 1998 to 2000. She served as the manager in the engineering contract and budget department at H.K.I. Company Limited, a subsidiary of HKI Group, from 1996 to 1998. She served as a project manager at Beijing Uni.-Construction Group Company Limited from 1990 to 1996. Ms. Huang holds a bachelor's degree in engineering from North China University of Technology, a master's degree in business administration from Beijing Jiaotong University (formerly Northern Jiaotong University) and a PhD degree in management from Huazhong University of Science and Technology. Ms. Huang is currently pursuing her EMBA degree in PBC School of Finance, Tsinghua University.

*Jie Jiao* has served as our independent director since May 30, 2019. Ms. Jiao has served as the chief financial officer of Play for Dream Inc. since June 2019, and as the independent non-executive director of China Sunshine Paper Holdings Company (2002.HK), TradeGo FinTech Limited (8017.HK) and MOG Holdings Limited (1942.HK), all of which are Hong Kong-listed companies, since January 2014, September 2018 and April 2020, respectively. Ms. Jiao has also served as the independent director of Quhuo Limited (NASDAQ: QH), a NASDAQ-listed company, since July 2020. Prior to joining us, Ms. Jiao served as the chief financial officer at iClick Interactive Asia Group Limited (ICLK.NASDAQ), a NASDAQ-listed company, from June 2014 to December 2018. She was the vice chief executive officer at ArtGo Holdings Limited (3313.HK), a Hong Kong-listed company, mainly in charge of their initial public offerings, compliance after the initial public offerings and investor relationship from March 2012 to May 2014. Ms. Jiao served as the general counsel of and head of the investor relationship department of Fang from April 2010 to March 2012. Ms. Jiao also served as the board secretary and vice chief executive officer of China Sunshine Paper Holdings Company Limited (2002.HK), a Hong Kong-listed company, from April 2007 to March 2010. She was a senior counsel at Jingtian & Gongcheng from 2004 to 2007. Ms. Jiao received her bachelor degree of law and bachelor degree of economics from Peking University, and her master degree of law in Oxford University. Ms. Jiao is a Chartered Financial Analyst and has obtained her PRC Legal Profession Qualification Certificate.

*Robert Ciemniak* has served as our independent director since May 30, 2019. Mr. Ciemniak has served as the chief executive officer of Robotic Online Intelligence Limited since February 2017 and as the chief executive officer of Real Estate Foresight Limited since February 2012. Both Real Estate Foresight Limited and Robotic Online Intelligence Limited were set up via Rheticus Ventures Limited founded by Mr. Ciemniak in January 2012. Mr. Ciemniak served in various positions, including global head of Real Estate Market, and earlier as head of Corporate Foresight in Group Strategy at Thomson Reuters Corporation, a company listed on the NYSE, from October 1998 to December 2011. Mr. Ciemniak received his master degree of management and marketing from Warsaw School of Economics and his dual MBA degree from London Business School and Columbia Business School.

*Jeff Xuesong Leng* has served as our independent director since May 30, 2019. Mr. Leng is the founder of Lupin Capital, a China-focused private equity fund and has served as an independent non-executive director of MEITUAN DIANPING (3690.HK) since September 2018. Prior to founding Lupin Capital, Mr. Leng served as a managing director of General Atlantic LLC from September 2007 to December 2014. He joined Warburg Pincus Asia LLC in September 1999 as an associate and served as a managing director when he left in August 2007. Mr. Leng also served as a non-executive director of China Huiyuan Juice Group Limited (1886.HK) from September 2006 to August 2007, a non-executive director of Zhongsheng Group Holdings Limited (881.HK) from August 2008 to June 2015, a non-executive director of Wuxi Pharmatech (Cayman) Inc. (previously listed as WX.NYSE) from March 2008 to December 2015 and a non-executive director of Fang from October 2010 to December 2014.

*Lili Chen* has served as our deputy chief financial officer since January 2021 and served as our financial controller from January 2018 to December 2020, in charge of financial affairs of our company. Ms. Chen served as the director of the Beijing financial management center of Fang from 2017 to 2018, a senior financial manager at Fang from 2015 to 2016, and as a financial manager at Fang from 2014 to 2015. She served as a financial assistant at Melbourne Masolino Supermarket from 2012 to 2013. Ms. Chen holds a bachelor's degree and a master's degree in finance from La Trobe University at Melbourne, Australia.

*Can Xie* has served as our chief technology officer since May 2019. Mr. Xie has also served as the chief technology officer of our subsidiary, Beijing Zhong Zhi Xun Bo Data Information Technology Co., Ltd., since January 2019. Since joining our company in January 2008, he has served various positions in our subsidiaries. From August 2015 to January 2019, he served as the technology director at Beijing Zhong Zhi Xun Bo Data Information Technology Co., Ltd. From January 2008 to August 2015, Mr. Xie served as a software engineer and then the vice technology director at our WFOE. Mr. Xie holds a bachelor's degree in computer science from the PLA Information Engineering University.

**Yong Wang** has served as our vice president since May 2019. Mr. Wang has also served as the vice president and general manager of Chongqing branch of our WFOE since October 2007. Mr. Wang served as the research director at a subsidiary of Fang from April 2003 to October 2007. Mr. Wang holds a bachelor's degree in civil engineering from Chongqing Jiaotong University, a master's degree in management engineering from Chongqing University and a PhD degree in real estate from National University of Singapore.

### B. Compensation

### Compensation of Directors and Executive Officers

In 2021, the aggregate cash compensation to our directors and executive officers was approximately RMB6.2 million (US$1.0 million). Other than the statutory benefits that we are required by the PRC law to contribute for each employee, including pension insurance, we have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our directors and executive officers.

### 2019 Equity Incentive Plan

We adopted our 2019 equity incentive plan, or the 2019 Equity Incentive Plan, on May 2, 2019. The purpose of our 2019 Equity Incentive Plan is to recognize and acknowledge the contributions made to our company by eligible participants and to promote the success of our business. By providing an opportunity to have a personal stake in our company, our 2019 Equity Incentive Plan aims to attract and retain the best available personnel, to provide an additional incentive to our employees, directors and consultants, and to promote the success of our business.

Prior to the completion of the separation and distribution, we awarded options to purchase certain of our Class A ordinary shares and Class B ordinary shares to holders of Fang's equity awards, to make them whole under the separation. The options have a nominal exercise price and may be exercisable if and to the extent that the corresponding Fang's equity awards are exercised.

**Eligible Participants.** Under our 2019 Equity Incentive Plan, our board of directors or its designated committee may, at its discretion, offer to grant an option to subscribe for such number of our ordinary shares at an exercise price as our directors may determine to the following parties: (1) any full-time or part-time employees, executives or officers of us, our parent or any of our subsidiaries; (2) any directors of us, our parent or any of our subsidiaries; (3) any advisers, consultants and agents to us or any of our subsidiaries; and (4) such other persons who, in the sole opinion of our board of directors or its designated committee, has made contributions to the business or other development of us.

**Maximum Number of Ordinary Shares.** The maximum number of ordinary shares in respect of which awards may be granted will not exceed (1) 5% of our outstanding ordinary shares as of the date of completion of the separation and distribution plus (2) the number of ordinary shares that may be issued upon exercise of the awards to be granted with respect to the share options issued prior to the completion of the separation and distribution to holders of Fang's equity awards to make them whole under the separation.

**Price of Ordinary Shares.** The determination by our board of directors, or its designated committee, of the exercise price of the options to purchase our ordinary shares will be by reference to the fair market value of the ordinary shares, and the exercise price may be the same as, higher, or lower than the fair market value, except for options or awards which are incentive stock options or subject to Rule 409A of the Code. If there exists a public market for our ordinary shares, including our ADSs, the fair market value of our ordinary shares will be (1) the closing price for the last market trading day prior to the time of the determination (or, if no closing price was reported on that date, on the last trading date on which a closing price was reported) on the stock exchange determined by our board of directors, or its designated committee, to be the primary market for our ordinary shares or the NASDAQ, whichever is applicable, or (2) if the ordinary shares are not traded on any such exchange or national market system, the average of the closing bid and asked prices of an ordinary share on the day prior to the time of the determination (or, if no such prices were reported on that date, on the last date on which such prices were reported), in each case, as reported in The Wall Street Journal or such other source as the board of directors or its designated committee deems reliable. If there is no established market for our ordinary shares, our board of directors, or its designated committee, will determine the fair market value of our ordinary shares in good faith by reference to the placing price of the latest private placement of our ordinary shares and the development of our business operations since such latest private placement.

89

Table of Contents

**Performance Criteria.** The 2019 Equity Incentive Plan allows our board of directors, or its designated committee, to establish the performance criteria when granting awards on the basis of any one of, or combination of, increase in our share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenues, economic value-added, personal management objectives, or other measures of performance selected by our board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the award agreement with the relevant grantee.

**Time of Exercise of Options.** The time and conditions under which an award may be exercised will be determined by the board of directors, or its designated committee, under the terms of the 2019 Equity Incentive Plan and as specified in the award agreement with each individual grantee. Notwithstanding the foregoing, in the case of any awards granted to an officer, director or consultant that may become exercisable, the award agreement governing such grant may provide that the awards may become exercisable subject to reasonable conditions such as the officer, director or consultant's continuous service at any time or during any period established in the award agreement governing such grant.

**Dissolution, Liquidation or Change in Control.** In the event of the proposed dissolution or liquidation of our company, our board of directors, or its designated committee, will notify the grantees as soon as practicable prior to the effective date of such proposed transaction. Any awards will terminate immediately prior to the consummation of such proposed action. In the event of a change in control or a merger of our company, each award may be assumed or an equivalent stock option or right may be substituted by the successor corporation. In the event that no such substitution or assumption occurs, the outstanding awards will automatically vest and become exercisable for a limited period of time as determined by our board of directors, or its designated committee, and such awards will terminate upon the expiration of such period.

**Termination.** Unless terminated earlier, the 2019 Equity Incentive Plan will continue for a term of ten years. Our board of directors has the authority to amend or terminate the 2019 Equity Incentive Plan subject to shareholder approval with respect to certain amendments. However, no such action may impair the rights of any grantee of any options unless agreed by the grantee.

The following table summarizes, as of March 31, 2022, the outstanding options granted to our current directors and executive officers, excluding options that were exercised, forfeited or canceled after the relevant grant dates.

| Name | Number of Class A Ordinary Shares to be Issued upon Exercise of Options | Number of Class B Ordinary Shares to be Issued upon Exercise of Options | Exercise Price per Ordinary Share (US$) | Date of Grant | Date of Expiration |
|------|------|------|------|------|------|
| Yu Huang | 122,500 | — | 0.001 | July 25, 2022 | July 25, 2022 — December 30, 2029 |
| | 961,123 | — | 1.35 | April 1, 2020 | March 31, 2030 |
| Lili Chen | * | — | 0.001 | June 10, 2019 | November 30, 2026 — June 6, 2029 |
| | * | — | 1.35 | April 1, 2020 | March 31, 2030 |
| Can Xie | * | — | 0.001 | June 10, 2019 | July 25, 2022 — June 6, 2029 |
| | * | — | 1.35 | April 1, 2020 | March 31, 2030 |
| Yong Wang | * | — | 0.001 | June 10, 2019 | July 25, 2022 — June 6, 2029 |
| | * | — | 1.35 | April 1, 2020 | March 31, 2030 |
| **Total** | **1,372,823** | **—** | | | |

\*      Less than 1% of our total outstanding shares on an as-converted basis or voting power assuming full exercise of the options.

As of March 31, 2022, our employees other than members of our directors and officers as a group held outstanding options to purchase 1,958,853 and 2,728,532 Class A ordinary shares of our company, with an exercise price of US$0.001 and US$1.35 per share, respectively.

As of March 31, 2022, there was no outstanding restricted share unit granted by us.

*C. Board Practices*

**Board of Directors**

Our board of directors consists of five directors. A director is not required to hold any shares in our company by way of qualification. A director may vote with respect to any contract or transaction, or proposed contract or transaction in which he is interested provided such director has declared the nature of his interest at the earliest meeting of the board at which it is practicable for him to do so, either specifically or by way of a general notice. The directors may from time to time at their discretion exercise all the powers of the company to borrow money, mortgage or charge its undertaking, property and uncalled capital or any part thereof, and issue debentures, debenture stock, bonds and other securities, whether outright or as collateral security for any debt, liability or obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of service.

**Board Committees**

Our board of directors has established an audit committee, a compensation committee and a nominating and corporate governance committee and adopted a charter for each of the three committees. Each committee's members and functions are described below.

*Audit Committee.* Our audit committee consists of Ms. Jie Jiao, Mr. Robert Ciemniak and Mr. Jeff Xuesong Leng, and is chaired by Ms. Jie Jiao. Ms. Jie Jiao, Mr. Robert Ciemniak and Mr. Jeff Xuesong Leng satisfy the "independence" requirements of Rule 5605 of the NASDAQ Stock Market Rules and meet the independence standards under Rule 10A-3 under the Exchange Act. We have determined that Ms. Jie Jiao qualifies as an "audit committee financial expert" within the meaning of the SEC rules and possesses financial sophistication within the meaning of the NASDAQ Stock Market Rules. The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- selecting the independent registered public accounting firm and pre-approving all auditing and non-auditing services permitted to be performed by the independent registered public accounting firm;

- reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response;

- reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act;

- discussing the annual audited financial statements with management and the independent registered public accounting firm;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- reviewing and reassessing annually the adequacy of our audit committee charter;

- meeting separately and periodically with management, internal auditors and the independent registered public accounting firm;

- discussing policies with respect to risk assessment and risk management;

- reporting regularly to the full board of directors; and

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our internal control and accounting and auditing procedures to ensure proper compliance.

Table of Contents

***Compensation Committee.*** Our compensation committee consists of Mr. Robert Ciemniak, Mr. Jeff Xuesong Leng and Mr. Richard Jiangong Dai, and is chaired by Mr. Richard Jiangong Dai. Mr. Robert Ciemniak and Mr.Jeff Xuesong Leng satisfy the "independence" requirements of Rule 5605 of the NASDAQ Stock Market Rules. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting during which their compensation is deliberated upon. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our chief executive officer and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

***Nominating and Corporate Governance Committee.*** Our nominating and corporate governance committee consists of Ms. Jie Jiao, Mr. Jeff Xuesong Leng and Mr. Richard Jiangong Dai, and is chaired by Mr. Richard Jiangong Dai. Ms. Jie Jiao and Mr. Jeff Xuesong Leng satisfy the "independence" requirements of Rule 5605 of the NASDAQ Stock Market Rules. The nominating and corporate governance committee assists the board in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The nominating and corporate governance committee is responsible for, among other things:

- recommending nominees to the board for election or re-election to the board, or for appointment to fill any vacancy on the board;

- reviewing annually with the board the current composition of the board with regards to characteristics such as independence, age, skills, experience and availability of service to us;

- selecting and recommending to the board the names of directors to serve as members of the audit committee and the compensation committee, as well as of the nominating and corporate governance committee itself;

- developing and reviewing the corporate governance principles adopted by the board and advising the board with respect to significant developments in the law and practice of corporate governance and our compliance with such laws and practices; and

- evaluating the performance and effectiveness of the board as a whole.

**Duties of Directors**

Under Cayman Islands law, our directors owe us fiduciary duties, including a duty of loyalty, a duty to act honestly and a duty to act in what they consider in good faith to be in our best interests. Our directors must also exercise their powers only for a proper purpose. Our directors also have a duty to exercise the skill they actually possess and such care and diligence that a reasonably prudent person would exercise in comparable circumstances. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than what may reasonably be expected from a person of his knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care, and these authorities are likely to be followed in the Cayman Islands. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association, as amended and restated from time to time. Our company may have the right to seek damages if a duty owed by our directors is breached.

**Terms of Directors and Executive Officers**

Our directors may be elected by a resolution of our board of directors, or by an ordinary resolution of our shareholders and our executive officers will be elected by and serve at the discretion of the board. A director may be appointed on terms that he or she shall automatically retire from office (unless he or she has sooner vacated office) at the next or a subsequent annual general meeting, upon any specified event or after any specified period in a written agreement between our company and the director, if any; but no such term shall be implied in the absence of express provisions. Each director whose term of office expires shall be eligible for re-election at a meeting of the shareholders or re-appointment by the board of directors. A director will cease to be a director if, among other things, the director (1) becomes bankrupt or makes any arrangement or composition with his creditors; (2) dies or is found to be or becomes of unsound mind, (3) resigns his office by notice in writing to the company, (4) without special leave of absence from our board, is absent from three consecutive board meetings and our directors resolve that his office be vacated, or (5) is removed from office pursuant to any other provision of our memorandum and articles of association. Our officers are elected by and serve at the discretion of the board of directors.

**Employment Agreements**

We have entered into employment agreements with our executive officers. Each of our executive officers is employed for a specified time period. We may terminate the employment for cause, at any time, without advance notice or remuneration. An executive officer may terminate his or her employment at any time with a 30-day prior written notice.

Each executive officer has agreed to hold, both during and after the employment agreement expires, in strict confidence and not to use or disclose to any person, corporation or other entity without written consent, any confidential information. Each executive officer has also agreed to assign to us all his or her all inventions, work, computer software programs, confidential technical information and trade secrets.

*D. Employees*

We had 858 employees as of December 31, 2021. The following table sets forth the number of our employees categorized by function as of December 31, 2021.

| Function | Number of Employees | % of Total |
|---|---|---|
| Marketing | 512 | 59.7 |
| Research and analysis | 166 | 19.3 |
| Technology | 67 | 7.8 |
| Administrative | 48 | 5.6 |
| Product editing | 65 | 7.6 |
| **Total** | **858** | **100.0** |

Our employees are based in our principal executive offices in Beijing, China and regional centers across China.

We believe we offer our employees competitive compensation packages and a dynamic work environment that encourages initiative and is based on merit. As a result, we have generally been able to attract and retain qualified personnel and maintain a stable core management team. We plan to hire additional experienced and talented employees in areas such as research and analysis and sales as we expand our business.

We believe that we maintain a good working relationship with our employees, and we have not experienced any major labor disputes.

93

*E. Share Ownership*

The following table sets forth information concerning the beneficial ownership of our ordinary shares as of March 31, 2022 by:

- each of our directors and executive officers; and

- each person known to us to beneficially own more than 5.0% of our ordinary shares.

The calculation and information provided in the table below is based on our records, information filed with the SEC and information provided to us, except where otherwise noted. The information in the table below is based upon the fact that there are 90,425,368 ordinary shares outstanding, including 66,788,662 Class A ordinary shares and 23,636,706 Class B ordinary shares outstanding as of March 31, 2022.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant, or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Class A Ordinary Shares Beneficially Owned | | Class B Ordinary Shares Beneficially Owned | | % of Aggregate Voting Power† |
|---|---|---|---|---|---|
| | Number | % of share capital | Number | % of share capital | |
| **Directors and Executive Officers:** | | | | | |
| Richard Jiangong Dai | * | * | — | — | * |
| Yu Huang | * | * | — | — | * |
| Jie Jiao | — | — | — | — | — |
| Robert Ciemniak | — | — | — | — | — |
| Jeff Xuesong Leng | — | — | — | — | — |
| Lili Chen | * | * | — | — | * |
| Can Xie | * | * | — | — | * |
| Yong Wang | * | * | — | — | * |
| Directors and executive officers as a group | 695,097 | 1.0 | — | — | 0.2 |
| **Principal Shareholders:** | | | | | |
| Mr. Vincent Tianquan Mo and his affiliated entities [1] | 6,372,742 | 9.5 | 18,227,259 | 77.1 | 62.2 |
| Fang Holdings Limited [2] | 6,731,275 | 10.1 | 11,119,686 | 47.0 | 38.9 |
| General Atlantic Singapore Fund Pte. Ltd. [3] | 10,122,769 | 15.2 | — | — | 3.3 |
| Evenstar Capital Management Limited [4] | 9,229,951 | 13.8 | — | — | 3.0 |
| IDG Alternative Global Limited [5] | 8,294,881 | 12.4 | — | — | 2.7 |
| Davis Selected Advisers, L.P. [6] | 4,452,643 | 6.7 | — | — | 1.5 |

\*   Less than 1% of our total outstanding voting securities on an as converted basis.

\*\*  Except where otherwise disclosed in the footnotes below, the business address of our directors and executive officers is Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, People's Republic of China.

†   For each person and group included in this column, percentage of total voting power represents dividing the voting power beneficially owned by such person or group by the voting power of all of our Class A and Class B ordinary shares as a single class. In respect of all matters upon which the ordinary shares are entitled to vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to ten votes, voting together as one class. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary share unless approved by our board of directors.

94

(1) Represents 6,372,742 Class A ordinary shares and 18,227,259 Class B ordinary shares held by ACE Smart Investments Limited, Media Partner Technology Limited, Next Decade Investments Limited, Karistone Limited, Ateefa Limited, Deanhale Limited and Open Land Holdings Limited as reported in a Schedule 13D/A filed by Mr. Vincent Tianquan Mo and his affiliates on July 20, 2021, including 2,662,671 Class A ordinary shares and 1,754,500 Class B ordinary shares issuable upon exercise of certain stock options exercisable within 60 days. All of the shares of Media Partner Technology Limited and Next Decade Investments Limited, including ordinary shares represented by ADSs are held in two irrevocable discretionary family trusts established by Mr. Vincent Tianquan Mo for the benefit of his designated family members. In our annual report for the fiscal year ended December 31, 2019, filed with the SEC on April 30, 2020, we reported beneficial ownership by Mr. Vincent Tianquan Mo and his affiliated entities of 86.6% of our issued and outstanding Class B ordinary shares. The address of Mr. Vincent Tianquan Mo and his affiliated entities is c/o Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing, People's Republic of China.

(2) Represents 6,731,275 Class A ordinary shares in the form of ADSs and 11,119,686 Class B ordinary shares held by Fang Holdings Limited as reported in a Schedule 13D/A filed by it on June 24, 2020. Please refer to the Form 20-F filed by Fang Holdings Limited on May 27, 2020 for its shareholding information. Mr. Richard Jiangong Dai is the chairman of the board of directors of Fang Holdings Limited. In our annual report for the fiscal year ended December 31, 2019, filed with the SEC on April 30, 2020, we reported beneficial ownership by Fang Holdings Limited of 3.2% and 21.2% of our issued and outstanding Class A ordinary shares and Class B ordinary shares, respectively. The address of Fang Holdings Limited is c/o Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing, People's Republic of China.

(3) Represents 10,122,769 Class A ordinary shares in the form of ADSs beneficially owned by General Atlantic Singapore Fund Pte. Ltd. as reported in a Schedule 13D filed by it and its affiliates on November 30, 2020. The address of General Atlantic Singapore Fund Pte. Ltd. is Asia Square Tower 1, 8 Marina View, #41-04, Singapore 018960.

(4) Represents 9,229,951 Class A ordinary shares beneficially owned by Evenstar Capital Management Limited and its affiliates as reported in a Schedule 13D/A filed by it and its affiliates on January 6, 2021, including Class A ordinary shares held by Evenstar Master Fund SPC, Evenstar Special Situations Limited and Geminis Funds SPC. In our annual report for the fiscal year ended December 31, 2019, filed with the SEC on April 30, 2020, we did not report that Evenstar Capital Management Limited beneficially owned five percent or more of our issued and outstanding Class A ordinary shares. The address of Evenstar Capital Management Limited and its affiliates Ugland House, P.O. Box 309, Grand Cayman, KY1 – 1104, Cayman Islands.

(5) Represents 8,294,881 Class A ordinary shares beneficially owned by IDG Alternative Global Limited and its affiliates as reported in a Schedule 13G filed by it and its affiliates on February 14, 2020, including Class A ordinary shares held by IDG-Accel China Capital L.P., IDG-Accel China Capital Investors L.P., IDG Alternative Global Limited, Chuang Xi Capital Holdings Limited, Quartz Fortune Limited, IDG Ultimate Global Limited, Velda Power Limited and Clever Sight Limited. IDG-Accel China Capital L.P. and IDG-Accel China Capital Investors L.P. have the same ultimate general partner, IDG-Accel China Capital GP Associates Ltd., of which Quan Zhou and Chi Sing Ho are directors. Chi Sing Ho is also a director of IDG Alternative Global Limited, Chuang Xi Capital Holdings Limited, Quartz Fortune Limited, IDG Ultimate Global Limited, Velda Power Limited and Clever Sight Limited. The address of IDG Alternative Global Limited and its affiliates is c/o IDG Capital Management (HK) Limited, Unit 5505, The Center, 99 Queen's Road Central, Hong Kong.

(6) Represents 4,452,643 Class A ordinary shares in the form of ADSs beneficially owned by Davis Selected Advisers, L.P. as reported in a Schedule 13G/A filed by it on February 11, 2022. The address of Davis Selected Advisers, L.P. is 2949 East Elvira Road, Suite 101, Tucson, AZ 85756.

JPMorgan Chase Bank, N.A., the depositary of our ADSs, has advised us that as of March 31, 2022, of the 90,425,368 issued and outstanding ordinary shares, including both Class A ordinary shares and Class B ordinary shares, approximately 87.8% of our outstanding Class A ordinary shares, were in the form of ADSs. To our knowledge, as of March 31, 2022, the record holder of our Class A ordinary shares in the United States includes JPMorgan Chase Bank, N.A. None of our outstanding Class B ordinary shares was held by any record holder with an address in the United States.

Table of Contents

**ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS**

*A. Major Shareholders*

See "Item 6. Directors, Senior Management and Employees—E. Share Ownership."

*B. Related Party Transactions*

**Contractual Arrangements**

In order to comply with PRC regulatory requirements restricting foreign ownership of value-added telecommunications and certain other businesses in China, we, through WFOE, which is our PRC subsidiary and a wholly foreign-owned enterprise, have entered into a series of contractual arrangements with (1) our VIEs, and (2) the shareholders of the VIEs, which enables us to:

- exercise effective control over our VIEs;

- receive substantially all of the economic benefits of our VIEs; and

- have exclusive options to purchase all or part of the equity interests in our VIEs when and to the extent permitted by PRC law.

As a result of our direct ownership in WFOE and the contractual arrangements relating to the VIEs, we are regarded as the primary beneficiary of the VIEs, and we consolidate the financial results of the VIEs in our combined and consolidated financial statements in accordance with U.S. GAAP.

For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure—Our Contractual Arrangements."

**Separation and Distribution Related Agreements**

On May 24, 2019, we entered into with Fang a separation and distribution agreement and related ancillary agreements, including business cooperation agreement, data license agreement, software license agreement, intellectual property right license agreement, and lease framework agreement in connection with the separation and distribution to affect the separation and provide a framework for our relationship with Fang after the separation and distribution. These agreements provide for the allocation between us and Fang of business, assets, employees, liabilities and obligations (including investments, property and employee benefits and tax-related assets and liabilities) attributable to periods prior to, at and after our separation and distribution and govern certain relationships between us and Fang after the separation and distribution. The summaries of each of the aforementioned agreements are listed as below.

*Separation and Distribution Agreement*

We have entered into a separation and distribution agreement with Fang, which sets forth our agreements with Fang regarding the principal transactions necessary to separate us from Fang. It also sets forth other agreements that govern certain aspects of our relationship with Fang after the completion of the separation and distribution.

*Delineation of business.* According to the separation and distribution agreement, we have the exclusive right to operate the spun-off business comprising certain portions of Fang's listing and value-added services identified in this annual report, and Fang have the exclusive right to operate the retained business. In particular, the spun-off business comprises (1) certain information and analytics services, initially operated as part of Fang's value-added services, and (2) certain marketplace services, initially operated as part of Fang's listing services. Following the separation and distribution, we will strategically focus on serving the commercial property sector in China to capture the enormous market opportunity from its rapid development, while Fang retains its business operating a real estate Internet portal focusing primarily on serving the residential property sector.

Table of Contents

*Transfer of assets and assumption of liabilities.* The separation and distribution agreement identifies assets to be transferred, liabilities to be assumed and contracts to be assigned to us as part of the separation of Fang into two independent companies, and described when and how these transfers, assumptions and assignments will occur. In particular, the separation and distribution agreement provides that, subject to the terms and conditions contained in the agreement: (1) Fang assigned to us all of the assets and liabilities of Fang related to the spun-off business; and (2) all of the assets and liabilities (including whether accrued, contingent or otherwise) other than the foregoing are retained or assumed by Fang, including but not limited to the tax liability that may be borne by Fang in the event that the separation and distribution were considered as not tax-free by competent taxation authorities, and the potential liability associated with the assets retained in Fang after the separation and distribution.

Except as expressly set forth in the separation and distribution agreement or any ancillary agreement, neither we nor Fang will make any representation or warranty as to the assets, business or liabilities transferred or assumed as part of the separation, as to any approvals or notifications required in connection with the transfers, as to the value of or the freedom from any security interests of any of the assets transferred, as to the absence or presence of any defenses or right of setoff or freedom from counterclaim with respect to any claim or other asset of either us or Fang, or as to the legal sufficiency of any assignment, document or instrument delivered to convey title to any asset or thing of value to be transferred in connection with the separation. All assets will be transferred on an "as is," "where is" basis and the respective transferees would bear the economic and legal risks that any conveyance would prove to be insufficient to vest in the transferee good and marketable title, free and clear of all security interests, that any necessary consents or governmental approval are not obtained or that any requirements of laws, agreements, security interests, or judgments are not complied with.

To the extent that any transfers contemplated by the separation and distribution agreement have not been consummated on or prior to the date of the separation, the will would agree to cooperate to affect such transfers as promptly as practicable following the date of the separation. In addition, each of the parties will agree to cooperate with each other and use reasonable best efforts to take or to cause to be taken all actions, and to do, or to cause to be done, all things reasonably necessary under applicable law or contractual obligations to consummate and make effective the transactions contemplated by the separation and distribution agreement and the ancillary agreements.

*The distribution.* The separation and distribution agreement also governs the rights and obligations of the parties regarding the distribution. On the distribution date, Fang will cause our share registrar and depositary to distribute to its equity holders that hold Fang ordinary shares or American depositary shares of Fang as of the record date all of our issued and outstanding ordinary shares (including those represented by ADSs) prior to the separation and distribution. No fractional ordinary shares will be distributed in the distribution. Holders of American depositary shares of Fang will receive cash in lieu of any fractional ADSs. The separation and distribution agreement provides that the distribution is subject to satisfaction (or waiver by Fang) of certain conditions. Fang will have the sole and absolute discretion to determine the terms of, and whether to proceed with, the distribution.

*Settlement of accounts between us and Fang.* The separation and distribution agreement provides that all inter-company receivables and payables as to which there were no third parties and that are between us or our subsidiaries and VIEs, on the one hand, and Fang or its subsidiaries or consolidated affiliated entities, on the other hand, other than accounts related to the agreements to be entered into in connection with the separation and distribution and post-separation agreements between Fang and us and other than any accrued liabilities incurred in connection with providing the services that will be memorialized by certain ancillary agreements, in each case existing as of or immediately prior to the completion of the separation and distribution, would be settled, capitalized, cancelled, assigned or assumed by us or one or more of our subsidiaries.

*Releases.* Except as otherwise provided in the separation and distribution agreement or any ancillary agreement, each party will release and forever discharge the other party from all liabilities existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the separation and distribution. The releases will not extend to obligations or liabilities under any agreements between the parties that remain in effect following the separation, including the separation and distribution agreement or any ancillary agreement.

*Claims and indemnification.* In general, each party to the separation and distribution agreement will assume or retain liability for all pending, threatened and unasserted legal matters related to its own business or its assumed or retained liabilities and will indemnify the other party for any liability to the extent arising out of or resulting from such assumed or retained legal matters.

*Intellectual property.* Following the distribution, Fang will continue to own *fang.com* and other intellectual property rights associated with such brands and will license to us certain intellectual property rights for the operation of our business.

*Employee Matters.* We and Fang have agreed to allocate liabilities and responsibilities relating to certain employee benefit matters, including the issuance of share options by us to reflect the share options granted under Fang's equity compensation programs.

*Tax Matters.* We and Fang have agreed that after to separation, all tax liabilities (1) resulting or arising from the contribution of the spun-off business to us, the distribution of our ordinary shares and the other separation transactions, (2) in the event that the separation and distribution is considered as not tax-free by competent taxation authorities or (3) otherwise attributable to Fang or relating to the retained business, will be borne by Fang. Neither we nor Fang will indemnify Fang's equity holders against any tax liability if the distribution, together with certain related transactions, does not qualify as tax-free for U.S. federal income tax or PRC tax purposes. As a result, we generally expect to be liable only for tax liabilities attributable to, or incurred with respect to, the spun-off business or otherwise attributable to us after the distribution date.

*Legal matters.* Except as otherwise set forth in the separation and distribution agreement, we will assume the liability for, and control of, all pending and threatened legal matters related to the spun-off business or assumed liabilities and we will indemnify Fang for any liability arising out of or resulting from such assumed legal matters. Each party to a claim will agree to cooperate in defending any claims against the other party for events that took place prior to, on or after the date of separation. Fang will retain liability for pending and threatened legal matters related to the retained business.

*Further assurances.* In addition to the actions specifically provided for in the separation and distribution agreement, except as otherwise set forth therein or in any ancillary agreement, both we and Fang will agree to use reasonable best efforts, prior to, on and after the distribution date, to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by the separation and distribution agreement and the ancillary agreements.

**Business Cooperation Agreement**

Fang and we have entered into a business cooperation agreement in respect of our cooperation on certain commercial property-related business, particularly our listing services, operated through Fang's website, *Fang.com*, after the separation and distribution. The initial term of this agreement is ten years commencing from the signing date and may be terminated by mutual written agreement between Fang and us.

*Business Cooperation.* We have the exclusive right to operate all the commercial property-related business, such as the online listing of commercial properties and lands as well as the advertising and marketing services provided through Fang's commercial property-related web pages, for which Fang will be responsible for operating and maintaining at our expenses, which will include IT system upgrade, servers maintenance and software upgrade. Fang has the exclusive right to operate all the residential property-related business, except for those provided by us to clients relating to residential property-related business, including the information and analytics services as well as promotion services. We historically cooperated with Fang to operate our commercial property-related business through its web pages.

*Intellectual Property Cooperation.* Fang has agreed to authorize us to use for free certain of its trademarks, copyrights, patents and other intellectual properties in connection with the operation of our commercial property-related business.

*Revenues and Expenses Allocation.* Originally under the business cooperation agreement, during the term of our cooperation, Fang has the right to receive (1) 100% of the revenues generated by residential property-related business on Fang's residential property-related web pages, (2) 85% of the revenues generated by commercial property-related business on Fang's residential property-related web pages, and (3) 15% of the revenues generated by residential property-related business on Fang's commercial property-related web pages. We will have the right to receive (1) 100% of the revenues generated by commercial property-related business on Fang's commercial property-related web pages, for which we will bear the cost for operating and maintaining the related web pages and servers, (2) 85% of the revenues generated by residential property-related business on Fang's commercial property-related web pages, and (3) 15% of the revenues generated by commercial property-related business on Fang's residential property-related web pages. We and Fang have agreed to terminate, effective from January 1, 2020, such revenue allocation arrangement, and as a result, Fang had the right to receive 100% of the revenue generated by business on Fang's residential real estate channel, whereas we had the right to receive 100% of the revenue generated by business on our commercial real estate channel in 2020. We discontinued our commercial listing services business from January 2021.

### Data License Agreement

We have entered into a data license agreement with Fang, pursuant to which, Fang agrees to license the right of using certain data to us for development of our business, and we agree to provide certain data to Fang, including property appraisal and transaction data. Each of Fang and us will not pay any royalty fees. The term of the data license agreement is ten years commencing from the signing date and may be terminated by mutual agreement between Fang and us.

### Software License Agreement

We have entered into a software license agreement with Fang, pursuant to which, Fang agrees to license the right of using certain of their software at annual royalty fee of RMB500,000, subject to adjustment. The term of the software license agreement is ten years commencing from the signing date and may be terminated by mutual agreement between Fang and us.

### Intellectual Property License Agreement

In connection with the separation, we have entered into an intellectual property license agreement with Fang, pursuant to which we will be granted a non-exclusive and royalty-free right to use certain of Fang's intellectual properties in connection with the operation of our business. The intellectual property license agreement will be valid for a term of ten years commencing from the signing date and may be terminated by mutual written agreement between Fang and us.

### Lease Framework Agreement

Fang and we have entered into a lease framework agreement, pursuant to which Fang agrees to lease properties owned by it or its affiliates to us at market price. The lessors and lessees have entered into detailed lease agreements in accordance with this framework agreement based on our actual demands. The initial term of this agreement is ten years commencing from the signing date and may be terminated by mutual written agreement between Fang and us.

### Other Transactions with Companies Controlled by or Affiliated with Mr. Vincent Tianquan Mo

We are ultimately controlled by Mr. Vincent Tianquan Mo, Fang's controlling shareholder. In 2019, 2020 and 2021, we had the following transactions with companies controlled by or affiliated with Mr. Vincent Tianquan Mo.

99

Table of Contents

In 2019 and 2020, we provided listing service and analytics services to Fang and other companies controlled by Mr. Vincent Tianquan Mo. The total revenues in connection with the listing services provide by us to Fang were approximately RMB26.4 million, nil and nil, respectively, in 2019, 2020 and 2021. We also provided analytics services to Beihai Long Island Hotel Co., Ltd., Guangxi Pukai Xinye Hotel Investment Co., Ltd. and Beijing CheTianXia Information Co. Ltd., all of which are controlled by Mr. Vincent Tianquan Mo, and generated revenues of RMB4.7 million, RMB4.7 million and RMB7.8 million from these three entities in 2019, respectively. We generated revenues of RMB4.7 million, RMB2.4 million and RMB3.9 million from these three entities in 2020, respectively. We generated nil analytics services revenue from these three entities in 2021. As of December 31, 2019, the amounts due from Beihai Long Island Hotel Co., Ltd. and Beijing CheTianXia Information Co. Ltd were RMB1.5 million and RMB3.3 million, respectively. As of December 31, 2020 and 2021, the amounts due from Beihai Long Island Hotel Co., Ltd. and Beijing CheTianXia Information Co. Ltd were nil.

In 2019, Fang performed centralized functions on our behalf prior to our separation from Fang. Accordingly, certain amount of Fang's costs was allocated to us and reflected as expenses in the combined and consolidated financial statements. Costs and expenses allocated from Fang in 2019 were RMB4.4 million. In addition, certain of our employees participated in Fang's share-based compensation plans, and accordingly, the share-based compensation expenses related to Fang's share-based awards were RMB3.9 million in 2019.

We have leased office space from Fang in 2019, 2020 and 2021 for which the rental expenses were RMB7.6 million, RMB7.6 million and RMB7.6 million (US$1.2 million), respectively. We entered into a lease framework agreement with Fang in 2018, with an initial term of ten years, pursuant to which Fang leases offices to us at annual rental fee of RMB7.6 million.

We used certain of Fang's software in 2019, 2020 and 2021 pursuant to the software license agreement entered into between Fang and us in relation to our separation from Fang, and incurred software license expenses in the amount of RMB0.3 million, RMB0.5 million and RMB0.5 million (US$78,000), respectively. We also utilized the server and other IT services of Fang in 2019, 2020 and 2021 and incurred network related expenses in the amount of RMB5.2 million, RMB7.5 million and RMB7.5 million (US$1.2 million), respectively.

During the period from the completion of our separation from Fang to December 31, 2021, we made certain cash collections and cash payments on behalf of Fang and vice versa. In November 2019, we entered into an agreement with Fang, according to which, net balances between Fang, its subsidiaries and consolidated affiliated entities, on the one hand, and our company, our subsidiaries and VIEs, on the other hand, are to be settled on a quarterly basis. Accordingly, the amounts due to Fang were RMB156 thousand and RMB12.3 million (US$1.9 million) as of December 31, 2020 and 2021, respectively, after offsetting amounts due from and prepayments to Fang of RMB84.8 million and RMB83.8 million (US$13.2 million) as of December 31, 2020 and 2021, respectively.

In April 2020, we disposed of two of our subsidiaries, namely Shouxiruizhi Commercial Service (Chengdu) Co., Ltd. and Shuntaiduoli Network Technology (Chengdu) Co., Ltd. to Fang for a consideration of RMB4.3 million, which was the carrying amount of the net assets of the two subsidiaries as of the date of disposal. We collected the consideration in cash in October 2020.

We provided a cash advance of RMB3.1 million to one of the non-controlling interest holders of Shouzheng in 2020. As of December 31, 2020, the amount due was RMB3.1 million and we collected the balance in cash in March 2021.

On May 31, 2021, we entered into a contract with one of the non-controlling interest holders of Shouzheng, pursuant to which we were engaged to provide data services from July 1, 2021 to June 30, 2022 for a total consideration of RMB500 thousand. We recognized data services revenue of RMB238 thousand (US$37.3 thousand) from this related party for the year ended December 31, 2021.

In 2021, we entered into settlement deeds with Fang and the holders of the 2022 Notes. Pursuant to the settlement deeds, Fang and we each agreed to repay 50% of the outstanding principal and unpaid interest by installment in 2021 to the holders of the 2022 Notes. As of the date of this annual report, the 2022 Notes have been fully repaid. Separately, we entered into a supplemental agreement with Fang on September 24, 2021, pursuant to which Fang has agreed to repay us the amount borne by us under the settlement deeds by December 31, 2023. Accordingly, we recorded amounts due from Fang in the gross amount of RMB547.1 million as of December 31, 2020 and have made an allowance for doubtful accounts of RMB547.1 million. Our amounts due from Fang in the gross amount as of December 31, 2021 was RMB536.6 million (US$84.2 million) and allowance for doubtful accounts was RMB536.6 million (US$84.2 million). For details of the 2022 Notes and settlement deeds, see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources."

**Employment Agreements**

See "Item 6. Directors, Senior Management and Employees Management—C. Board Practices—Employment Agreements."

**2019 Equity Incentive Plan**

See "Item 6. Directors, Senior Management and Employees—B. Compensation—2019 Equity Incentive Plan."

*C. Interests of Experts and Counsels*

Not applicable.

**ITEM 8. FINANCIAL INFORMATION**

*A. Combined and Consolidated Statements and Other Financial Information*

We have appended combined and consolidated financial statements filed as part of this annual report.

**Legal Proceedings**

See "Item 4. Information on the Company—B. Business Overview—Legal and Other Proceedings."

**Dividend Policy**

We do not have any present plan to pay any dividends on our ordinary shares or ADSs in the foreseeable future.

Our board of directors has complete discretion in deciding the payment of any future dividends, subject to certain requirements of Cayman Islands law. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our board of directors. Under Cayman Islands law, a Cayman Islands company may pay a dividend out of either profit or share premium account, provided that in no circumstances may a dividend be paid if this would result in the company being unable to pay its debts as they fall due in the ordinary course of business. The declaration and payment of dividends will depend upon, among other things, our future operations and earnings, capital requirements and surplus, our financial condition, contractual restrictions, general business conditions and other factors as our board of directors may deem relevant.

We are a holding company registered by way of continuation in the Cayman Islands. We may rely on dividends from our subsidiaries in China for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiaries to pay dividends or of our VIEs to make cash payments to us. See "Item 3. Key Information—D. Risk Factors—Risks Relating to Doing Business in China—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business."

If we pay any dividends, we will pay our ADS holders to the same extent as holders of our Class A ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

### B. Significant Changes

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited combined and consolidated financial statements included in this annual report.

## ITEM 9. THE OFFER AND LISTING

### A. Offer and Listing Details

Our ADSs have been listed on the NASDAQ Global Select Market under the symbol "CIH" since June 11, 2019. Each ADS represents one Class A ordinary share.

### B. Plan of Distribution

Not applicable.

### C. Markets

Our ADSs have been listed for trading on the NASDAQ Global Select Market under the symbol "CIH" since June 11, 2019.

### D. Selling Shareholders

Not applicable.

### E. Dilution

Not applicable.

### F. Expenses of the Issue

Not applicable.

## ITEM 10. ADDITIONAL INFORMATION

### A. Share Capital

Not applicable.

### B. Memorandum and Articles of Association

See Exhibit 2.4 "Description of securities."

### C. Material Contracts

Material contracts other than in the ordinary course of business are described in "Item 4. Information on the Company" and "Item 7. Major Shareholders and Related Party Transactions".

*D. Exchange Controls*

See "Item 4. Information on the Company—B. Business Overview—Regulations—Foreign Exchange Administration."

*E. Taxation*

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties which are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

Payments of dividends and capital in respect of our shares or ADSs will not be subject to taxation in the Cayman Islands and no withholding will be required on the payment of a dividend or capital to any holder of our shares or ADSs, nor will gains derived from the disposal of our shares or ADSs be subject to Cayman Islands income or corporation tax.

Pursuant to the Tax Concessions Act (As Revised) of the Cayman Islands, we have obtained an undertaking from the Financial Secretary:

- that no law which is hereafter enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to our company or its operations; and

- that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable:

   (a)  on or in respect of the shares, debentures or other obligations of our company; or

   (b)  by way of the withholding, in whole or part, of any relevant payment as defined in Section 6(3) of the Tax Concessions Act (As Revised).

The undertaking for us is for a period of 20 years from April 25, 2019.

**PRC Taxation**

*Holding our ADSs or Ordinary Shares*

The Enterprise Income Tax Law provides that an enterprise established under the laws of a foreign country or region but whose "*de facto* management body" is located in the PRC is treated as a PRC resident enterprise for PRC tax purposes and consequently subject to the PRC income tax at the rate of 25% on its global income. The implementing rules of the Enterprise Income Tax Law merely define the location of the "*de facto* management body" as an "organizational body which effectively manages and controls the production and business operation, personnel, an accounting, properties and other aspects of operations of an enterprise." Based on a review of surrounding facts and circumstances, we do not believe that we should be considered a PRC resident enterprise for PRC tax purposes. However, there is limited guidance and implementation history of the Enterprise Income Tax Law, and if we are treated as a PRC resident enterprise for PRC tax purposes, we will be subject to PRC tax on our global income at a uniform tax rate of 25%.

PRC income tax at the rate of 10% will apply to payments of dividends we make to investors that are "non-resident enterprises" of the PRC, if such investors do not have an establishment or place of business in the PRC, or if they have such establishment or place of business in the PRC but the relevant income is not effectively connected with such establishment or place of business, to the extent such dividends are deemed to be sourced within the PRC.

Furthermore, any gain realized on the transfer of our ADSs or Class A ordinary shares by such investors would also be subject to PRC income tax at 10% if such gain is regarded as income derived from sources within the PRC.

Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider the dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, such dividends and gains earned by non-resident individuals would be subject to the 20% PRC individual income tax.

These rates could be reduced by applicable tax treaties or similar arrangements between China and the jurisdiction of the investor. For example, for investors in Hong Kong, the tax rate is reduced to 7% for interest payments and 5% for dividends. However, it is unclear whether non-PRC shareholders would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise.

A description of the PRC tax considerations applicable to our separation from Fang is contained in our registration statement on Form F-1 (File No. 333-231679) filed with the SEC on May 24, 2019, as amended.

**U.S. Federal Income Taxation**

The following is a general discussion of material U.S. federal income tax considerations to a U.S. Holder, as defined below, relating to the ownership and disposition of our ADSs or Class A ordinary shares. This discussion applies only to U.S. Holders who hold our ADSs or ordinary shares as "capital assets" (generally, property held for investment) under the U.S. Internal Revenue Code of 1986, as amended, or the Code. This discussion is based upon existing U.S. federal income tax law, which is subject to differing interpretations or change, possibly with retroactive effect. No ruling has been sought from the Internal Revenue Service, or IRS, with respect to any U.S. federal income tax consequences described below, and there can be no assurance that the IRS or a court will not take a contrary position. This discussion does not address all aspects of U.S. federal income taxation that may be important to particular holders in light of their individual circumstances, including holders subject to special tax rules (such as, for example, banks or other financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker-dealers, traders in securities that elect mark-to-market treatment, partnerships or other pass-through entities and their partners or investors, and tax-exempt organizations (including private foundations)), holders who are not U.S. Holders or who are former citizens or long-term residents of the United States, holders that own (directly, indirectly, or constructively) 10% or more of our ADSs or ordinary shares (by vote or by value), holders that hold ADSs or ordinary shares as part of a straddle, hedge, conversion, constructive sale or other integrated transaction, holders subject to special tax accounting rules as a result of any item of gross income with respect to our shares being taken into account in an applicable financial statement, or holders that have a functional currency other than the U.S. dollar, all of whom may be subject to tax rules that differ significantly from those discussed below. In addition, this discussion does not address the alternative minimum tax or the Medicare contribution tax on net investment income or any state, local, or non-U.S. tax considerations.

We believe that certain purchases of our ordinary shares in December 2019 and thereafter by Fang from certain related parties of Mr. Vincent Tianquan Mo do not affect the conclusions regarding the U.S. federal income tax treatment of our separation from Fang in June 2019 in any material respect. A description of the U.S. federal income tax considerations applicable to our separation from Fang is contained in our registration statement on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019, as amended.

You are urged to consult your tax advisor regarding the U.S. federal, state, local and non-U.S. income and other tax considerations of an investment in our ADSs or ordinary shares and receiving our ADSs or ordinary shares to be distributed to you in the separation and distribution.

104

*General*

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of our ADSs or ordinary shares that is, for U.S. federal income tax purposes, (1) an individual who is a citizen or resident of the United States, (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created in, or organized under the laws of, the United States or any state thereof or the District of Columbia, (3) an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source, or (4) a trust (a) the administration of which is subject to the primary supervision of a U.S. court and which has one or more U.S. persons who have the authority to control all substantial decisions of the trust or (b) that has otherwise elected to be treated as a U.S. person under the Code.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of our ADSs or ordinary shares, the tax treatment of a partner in the partnership will depend upon the status of the partner and the activities of the partnership. Partnerships and partners of a partnership holding our ADSs or ordinary shares are urged to consult their tax advisors regarding an investment in our ADSs or ordinary shares.

For U.S. federal income tax purposes, a U.S. Holder of ADSs will generally be treated as the beneficial owner of the underlying shares represented by the ADSs. Accordingly, deposits or withdrawals of ordinary shares for ADSs will generally not be subject to U.S. federal income tax.

*Dividends on Ordinary Shares or ADSs*

Subject to the PFIC rules as described below, the gross amount of any distributions (including amounts withheld to reflect PRC withholding taxes, if any) you receive on your ordinary shares or ADSs will generally be treated as dividend income if the distributions are made from our current or accumulated earnings and profits, calculated according to U.S. federal income tax principles. Such income (including any withheld taxes) will be includable in your gross income on the day actually or constructively received by you, in the case of ordinary shares, or by the depositary in the case of ADSs. Distributions in excess of current and accumulated earnings and profits will be treated first as a non-taxable return of capital to the extent of your basis in the ordinary shares or ADSs and thereafter as a capital gain. If you are a non-corporate U.S. Holder, including an individual, and have held your ADSs for a sufficient period of time, dividend distributions paid on our ADSs (but not our ordinary shares) will generally constitute qualified dividend income taxed at a preferential rate as long as we constitute a qualified foreign corporation with respect to such distributions. In this regard, we have been approved to list the ADSs, and the ADSs have been listed, on the NASDAQ. Accordingly, we believe that the ADSs are considered readily tradable on an established securities market in the United States and therefore that we are a qualified foreign corporation with respect to dividends paid on the ADSs. Based on existing guidance, it is not clear whether a dividend on an ordinary share will be treated as a qualified dividend, because the ordinary shares are not themselves listed on a U.S. exchange. If, however, we are treated as a PRC resident enterprise under PRC law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC, or the U.S.-PRC income tax treaty, in which case dividends paid on our ordinary shares and ADSs would both be treated as qualified dividends (subject to the relevant holding period requirements). You should consult your own tax advisor as to the rate of tax that will apply to you with respect to dividend distributions, if any, you receive from us.

We do not intend to calculate our earnings and profits according to U.S. tax accounting principles. Accordingly, notwithstanding the discussion in the preceding paragraph, distributions on our ordinary shares or ADSs, if any, will generally be taxed to you as dividend distributions for U.S. tax purposes. If you are a corporation, you generally will not be entitled to claim a dividends-received deduction with respect to distributions you receive from us. In the event we are treated as a PRC resident enterprise under PRC law, we may be required to withhold PRC income tax on dividends paid to you under the EIT Law. See "—PRC Taxation—Holding our ADSs or Ordinary Shares." Subject to generally applicable limitations, you may be eligible to claim a deduction or a foreign tax credit for PRC tax withheld at the appropriate rate. Dividends generally will be categorized as "passive category income" or, in the case of some U.S. Holders, as "general category income" for foreign tax credit limitation purposes. If the dividends qualify for the reduced tax rate on qualified dividend income as discussed above, the amount of the dividend taken into account for purposes of calculating the foreign tax credit limitation generally will be limited. The rules governing the use of foreign tax credits are very complex, and you are urged to consult your own tax advisor as to your ability, and the various limitations on your ability, to claim foreign tax credits in connection with the receipt of dividends.

105

*Sales and Other Dispositions of Ordinary Shares or ADSs*

Subject to the PFIC discussion below, when you sell or otherwise dispose of ordinary shares or ADSs in a taxable transaction, you will generally recognize capital gain or loss in an amount equal to the difference between the amount realized on the sale or other taxable disposition and your adjusted tax basis in the ordinary shares or ADSs, both as determined in U.S. dollars. Any gain or loss you recognize will be long-term capital gain or loss if you have held the ordinary shares or ADSs for more than one year at the time of disposition. If you are an individual, long-term capital gain will be taxed at preferential rates. Your ability to deduct capital losses will be subject to various limitations.

The gain or loss you recognize on a sale or disposition of our ordinary shares or ADSs generally will be treated as arising from sources within the United States for foreign tax credit limitation purposes. However, if gains from the disposition of ordinary shares or ADSs are taxed under the EIT Law (as discussed above under "—PRC Taxation—Holding our ADSs or Ordinary Shares," the U.S.-PRC income tax treaty may apply, in which case you may elect to treat such gains as arising from sources within China for foreign tax credit limitation purposes (assuming certain conditions are met). You are urged to consult your own tax advisors regarding the tax consequences to you under your particular circumstances if any PRC withholding tax is imposed on the disposition of ordinary shares or ADSs, including the availability of the foreign tax credit.

*Status as a PFIC*

If we are a PFIC in any taxable year in which you hold ordinary shares or ADSs, you will generally be subject to additional taxes and interest charges on certain "excess distributions" we make and on any gain realized on the disposition or deemed disposition of your ordinary shares or ADSs, regardless of whether we continue to be a PFIC in the year in which you receive an "excess distribution" or dispose of or are deemed to dispose of your ordinary shares or ADSs. Distributions in respect of your ordinary shares or ADSs during a taxable year will generally constitute "excess distributions" if, in the aggregate, they exceed 125% of the average amount of distributions in respect of your ordinary shares or ADSs over the three preceding taxable years or, if shorter, the portion of your holding period before such taxable year.

To compute the tax on excess distributions or any gain, (1) the excess distribution or the gain will be allocated ratably to each day in your holding period, (2) the amount allocated to the current year and any tax year before we first became a PFIC will be taxed as ordinary income in the current year, (3) the amount allocated to other taxable years will be taxable at the highest applicable marginal rate in effect for that year, and (4) an interest charge at the rate for underpayment of taxes for any period described under (3) above will be imposed with respect to any portion of the excess distribution or gain that is allocated to such period. In addition, if we are a PFIC or were in the year prior to a distribution, no distribution that you receive from us will qualify for taxation at the preferential rate discussed in the "—U.S. Federal Income Taxation—Dividends on Ordinary Shares or ADSs" section above.

Our ordinary shares or ADSs would be stock of a PFIC with respect to a U.S. Holder if during such U.S. Holder's holding period for our ordinary shares or ADSs, after the application of applicable "look-through rules," (1) 75 percent or more of our gross income for the taxable year consists of "passive income" (including dividends, interest, gains from the sale or exchange of investment property and rents and royalties other than rents and royalties which are received from unrelated parties in connection with the active conduct of a trade or business, as defined in applicable U.S. Treasury regulations), or (2) at least 50 percent of our assets for the taxable year (averaged over the year) produce or are held for the production of "passive income."

106

Table of Contents

If a foreign corporation is not a "controlled foreign corporation" (as defined for U.S. federal income tax purposes), or "CFC," the PFIC asset test is, unless the foreign corporation elects otherwise, applied based on the value of the foreign corporation's assets. In addition, if a CFC is a "publicly traded corporation" for a taxable year, the PFIC asset test is applied based on the value of the CFC's assets. However, if a CFC is not a publicly traded corporation,, the asset test is applied based on the adjusted tax bases of the CFC's assets as determined for the purposes of computing earnings and profits under U.S. federal income tax principles. We believe that we have become a publicly traded corporation in connection with the consummation of our separation from Fang in June 2019 and as a result, we are able to apply the asset test based on the value of our assets. Recent changes in U.S. tax law have made it more likely that certain non-U.S. corporations will be treated as CFCs; however, proposed U.S. Treasury regulations issued on July 11, 2019 would reduce the likelihood that we will be considered a CFC for purposes of the PFIC asset test. These proposed U.S. Treasury regulations state that they may be relied on by taxpayers for prior taxable years, subject to certain limitations. The implications of these changes for our potential PFIC status determinations are not yet clear with respect to your ownership of our ordinary shares or ADSs. If we are not able to apply the asset test based on the value of our assets for a taxable year, there is a significant risk that we will be treated as a PFIC for that taxable year. Assuming that we can rely on the proposed U.S. Treasury regulations described in this paragraph, we do not believe that we were a PFIC for the taxable year ended December 31, 2021, and at this time we are unable to determine whether we will be a PFIC for the taxable year ending December 31, 2022 or any future taxable year. However, the application of the proposed U.S. Treasury regulations is not entirely clear at this time. Accordingly, whether the assumption that we can rely on the proposed U.S Treasury regulations holds is uncertain. You should consult your tax advisors about the U.S. federal income tax consequences to you arising from these uncertainties.

For taxable years in which we are treated as a publicly traded corporation, or for which we are not a CFC, the calculation of the value of our assets will be based, in part, on the quarterly market value of our ADSs, which is subject to change. Furthermore, we have not conducted a separate appraisal of the values of our assets for this purpose and, while we believe that our assets and the income derived from our assets do not generally constitute passive assets and income under the PFIC rules, there is no assurance that the IRS will agree with us. In addition, in making the foregoing determinations, although the law in this regard is not entirely clear, we treat our consolidated controlled entities as being owned by us for U.S. federal income tax purposes. As a result, there can be no assurance that we will not be a PFIC in the current or any future taxable years. Furthermore, once we are treated as a PFIC for the current year with respect to a U.S. Holder, we will generally remain as a PFIC absent any special election, even if we cease to be a PFIC in the following taxable years.

If we are a PFIC in any year, as a U.S. Holder, you will generally be required to file a return on IRS Form 8621 regarding your ordinary shares or ADSs on an annual basis. You should consult your own tax adviser regarding reporting requirements with regard to your ordinary shares or ADSs.

If we are a PFIC in any year, so long as the ADSs are and remain "marketable," you will be able to avoid the excess distribution rules described above by making a timely so-called "mark-to-market" election with respect to such U.S. Holder's ADSs. The ADSs will be "marketable" as long as they remain regularly traded on a national securities exchange, such as the NASDAQ. If you make this election in a timely fashion, you will generally recognize as ordinary income or ordinary loss (limited to the amount of prior ordinary gain) the difference between the adjusted tax basis of your ADSs on the first day of any taxable year and their value on the last day of that taxable year. Your basis in the ADSs will be adjusted to reflect any such income or loss. A mark-to-market election will be effective for the taxable year for which the election is made and for all subsequent taxable years, unless the ADSs are no longer regularly traded on a qualified exchange or the IRS consents to the revocation of the election. However, because a mark-to-market election cannot be made for any lower-tier PFICs that we may own, you may continue to be subject to the PFIC rules with respect to any indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes, including our subsidiaries. In addition, because our ordinary shares are not regularly traded on a national securities exchange, you will not be able to make a mark-to-market election with respect to any ordinary shares. You should consult your own tax advisors with respect to making a mark-to-market election.

In addition, if we are a PFIC in any year, you might be able to avoid the excess distribution rules described above by making a timely so-called "qualified electing fund," or QEF, election to be taxed currently on your pro rata portion of our income and gain. However, we do not intend to provide the information that would be necessary for you to make a QEF election. Accordingly, you will not be able to make or maintain a QEF election with respect to your ADSs or ordinary shares.

You should consult with your tax advisors regarding the U.S. federal income tax consequences of holding ADSs or ordinary shares if we are considered to be a PFIC in any taxable year as well as your eligibility for a "mark-to-market" election and whether making such an election would be advisable to you in your particular circumstances.

*Information Reporting and Backup Withholding Rules*

In general, dividend payments with respect to the ordinary shares or ADSs and the proceeds received on the sale or other disposition of those ordinary shares or ADSs may be subject to information reporting to the IRS, and to backup withholding (currently imposed at a rate of 24%). Backup withholding will not apply, however, if you (1) are a corporation or come within certain other exempt categories and, when required, can demonstrate that fact or (2) provide a taxpayer identification number, certify as to no loss of exemption from backup withholding and otherwise comply with the applicable backup withholding rules. To establish your status as an exempt person, you will generally be required to provide certification on IRS Form W-9. Any amounts withheld from payments to you under the backup withholding rules will generally be allowed as a refund or a credit against your U.S. federal income tax liability, provided that you timely furnish the required information to the IRS.

You may be required to report information with respect to your ordinary shares or ADSs not held through a custodial account with a U.S. financial institution to the IRS. In general, if you hold specified "foreign financial assets" (which generally would include ordinary shares or ADSs) with an aggregate value exceeding $50,000, you will be required to report information about those assets on IRS Form 8938, which must be attached to your annual income tax return. Higher asset thresholds apply if you file a joint tax return or reside abroad. If you fail to report required information, you could become subject to substantial penalties. You should consult your own tax advisor regarding your obligation to file IRS Form 8938.

You should consult your own tax advisor regarding the application of the U.S. federal income tax laws to their particular situations as well as any additional tax consequences resulting from purchasing, holding or disposing of ordinary shares or ADSs, including the applicability and effect of the tax laws of any state, local or foreign jurisdiction and any estate, gift, and inheritance laws.

**F. Dividends and Paying Agents**

Not applicable.

**G. Statement by Experts**

Not applicable.

**H. Documents on display**

We have previously filed with the SEC our registration statement on Form F-1 (File No. 333-231376), as amended, and a prospectus under the Securities Act with respect to our ordinary shares represented by our ADSs, and a related registration statement on Form F-6 (File Number 333-231676) with respect to our ADSs, as amended.

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a web site at *www.sec.gov* that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system.

As a foreign private issuer, we are exempt from the rules of the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and our executive officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we are not required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act.

Table of Contents

We will furnish JPMorgan Chase Bank, N.A., the depositary, with our annual reports, which include a review of operations and annual audited combined and consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meeting and other reports and communications that are made generally available to our shareholders. The depositary makes such notices, reports and communications available to holders of ADSs and, upon our request, mails to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

*I. Subsidiary Information*

Not applicable.

## ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Foreign Exchange Risk**

Substantially all of our revenues and expenses are denominated in Renminbi. We do not believe that we currently have any significant direct foreign exchange risk and have not used any derivative financial instruments to hedge exposure to such risk. Although in general our exposure to foreign exchange risks should be limited, the value of your investment in our ADSs will be affected by the exchange rate between the U.S. dollar and the Renminbi because the value of our business is effectively denominated in Renminbi, while our ADSs will be traded in U.S. dollars.

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The PRC government allowed the Renminbi to appreciate by more than 20% against the U.S. dollar between July 2005 and July 2008. Between July 2008 and June 2010, the exchange rate between the Renminbi and the U.S. dollar had been stable and traded within a narrow band. Since June 2010, the Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. On November 30, 2015, the Executive Board of the International Monetary Fund, or the IMF, completed the regular five-year review of the basket of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, Renminbi is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the Renminbi has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system, and we cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. Accordingly, it is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

To the extent that we need to convert U.S. dollars into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we receive from the conversion. Conversely, if we decide to convert Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amounts available to us.

**Interest Rate Risk**

We have not been exposed to material risks due to changes in market interest rates, and we have not used any derivative financial instruments to manage our interest risk exposure. However, we cannot provide assurance that we will not be exposed to material risks due to changes in market interest rate in the future.

## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

*A. Debt Securities*

Not applicable.

109

Table of Contents

***B. Warrants and Rights***

Not applicable.

***C. Other Securities***

Not applicable.

***D. American Depositary Shares***

JPMorgan Chase Bank, N.A., our depositary, may charge each person to whom ADSs are issued, including, without limitation, issuances against deposits of shares, issuances in respect of share distributions, rights and other distributions, issuances pursuant to a stock dividend or stock split declared by us or issuances pursuant to a merger, exchange of securities or any other transaction or event affecting the ADSs or deposited securities, and each person surrendering ADSs for withdrawal of deposited securities or whose ADSs are cancelled or reduced for any other reason, $5.00 for each 100 ADSs (or any portion thereof) issued, delivered, reduced, cancelled or surrendered, as the case may be. The depositary may sell (by public or private sale) sufficient securities and property received in respect of a share distribution, rights and/or other distribution prior to such deposit to pay such charge.

The following additional charges shall be incurred by the ADR holders and beneficial owners of ADSs, by any party depositing or withdrawing shares or by any party surrendering ADSs and/or to whom ADSs are issued (including, without limitation, issuance pursuant to a stock dividend or stock split declared by us or an exchange of stock regarding the ADSs or the deposited securities or a distribution of ADSs), whichever is applicable:

- a fee of US$1.50 per ADR or ADRs for transfers of certificated or direct registration ADRs;

- a fee of up to US$0.05 per ADS held upon which any cash distribution made pursuant to the deposit agreement;

- an aggregate fee of up to US$0.05 per ADS per calendar year (or portion thereof) for services performed by the depositary in administering the ADRs (which fee may be charged on a periodic basis during each calendar year and shall be assessed against holders of ADRs as of the record date or record dates set by the depositary during each calendar year and shall be payable in the manner described in the next succeeding provision);

- a fee for the reimbursement of such fees, charges and expenses as are incurred by the depositary and/or any of its agents (including, without limitation, the custodian and expenses incurred on behalf of holders in connection with compliance with foreign exchange control regulations or any law, rule or regulation relating to foreign investment) in connection with the servicing of the shares or other deposited securities, the sale of securities (including, without limitation, deposited securities), the delivery of deposited securities or otherwise in connection with the depositary's or its custodian's compliance with applicable law, rule or regulation (which fees and charges shall be assessed on a proportionate basis against holders as of the record date or dates set by the depositary and shall be payable at the sole discretion of the depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions);

- a fee for the distribution of securities (or the sale of securities in connection with a distribution), such fee being in an amount equal to the US$0.05 per ADS issuance fee for the execution and delivery of ADSs which would have been charged as a result of the deposit of such securities (treating all such securities as if they were shares) but which securities or the net cash proceeds from the sale thereof are instead distributed by the depositary to those holders entitled thereto;

- stock transfer or other taxes and other governmental charges;

- SWIFT, cable, telex and facsimile transmission and delivery charges incurred at your request in connection with the deposit or delivery of shares, ADRs or deposited securities;

Table of Contents

- transfer or registration fees for the registration of transfer of deposited securities on any applicable register in connection with the deposit or withdrawal of deposited securities;

- in connection with the conversion of foreign currency into U.S. dollars, JPMorgan shall deduct out of such foreign currency the fees, expenses and other charges charged by it and/or its agent (which may be a division, branch or affiliate) so appointed in connection with such conversion; and

- fees of any division, branch or affiliate of the depositary utilized by the depositary to direct, manage and/or execute any public and/or private sale of securities under the deposit agreement.

JPMorgan and/or its agent may act as principal for such conversion of foreign currency. For further details see *https://www.adr.com*.

We will pay all other charges and expenses of the depositary and any agent of the depositary (except the custodian) pursuant to agreements from time to time between us and the depositary.

The fees and charges you may be required to pay may vary over time and may be changed by us and by the depositary. Registered holders of ADRs will receive prior notice of the increase in any such fees and charges. The right of the depositary to receive payment of fees, charges and expenses as provided above shall survive the termination of the deposit agreement.

The depositary may make available to us a set amount or a portion of the depositary fees charged in respect of the ADR program or otherwise upon such terms and conditions as we and the depositary may agree from time to time. The depositary collects its fees for issuance and cancellation of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deduction from cash distributions, or by directly billing investors, or by charging the book-entry system accounts of participants acting for them. The depositary will generally set off the amounts owing from distributions made to holders of ADSs. If, however, no distribution exists and payment owing is not timely received by the depositary, the depositary may refuse to provide any further services to holders that have not paid those fees and expenses owing until such fees and expenses have been paid. At the discretion of the depositary, all fees and charges owing under the deposit agreement are due in advance and/or when declared owing by the depositary.

111

PART II

**ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES**

Not applicable.

**ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS**

**Material Modifications to the Rights of Security Holders**

None.

**Use of Proceeds**

Not applicable.

**ITEM 15. CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and deputy chief financial officer has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2021, our disclosure controls and procedures were not effective in certain respects, primarily due to the material weakness in our internal controls, as discussed below, to ensure that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and deputy chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this evaluation, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2021 due to the existence of a material weakness, as described below.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's financial statements will not be prevented or detected on a timely basis. Our material weakness is that we did not have sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements.

112

Notwithstanding the identified material weakness, management, including our chief executive officer and deputy chief financial officer, believes the consolidated financial statements included in this annual report on Form 20-F present fairly, in all material respects, our financial condition, results of operations and cash flows in conformity with U.S. GAAP.

**Attestation Report of the Registered Public Accounting Firm**

This annual report on Form 20-F does not include an attestation report of our registered public accounting firm because as an emerging growth company, we are currently exempt from this requirement.

**Changes in Internal Control over Financial Reporting**

We are currently in the process of remediating the material weakness described above. In 2022, we will continue to implement additional measures to remediate the existing material weakness as discussed above. However, we cannot assure you that we will remediate our material weakness in a timely manner. See "Item 3. D. Key Information—Risk Factors—Risks Relating to Our Business and Industry—If we fail to achieve and maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, which could result in harm to our business, loss of investor confidence in our financial reporting and a lower trading price of our ADSs."

## ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT

Our board of directors has determined that Ms. Jie Jiao is an "audit committee financial expert" as defined by SEC rules, and that she satisfies the independence requirements of Rule 5605 of the NASDAQ Stock Market Rules and Rule 10A-3 promulgated under the Exchange Act.

## ITEM 16B. CODE OF ETHICS

Our board of directors has adopted our code of ethics, a code that applies to members of the board of directors including its chairman and other senior officers, including the chief executive officer and financial controller. This code is publicly available on our website at *ir.chinaindexholdings.com.*

## ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by our independent registered public accounting firm, MaloneBailey, LLP, for the year ended December 31, 2021 and our former independent registered public accounting firm, KPMG Huazhen LLP, for the years ended December 31, 2020 and 2021, respectively. Save as disclosed below, we did not pay any other fees to KPMG Huazhen LLP or MaloneBailey, LLP during the periods indicated below.

| | 2020 | 2021 | |
| --- | --- | --- | --- |
| | RMB | RMB (in thousands) | US$ |
| Audit fees [1] | 4,968 | 5,098 | 800 |
| Audit-related fees | — | — | — |
| Tax fees | — | — | — |
| All other fees | — | — | — |
| **Total** | **4,968** | **5,098** | **800** |

(1) Audit fees represent the aggregate fees billed for each of the fiscal years listed for professional services rendered by our principal accountant for the audit of our annual combined and consolidated financial statements, limited procedures on quarterly financial information, and audit services that are normally provided by the principal accountant in connection with regulatory filings or engagements for those fiscal years.

**Audit Committee Pre-approval Policy**

Our audit committee is responsible for pre-approving all audit and non-audit services provided by our independent registered public accounting firm. The advance approval of the Audit Committee or member thereof, to whom approval authority has been delegated, is required for all audit and non-audit services provided by our independent registered public accounting firm. The advance approval of the Audit Committee is required for all audit and non-audit services provided by our independent registered public accounting firm and was obtained for all such services provided in 2020 and 2021. Our independent registered public accounting firm and management report, on a regular basis, to the Audit Committee regarding the extent of the services provided and the fees for the services performed to date.

**ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES**

Not applicable.

**ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Not applicable.

**ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

On December 17, 2021, we dismissed KPMG Huazhen LLP ("KPMG") and on the same date, we appointed MaloneBailey, LLP as our independent registered public accounting firm. The change of our independent registered public accounting firm was approved by our board of directors and our audit committee on December 17, 2021.

During the two fiscal years ended December 31, 2020, and the subsequent interim period through December 17, 2021, there were no: (1) disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements if not resolved to their satisfaction would have caused them to make reference in connection with their opinion to the subject matter of the disagreement, or (2) reportable events pursuant to Item 16F(a)(1)(v) of the instructions to Form 20-F, except that KPMG advised us of the material weakness in its internal control over financial reporting that we did not have sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements.

The audit reports of KPMG on the combined and consolidated financial statements of the Company for the years ended December 31, 2020 and 2019 did not contain any adverse opinion or a disclaimer of opinion, nor were they qualified or modified as to uncertainty, audit scope or accounting principles, except as follows:

KPMG's report on the combined and consolidated financial statements of the Company as of and for the years ended December 31, 2020 and 2019 contained separate paragraphs stating that:

- "As discussed in Note 1 and Note 2, the combined financial statements, constituting the periods prior to June 11, 2019, include Fang Holdings Limited's ("Fang") real estate information, analytics and marketplace services business and have been derived from the consolidated financial statements and underlying accounting records of Fang. The combined financial statements also include expense allocations for certain functions historically provided by Fang. These allocations may not be indicative of the actual expenses which would have been incurred had the Company operated as a separate entity apart from Fang prior to June 11, 2019", and

- "As discussed in Note 2 to the combined and consolidated financial statements, the Company has changed its method of accounting for leases as of January 1, 2019 due to the adoption of ASC Topic 842, Leases".

We have provided KPMG with a copy of the foregoing disclosure and have requested that KPMG furnish to us a letter addressed to the SEC stating whether or not KPMG agrees with such disclosure. A copy of the letter is filed as Exhibit 16.1 to this annual report on Form 20-F.

114

During the two fiscal years ended December 31, 2020 and the subsequent period prior to our engagement of MaloneBailey, LLP, neither we nor anyone on our behalf consulted with MaloneBailey, LLP regarding (i) either the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that would have been rendered on our combined and consolidated financial statements, and neither a written report nor oral advice was provided to us that MaloneBailey, LLP concluded was an important factor considered by us in reaching a decision as to any accounting, audit, or financial reporting issue, (ii) any matter that was the subject of a disagreement pursuant to Item 16F(a)(1)(iv) of the instructions to Form 20-F, or (iii) any reportable event pursuant to Item 16F(a)(1)(v) of the instructions to Form 20-F.

**ITEM 16G. CORPORATE GOVERNANCE**

As a Cayman Islands exempted company listed on the NASDAQ Global Select Market, we are subject to the NASDAQ corporate governance requirements. However, the NASDAQ corporate governance requirements permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NASDAQ corporate governance requirements for companies incorporated in other jurisdictions such as the United States. For instance, we are not required to: (1) have a majority of the board be independent; (2) have a compensation committee or a nominating and corporate governance committee consisting entirely of independent directors; (3) have regularly scheduled executive sessions with only independent directors each year; or (4) hold annual meeting of shareholders within one year after the end of a fiscal year.

We have elected to follow home country practice with respect to annual meetings in lieu of the requirement that an annual meeting of shareholders be held no later than one year after the end of a fiscal year under NASDAQ Stock Market Marketplace Rule 5620(a).

To the extent we choose to follow home country practice with respect to corporate governance matters, our shareholders may be afforded less protection than they otherwise would under rules and regulations applicable to U.S. domestic issuers. See "Item 3. Key Information—D. Risk Factors—Risks Relating to the ADSs—As a company registered in the Cayman Islands, we are permitted to adopt certain home country practices in relation to corporate governance matters that differ significantly from the NASDAQ corporate governance requirements; these practices may afford less protection to shareholders than they would enjoy if we complied fully with the NASDAQ corporate governance requirements."

In addition, we are a "controlled company" under the rules of the NASDAQ and, as a result, may elect not to comply with certain corporate governance requirements, including the requirement that we have a majority of independent directors on our board of directors. To the extent we choose to rely on such exemptions, our shareholders may not have the same protections afforded to shareholders of companies that are subject to all of the applicable corporate governance requirements. See "Item 3. Key Information—D. Risk Factors—Risks Relating to the ADSs—We are a "controlled company" under the rules of the NASDAQ and, as a result, qualify for exemptions from certain corporate governance requirements that provide protection to shareholders of other companies."

**ITEM 16H. MINE SAFETY DISCLOSURE**

Not applicable.

**ITEM 16I. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

Table of Contents

## PART III

**ITEM 17. FINANCIAL STATEMENTS**

We have elected to provide financial statements pursuant to Item 18.

**ITEM 18. FINANCIAL STATEMENTS**

Our combined and consolidated financial statements are included at the end of this annual report.

**ITEM 19. EXHIBITS**

| Exhibit No. | Description of Exhibit |
|---|---|
| 1.1 | Second amended and restated memorandum and articles of association of the registrant, adopted on May 2, 2019 and effective on June 11, 2019 (incorporated by reference to Exhibit 3.2 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 2.1 | Registrant's specimen American depositary receipt (included in Exhibit 2.3) |
| 2.2 | Registrant's specimen certificate for ordinary shares (incorporated by reference to Exhibit 4.2 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 2.3 | Form of deposit agreement by and among the registrant, the depositary and holders of the American Depositary Receipts (incorporated by reference to Exhibit 4.3 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 2.4* | Description of securities |
| 4.1 | 2019 equity incentive plan (incorporated by reference to Exhibit 10.9 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.2 | Form of indemnification agreement between the registrant and each of its directors and executive officers (incorporated by reference to Exhibit 10.1 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.3 | English translation of form of employment agreement between the registrant and each of its executive officers (incorporated by reference to Exhibit 10.2 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.4 | Form of separation and distribution agreement between Fang Holdings Limited and China Index Holdings Limited, dated May 24, 2019 (incorporated by reference to Exhibit 10.3 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.5 | English translation of form of business cooperation agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.4 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.6 | English translation of form of data license agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.5 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.7 | English translation of form of intellectual property right license agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.6 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |

| 4.8 | English translation of form of lease framework agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated September 30, 2018 (incorporated by reference to Exhibit 10.7 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
|---|---|
| 4.9 | English translation of form of software license agreement between Fang Holdings Limited and Beijing Zhong Zhi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.8 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.10 | English translation of loan agreement between and among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 (incorporated by reference to Exhibit 10.10 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.11 | English translation of equity pledge agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 (incorporated by reference to Exhibit 10.11 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.12 | English translation of shareholders' proxy agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd., Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 (incorporated by reference to Exhibit 10.12 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.13 | English translation of operating agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd., Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 (incorporated by reference to Exhibit 10.13 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.14 | English translation of exclusive technical consultancy and services agreement between Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd., dated June 11, 2018 (incorporated by reference to Exhibit 10.14 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.15 | English translation of exclusive call option agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd., Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 (incorporated by reference to Exhibit 10.15 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.16 | English translation of supplementary agreement to the exclusive call option agreement, among China Index Holdings Limited, Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd., Mr. Vincent Tianquan Mo and Ms. Yu Huang dated October 1, 2018 (incorporated by reference to Exhibit 10.16 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.17 | Form of warrant (incorporated by reference to Exhibit 4.4 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.18 | Form of guarantee letter (incorporated by reference to Exhibit 10.17 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 4.19 | English translation of loan agreement between and among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Mr. Jianning Dai, dated December 9, 2019 (incorporated by reference to Exhibit 4.19 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |

| 4.20 | English translation of equity pledge agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Mr. Jianning Dai, dated December 9, 2019 (incorporated by reference to Exhibit 4.20 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
|------|------|
| 4.21 | English translation of shareholder's proxy agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Beijing Zhong Zhi Information Technology Academy and Mr. Jianning Dai, dated December 9, 2019 (incorporated by reference to Exhibit 4.21 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.22 | English translation of operating agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Beijing Zhong Zhi Information Technology Academy and Mr. Jianning Dai, dated December 9, 2019 (incorporated by reference to Exhibit 4.22 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.23 | English translation of exclusive technical consultancy and services agreement between Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Beijing Zhong Zhi Information Technology Academy, dated December 9, 2019 (incorporated by reference to Exhibit 4.23 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.24 | English translation of exclusive call option agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Mr. Jianning Dai, Beijing Zhong Zhi Information Technology Academy and China Index Holdings Limited, dated December 9, 2019 (incorporated by reference to Exhibit 4.24 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.25 | English translation of loan agreement between and among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Jiatianxia Credit Management Co., Ltd., dated September 3, 2020 (incorporated by reference to Exhibit 4.25 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.26 | English translation of equity pledge agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Jiatianxia Credit Management Co., Ltd., dated September 3, 2020 (incorporated by reference to Exhibit 4.26 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.27 | English translation of shareholder's proxy agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Shouzheng Credit Rating Co., Ltd. and Jiatianxia Credit Management Co., Ltd., dated September 3, 2020 (incorporated by reference to Exhibit 4.27 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.28 | English translation of operating agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Shouzheng Credit Rating Co., Ltd. and Jiatianxia Credit Management Co., Ltd., dated September 3, 2020 (incorporated by reference to Exhibit 4.28 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.29 | English translation of exclusive technical consultancy and services agreement between Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Shouzheng Credit Rating Co., Ltd., dated September 3, 2020 (incorporated by reference to Exhibit 4.29 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 4.30 | English translation of exclusive call option agreement among Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., Jiatianxia Credit Management Co., Ltd., Shouzheng Credit Rating Co., Ltd. and China Index Holdings Limited, dated September 3, 2020 (incorporated by reference to Exhibit 4.30 of our annual report on Form 20-F (File No. 001-38917) filed with the SEC on November 15, 2021) |
| 8.1* | List of principal subsidiaries and variable interest entities of the registrant |

Table of Contents

| | |
|---|---|
| 11.1 | Code of business conduct and ethics of the registrant (incorporated by reference to Exhibit 99.2 of our registration statement on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended) |
| 12.1* | CEO Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | CFO Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | CEO Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | CFO Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Jingtian & Gongcheng |
| 15.2* | Consent of MaloneBailey, LLP |
| 15.3* | Consent of KPMG Huazhen LLP |
| 16.1* | Letter dated April 26, 2022 from KPMG Huazhen LLP to the SEC |
| 101.INS* | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH* | XBRL Taxonomy Extension Scheme Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | The cover page has been formatted in Inline XBRL |

---

\*   Filed with this annual report on Form 20-F
\*\*   Furnished with this annual report on Form 20-F

119

Table of Contents

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

China Index Holdings Limited

By:    /s/ Yu Huang
Name:  Yu Huang
Title:   Chief Executive Officer

Date: April 26, 2022

120

**CHINA INDEX HOLDINGS LIMITED**

**INDEX TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**

| CONTENTS | PAGE(S) |
|---|---|
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM (PCAOB ID 206) | F-2 |
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM (KPMG Huazhen LLP, Beijing, China, Auditor Firm ID: 1186) | F-3 |
| CONSOLIDATED BALANCE SHEETS AS OF DECEMBER 31, 2020 AND 2021 | F-4 |
| COMBINED AND CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS) FOR THE YEARS ENDED DECEMBER 31, 2019, 2020 AND 2021 | F-5 |
| COMBINED AND CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT) FOR THE YEARS ENDED DECEMBER 31, 2019, 2020 AND 2021 | F-6 |
| COMBINED AND CONSOLIDATED STATEMENTS OF CASH FLOWS FOR THE YEARS ENDED DECEMBER 31, 2019, 2020 AND 2021 | F-7 |
| NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS | F-8 – F-44 |

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of
China Index Holdings Limited

*Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheet of China Index Holdings Limited and its subsidiaries (the "Company") as of December 31, 2021, and the related consolidated statements of comprehensive income, shareholders' equity, and cash flows for the year then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

*/s/ MaloneBailey, LLP*
www.malonebailey.com
We have served as the Company's auditor since 2021.
Houston, Texas
April 26, 2022

F-2

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors
China Index Holdings Limited:

**Opinion on the Combined and Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheet of China Index Holdings Limited and subsidiaries (the Company) as of December 31, 2020, the related combined and consolidated statements of comprehensive income (loss), shareholders' equity (deficit) and cash flows for each of the years in the two-year period ended December 31, 2020, and the related notes (collectively, the combined and consolidated financial statements). In our opinion, the combined and consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles.

**Basis of Preparation**

As discussed in Note 1 and Note 2, the combined financial statements, constituting the periods prior to June 11, 2019, include Fang Holdings Limited's ("Fang") real estate information, analytics and marketplace services business and have been derived from the consolidated financial statements and underlying accounting records of Fang. The combined financial statements also include expense allocations for certain functions historically provided by Fang. These allocations may not be indicative of the actual expenses which would have been incurred had the Company operated as a separate entity apart from Fang prior to June 11, 2019.

**Basis for Opinion**

These combined and consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these combined and consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the combined and consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the combined and consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the combined and consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the combined and consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ KPMG Huazhen LLP
We served as the Company's auditor from 2018 to 2021.
Beijing, China
November 15, 2021

F-3

# CHINA INDEX HOLDINGS LIMITED
## CONSOLIDATED BALANCE SHEETS
### (Amounts in thousands of Renminbi ("RMB"), except for share data)

| | Notes | As of December 31, 2020 | 2021 |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | 2 (d) | 280,355 | 361,521 |
| Short-term investments | 2 (u) | 391,671 | — |
| Accounts receivable, net of allowance for doubtful accounts | 3 | 29,680 | 49,217 |
| Prepaid expenses and other current assets | 4 | 2,557 | 25,531 |
| Amounts due from a related party - current | 10 | 3,090 | — |
| **Total current assets** | | **707,353** | **436,269** |
| | | | |
| **Non-current assets:** | | | |
| Property and equipment, net | | 2,345 | 1,424 |
| Right of use assets | 5 | 44,369 | 38,892 |
| Amounts due from a related party - non-current, less allowance for doubtful accounts of RMB547,069 and RMB536,556 as of December 31, 2020 and 2021, respectively | 10 | — | — |
| Other non-current assets | | 3,270 | 4,212 |
| **Total non-current assets** | | **49,984** | **44,528** |
| | | | |
| **Total assets** | | **757,337** | **480,797** |
| | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | |
| **Current liabilities:** | | | |
| Accounts payable | | 9,343 | 11,465 |
| Amounts due to a related party | 10 | 156 | 12,300 |
| Deferred revenue | 8 | 224,141 | 216,188 |
| Income taxes payable | 9 | 26,737 | 25,474 |
| Accrued expenses and other current liabilities (including accrued expenses and other current liabilities of VIEs without recourse to the Company of RMB386 and RMB374 as of December 31, 2020 and 2021, respectively) | 6 | 637,693 | 99,657 |
| **Total current liabilities** | | **898,070** | **365,084** |
| | | | |
| **Non-current liabilities:** | | | |
| Long-term lease liabilities | 5 | 27,427 | 29,570 |
| Other non-current liabilities | 7 | 117,987 | 75,288 |
| **Total non-current liabilities** | | **145,414** | **104,858** |
| | | | |
| **Total liabilities** | | **1,043,484** | **469,942** |
| | | | |
| **Commitments and contingencies** | 15 | — | — |
| **SHAREHOLDERS' EQUITY (DEFICIT)** | | | |
| Class A ordinary shares (US$0.001 per share, 1,000,000,000 shares authorized for Class A and Class B in aggregate as of December 31, 2020 and 2021; 72,475,630 shares issued as of December 31, 2020 and 2021; 66,411,428 and 66,787,537 shares outstanding as of December 31, 2020 and 2021, respectively) | 12 | 500 | 500 |
| Class B ordinary shares (US$0.001 per share, 1,000,000,000 shares authorized for Class A and Class B in aggregate as of December 31, 2020 and 2021; 23,636,706 shares issued and outstanding as of December 31, 2020 and 2021; each Class B ordinary share is convertible into one Class A ordinary share) | 12 | 163 | 163 |
| Treasury shares (6,064,202 and 5,688,093 shares as of December 31, 2020 and 2021, respectively) | 12 | (42) | (39) |
| Capital deficit | | (126,571) | (121,631) |
| Retained earnings (accumulated deficits) | | (162,728) | 116,454 |
| Accumulated other comprehensive income | | 1,232 | 14,043 |
| **Total shareholders' equity (deficit) attributable to China Index Holdings Limited** | | **(287,446)** | **9,490** |
| | | | |
| Noncontrolling interests | | 1,299 | 1,365 |
| | | | |
| **Total shareholders' equity (deficit)** | | **(286,147)** | **10,855** |
| | | | |
| **Total liabilities and shareholders' equity (deficit)** | | **757,337** | **480,797** |

The accompanying notes are an integral part of the combined and consolidated financial statements.

F-4

**CHINA INDEX HOLDINGS LIMITED**
**COMBINED AND CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(Amounts in thousands of RMB, except for per share data)**

| | Notes | For the Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2019 | 2020 | 2021 |
| Revenues (including revenues from related parties of RMB43,678, RMB11,006 and RMB238 for the years ended December 31, 2019, 2020 and 2021, respectively) | 8 | 579,650 | 635,910 | 620,953 |
| Cost of revenues (including cost of revenues resulting from transactions with related parties of RMB11,082, RMB8,981 and RMB8,826 for the years ended December 31, 2019, 2020 and 2021, respectively) | | (110,492) | (105,528) | (110,118) |
| **Gross profit** | | **469,158** | **530,382** | **510,835** |
| | | | | |
| **Operating expenses:** | | | | |
| Selling and marketing expenses (including selling and marketing expenses resulting from transactions with related parties of RMB4,761, RMB4,552 and RMB4,787 for the years ended December 31, 2019, 2020 and 2021, respectively) | | (99,020) | (112,414) | (113,626) |
| General and administrative expenses (including general and administrative expenses resulting from transactions with related parties of RMB9,383, RMB2,088 and RMB2,008 for the years ended December 31, 2019, 2020 and 2021, respectively) | | (77,773) | (85,700) | (81,667) |
| Bad debt expense (including bad debt expense resulting from transactions with a related party of nil, RMB547,069 and RMB1,998 for the years ended December 31, 2019, 2020 and 2021, respectively) | 3, 10 | (4,842) | (559,445) | (8,767) |
| **Operating income (loss)** | | **287,523** | **(227,177)** | **306,775** |
| Interest income | | 2,200 | 1,625 | 9,750 |
| Change in fair value of the warrants | 7 | (1,152) | 1,359 | — |
| Investment income | 2 (e) | 714 | 9,294 | 8,458 |
| Government grants | 2 (n) | 903 | 5,997 | 765 |
| **Income (loss) before income taxes** | | **290,188** | **(208,902)** | **325,748** |
| Income tax expense | 9 | (44,737) | (109,454) | (46,500) |
| **Net income (loss)** | | **245,451** | **(318,356)** | **279,248** |
| Less: net income (loss) attributable to noncontrolling interest holders | | — | (304) | 66 |
| **Net income (loss) attributable to China Index Holdings Limited** | | **245,451** | **(318,052)** | **279,182** |
| | | | | |
| Other comprehensive income (loss) | | | | |
| Foreign currency translation adjustments, net of nil income taxes | | (7) | 1,012 | 12,811 |
| Unrealized holding gains on short-term investments, net of RMB107, nil and nil income taxes for the years ended December 31, 2019, 2020 and 2021, respectively | 2 (e) | 607 | — | — |
| Less: Reclassification adjustment for gains on short-term investments realized in net income, net of RMB107, nil and nil income taxes for the years ended December 31, 2019, 2020 and 2021, respectively | 2 (e) | (607) | — | — |
| **Total comprehensive income (loss)** | | **245,444** | **(317,344)** | **292,059** |
| Less: net comprehensive income (loss) attributable to noncontrolling interest holders | | — | (304) | 66 |
| **Comprehensive income (loss) attributable to China Index Holdings Limited** | | **245,444** | **(317,040)** | **291,993** |
| **Earnings (loss) per share for Class A and Class B ordinary shares** | | | | |
| Basic | 13 | 2.74 | (3.54) | 3.10 |
| Diluted | 13 | 2.74 | (3.54) | 3.08 |
| **Weighted average number of Class A and Class B ordinary shares and ordinary shares equivalents outstanding:** | | | | |
| Basic | 13 | 89,515,153 | 89,842,465 | 90,196,440 |
| Diluted | 13 | 89,545,710 | 89,842,465 | 90,602,539 |

The accompanying notes are an integral part of the combined and consolidated financial statements.

**CHINA INDEX HOLDINGS LIMITED**
**COMBINED AND CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT)**
**(Amounts in thousands of RMB, except for share data)**

| | Class A ordinary shares | | Class B ordinary shares | | | | | | Accumulated other comprehensive income | | | |
| | Number of Class A ordinary shares | Amount | Number of Class B ordinary shares | Amount | Treasury shares | Capital deficit | Retained earnings (accumulated deficit) | Parent company deficit | Foreign currency translation adjustments | Unrealized gain on short-term investments | Noncontrolling interests | Total shareholders' equity (deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of January 1, 2019** | — | — | — | — | — | — | — | (72,522) | 227 | — | — | (72,295) |
| Net income | — | — | — | — | — | — | 155,324 | 90,127 | — | — | — | 245,451 |
| Foreign currency translation adjustments, net of nil income taxes | — | — | — | — | — | — | — | — | (7) | — | — | (7) |
| Share-based compensation | — | — | — | — | — | 4,340 | — | 3,894 | — | — | — | 8,234 |
| Unrealized holding gains on short-term investments, net of RMB107 income taxes | — | — | — | — | — | — | — | — | — | 607 | — | 607 |
| Reclassification adjustment for gains on short-term investments realized in net income, net of RMB107 income taxes | — | — | — | — | — | — | — | — | — | (607) | — | (607) |
| Net transfers to Parent | — | — | — | — | — | — | — | (160,401) | — | — | — | (160,401) |
| Capitalization at separation | 65,762,936 | 500 | 23,636,706 | 163 | (46) | (139,519) | — | 138,902 | — | — | — | — |
| **Balance as of December 31, 2019** | 65,762,936 | 500 | 23,636,706 | 163 | (46) | (135,179) | 155,324 | — | 220 | — | — | 20,982 |
| Net loss | — | — | — | — | — | — | (318,052) | — | — | — | (304) | (318,356) |
| Foreign currency translation adjustments, net of nil income taxes | — | — | — | — | — | — | — | — | 1,012 | — | — | 1,012 |
| Share-based compensation | — | — | — | — | — | 8,612 | — | — | — | — | — | 8,612 |
| Noncontrolling interests acquired in business acquisition | — | — | — | — | — | — | — | — | — | — | 1,603 | 1,603 |
| Settlement of vested restricted shares using treasury shares | 648,492 | — | — | — | 4 | (4) | — | — | — | — | — | — |
| **Balance as of December 31, 2020** | 66,411,428 | 500 | 23,636,706 | 163 | (42) | (126,571) | (162,728) | — | 1,232 | — | 1,299 | (286,147) |
| Net income | — | — | — | — | — | — | 279,182 | — | — | — | 66 | 279,248 |
| Foreign currency translation adjustments, net of nil income taxes | — | — | — | — | — | — | — | — | 12,811 | — | — | 12,811 |
| Share-based compensation | — | — | — | — | — | 4,943 | — | — | — | — | — | 4,943 |
| Settlement of vested restricted shares and exercised share options using treasury shares | 376,109 | — | — | — | 3 | (3) | — | — | — | — | — | — |
| **Balance as of December 31, 2021** | 66,787,537 | 500 | 23,636,706 | 163 | (39) | (121,631) | 116,454 | — | 14,043 | — | 1,365 | 10,855 |

The accompanying notes are an integral part of the combined and consolidated financial statements.

**CHINA INDEX HOLDINGS LIMITED**
**COMBINED AND CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Amounts in thousands of RMB)**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2020** | **2021** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income (loss) | 245,451 | (318,356) | 279,248 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Share-based compensation expense | 8,234 | 8,612 | 4,943 |
| Depreciation | 1,119 | 1,196 | 1,411 |
| Reduction in the carrying amount of the right of use assets | 4,984 | 5,226 | 5,478 |
| Allowance for doubtful accounts | 4,842 | 12,376 | 6,769 |
| Allowance for amounts due from a related party - non-current | — | 547,069 | 1,998 |
| Investment income | (714) | (9,294) | (8,458) |
| Deferred income tax expense (benefit) | — | 60,516 | (986) |
| Change in fair value of the warrants | 1,152 | (1,359) | — |
| (Gain) loss on disposal of property and equipment | 2 | (5) | (36) |
| Changes in operating assets and liabilities, net of effects of acquisition and disposal of subsidiaries: | | | |
| Accounts receivable | (13,551) | (17,744) | (26,307) |
| Prepayments to and amounts due from related parties | (4,820) | 4,820 | — |
| Prepaid expenses and other current assets | (3,871) | (1,546) | (4,802) |
| Accounts payable | 2,660 | 1,499 | 2,122 |
| Amounts due to a related party | 7,028 | (7,282) | 12,215 |
| Deferred revenue | 60,272 | 20,623 | (7,945) |
| Income tax payable | 8,916 | 3,341 | (1,262) |
| Amounts due from a related party - non-current | — | (547,069) | (1,998) |
| Accrued expenses and other current liabilities | 4,384 | 557,590 | (7,067) |
| Long-term lease liabilities | (14,930) | (10,252) | 2,143 |
| Other non-current liabilities | 22,881 | 17,583 | (42,646) |
| **Net cash provided by operating activities** | **334,039** | **327,544** | **214,820** |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Purchase of short-term investments | (340,000) | (4,084,440) | (2,199,090) |
| Proceeds from sales of short-term investments | 215,714 | 3,827,063 | 2,599,219 |
| Purchase of property and equipment | (63) | (585) | (491) |
| Proceeds from disposal of property and equipment | 1 | 5 | 36 |
| Proceeds from disposal of subsidiaries | — | 4,325 | — |
| Cash disposed for sales of subsidiaries | — | (1,035) | — |
| Advance to a noncontrolling interest holder | — | (3,090) | — |
| Cash acquired from business acquisition | — | 7 | — |
| Advance to a third party | — | — | (18,151) |
| Repayment of advance to a noncontrolling interest holder | — | — | 3,090 |
| **Net cash provided by (used in) investing activities** | **(124,348)** | **(257,750)** | **384,613** |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Net transfers to the parent company | (160,194) | — | — |
| Cash received from a third party for loan collateral | — | — | 18,141 |
| Settlement of guarantee liability in relation to convertible notes issued by a related party | — | — | (540,375) |
| **Net cash used in financing activities** | **(160,194)** | **—** | **(522,234)** |
| **Effect of foreign currency exchange rate changes on cash and cash equivalents** | **377** | **(3,515)** | **3,967** |
| **Net increase in cash and cash equivalents** | **49,874** | **66,279** | **81,166** |
| **Cash and cash equivalents as of the beginning of the year** | **164,202** | **214,076** | **280,355** |
| **Cash and cash equivalents as of the end of the year** | **214,076** | **280,355** | **361,521** |
| **Supplemental disclosure of cash flow information:** | | | |
| Income tax paid | 12,940 | 25,645 | 29,394 |
| Withholding income tax paid | — | — | 62,000 |
| Issuance of warrants in connection with the separation from Fang | 207 | — | — |
| Net assets and noncontrolling interests acquired in business acquisition | — | 1,603 | — |

The accompanying notes are an integral part of the combined and consolidated financial statements.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

## 1.   DESCRIPTION OF PRINCIPAL ACTIVITIES AND ORGANIZATION

### *(a)   Description of Principal Activities*

China Index Holdings Limited ("CIH" or the "Company"), formerly known as Selovo Investments Limited, is an exempted company with limited liability and was re-domiciled from the British Virgin Islands to the Cayman Islands on July 26, 2018. The Company separated from Fang Holdings Limited ("Fang" or the "Parent") on June 11, 2019 (the "separation"), becoming an independent publicly traded company as a result of a pro rata distribution (the "distribution") of all outstanding shares of CIH Class A ordinary shares to shareholders of Fang. On June 11, 2019, Fang's shareholders of record received one share of CIH Class A ordinary shares for every one share of Fang ordinary shares held as of the record date. CIH ordinary shares began trading under the ticker symbol "CIH" on the NASDAQ on June 12, 2019.

The Company, through its wholly-owned subsidiaries and consolidated variable interest entities ("VIEs"), offers real estate data and analytics tools to customers. The Company also offers customers, primarily real estate developers, marketplace services which include promotion service and listing service prior to January 1, 2021 and promotion service since January 1, 2021. All of the Company's operations are located in the People's Republic of China ("PRC") with nearly all of its customers located in the PRC.

### *(b)   Organization*

In order to continue to operate its business after the separation of the Company from Fang in compliance with PRC regulatory requirements which restrict foreign ownership of value-added telecommunications, CIH, through Beijing Zhong Zhi Shi Zheng Information Technology Co., Ltd ("WFOE"), which is a PRC operating entity of the Company, entered into a series of contractual agreements and arrangements ("Zhong Zhi Hong Yuan VIE Agreements") with (1) Zhong Zhi Hong Yuan Data Information Technology Co., Ltd ("Zhong Zhi Hong Yuan" or the "VIE"), a PRC legal entity, and (2) the shareholders of Zhong Zhi Hong Yuan, including Mr. Vincent Tianquan Mo ("Mr. Mo"), chairman of the board of directors prior to February 28, 2022 and the controlling shareholder of the Company, and Ms. Yu Huang ("Ms. Huang"), director, chief executive officer and president of the Company.

Zhong Zhi Hong Yuan was established by Mr. Mo and Ms. Huang on June 11, 2018. The registered capital of Zhong Zhi Hong Yuan is RMB1.5 million. Zhong Zhi Hong Yuan obtained a license of telecommunications and information services, or ICP license on July 2, 2019, from the government in order to carry out commercial Internet content provision operations in China.

All of the equity interests of Zhong Zhi Hong Yuan are legally held by Mr. Mo and Ms. Huang. Both individuals are nominee equity holders of Zhong Zhi Hong Yuan and holding their equity interests on behalf of CIH. Through the Zhong Zhi Hong Yuan VIE Agreements, the nominee equity holders of Zhong Zhi Hong Yuan have granted all their legal rights including voting rights and disposition rights of their equity interests in Zhong Zhi Hong Yuan to CIH. The nominee equity holders of Zhong Zhi Hong Yuan do not participate significantly in income and loss and do not have the power to direct the activities of Zhong Zhi Hong Yuan that most significantly impact its economic performance. Accordingly, Zhong Zhi Hong Yuan is considered a VIE.

CIH has a controlling financial interest in the VIE because CIH has (i) the power to direct activities of the VIE that most significantly impact the economic performance of the VIE; and (ii) the obligation to absorb the expected losses and the right to receive expected residual return of the VIE that could potentially be significant to the VIE. Thus, CIH is the primary beneficiary of the VIE.

Under the terms of the Zhong Zhi Hong Yuan VIE Agreements, CIH has (i) the right to receive economic benefits that could potentially be significant to the VIE in the form of service fees under the exclusive technical consultancy and services agreement; (ii) the right to receive all dividends declared by the VIE and the right to all undistributed earnings of the VIE; (iii) the right to receive the residual benefits of the VIE through its exclusive option to acquire 100% of the equity interests in the VIE, to the extent permitted under PRC law. Accordingly, the financial statements of the VIE are consolidated in the Company's combined and consolidated financial statements.

F-8

Table of Contents

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**1.   DESCRIPTION OF PRINCIPAL ACTIVITIES AND ORGANIZATION (continued)**

Under the terms of Zhong Zhi Hong Yuan VIE Agreements, the VIE's nominee equity holders have no rights to the net assets nor have the obligations to fund the deficit, and such rights and obligations have been vested to CIH. All of the equity (net assets) and net loss of the VIE are attributed to CIH.

The key terms of Zhong Zhi Hong Yuan VIE Agreements are as follows:

***Equity Pledge Agreement***

Pursuant to the equity pledge agreement, each nominee equity holder of the VIE has pledged all of his or her equity interest in the VIE to guarantee the VIE's performance under the exclusive technical consultancy and services agreement. If the VIE or its nominee equity holder breach their contractual obligations under this agreement, WFOE, as pledgee, will be entitled to certain rights regarding the pledged interests, including receiving proceeds from the auction or sale of all or part of the pledged interests of the VIE in accordance with the law. Each nominee equity holder of the VIE agrees that, during the term of the equity pledge agreement, he or she will not dispose of the pledged equity interests or create or allow any encumbrance on the pledged equity interests without the prior written consent of WFOE. WFOE also has the right to receive dividends of the VIE from its nominee equity holder. The equity pledge agreements remain effective for 10 years commencing from June 11, 2018 and can be extended at the sole discretion of WFOE. The pledge was registered with the relevant local administration for industry and commerce in July 2018 and will remain binding until the VIE and their nominee equity holders discharge all their obligations under the contractual arrangements. The registration of the equity pledge enables the WFOE to enforce the equity pledge against third parties who acquire the equity interests of the VIE in good faith.

***Shareholders' Proxy Agreement***

Under the shareholders' proxy agreement, the nominee equity holders agreed to irrevocably entrust WFOE to exercise their rights as the registered equity holders of the VIE to attend shareholders' meetings, cast votes on all matters of the VIE requiring shareholder approval. WFOE may assign part or all of these proxy rights to its designated employees. WFOE will be indemnified for any loss under this agreement. This agreement will also be binding upon successors of the parties or transferees of the parties' equity interests. This agreement will remain in effect until terminated upon written consent by all the parties to the agreement or by their successors.

***Exclusive Technical Consultancy and Services Agreement***

Under the exclusive technical consultancy and services agreement among WFOE and the VIE, WFOE has the exclusive right to provide the VIE with technical services relating to its business. In exchange for these services, the VIE has agreed to make monthly payments to the service provider for such services at an amount determined by the time consumed, the seniority of employees of WFOE providing services to the VIE and amounts agreed by WFOE and the VIE for services provided. Without WFOE's prior written consent, the VIE agrees not to accept the same or any similar services provided by any third party. WFOE owns the intellectual property rights arising out of the performance of this agreement. The agreement has an original term of 10 years commencing from June 11, 2018, which can be extended by WFOE at its sole discretion, or can be terminated by WFOE upon 30 days' advance notice.

***Operating Agreement***

Under the operating agreement, WFOE has undertaken to enter into guarantee contracts with third parties, as required by third parties, to guarantee the performance of the VIE under its business contracts with third parties. In return, the VIE is required to pledge its accounts receivable and mortgage all of its assets as counter security to WFOE. Each of the VIE and the nominee equity holders has agreed not to enter into any transaction that would substantially affect the assets, rights, obligations or operations of the VIE without the prior written consent of WFOE. The agreement has an original term of 10 years which can be extended prior to the expiration with written confirmation from WFOE, or can be terminated by WFOE upon 30 days' advance notice.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**1.   DESCRIPTION OF PRINCIPAL ACTIVITIES AND ORGANIZATION (continued)**

*Exclusive Call Option Agreement*

Pursuant to the exclusive call option agreements, each equity holder of the VIE has irrevocably granted CIH and WFOE an exclusive option to purchase, or have its designated person or persons to purchase, at its discretion, to the extent permitted under PRC law, all or part of the equity interests in the VIE. The purchase price shall be the minimum price permitted under PRC law. Without CIH and WFOE's prior written consent, the VIE shall not amend its articles of association, increase or decrease the registered capital, sell or otherwise dispose of its assets or beneficial interest, create or allow any encumbrance on its assets or other beneficial interests, provide any loans to any third parties, enter into any material contract with a value of more than RMB100,000 (except those contracts entered into in the ordinary course of business), conduct mergers or acquisitions or make any investments, or distribute dividends to the shareholders. Each shareholder of the VIE has agreed that, without CIH and WFOE's prior written consent, he or she will not dispose his or her equity interests in the VIE or create or allow any encumbrance on their equity interests. Moreover, without CIH and WFOE's prior written consent, no dividend will be distributed to the VIE's equity holders, and if any of the equity holders receives any profit, interest, dividend or proceeds of share transfer or liquidation, the equity holder must give such profit, interest, dividend and proceeds to CIH and WFOE or their designated person(s). The agreement has an original term of 10 years commencing from June 11, 2018 which can be extended at the sole discretion of CIH and WFOE.

*Loan Agreement*

Pursuant to the loan agreement among WFOE and the equity holders of the VIE, WFOE made loans in an aggregate amount of RMB1.5 million to the equity holders of the VIE solely for making contributions to the business development of the VIE. Pursuant to the loan agreement, the equity holders of the VIE shall repay the loan by transferring of all his or her equity interest in the VIE to WFOE or their designated person(s). The equity holders of the VIE must pay all of the proceeds from sale of such equity interests to WFOE. The loan must be repaid immediately under certain circumstances, including, among others, if a foreign investor is permitted to operate the value-added telecommunication service business and CIH and WFOE elect to exercise its exclusive equity purchase option. The loan agreement has an original term of 10 years commencing from June 11, 2018 which will be automatically extended until WFOE agrees and is permitted to directly hold the equity interest of the VIE under applicable laws of the PRC. The equity holders of the VIE shall not repay such loans in advance unless it is otherwise provided in this agreement.

In addition, (i) on December 9, 2019, WFOE entered into a series of contractual agreements and arrangements ("Zhong Zhi Academy Agreements") with (1) Beijing Zhong Zhi Information Technology Academy ("Beijing Zhong Zhi Academy"), a PRC legal entity, in which WFOE holds 44% equity interest, and (2) the nominal individual shareholder of Beijing Zhong Zhi Academy, who holds 56% of Beijing Zhong Zhi Academy's equity interest. (ii) On August 30, 2020, WFOE entered into a series of contractual agreements and arrangements ("Shouzheng Agreements") with (1) Shouzheng Credit Rating Co., Ltd.("Shouzheng"), a PRC legal entity, and (2) the shareholder of Shouzheng, Jiatianxia Credit Management Co., Ltd. ("Jiatianxia Credit"), an entity under the control of Mr. Vincent Tianquan Mo, which holds 67% of Shouzheng's equity interest.

All of the terms of Zhong Zhi Academy Agreements and Shouzheng Agreements are substantially similar to Zhong Zhi Hong Yuan VIE Agreements described above (collectively referred to as "VIE Agreements").

The Company relies on the VIE Agreements to operate and control the VIEs. All of the VIE Agreements are governed by PRC laws and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC laws and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit the Company's ability to enforce these contractual arrangements. In the event that the Company is unable to enforce these contractual arrangements, or if the Company suffers significant delay or other obstacles in the process of enforcing these contractual arrangements, it may not be able to exert effective control over the VIEs and relevant rights and licenses held by it which the Company requires in order to operate its business, and its ability to conduct its business may be negatively affected.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

## 1.   DESCRIPTION OF PRINCIPAL ACTIVITIES AND ORGANIZATION (continued)

In the opinion of management, based on the legal opinion obtained from the Company's PRC legal counsel, the above contractual arrangements are legally binding and enforceable and do not violate current PRC laws and regulations. However, there are uncertainties regarding the interpretation and application of existing and future PRC laws and regulations. Accordingly, the Company cannot be assured that PRC regulatory authorities will not ultimately take a contrary view to its opinion. If the current ownership structure of the Company and the VIE Arrangements are found to be in violation of any existing or future PRC laws and regulations, the PRC government could:

    (a)  revoking the business and operating licenses of the Company;

    (b)  levying fines on the Company;

    (c)  confiscating any of the income that they deem to be obtained through illegal operations;

    (d)  shutting down the Company's services;

    (e)  discontinuing or restricting the Company's operations in China;

    (f)  imposing conditions or requirements with which the Company may not be able to comply;

    (g)  requiring the Company to change its corporate structure and contractual arrangements;

    (h)  restricting or prohibiting the use of the proceeds from overseas offering to finance the Company's VIEs' business and operations; and

    (i)  taking other regulatory or enforcement actions that could be harmful to the Company's business.

If the imposition of any of these penalties or requirement to restructure the Company's corporate structure causes it to lose the rights to direct the activities of the VIEs or the Company's right to receive its economic benefits, the Company would no longer be able to consolidate the financial results of the VIEs in its combined and consolidated financial statements. In the opinion of management, the likelihood of deconsolidation of the VIEs is remote based on current facts and circumstances.

The Company's involvement with VIEs under the VIE Agreements affected the Company's combined and consolidated financial position, results of operations and cash flows as indicated below. All intercompany transactions and balances with the Company and its wholly-owned subsidiaries have been eliminated upon consolidation.

The assets and liabilities of the VIEs that were included in the accompanying consolidated financial statements as of December 31, 2020 and 2021 were as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2020 | 2021 |
| Total assets | 1,957 | 5,238 |
| Total liabilities | 386 | 2,022 |

F-11

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

## 1. DESCRIPTION OF PRINCIPAL ACTIVITIES AND ORGANIZATION (continued)

The financial performance and cash flows of the VIEs that were included in the accompanying combined and consolidated financial statements for the years ended December 31, 2019, 2020 and 2021 were as follows:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2021 |
| Revenues | 26 | — | 267 |
| Net loss | (705) | (1,755) | (548) |
| Net cash provided by (used in) operating activities | (318) | (1,362) | 403 |
| Net cash provided by investing activities | — | — | 3,090 |
| Net cash provided by financing activities* | — | 1,910 | — |

---

\* Net cash provided by financing activity represents capital injection in the VIEs by nominee equity holders, which was eliminated upon consolidation.

In accordance with the VIE Agreements, CIH has the power to direct the activities of the VIEs. Therefore, the Company considers that there are no assets in the VIEs that can be used only to settle obligations of the VIEs, except for the registered capital of the VIEs in the amount of RMB6,500 and RMB9,590 as of December 31, 2020 and 2021. None of the assets of the VIEs have been pledged or collateralized. The creditors of the VIEs do not have recourse to the general credit of CIH and WFOE.

## 2. SIGNIFICANT ACCOUNTING POLICIES

### (a) Basis of Presentation and Principles of Consolidation

The accompanying combined and consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP").

In connection with the Company's separation from Fang, the direct and indirect equity interests of all of the Company's operating subsidiaries and intermediate holding companies were transferred from Fang to the Company, when the Company was still one of Fang's subsidiaries, through a series of transactions, which were completed in May 2019. As a result of these transactions, the Company assumed all of the business and operations of real estate information, analytics and marketplace services business from Fang by acquiring the relevant portion of the businesses historically not conducted by the Company. The Company separated from Fang on June 11, 2019, becoming an independent publicly traded company as a result of a pro rata distribution of all outstanding shares of CIH ordinary shares to shareholders of Fang.

The financial statements presented herein represent (i) prior to June 11, 2019, the combined financial statements of Fang's real estate information, analytics and marketplace services business when the Company was a wholly owned subsidiary of Fang and (ii) subsequent to June 11, 2019, the consolidated financial statements of the Company as a separate publicly traded company following its separation from Fang.

The combined financial statements have been prepared on a stand-alone basis and are derived from Fang's consolidated financial statements and underlying accounting records. The combined financial statements include all revenues, costs, assets and liabilities directly attributable to the Company either through specific identification or allocation.

The consolidated financial statements include the financial statements of the Company, its wholly-owned subsidiaries and the VIEs. All intercompany transactions and balances among the Company, its wholly-owned subsidiaries and the VIEs have been eliminated upon consolidation.

F-12

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

**Allocation of Expenses**

Prior to the separation, Fang has historically performed centralized functions on behalf of the Company. Accordingly, certain Fang's costs have been allocated to the Company and reflected as expenses in the combined statement of comprehensive income for the period between January 1, 2019 and June 11, 2019. Expense allocations primarily relate to centralized functions, including finance, accounting, treasury, tax, legal, internal audit and human resources functions. In addition, expense allocations include, among other costs, IT maintenance and professional fees. All of the allocations of costs are deemed to have been incurred and settled through parent company deficit in the period when the costs were recorded. The allocations of costs were based on the number of staff of the Company relative to Fang's total number of staff, or the Company's revenues relative to Fang's total revenues, where appropriate. Management considers the allocation methodologies used to be reasonable and appropriate reflections of the historical parent expenses attributable to the Company. The expenses reflected in the combined statement of comprehensive income may not be indicative of the actual expenses that would have been incurred during the period presented if the Company had operated as a separate, stand-alone entity. It is not practicable to estimate actual costs that would have been incurred had the Company been a stand-alone company during the period presented. Following the separation from Fang, the Company performs these functions using its own resources or purchased services.

The following table sets forth cost of revenues, selling and marketing expenses, and general and administrative expenses, allocated from Fang for the period between January 1, 2019 and June 11, 2019:

|  | For the period between January 1 and June 11, 2019 |
|---|---|
| Cost of revenues | 2,309 |
| Selling and marketing expenses | 305 |
| General and administrative expenses | 1,723 |
| **Total** | **4,337** |

**Cash Management and Treasury**

The Company funds its operations through cash generated from operating activities. Prior to June 11, 2019, excess cash has historically been repatriated to Fang through intercompany advances. Transfers of cash both to and from Fang are included within parent company investment (deficit) on the combined statement of equity (deficit). Fang has issued debt for general corporate purposes but in no case has any such debt been guaranteed or assumed by the Company or otherwise secured by the assets of the Company. As Fang's debt and related interest is not directly attributable to the Company, no such amounts have been allocated to the combined financial statements before the separation.

**Parent Company Deficit**

Parent company deficit in the combined statement of equity (deficit) represents Fang's historical investment in the Company, the Company's accumulated net earnings after income taxes, and the net effect of transactions with and allocations from Fang prior to June 11, 2019. The combined statement of equity (deficit) includes net cash transfers to and from Fang and the Company. The total net effect of the settlement of these transactions is reflected in financing activities in the accompanying combined and consolidated statements of cash flows. Upon the separation, parent company deficit formed the Company's ordinary shares, treasury shares and capital deficit.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(b)   Use of Estimates*

The preparation of the combined and consolidated financial statements in accordance with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the balance sheet dates and the reported amounts of expenses during the reporting periods. Significant estimates and assumptions reflected in the Company's financial statements include, but are not limited to, collectability of accounts receivable and amounts due from a related party, estimated stand-alone selling prices of performance obligations, accruals for tax uncertainties, realization of deferred tax assets, allocation of expenses, useful lives of property and equipment, impairment of long-lived assets, fair value of the warrants and share-based compensation awards, and the incremental borrowing rate used in calculating operating lease liabilities. Changes in facts and circumstances may result in revised estimates. Actual results could materially differ from those estimates.

*(c)   Foreign Currency*

The functional currency of the Company and its subsidiaries incorporated at Hong Kong Special Administrative Region ("Hong Kong SAR"), British Virgin Islands ("BVI") and the United States of America (the "USA"), is United States Dollars ("US$"), whereas the functional currency of the Company's other PRC subsidiaries and the VIEs is Chinese Renminbi ("RMB"). Transactions denominated in currencies other than the functional currency are translated into the functional currency at the exchange rates prevailing at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are translated into the functional currency using the applicable exchange rate at the balance sheet date. The resulting exchange differences are recorded in general and administrative expenses in the combined and consolidated statements of comprehensive income (loss).

The Company uses RMB as its reporting currency. Assets and liabilities of entities with functional currencies other than RMB are translated into RMB using the exchange rate on the balance sheet date. Revenues and expenses are translated into RMB at average rates prevailing during the reporting period. The resulting foreign currency translation adjustment are recorded in accumulated other comprehensive income within equity.

Since the RMB is not a fully convertible currency, all foreign exchange transactions involving RMB must take place either through the People's Bank of China (the "PBOC") or other institutions authorized to buy and sell foreign exchange. The exchange rates adopted for the foreign exchange transactions are the rates of exchange quoted by the PBOC.

Amounts are stated in thousands of RMB, except otherwise stated.

*(d)   Cash and Cash Equivalents*

Cash and cash equivalents represent cash on hand, demand deposits, time deposits and highly liquid investments placed with banks, which have original maturities of three months or less at the date of purchase and are readily convertible to known amounts of cash. Interest earned from cash and cash equivalents is recorded in interest income in the combined and consolidated statements of comprehensive income (loss).

F-14

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

Cash and cash equivalents maintained at banks consist of the following:

|  | As of December 31, | |
| --- | --- | --- |
|  | **2020** | **2021** |
| RMB denominated bank deposits with financial institutions in the PRC | 225,323 | 309,826 |
| RMB denominated bank deposits with financial institutions in Hong Kong SAR | 1,692 | 2,299 |
| US dollar denominated bank deposits with a financial institution in Hong Kong SAR | 2,363 | 17,962 |
| HK dollar denominated bank deposits with a financial institution in Hong Kong SAR | 357 | 680 |
| USD denominated bank deposits with a financial institution in BVI | 58 | 53 |
| USD denominated bank deposits with a financial institution in Cayman Islands | 3,437 | 2,737 |
| USD denominated bank deposits with a financial institution in the USA | 47,105 | 27,964 |

*(e)   Short-term Investments*

The Company's short-term investments represent investments in wealth management products which have the original maturities of less than twelve months. These wealth management products are managed by financial institutions in the PRC with variable interest rates referenced to performance of underlying assets.

During the year ended December 31, 2019, the Company invested RMB340,000 in financial products managed by a financial institution in the PRC, which were classified as available-for-sale securities and recorded at fair value. The terms of the financial products range between 7 days and 83 days. Unrealized holding gains, net of the related income tax effect, on available-for-sale securities are excluded from earnings and reported as a separate component of accumulated other comprehensive income until realized. Realized gains and losses from the sale of available-for-sale securities are determined on a specific-identification basis. The Company recorded a gain of RMB714 on the financial products, which was included in investment income in the combined and consolidated statement of comprehensive income for the year ended December 31, 2019. For the short-term investments of RMB4,084,440 and RMB2,199,090 purchased during the years ended December 31, 2020 and 2021, respectively, the Company elects the fair value option at the date of initial recognition in accordance with ASC 825. Changes in the fair value of these investments in the amount of RMB9,294 and RMB8,458 for the years ended December 31, 2020 and 2021, respectively, are reflected on the consolidated statements of comprehensive income (loss) as "Investment income". Fair value is estimated based on quoted prices provided by financial institutions at the end of each reporting period.

*(f)   Property and Equipment, Net*

Property and equipment are stated at cost less depreciation and any impairment.

Property and equipment are depreciated using the straight-line method over the estimated useful lives of the assets, as follows:

| Category | Estimated Useful Life |
| --- | --- |
| Electronic equipment | 3 to 5 years |
| Office furniture | 5 years |
| Leasehold improvement | Shorter of the lease term or the estimated useful life of the assets |

Ordinary maintenance and repairs are charged to expenses as incurred, while replacements and betterments are capitalized. When items are retired or otherwise disposed of, income is charged or credited for the difference between net book value of the item disposed and proceeds realized thereon.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
(Amounts in thousands of RMB, except for share data)

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(g)   Operating Leases*

The Company leases premises for offices under non-cancellable operating leases. There are no capital improvement funding, lease concessions, escalated rent provisions or contingent rent in the lease agreements. The Company has no legal or contractual asset retirement obligations at the end of the lease term.

The Company early adopted Accounting Standard Codification ("ASC") Topic 842 *Leases*, as of January 1, 2019, using a modified retrospective method for leases that exist at, or are entered into after, January 1, 2019.

Prior to the adoption of ASC Topic 842, operating leases were not recognized on the balance sheet of the Company, but payments made under operating lease are charged to the combined and consolidated statements of comprehensive income (loss) on a straight-line basis over the term of underlying lease.

Upon adoption of ASC Topic 842, Right of use ("ROU") assets and lease liabilities are recognized upon lease commencement for operating leases based on the present value of lease payments over the lease term. As the rate implicit in the lease cannot be readily determined, the Company uses its incremental borrowing rate at the lease commencement date in determining the imputed interest and present value of lease payments. The incremental borrowing rate was determined based on the rate of interest that the Company would have to borrow an amount equal to the lease payments on a collateralized basis over a similar term. The incremental borrowing rate is primarily influenced by the risk-free interest rate of China, the Company's credit rating and lease term.

The Company has elected not to recognize ROU assets or lease liabilities for leases with an initial term of 12 months or less and recognizes a single lease cost on a straight-line basis over the remaining lease term for the operating leases.

*(h)   Impairment of Long-lived Assets*

Long-lived assets, including property and equipment and right of use assets are evaluated for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. Recoverability of a long-lived asset or asset group to be held and used is measured by a comparison of the carrying amount of an asset or asset group to the estimated undiscounted future cash flows expected to be generated by the asset or asset group. If the carrying value of an asset or asset group exceeds its estimated undiscounted future cash flows, an impairment loss is recognized by the amount that the carrying value exceeds the estimated fair value of the asset or asset group. Fair value is determined through various valuation techniques including discounted cash flow models, quoted market values and third-party independent appraisals, as considered necessary. Assets to be disposed are reported at the lower of carrying amount or fair value less costs to sell, and are no longer depreciated. No impairment of long-lived assets was recognized for any of the years presented.

*(i)   Revenue Recognition*

The Company derives revenues by (i) providing information and analytics services, including data services and analytics services and (ii) providing marketplace services, including promotion services and listing services. The Company has ceased the business operation of listing services starting January 1, 2021.

The Company recognizes revenues upon the satisfaction of its performance obligation (upon transfer of control of promised goods or services to customers) in an amount that reflects the consideration to which the Company expects to be entitled to in exchange for those goods or services, excluding amounts collected on behalf of third parties (for example, value-added taxes). For each performance obligation satisfied over time, the Company recognizes revenue over time by measuring the progress toward complete satisfaction of that performance obligation. If the Company does not satisfy a performance obligation over time, the performance obligation is satisfied at a point in time.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

The Company's contracts with customers often include promises to transfer multiple products and services. For these contracts, the Company accounts for individual performance obligations separately if they are capable of being distinct and distinct within the context of the contract. Determining whether products and services are considered distinct performance obligations may require significant judgment. Judgment is also required to determine the stand-alone selling price ("SSP") for each distinct performance obligation. In instances where SSP is not directly observable, such as when the Company does not sell the product or service separately, the Company determines the SSP using information that may include market conditions and other observable inputs.

***Information and Analytics Services***

*Data Services*

The Company derives revenues by providing access and analytics tools, including appraisal and rating, and land modules, based on its proprietary database of commercial real estate information, typically through a fixed monthly fee for its subscription-based services. The Company determines that the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract and the earning process is straight-line. Revenues from subscription-based services are recognized on a straight-line basis over the subscription period.

*Analytics Services*

The Company derives revenues by providing customized research reports to customers. There are no contractual customer acceptance provisions. Revenues from customized research reports are recognized when the Company delivers the reports to customers, which is when the control over the report has been transferred to customers.

The Company provides data monitoring and survey services over a period of time, generally less than one year. Revenues are recognized on a straight-line basis over the term of the agreement since the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract and the earning process is straight-line.

***Marketplace Services***

*Promotion Services*

The Company offers promotion services, consisting of a number of online and offline themed campaigns, including industry forums, periodic updates and online promotions to its customers to promote their brands. The promotion services contain a number of defined but not identical or similar activities to be performed over the period of one year. These activities are to fulfill the promotion service and are not separate promises in the contract. The Company determines that each day of the promotion service is distinct because the customer can benefit from each increment of service on its own (that is, it is capable of being distinct) and each increment of service is separately identifiable because no day of service significantly modifies or customizes another and no day of service significantly affects either the Company's ability to fulfill another day of service or the benefit to the customer of another day of service. The Company determines that it is providing a series of distinct goods or services because the services provided each day are substantially the same, the customer simultaneously receives and consumes the benefits provided by the Company as the Company performs, and the same measure of progress would be used to measure the Company's progress toward satisfying its promise to provide the promotion services. Revenues of promotion services are recognized on a straight-line basis over the period of one year.

F-17

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Listing Services*

Listing services comprise of commercial property listing and listing agent services for commercial properties.

Commercial listing services entitle customers to post and make changes to information for commercial properties on the website and mobile apps for a specified period of time, which typically range from one to three months, in exchange for a fixed fee. Revenues are recognized on a straight-line basis over the service period. The Company determines that its performance pattern to be straight-line since the customer simultaneously receives and consumes the benefits provided by the Company as the Company performs during the term of the contract and the earning process is straight-line.

Since January 1, 2021, the Company has ceased the business operation of listing services.

Prior to January 1, 2020, the Company also acted as an agent on behalf of Fang on listing services for commercial properties. The Company determined that it acted as an agent for the listing service because it did not obtain control of the listing service from Fang before the service was transferred to the customer. Revenues were recognized when Fang and its customers entered into a sales contract and reported on net basis.

*(j)   Contract Balances*

The Company bills its customers based upon contractual schedules, which normally is based on the passage of time. The timing of revenue recognition, billings and cash collections result in accounts receivable and contract liabilities (i.e. deferred revenue).

Accounts receivable are recognized in the period when the Company has transferred products or provided services to its customers and when its right to consideration is unconditional. Amounts collected on accounts receivable are included in net cash provided by operating activities in the combined and consolidated statements of cash flows. The Company maintains an allowance for doubtful accounts for estimated losses inherent in its accounts receivable portfolio. In establishing the required allowance, management considers historical losses adjusted to take into account current market conditions and customers' financial condition, the amount of receivables in dispute, and the current receivables aging and current payment patterns. The Company reviews its allowance for doubtful accounts on a customer-by-customer basis. Accounts receivable are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote.

Deferred revenue (a contract liability) is recognized when the Company has an obligation to transfer goods or services to a customer for which the Company has received consideration from the customer, or for which an amount of consideration is due from the customer.

*(k)   Advertising Expenses*

Advertising costs are expensed as incurred and included in selling and marketing expenses in the combined and consolidated statements of comprehensive income (loss). For the years ended December 31, 2019, 2020 and 2021, advertising expenses were RMB5,270, RMB9,281 and RMB6,070, respectively.

*(l)   Research and Development Expenses*

Research and development expenses are expensed as incurred and recorded in general and administrative expenses in the Company's combined and consolidated statements of comprehensive income (loss). Research and development expenses were RMB32,032, RMB35,846 and RMB31,573 for the years ended December 31, 2019, 2020 and 2021, respectively.

F-18

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(m)   Employee Benefits*

Pursuant to relevant PRC regulations, the Company is required to make contributions to various defined contribution plans organized by municipal and provincial PRC governments. The contributions are made for each PRC employee at rates ranging from 25.35% to 43.1% on a standard salary base as determined by local social security bureau. Contributions to the defined contribution plans are charged to the combined and consolidated statements of comprehensive income (loss) when the related service is provided. For the years ended December 31, 2019, 2020 and 2021, the costs of the Company's obligations to the defined contribution plans amounted to RMB14,281, RMB12,064 and RMB20,772, respectively. The Company has no other obligation for the payment of employee benefits associated with these plans beyond the contributions described above.

As a result of COVID-19, the PRC government exempted or reduced certain enterprises' contributions to basic pension insurance, unemployment insurance, and work injury insurance ("certain social insurance"). The Company's PRC subsidiaries and VIEs were exempted from contributions to certain social insurance between February 2020 and December 2020. The exemption was recognized as a reduction of cost of revenues and operating expenses in the amount of RMB5,396 for the year ended December 31, 2020.

*(n)   Government Grants*

Government grant is recognized when there is reasonable assurance that the Company will comply with the conditions attach to it and the grant will be received. Government grant for the purpose of giving immediate financial support to the Company with no future related costs or obligation is recognized in the Company's combined and consolidated statements of comprehensive income (loss) when the grant becomes receivable. The government grants with certain operating conditions are recorded as liabilities when received and will be recorded as government grants when the conditions are met. RMB903, RMB5,997 and RMB765 of government grants were recognized for the years ended December 31, 2019, 2020 and 2021, respectively.

*(o)   Income Taxes*

Income taxes are accounted for under the asset and liability method. Deferred income tax assets and liabilities are recognized based on the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, as well as operating loss and tax credit carryforwards, if any. Deferred income tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the periods in which those temporary differences are expected to be recovered or settled. The effect on deferred income tax assets and liabilities of a change in tax rates or tax laws is recognized in the combined and consolidated statements of comprehensive income (loss) in the period the change in tax rates or tax laws is enacted. Deferred tax assets and liabilities are offset if there is a legally enforceable right to offset deferred tax liabilities and assets, and they relate to income taxes levied by the same tax authority on the same taxable entity, or on different tax entities, but they intend to settle deferred tax liabilities and assets on a net basis or their deferred tax assets and liabilities will be realized simultaneously.

The Company reduces the carrying amounts of deferred tax assets by a valuation allowance, if based on the available evidence, it is "more-likely-than-not" that such assets will not be realized. Accordingly, the need to establish valuation allowances for deferred tax assets is assessed at each reporting period based on a "more-likely-than-not" realization threshold. This assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of futures profitability, the duration of statutory carryforward periods, the Company's experience with operating loss and tax credit carryforwards, if any, not expiring.

The Company recognizes in its financial statements the impact of a tax position if that position is "more-likely-than-not" to prevail based on the facts and technical merits of the position. Tax positions that meet the "more-likely-than-not" recognition threshold are measured at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement. Interest and penalties recognized related to an unrecognized tax benefit are classified as income tax expense in the combined and consolidated statements of comprehensive income (loss).

Table of Contents

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(p)  Share Based Compensation*

All grants of share-based awards to employees classified as equity awards are recognized in the financial statements based on their grant date fair values.

The Company recognizes compensation cost for an equity classified award with only service conditions that has a graded vesting schedule on a straight-line basis over the requisite service period for the entire award, provided that the cumulative amount of compensation cost recognized at any date at least equals the portion of the grant date fair value of such award that is vested at that date. For equity awards that contain both a service condition and a performance condition, the Company recognizes compensation cost on a tranche-by-tranche basis. To the extent the required vesting conditions are not met resulting in the forfeiture of the share-based awards, previously recognized compensation expense relating to those awards is reversed.

*(q)  Treasury Shares*

Treasury shares are accounted for under the cost method. These shares have no voting rights and are not entitled to receive dividends and are excluded from the weighted average outstanding shares in calculation of earnings per share.

*(r)  Statutory Reserves*

In accordance with the laws applicable to China's Foreign Investment Enterprises, the Company's PRC subsidiaries registered as WFOEs have to make appropriations from their after-tax profits (as determined under the Accounting Standards for Business Enterprises as promulgated by the Ministry of Finance of PRC ("PRC GAAP") to a general reserve fund. The appropriation to the general reserve fund must be at least 10% of the after-tax profits calculated in accordance with PRC GAAP. Appropriation is not required if the general reserve fund has reached 50% of the registered capital of the company.

In addition, in accordance with the Company Laws of the PRC, the Company's PRC subsidiaries and the VIEs registered as PRC domestic companies must make appropriations from their after-tax profits as determined under the PRC GAAP to non-distributable reserve funds including a statutory surplus fund and a discretionary surplus fund. The appropriation to the statutory surplus fund must be at least 10% of the after-tax profits as determined under the PRC GAAP. Appropriation is not required if the surplus fund has reached 50% of the registered capital of the company. Appropriation to the discretionary surplus fund is made at the discretion of the company.

The use of the statutory reserves is restricted to the off-setting of losses or increasing capital of the respective company. All these reserves are not allowed to be transferred to their investors in terms of cash dividends, loans or advances, nor can they be distributed except under liquidation.

The accumulated balance of the statutory reserves as of December 31, 2020 and 2021 was RMB2,765 and RMB2,765, respectively.

*(s)  Contingencies*

In the normal course of business, the Company is subject to loss contingencies, such as legal proceedings and claims arising out of its business, that cover a wide range of matters, including, among others, government investigations, shareholder lawsuits, and non-income tax matters. An accrual for a loss contingency is recognized when it is probable that a liability has been incurred and the amount of loss can be reasonably estimated. If a potential material loss contingency is not probable but is reasonably possible, or is probable but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss if determinable and material, is disclosed.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(t)   Segment Reporting*

The Company uses the management approach in determining its operating segments. The management approach considers the internal reporting used by the Company's chief operating decision maker for making decisions about the allocation of resources to and the assessment of the performance of the segments of the Company. Management has determined that the Company has one operating segment, which is the real estate information, analytics and marketplace services segment. Substantially all of the Company's operations and customers are located in the PRC. Consequently, no geographic information is presented.

*(u)   Fair Value Measurements*

The Company applies ASC Topic 820, *Fair Value measurements and Disclosures*, for fair value measurements of financial assets and financial liabilities and for fair value measurements of nonfinancial items that are recognized or disclosed at fair value in the financial statements on a recurring and nonrecurring basis. ASC Topic 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Company considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability. ASC Topic 820 also establishes a framework for measuring fair value and expands disclosures about fair value measurements.

ASC Topic 820 establishes a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. ASC Topic 820 establishes three levels of inputs that may be used to measure fair value.

The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to measurements involving significant unobservable inputs (Level 3 measurements). The three levels of the fair value hierarchy are as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access at the measurement date.

- Level 2 inputs are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly.

- Level 3 inputs are unobservable inputs for the asset or liability.

The level in the fair value hierarchy within which a fair value measurement in its entirety falls is based on the lowest level input that is significant to the fair value measurement in its entirety. In situations where there is little, if any, market activity for the asset or liability at the measurement date, the fair value measurement reflects management's own judgments about the assumptions that market participants would use in pricing the asset or liability. Those judgments are developed by management based on the best information available in the circumstances.

*Fair Value of Financial Instruments*

Financial assets and liabilities of the Company primarily consist of cash and cash equivalents, short-term investments, accounts receivable, other receivables included in prepaid expenses and other current assets, amounts due from a related party–current, accounts payable, amounts due to a related party, income taxes payable, accrued expenses and other current liabilities, long-term lease liabilities and warrants in other non-current liabilities.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

The carrying amounts of cash and cash equivalents, accounts receivable, other receivables included in prepaid expenses and other current assets, amounts due from a related party-current, accounts payable, income taxes payable and accrued expenses and other current liabilities as of December 31, 2020 and 2021, approximate their fair values due to short maturity.

The carrying amount of long-term lease liabilities approximates fair value as the related interest rates approximate rates currently offered by financial institutions for similar debt instruments of comparable maturities.

*Recurring Fair Value Measurements*

Short-term investments include financial products issued by a financial institution, which are valued based on prices per units quoted by the financial institution. They are categorized in Level 2 of the fair value hierarchy.

Short-term investments consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2020 | 2021 |
| Aggregate cost basis | 391,360 | — |
| Gross unrealized holding gain | 311 | — |
| **Aggregate fair value** | **391,671** | **—** |

The tables below reflect the reconciliation from the opening balance to the closing balance for recurring fair value measurements of the fair value hierarchy for the years ended December 31, 2019, 2020 and 2021:

|  | For the Year Ended December 31, 2019 | | | | |
|---|---|---|---|---|---|
|  | January 1, 2019 | Purchase | Sell | Included in earnings | December 31, 2019 |
| **Assets** |  |  |  |  |  |
| Short-term investments | — | 340,000 | 215,714 | 714 | 125,000 |
| **Total** | **—** | **340,000** | **215,714** | **714** | **125,000** |

|  | For the Year Ended December 31, 2020 | | | | |
|---|---|---|---|---|---|
|  | January 1, 2020 | Purchase | Sell | Included in earnings | December 31, 2020 |
| **Assets** |  |  |  |  |  |
| Short-term investments | 125,000 | 4,084,440 | 3,827,063 | 9,294 | 391,671 |
| **Total** | **125,000** | **4,084,440** | **3,827,063** | **9,294** | **391,671** |

|  | For the Year Ended December 31, 2021 | | | | |
|---|---|---|---|---|---|
|  | January 1, 2021 | Purchase | Sell | Included in earnings | December 31, 2021 |
| **Assets** |  |  |  |  |  |
| Short-term investments | 391,671 | 2,199,090 | 2,599,219 | 8,458 | — |
| **Total** | **391,671** | **2,199,090** | **2,599,219** | **8,458** | **—** |

The Company classifies the warrants within Level 3 in the fair value hierarchy because it utilizes unobservable inputs to determine their fair value on a recurring basis. See Note 7.

The Company's non-financial assets, such as property and equipment and right of use assets, would be measured at fair value only if they were determined to be impaired.

F-22

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(v)   Earnings (Loss) Per Share*

Basic earnings (loss) per share is computed by dividing net income (loss) attributable to holders of ordinary shares by the weighted average number of ordinary shares and ordinary share equivalents outstanding during the period using the two-class method. Vested restricted shares are included in the calculation of the weighted-average number of ordinary shares as ordinary share equivalents. Under the two-class method, any net income is allocated between ordinary shares and other participating securities based on their participating rights. A net loss is not allocated to participating securities when the participating securities do not have contractual obligation to share losses.

Diluted earnings (loss) per share is calculated by dividing net income (loss) attributable to ordinary shareholders by the weighted average number of ordinary shares used in calculating basic net earnings per ordinary share and dilutive ordinary equivalent shares outstanding during the period. Dilutive ordinary equivalent shares consist of ordinary shares issuable upon the exercise of outstanding share options, unvested restricted shares and warrants (using the treasury stock method). Ordinary equivalent shares are calculated based on the most advantageous conversion rate or exercise price from the standpoint of the security holder. Ordinary equivalent shares are not included in the denominator of the diluted earnings per share calculation when inclusion of such shares would be anti-dilutive.

*(w)   Impact of COVID-19*

The COVID-19 pandemic continues to evolve. There are still uncertainties of COVID-19's future impact, and the extent of the impact will depend on a number of factors, including the duration and severity of COVID-19, possibility of Delta and Omicron outbreak, the development and progress of distribution of COVID-19 vaccine and other medical treatment, the potential change in customer behavior, the actions taken by government authorities, particularly to contain the outbreak, stimulate the economy to improve business condition especially for small and medium enterprises, almost all of which are beyond the Company's control. As a result, certain of the Company's estimates and assumptions, including the allowance for doubtful accounts and long-lived assets subject to impairment assessments require significant judgments and involve a higher degree of variability and volatility that could result in material changes to the Company's current estimates in future periods.

*(x)   Related Parties and Transactions*

The Company identifies related parties, and accounts for, discloses related party transactions in accordance with ASC 850, "Related Party Disclosures" and other relevant ASC standards.

Parties, which can be an entity or individual, are considered to be related if they have the ability, directly or indirectly, to control the Company or exercise significant influence over the Company in making financial and operational decisions. Entities are also considered to be related if they are subject to common control or common significant influence.

Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(y)   Recently Issued Accounting Standards*

In June 2016, the FASB issued Accounting Standards Update ("ASU") No. 2016-13, *Financial Instruments—Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments*. ASU No. 2016-13 was further amended in November 2020 by ASU No. 2020-10, *Financial Instruments—Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842)*. As a result, ASC Topic 326, *Financial Instruments — Credit Losses* is effective for public companies for annual reporting periods, and interim periods within those years beginning after December 15, 2020. For all other entities, it is effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. As the Company is an "emerging growth company" and elects to apply for the new and revised accounting standards at the effective date for a private company, ASU No. 2016-13 will be applied for the fiscal year ending December 31, 2023. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements.

In December 2019, the FASB issued ASU No. 2019-12, *Income Taxes (Topic 740), Simplifying the Accounting for Income Taxes*. ASU No. 2019-12 removes certain exceptions to the general principles in Topic 740 and provides for consistent application of and simplifies generally accepted accounting principles for other areas of ASC Topic 740 by clarifying and amending existing guidance. The guidance is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020. The method of adoption varies depending on the component of the new rule that is being adopted. Early application is permitted. On January 1, 2021, the Company adopted ASU No. 2019-12. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In November 2021, the FASB issued ASU No. 2021-10, *Government Assistance (Topic 832), Disclosures by Business Entities About Government Assistance*, which improves the transparency of government assistance received by most business entities by requiring the disclosure of: (1) the types of government assistance received; (2) the accounting for such assistance; and (3) the effect of the assistance on a business entity's financial statements. The guidance is effective for all entities within their scope for financial statements issued for annual periods beginning after December 15, 2021, with early application permitted. This guidance is effective for the Company beginning on January 1, 2022 and is not expected to have a material impact on the Company's consolidated financial statements.

**3.   ACCOUNTS RECEIVABLE, NET OF ALLOWANCE FOR DOUBTFUL ACCOUNTS**

Accounts receivable, net of allowance for doubtful accounts were summarized as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| Accounts receivable | 46,898 | 73,204 |
| Allowance for doubtful accounts | (17,218) | (23,987) |
| **Accounts receivable, net of allowance for doubtful accounts** | **29,680** | **49,217** |

As of December 31, 2020 and 2021, the Company does not have any off-balance-sheet credit exposure related to its customers.

The movement of the allowance for doubtful accounts for the years ended December 31, 2019, 2020 and 2021 was as follows:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2021 |
| Balance as of the beginning of the year | — | 4,842 | 17,218 |
| Additions charged to bad debt expense | 4,842 | 12,376 | 10,678 |
| Reversal of allowance | — | — | (3,909) |
| **Balance as of the end of the year** | **4,842** | **17,218** | **23,987** |

F-24

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**4.   PREPAID EXPENSES AND OTHER CURRENT ASSETS**

| | Note | As of December 31, | |
| --- | --- | --- | --- |
| | | **2020** | **2021** |
| Loan to a third party | 4 (1) | — | 18,171 |
| Others | | 2,557 | 7,360 |
| **Total** | | **2,557** | **25,531** |

(1)  The Company made a US$2,850,000 (equivalent to RMB18,171) loan to a third party in December 2021. The loan bears an interest rate of 5% per annum with a maturity date of March 31, 2022. The borrower paid RMB18,141 to the Company as collateral for the loan which was included in accrued expenses and other current liabilities. On March 31, 2022, the maturity date of the loan was extended to September 30, 2022. The interest rate during the extended period is 5% per annum. In April 2022, the Company received interest income of approximately US$38,000 generated for the original loan term from the borrower.

**5.   RIGHT OF USE ASSETS**

The Company leases offices from Fang and third parties. The Company has elected not to recognize ROU assets or lease liabilities for leases with an initial term of 12 months or less.

The Company entered into a lease framework agreement (the Agreement) with Fang, pursuant to which the Company leases offices from Fang's wholly-owned subsidiaries at annual rental fee of RMB7,621. The Agreement is effective from January 1, 2018 with initial lease term of 10 years.

The Company adopted ASC Topic 842 on January 1, 2019, using a modified retrospective method for the lease. ROU assets and lease liabilities are recognized for the operating leases under the Agreement based on the present value of lease payments over the remaining lease term of 9 years as of January 1, 2019. As the rate implicit in the lease cannot be readily determined, the Company uses its incremental borrowing rate of 4.83% in determining the imputed interest and present value of lease payments.

The ROU assets and the amortization were summarized as follows:

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2021** |
| Right of use assets | 54,579 | 54,579 |
| Less: Accumulated amortization | (10,210) | (15,687) |
| **Right of use assets** | **44,369** | **38,892** |

Cash paid for amounts included in the measurement of operating lease liabilities was RMB12,647 and nil for the years ended December 31, 2020 and 2021, respectively.

Rental expense was allocated to the following expense items:

| | For the year ended December 31, | |
| --- | --- | --- |
| | **2020** | **2021** |
| Cost of revenues | 1,481 | 1,326 |
| General and administrative expenses | 1,588 | 1,508 |
| Selling and marketing expenses | 4,552 | 4,787 |
| **Total rental expenses** | **7,621** | **7,621** |

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**5.   RIGHT OF USE ASSETS (continued)**

Maturities of the lease liabilities as of December 31, 2021 were as follows:

| Years Ended December 31, | RMB'000 |
|---|---|
| 2022 | — |
| 2023 | 5,921 |
| 2024 | 7,621 |
| 2025 | 7,621 |
| 2026 | 7,621 |
| Thereafter | 7,621 |
| **Total undiscounted lease payments** | **36,405** |
| Less: Imputed interest | (6,835) |
| **Present value of lease liabilities balance** | **29,570** |
| Amounts due within 12 months | — |
| Long-term lease liabilities | 29,570 |

Amount of lease liabilities due within 2022 was nil, as the Company prepaid RMB9,321 to Fang for rental expenses as of December 31, 2021.

**6.   ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

| | Note | As of December 31, 2020 | As of December 31, 2021 |
|---|---|---|---|
| Guarantee liability | 15 | 547,069 | — |
| Accrued payroll and employee benefits | | 63,032 | 55,627 |
| Collateral received  in connection with a loan to a third party | 4 (1) | — | 18,141 |
| Others | | 27,592 | 25,889 |
| **Total** | | **637,693** | **99,657** |

Others mainly include value-added tax and other tax payables.

**7.   OTHER NON-CURRENT LIABILITIES**

| | Note | As of December 31, 2020 | As of December 31, 2021 |
|---|---|---|---|
| Unrecognized tax benefits | 9 | 55,943 | 75,288 |
| Deferred income tax liabilities | 9 | 62,044 | — |
| **Total** | | **117,987** | **75,288** |

F-26

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**7.   OTHER NON-CURRENT LIABILITIES (continued)**

Fang issued convertible notes to certain institutional investors in 2015, and an aggregate amount of US$250 million of such convertible notes remained outstanding as of June 11, 2019. These convertible notes bear an interest rate of 1.5% per annum until due in 2022. The holders have the right, from time to time, to convert all or any portion of the convertible notes into Fang's Class A ordinary shares at an initial conversion rate of 27.9086 Fang's Class A ordinary shares per US$1,000 principal amount, subject to adjustment under the terms of the convertible notes. In connection with the separation and distribution, the Company agreed to issue a warrant to each of the holders of such convertible notes, which entitled them to purchase for nominal consideration such number of CIH's Class A ordinary shares as calculated based on the number of Fang Class A ordinary shares upon the assumed conversion of the convertible notes immediately prior to or on the record date if and only if such holders subsequently decide to convert the convertible notes. The holders will be able to purchase up to 6,977,150 Class A ordinary shares in the aggregate based on the initial conversion rate into Fang's Class A ordinary shares and a one-for-one distribution rate into CIH's Class A ordinary shares.

In the event that holders subsequently decide not to convert the convertible notes, and instead, demand payment of principal and accrued interest upon maturity of the convertible notes, the warrants will be canceled and the right to purchase CIH's Class A ordinary shares will be forfeited.

On October 28 and December 31, 2019, Fang repurchased portion of the convertible notes from certain holders in an amount of US$55 million and US$28 million, respectively. The relative warrants were cancelled and the right to purchase the CIH's Class A ordinary shares was forfeited, correspondingly.

As a result of a winding-up petition against Fang in November 2020 and pursuant to the terms of the convertible notes, the outstanding principal of, and accrued and unpaid interest on the convertible notes, which were originally due in 2022, became due and payable on December 13, 2020. In 2021, the Company entered into settlement deeds with Fang and the holders of the convertible notes pursuant to which Fang and the Company each agreed to repay 50% of the total amount of US$168.0 million by installment in 2021 to the holders of the convertible notes.

The Company repaid to the holders of the convertible notes on behalf of Fang: 1) US$42.4 million (including US$0.2 million of interest expenses in 2021) in September 2021 and 2) US$41.8 million in November 2021, respectively. In addition, Fang repaid to the holders of the convertible notes: 1) US$42.4 million in September 2021 (including US$0.2 million of interest expenses in 2021) and 2) US$41.8 million in November 2021, respectively. Consequently, the remaining warrants have been canceled and the right to purchase CIH's Class A ordinary shares has been forfeited.

The following was a summary of the outstanding and exercisable warrants balance:

| | For the year ended December 31, | |
| --- | --- | --- |
| **Number of Warrants** | **2020** | **2021** |
| **Outstanding as of the beginning of the year** | **4,662,411** | **4,662,411** |
| Issuance | — | — |
| Cancelled | — | (4,662,411) |
| **Outstanding as of the end of the year** | **4,662,411** | **—** |

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**7.   OTHER NON-CURRENT LIABILITIES (continued)**

The fair values of the warrants were remeasured at the end of each reporting period, which were included in other non-current liabilities, using the binomial option pricing model with the following assumptions:

| | As of December 31, | |
| | 2020 | 2021 |
|---|---|---|
| Expected volatility | 48% | — |
| Expected dividends yield | nil | — |
| Expected term (in years) | 1.73 ~1.84 years | — |
| Risk-free interest rate per annum | 0.12%~0.13% | — |

The risk-free interest rate was based on the U.S. Treasury rate for the expected remaining life of the warrants. The expected volatility was estimated based on the historical volatility of comparable peer public companies with a time horizon close to the expected term of the Company's warrants. Expected dividend yield is zero as the Company does not anticipate any dividend payments in the foreseeable future. Expected term is the expected term to exercise the warrants.

The movement of the warrants was as follows:

| | For the Year Ended December 31, | | |
| | 2019 | 2020 | 2021 |
|---|---|---|---|
| **Balance as of the beginning of the year** | — | 1,374 | — |
| Issuance | 207 | — | — |
| Change in fair value | 1,152 | (1,359) | — |
| Foreign currency translation adjustment | 15 | (15) | — |
| **Balance as of the end of the year** | 1,374 | — | — |

**8.   REVENUES**

Revenues consisted of the following:

| | For the Year Ended December 31, | | |
| | 2019 | 2020 | 2021 |
|---|---|---|---|
| **Information and analytics services** | | | |
| Data services | 138,643 | 166,264 | 187,353 |
| Analytics services | 129,905 | 137,088 | 124,502 |
| **Subtotal** | **268,548** | **303,352** | **311,855** |
| **Marketplace services** | | | |
| Promotion services | 244,154 | 301,962 | 309,098 |
| Listing services | 66,948 | 30,596 | — |
| **Subtotal** | **311,102** | **332,558** | **309,098** |
| **Total** | **579,650** | **635,910** | **620,953** |

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**8.   REVENUES (continued)**

The Company adopted ASC Topic 606 as of January 1, 2018. The Company's revenues are presented net of value-added tax collected on behalf of governments. The Company has elected to adopt the practical expedient for incremental costs to obtain a contract with a customer, i.e. sales commissions, with amortization periods of one year or less to be recorded in selling and marketing expenses when incurred.

Changes in the Company's deferred revenue for the years ended December 31, 2019, 2020 and 2021 were presented in the following table:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Deferred revenue as of the beginning of the year | **143,254** | **203,531** | **224,141** |
| Cash received in advance, net of VAT | 544,140 | 579,623 | 566,125 |
| Revenue recognized from opening balance of deferred revenue | (142,697) | (198,722) | (210,164) |
| Revenue recognized from deferred revenue arising during current year | (341,166) | (360,291) | (363,914) |
| Deferred revenue as of the end of the year | **203,531** | **224,141** | **216,188** |

The Company has elected the practical expedient not to disclose the information about remaining performance obligations which are part of contracts that have an original expected duration of one year or less.

**9.   TAXATION**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gains. In addition, upon payments of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

*BVI*

Under the current laws of the BVI, the Company's subsidiaries incorporated in the BVI are not subject to tax on income or capital gains. In addition, upon payments of dividends by the entity to their shareholders, no BVI withholding tax will be imposed.

*Hong Kong SAR*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they are exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends. A two-tiered profits tax rates regime was introduced in 2018 where the first HK$2 million of assessable profits earned by a company will be taxed at half of the current tax rate (8.25)% whilst the remaining profits will continue to be taxed at 16.5%. There is an anti-fragmentation measure where each group will have to nominate only one company in the group to benefit from the progressive rates. The Company did not make any provisions for Hong Kong profit tax as there were no assessable profits derived from or earned in Hong Kong for the years ended December 31, 2019 and 2020.

*USA*

The Company's subsidiaries incorporated in the USA are subject to profits tax at 21% statutory tax rate with respect to the profit generated from the USA.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**9.   TAXATION (continued)**

*China*

In March 2007, a new enterprise income tax law (the "New EIT Law") in the PRC was enacted which became effective on January 1, 2008. The New EIT Law applies a unified 25% enterprise income tax ("EIT") rate to both foreign invested enterprises and domestic enterprises, unless a preferential EIT rate is otherwise stipulated. On April 14, 2008, relevant governmental regulatory authorities released further qualification criteria, application procedures and assessment processes for meeting the High and New Technology Enterprise ("HNTE") status under the New EIT Law which would entitle qualified and approved entities to a favorable EIT tax rate of 15%. In April 2009, the State Administration for Taxation ("SAT") issued Circular Guoshuihan [2009] No. 203 ("Circular 203") stipulating that entities which qualified for the HNTE status should apply with in-charge tax authorities to enjoy the reduced EIT rate of 15% provided under the New EIT Law starting from the year when the new HNTE certificate becomes effective. The HNTE certificate is effective for a period of three years and can be renewed for another three years. Subsequently, an entity needs to re-apply for the HNTE status in order to be able to enjoy the preferential tax rate of 15%.

Income tax returns of PRC subsidiaries and the VIEs are filed on an individual entity basis. The Company has calculated its income tax provision using the separate return method in the combined and consolidated financial statements.

Beijing Zhong Zhi Shi Zheng and Beijing Zhong Zhi Xun Bo Data Information Technology Co., Ltd., two of the Company's PRC subsidiaries, renewed and obtained the HNTE certificate, respectively, in October 2018, hence were entitled to the preferential income tax rate of 15% for the years between December 31, 2018 to December 31, 2020. The two subsidiaries renewed their HNTE certificate in December 2021 and October 2021, respectively and were entitled to the preferential income tax rate of 15% for the years ended December 31, 2021 through 2023.

Xinjiang Zhong Zhi, one of the Company's PRC subsidiaries, was entitled to a tax holiday for five years starting from 2017, because it was established in the Xinjiang Huoerguosi Economic and Technological Development Zone.

Xinjiang Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. and Xinjiang Zhong Zhi Shi Zheng Big Data Co., Ltd., two of the Company's PRC subsidiaries, were entitled to a tax holiday for five years starting from 2020, because they were established in the Xinjiang Huoerguosi Economic and Technological Development Zone.

The PRC tax laws and its implementation rules impose a withholding income tax at 10%, unless reduced by a tax treaty or arrangement, on the amount of dividends distributed by a PRC-resident enterprise to its immediate holding company outside the PRC that are related to earnings accumulated beginning on January 1, 2008. As of December 31, 2020, the Company has accrued withholding income tax of RMB62,000 on undistributed earnings of RMB620,000 generated by the Company's PRC subsidiaries and VIEs. During the year ended December 31, 2021, the Company paid the withholding income tax of RMB62,000 when it paid dividends to its offshore parent company. As of December 31, 2020 and 2021, the Company has not provided for income taxes on earnings generated by the Company's PRC subsidiaries and VIEs of RMB336,470 and RMB620,105, respectively, as the Company plans to reinvest these earnings indefinitely in the PRC. The unrecognized deferred income tax liability related to these earnings was RMB33,647 and RMB62,011, respectively. The PRC tax authorities have up to five years to conduct examinations of the Company's tax filings. Accordingly, the PRC subsidiaries' and VIEs' tax years 2017 through 2021 remain open to examination by the respective taxing jurisdictions.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**9.   TAXATION (continued)**

The components of income (loss) before income taxes were as follows:

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2019** | **2020** | **2021** |
| PRC, excluding Hong Kong SAR | 291,928 | 335,102 | 329,873 |
| Hong Kong SAR | (427) | (515) | 1,549 |
| Cayman Islands | (1,354) | (543,135) | (5,853) |
| BVI | 41 | (640) | (5) |
| USA | — | 286 | 184 |
| **Total income (loss) before income taxes** | **290,188** | **(208,902)** | **325,748** |

The Company's income tax expense recognized in the combined and consolidated statements of comprehensive income (loss) consisted of the following:

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2019** | **2020** | **2021** |
| Current income tax expense - PRC, excluding Hong Kong SAR | 44,737 | 48,938 | 47,224 |
| Current income tax expense - Hong Kong SAR | — | — | 128 |
| Current income tax expense - USA | — | — | 134 |
| Deferred income tax expense - PRC, excluding Hong Kong SAR | — | 60,516 | (986) |
| **Total income tax expense** | **44,737** | **109,454** | **46,500** |

Reconciliation of the differences between PRC statutory income tax rate and the Company's effective income tax rate for each of the years ended December 31, 2019, 2020 and 2021 was as follows:

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2019** | **2020** | **2021** |
| PRC statutory income tax rate | 25.0 % | (25.0)% | 25.0 % |
| Increase (decrease) in effective income tax rate resulting from: |  |  |  |
| Research and development bonus deduction | (3.3)% | (5.9)% | (3.4)% |
| Non-deductible selling, general and administrative expenses | 1.4 % | 1.6 % | 0.3 % |
| Effect of tax rate differential for non-PRC entities | 0.1 % | 65.1 % | 0.4 % |
| Effect of preferential tax rates | (9.2)% | (14.7)% | (9.0)% |
| Effect of withholding tax for undistributed earnings from PRC subsidiaries | — | 29.7 % | — |
| Change in valuation allowance | 0.1 % | 0.3 % | 0.1 % |
| Interest and penalties on unrecognized tax benefits | 1.3 % | 1.3 % | 0.9 % |
| **Actual income tax rate** | **15.4 %** | **52.4 %** | **14.3 %** |

F-31

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**9.   TAXATION (continued)**

The principal components of deferred income tax assets and liabilities were as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| | RMB | RMB |
| **Deferred income tax assets** | | |
| Net operating loss carryforwards | 729 | 1,038 |
| Allowance for doubtful accounts | 1,530 | 2,469 |
| Long-term lease liabilities | 4,114 | 4,435 |
| **Total deferred income tax assets, gross** | **6,373** | **7,942** |
| Less: Valuation allowance | (729) | (1,038) |
| **Total deferred income tax assets, net** | **5,644** | **6,904** |
| | | |
| **Deferred income tax liabilities** | | |
| Short-term investments | 46 | — |
| Right of use assets | 4,114 | 4,435 |
| Withholding income tax on distributable profits of the PRC subsidiaries | 62,000 | — |
| **Total deferred income tax liabilities, gross** | **66,160** | **4,435** |
| | | |
| **Net deferred income tax assets (included in other non-current assets)** | 1,528 | 2,469 |
| **Net deferred income tax liabilities (included in other non-current liabilities)** | 62,044 | — |

The movement of the valuation allowance was as follows:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2021 |
| Balance as of the beginning of the year | (78) | (273) | (729) |
| Additions of valuation allowance | (195) | (456) | (309) |
| **Balance as of the end of the year** | **(273)** | **(729)** | **(1,038)** |

F-32

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**9.   TAXATION (continued)**

The valuation allowance as of December 31, 2020 and 2021 was primarily provided for the deferred income tax assets of certain Company's PRC subsidiaries and the VIEs, which were at cumulative loss positions. In assessing the realization of deferred income tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible or utilizable. Management considers projected future taxable income and tax planning strategies in making this assessment. As of December 31, 2021, the Company had net operating loss from certain of its PRC subsidiaries and the VIEs of RMB4,353, which can be carried forward to offset future taxable profit. The net operating loss of RMB134, RMB705, RMB2,079 and RMB1,435 will expire by 2024, 2025, 2026 and 2027 if unused.

A reconciliation of the beginning and ending amount of total unrecognized tax benefits, exclusive of related interest and penalties, for the years ended December 31, 2019, 2020 and 2021 was as follows:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2020** | **2021** |
| **Balance as of the beginning of the year** | **15,496** | **34,710** | **49,553** |
| Increase relating to prior year tax positions | 6,051 | — | — |
| Increase related to current year tax positions | 14,392 | 21,966 | 16,374 |
| Settlement | (1,235) | (7,100) | — |
| Foreign currency translation adjustment | 6 | (23) | (9) |
| **Balance as of the end of the year** | **34,710** | **49,553** | **65,918** |

As of December 31, 2020 and 2021, the Company had recorded 1) RMB49,553 and RMB65,918 as an accrual for unrecognized tax benefits, and 2) RMB6,390 and RMB9,370 as related interest and penalties, respectively, which are included in other non-current liabilities. The unrecognized tax benefits represent the estimated tax expenses the Company would be required to pay, should the deductible expenses for tax purpose recognized in accordance with tax laws and regulations. The unrecognized tax benefits would impact the effective tax rate if recognized. The Company is currently unable to provide an estimate of a range of total amount of unrecognized tax benefits that is reasonably possible to change significantly within the next twelve months.

For the years ended December 31, 2019, 2020 and 2021, the Company recognized RMB3,673, RMB2,717 and RMB2,980 in income tax expense for interest and penalties related to unrecognized tax benefits, respectively.

F-33

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**10. RELATED PARTY TRANSACTIONS**

For the years ended December 31, 2019, 2020 and 2021, significant related party transactions were as follows.

| | Note | For the Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2019 | 2020 | 2021 |
| Listing services revenue from Fang | 10 (1) | 26,382 | — | — |
| Analytics services revenue | 10 (2) | 17,296 | 11,006 | — |
| Data services revenue from a noncontrolling interest holder | 10 (8) | — | — | 238 |
| Costs and expenses allocated from Fang, excluding the share-based compensation costs and expenses related to Fang's share-based awards | 2 (a) | 4,337 | — | — |
| Rent expenses | 5 | 7,621 | 7,621 | 7,621 |
| IT service fee | 10 (3) | 5,214 | 7,500 | 7,500 |
| Software license fee | 10 (4) | 278 | 500 | 500 |
| Share-based compensation expenses related to Fang's share-based awards | 10 (6) | 3,894 | — | — |
| Disposal of subsidiaries to Fang | 10 (7) | — | 4,325 | — |
| Advance to a noncontrolling interest holder | 10 (8) | — | 3,090 | — |
| Repayment from a noncontrolling interest holder | 10 (8) | — | — | 3,090 |

Amounts due from a related party - current were as follows:

| | Note | As of December 31, | |
| --- | --- | --- | --- |
| | | 2020 | 2021 |
| **Amounts due from a related party - current** | | | |
| China Enterprise Evaluation Association | 10 (8) | 3,090 | — |
| **Total** | | **3,090** | **—** |

Amounts due from a related party – non-current were as follows:

| | Note | As of December 31, | |
| --- | --- | --- | --- |
| | | 2020 | 2021 |
| **Amounts due from Fang - non-current** | | | |
| Gross amount | 15 | 547,069 | 536,556 |
| Allowance for doubtful accounts | 15 | (547,069) | (536,556) |
| **Total** | | — | — |

Amounts due to a related party were as follows:

| | Note | As of December 31, | |
| --- | --- | --- | --- |
| | | 2020 | 2021 |
| **Amounts due to a related party** | | | |
| Fang | 10 (5) | 156 | 12,300 |
| **Total** | | **156** | **12,300** |

(1) The Company acted as an agent on behalf of Fang on listing services for commercial properties. The Company recorded the revenues on net basis when Fang and its customers enter into a sales contract. On January 1, 2020, the Company and Fang agreed to terminate the cooperation agreement.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**10. RELATED PARTY TRANSACTIONS (continued)**

(2) Beijing CheTianXia Information Co., Ltd. ("CheTianXia"), Guangxi Pukai Xingye Hotel Investment Co., Ltd. ("Guangxi Pukai") and Beihai Long Island Hotel Co, Ltd. ("Beihai Long Island") are companies under the control of Mr. Vincent Tianquan Mo, the Company's chairman of the board of directors prior to February 28, 2022 and the controlling shareholder.

On August 26, 2019, the Company entered into a contract with CheTianXia and Guangxi Pukai, pursuant to which the Company was engaged in providing analytics services for the sale of land use right assets and the total contract consideration was RMB20,000, over a period of shorter of (1) eighteen months effective from January 1, 2019 or (2) upon completion of the sales of the assets.

On August 26, 2019, the Company entered into a contract with Beihai Long Island, pursuant to which the Company was engaged in providing analytics services for the sales of properties and the total contract consideration was RMB10,000, over a period of shorter of (1) twelve months effective from July 1, 2019 or (2) upon completion of the sales of the properties.

The transactions were approved by the Company's Board of Director on August 22, 2019. The Company recognized revenue of analytics services on a cumulative catch-up basis since the effective dates of the contracts and both of the contracts matured on June 30, 2020. The Company recognized analytics services revenue from these three related parties of RMB17,296 and RMB11,006 for the years ended December 31, 2019 and 2020, respectively.

(3) The Company continued to utilize Fang's server and other IT services after the separation and incurred IT service fee of RMB5,214 during the period from June 11, 2019 to December 31, 2019. The Company paid RMB7,500 to Fang in 2019. The Company incurred IT service fee of RMB7,500 and RMB7,500 during the years ended December 31, 2020 and 2021, respectively. The Company paid RMB7,950 and RMB7,950 (valued-added tax included) to Fang for the IT service in 2020 and 2021, respectively. The balance of RMB1,836 represented the IT service fee prepaid to Fang as of December 31, 2020 and 2021, which was offset with an equivalent amount due to Fang according to the agreement described in Note 10 (5).

(4) The Company entered into a software license agreement with Fang, pursuant to which, Fang agrees to license the right of using certain of their software at annual royalty fee of RMB500. The term of the software license agreement is 10 years. The agreement was effective from June 11, 2019. RMB278 of software license fee incurred during the period from June 11, 2019 to December 31, 2019 and the Company did not settle the expense in cash in 2019. RMB500 of software license fee incurred during the years ended December 31, 2020 and 2021 and was settled in cash by the Company during the same year. The balance of RMB278 represented the software license fee payable to Fang as of December 31, 2020 and 2021, which was offset with an equivalent amount due from Fang according to the agreement described in Note 10 (5).

(5) After the completion of the separation, there were certain cash collections and cash payments on behalf of each other between the Company and Fang from June 11, 2019 to December 31, 2021. In November 2019, the Company entered into an agreement with Fang to settle all such balances with Fang on a quarterly basis in net amounts. The balances of RMB156 and RMB12,300 as of December 31, 2020 and 2021, respectively, represented the net amount due to Fang, after offsetting with an equivalent amount due from and prepayments to Fang of RMB84,831 and RMB83,847 as of December 31, 2020 and 2021, respectively.

(6) Prior to the separation, certain of the Company's employees participated in Fang's various stock related award incentive plans. Share-based compensation expenses related to Fang's share-based awards allocated from Fang were RMB6,808 and RMB3,894 for the year ended December 31, 2018 and during the period from January 1, 2019 to June 11, 2019, respectively. See Note 11 in details.

(7) The Company disposed of two of its subsidiaries in Chengdu to Fang in April 2020 at a consideration of RMB4,325, which was the carrying amount of the net assets of the subsidiaries as of the disposal date. The Company collected RMB4,325 in cash in October 2020.

(8) The amount due from China Enterprise Evaluation Association as of December 31, 2020, which is one of the noncontrolling interest holders of Shouzheng, represents cash advances provided by the Company. The Company collected the balance from China Enterprise Evaluation Association in cash in March 2021.

On May 31, 2021, the Company entered into a contract with China Enterprise Evaluation Association, pursuant to which the Company was engaged to provide data services from July 1, 2021 to June 30, 2022 for a total consideration of RMB500. The Company recognized data services revenue of RMB238 from this related party for the year ended December 31, 2021.

F-35

Table of Contents

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
(Amounts in thousands of RMB, except for share data)

**11.  SHARE-BASED COMPENSATION**

Prior to the separation, certain of the Company's employees participated in Fang's 2010 Stock Related Award Incentive Plan (the "2010 Plan") and 2015 Stock Related Award Incentive Plan (the "2015 Plan"), which provided employees with certain share-based awards as described below. Accordingly, certain costs related to the Plan have been allocated to the Company and are reflected in cost of revenues and operating expenses in the combined and consolidated statements of comprehensive income (loss).

*Fang's Stock related award incentive plan of 2010*

On August 4, 2010, Fang's board of directors and shareholders approved the 2010 Plan pursuant to which Fang may issue up to 10% of the total number of ordinary shares, including ordinary shares issuable upon conversion of any preferred shares to its employees. The awards are typically subject to a four-year service vesting condition and performance conditions with a contractual life of ten years.

*Fang's Stock related award incentive plan of 2015*

On June 4, 2015, Fang's board of directors and shareholders approved the 2015 Plan pursuant to which Fang may issue up to 1.5% of the total number of ordinary shares, including ordinary shares issuable upon conversion of any preferred shares to its directors and employees. The awards are typically subject to a four-year service vesting condition and multiple performance conditions with a contractual life of ten years.

On June 7, 2019, Fang's board of directors approved the grant of options to certain officers and employees of the Company to purchase 268,500 ordinary shares of Fang with the exercise price of US$5.85 per share. These options vest over a period of 4 years. The options have a contractual term of 10 years.

In order to protect Fang's equity awards holders from changes in the awards' value following the separation, the Company issued the equivalent number of CIH's equity awards to the holders of Fang's equity awards (including both the Company and Fang's employees) with substantially the same remaining vesting terms and conditions as applied to Fang's equity awards to make them whole under the separation. These CIH equity awards have a nominal exercise price and may be exercisable if and to the extent that the corresponding Fang's equity awards are exercised. The modified equity awards have the same terms and conditions as the awards held immediately before the separation.

*CIH's 2019 Equity Incentive Plan (CIH 2019 Plan)*

On May 2, 2019, CIH's board of directors and shareholders approved the CIH 2019 Plan pursuant to which CIH may issue up to (i) 5% of the total number of CIH's outstanding ordinary shares as of the completion of its separation from Fang, plus (ii) the number of CIH's ordinary shares that may be issued upon exercise of the awards to be granted with respect to the share options issued prior to the completion of the separation and distribution in connection with the Company to holders of Fang's equity awards to make them whole under the separation. The awards are typically subject to a four-year service vesting condition and multiple performance conditions with a contractual life of ten years.

On April 1, 2020, CIH's board of directors approved the grant of options to certain officers and employees of the Company to purchase 4,785,365 ordinary shares of CIH with the exercise price of US$1.35 per share. These options vest over a period of 4 years, with a contractual term of 10 years.

F-36

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**11. SHARE-BASED COMPENSATION (continued)**

**Share options**

A summary of Fang's share options activities held by the Company's employees for the year ended December 31, 2021 was as follows:

| | Number of Share Options | Weighted Average Exercise Price US$ | Weighted Average Remaining Contractual Years | Aggregate Intrinsic Value US$ |
|---|---|---|---|---|
| **Outstanding as of January 1, 2021** | **501,128** | **12.62** | **6.69** | **—** |
| Forfeited | (17,910) | 6.53 | — | — |
| Expired | (8,618) | 35.56 | — | — |
| **Outstanding as of December 31, 2021** | **474,600** | **12.43** | **5.55** | **—** |
| **Vested and expected to vest as of December 31, 2021 (a)** | **419,020** | **13.30** | **5.30** | **—** |
| **Exercisable as of December 31, 2021** | **363,440** | **14.44** | **4.97** | **—** |

(a) Vested and expected to vest as of December 31, 2021 represents fully vested Fang's share options and unvested Fang's share options held by the Company's employees, for which the requisite service period has not been rendered but that are expected to vest based on the achievement of a performance condition as of December 31, 2021.

The aggregate intrinsic value was nil as of December 31, 2021, because the exercise price was in excess of the fair value of Fang's ordinary share as of December 31, 2021.

The fair values of the share options granted by Fang to the Company's employees during the period from January 1, 2019 to June 11, 2019 were as follows:

| | For the period between January 1 and June 11, 2019 US$ |
|---|---|
| Weighted average grant date fair value of option per share | 2.88 |
| Aggregate grant date fair value of options | 773,280 |

Total intrinsic value of Fang's share options exercised by the Company's employees for the years ended December 31, 2019, 2020 and 2021 was nil.

F-37

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**11.  SHARE-BASED COMPENSATION (continued)**

A summary of CIH's share options activity held by both the Company's employees and Fang's employees for the year ended December 31, 2021 was as follows:

| | Number of Share Options | Weighted Average Exercise Price US$ | Weighted Average Remaining Contractual Years | Aggregate Intrinsic Value US$ |
|---|---|---|---|---|
| **Outstanding as of January 1, 2021** | **11,217,546** | **0.54** | **6.99** | **15,993,085** |
| Exercised | (93,319) | 0.76 | — | — |
| Forfeited | (511,788) | 1.09 | — | — |
| Expired | (269,406) | 0.25 | — | — |
| **Outstanding as of December 31, 2021** | **10,343,033** | **0.52** | **7.62** | **6,143,802** |
| **Vested and expected to vest as of December 31, 2021 (a)** | **8,546,426** | **0.39** | **7.51** | **5,869,735** |
| **Exercisable as of December 31, 2021** | **6,749,818** | **0.20** | **7.35** | **5,595,669** |

(a)  Vested and expected to vest as of December 31, 2021 represents fully vested CIH's share options and unvested CIH's share options held by the Company's and Fang's employees, for which the requisite service period has not been rendered but that are expected to vest based on the achievement of a performance condition as of December 31, 2021.

The aggregate intrinsic value in the table above represents the difference between the fair value of CIH's ordinary share as of December 31, 2021 and the exercise price of CIH's share options, which may be exercisable if and to the extent that the corresponding Fang's share options are exercised.

The weighted average grant date fair value and aggregate grant date fair value of the share options granted by CIH to the Company's employees for the year ended December 31, 2020 was US$0.49 per share and US$2,359,450. No share options were granted for the year ended December 31, 2021.

As of December 31, 2021, there was RMB6,308 of unrecognized share-based compensation cost related to CIH and Fang's share options held by the Company's employees that are expected to be recognized over a weighted-average vesting period of 2.10 years.

Fang and the Company estimated the fair value of share options granted to the Company's employees as of the date of grant, using the binomial option pricing model with the following assumptions:

| | For the period between January 1 and June 11, 2019 | For the period between June 11 and December 31, 2019 | For the year ended December 31, 2020 |
|---|---|---|---|
| Expected volatility | 45% | 38.7%~45.4% | 32% |
| Expected dividends yield | nil | nil | nil |
| Expected term | 10 years | 0.55~9.99 years | 10 years |
| Risk-free interest rate per annum | 2.08% | 1.9%~2.2% | 0.6% |
| Exercise multiple | 2.2-2.8 | 2.2~2.8 | 2.2~2.8 |

The volatility assumption was estimated based on the historical volatility of Fang and comparable companies in the same business, with a time horizon close to the expected term of the CIH and Fang's share options. The dividend yield of nil was based on estimated dividend distribution for the share options granted in the foreseeable future. The expected term was remaining contract life of the share options. The risk-free rate was estimated based on the market yield of US Treasury Bonds and Notes with maturity terms equal to the expected term of the share options. The expected exercise multiple was estimated as the average ratio of the share price to the exercise price of when employees would decide to voluntarily exercise their vested options.

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**11.  SHARE-BASED COMPENSATION (continued)**

<u>Restricted Shares</u>

A summary of Fang's restricted shares held by the Company's employees for the year ended December 31, 2021 was stated below:

|  | Number of Shares | Weighted Average Grant Date Fair Value US$ |
|---|---|---|
| **Unvested as of January 1, 2021** | **28,370** | **17.55** |
| Vested | (22,300) | 17.55 |
| Forfeited | (6,070) | 17.55 |
| **Unvested as of December 31, 2021** | **—** | **17.55** |

A summary of CIH's restricted shares held by both the Company's and Fang's employees for the year ended December 31, 2021 was stated below:

|  | Number of Shares | Weighted Average Grant Date Fair Value US$ |
|---|---|---|
| **Unvested as of January 1, 2021** | **301,475** | **0.34** |
| Vested | (282,790) | 0.34 |
| Forfeited | (18,685) | 0.34 |
| **Unvested as of December 31, 2021** | **—** | **0.34** |

As of December 31, 2021, there was no unrecognized share-based compensation cost related to CIH and Fang's restricted shares held by the Company's employees.

Total share-based compensation expense of CIH and Fang's share-based awards granted to CIH's employees was as follows:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2020** | **2021** |
| Cost of revenues | 1,537 | 1,772 | 685 |
| Selling and marketing expenses | 787 | 901 | 725 |
| General and administrative expenses | 5,910 | 5,939 | 3,533 |
| **Total** | **8,234** | **8,612** | **4,943** |

F-39

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**12.  EQUITY**

*Ordinary Shares*

On May 2, 2019, Fang's board of directors approved the distribution of its shares of CIH ordinary shares to holders of Fang's ordinary shares on a pro rata basis. On June 11, 2019, Fang's shareholders of record as of May 28, 2019 received a dividend distribution of one Class A ordinary share for every one Fang ordinary share (whether a Fang Class A ordinary share or a Fang Class B ordinary share) held as of the record date. On June 11, 2019, the Company completed the legal separation from Fang, and the Company began trading "regular way" under the ticker symbol "CIH" on the NASDAQ on June 12, 2019.

Based on 71,775,686 Fang Class A ordinary shares and 24,336,650 Fang Class B ordinary shares issued and outstanding on May 28, 2019, the record date, 96,112,336 Class A ordinary shares were distributed, of which 23,636,706 was re-designated as Class B ordinary shares and distributed to Mr. Vincent Tianquan Mo, and 6,712,694 was issued as treasury shares in connection with the separation and recorded at par value. The Company has used 648,492 and 282,790 shares of treasury shares for settlement of restricted shares vested for the years ended December 31, 2020 and 2021, respectively. The Company also used 93,319 shares of treasury shares for the exercise of share options for the year ended December 31, 2021.

Upon the separation on June 11, 2019, the Company authorized 1,000,000,000 shares for Class A and Class B in aggregate, with a par value of US$0.001. As of December 31, 2020 and 2021, there were 1) 66,411,428 and 66,787,537 Class A shares outstanding, and 2) 23,636,706 and 23,636,706 Class B shares outstanding, respectively.

The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting rights. Each Class A ordinary share is entitled to one vote per share whereas each Class B ordinary share is entitled to 10 votes per share. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder, but Class A ordinary shares are not convertible into Class B ordinary shares unless approved by the Company's board of directors.

**13.  EARNINGS (LOSS) PER SHARE**

On June 11, 2019, Fang's shareholders of record as of May 28, 2019 received one share of CIH Class A ordinary shares for every one share of Fang's ordinary shares held as of the record date. For the period presented prior to June 11, 2019, basic and diluted earnings per share were computed using the number of shares of CIH ordinary shares outstanding as of June 11, 2019, the date on which the CIH ordinary shares were distributed to Fang's shareholders, since there were no dilutive securities until after the separation.

F-40

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**13.  EARNINGS PER SHARE (continued)**

The following table set forth the basic and diluted earnings (loss) per share computation and provided a reconciliation of the numerator and denominator for the periods presented:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| **Numerator:** | | | |
| Net income (loss) attributable to Class A and Class B ordinary shareholders | 245,451 | (318,052) | 279,182 |
| | | | |
| **Denominator:** | | | |
| Weighted average number of Class A and Class B ordinary shares outstanding | 89,399,642 | 89,842,465 | 90,196,440 |
| Weighted average number of vested restricted shares | 115,511 | — | — |
| | | | |
| **Denominator for basic net income per Class A and Class B ordinary share** | **89,515,153** | **89,842,465** | **90,196,440** |
| Dilutive effect of share options and unvested restricted shares | 30,557 | — | 406,099 |
| | | | |
| **Denominator for diluted net income per Class A and Class B ordinary share** | **89,545,710** | **89,842,465** | **90,602,539** |
| | | | |
| **Earnings (loss) per Class A and Class B ordinary share** | | | |
| —Basic | 2.74 | (3.54) | 3.10 |
| —Diluted | 2.74 | (3.54) | 3.08 |

Securities that could potentially dilute basic earnings (loss) per share in the future that were not included in the calculation of diluted earnings (loss) per share for the years ended December 31, 2019, 2020 and 2021 were as below:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Warrants | 4,662,411 | 4,662,411 | — |
| Share options | 7,227,971 | 11,217,546 | 10,343,033 |
| Unvested restricted shares | — | 310,475 | — |

**14.  PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION**

For the presentation of the parent company only condensed financial information, the Company records its investment in subsidiaries and consolidated VIEs, under the equity method of accounting as prescribed in ASC Topic 323, *Investments-Equity Method and Joint Ventures*. Such investments are presented on the condensed balance sheets as "Investment in subsidiaries and consolidated VIEs" and the subsidiaries and consolidated VIEs' income as "Share of income from subsidiaries and consolidated VIEs" on the condensed statements of comprehensive income (loss). The parent company only condensed financial information should be read in conjunction with the Company's consolidated financial statements.

F-41

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**14.  PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION (continued)**

**a)  Condensed Balance Sheets**

| | As of December 31, | |
|---|---|---|
| | 2020 | 2021 |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | 3,436 | 2,737 |
| Prepaid expenses and other current assets | 2 | 2 |
| **Total current assets:** | **3,438** | **2,739** |
| | | |
| **Non-current assets:** | | |
| Amounts due from a related party - non-current, less allowance for doubtful accounts of RMB547,069 and RMB536,556 as of December 31, 2020 and 2021, respectively | — | — |
| Investments in subsidiaries and consolidated VIEs | 257,569 | 547,824 |
| | | |
| **Total assets** | **261,007** | **550,563** |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Current liabilities:** | | |
| Amounts due to a related party | 933 | 539,660 |
| Accrued expenses and other current liabilities | 547,520 | 1,413 |
| **Total current liabilities** | **548,453** | **541,073** |
| | | |
| **Non-current liabilities:** | | |
| Other non-current liabilities | — | — |
| | | |
| **Total liabilities** | **548,453** | **541,073** |
| | | |
| **Commitments and contingencies** | — | — |
| | | |
| **Shareholders' equity (deficit)** | | |
| Class A ordinary shares (US$0.001 per share, 1,000,000,000 shares authorized for Class A and Class B in aggregate as of December 31, 2020 and 2021; 72,475,630 shares issued as of December 31, 2020 and 2021; 66,411,428 and 66,787,537 shares outstanding as of December 31, 2020 and 2021, respectively) | 500 | 500 |
| Class B ordinary shares (US$0.001 per share, 1,000,000,000 shares authorized for Class A and Class B in aggregate as of December 31, 2020 and 2021; 23,636,706 shares issued and outstanding as of December 31, 2020 and 2021; each Class B ordinary share is convertible into one Class A ordinary share) | 163 | 163 |
| Treasury shares (6,064,202 and 5,688,093 shares as of December 31, 2020 and 2021, respectively) | (42) | (39) |
| Capital deficit | (126,571) | (121,631) |
| Retained earnings (accumulated deficits) | (162,728) | 116,454 |
| Accumulated other comprehensive income | 1,232 | 14,043 |
| **Total shareholders' equity (deficit)** | **(287,446)** | **9,490** |
| | | |
| **Total liabilities and shareholders' equity (deficit)** | **261,007** | **550,563** |

F-42

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**14. PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION (continued)**

**b) Condensed Statement of Operations**

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| Total operating expenses | (544,494) | (5,854) |
| Change in fair value of the warrants | 1,359 | — |
| Interest income | — | 1 |
| Share of income from subsidiaries and consolidated VIEs | 225,083 | 285,035 |
| **Income (loss) before income taxes** | **(318,052)** | **279,182** |
| Income tax expense | — | — |
| **Net income (loss)** | **(318,052)** | **279,182** |

**c) Condensed Statement of Cash Flows**

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| **Net cash provided by operating activities** | **3,634** | **539,747** |
| **Net cash used in financing activities** | **—** | **(540,375)** |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | (198) | (71) |
| **Net increase (decrease) in cash and cash equivalents** | **3,436** | **(699)** |
| **Cash and cash equivalents as of the beginning of the year** | **—** | **3,436** |
| **Cash and cash equivalents as of the end of the year** | **3,436** | **2,737** |

**CHINA INDEX HOLDINGS LIMITED**
**NOTES TO THE COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of RMB, except for share data)**

**15.  CONTINGENCIES**

In connection with the separation and distribution of the Company from Fang, the Company agreed to provide a guarantee for the benefit of the convertible notes holders of Fang, under which the Company is liable to the payment obligations under the convertible notes in the event that Fang fails to discharge its primary payment obligations under the convertible notes or certain circumstances relating to the Company, including, among others, change-in-control transactions or certain fundamental changes to the Company's share capital. Because the guarantee issued by the Company to Fang's convertible notes holders is a guarantee between companies under common control, it qualifies for the scope exclusion of recognition and measurement requirements of ASC 460, Guarantees.

On December 7, 2020, Fang announced that it attended a hearing before the Grand Court of the Cayman Islands (the "Cayman Court") regarding the application by certain shareholders of Fang (the "Petitioners") to appoint provisional liquidators over Fang and the Petitioners initiated a winding-up petition against Fang in Cayman Court on November 12, 2020, which was deemed to be an event of default as defined under the convertible notes. Consequently, 100% of the outstanding principle of, and unpaid interest on the notes became due and payable as of December 31, 2020.

Pursuant to the agreements among the Company, Fang and the holders of Fang's convertible notes, Fang and the Company each agreed to repay 50% of the total amount of US$168.0 million by installment in 2021 to the holders of Fang's convertible notes to settle the convertible notes agreements, as of December 31, 2020.

Accordingly, the Company accrued the guarantee liability in the amount of US$84.0 million (equivalent to RMB547,069) as of December 31, 2020.

The Company repaid to the holders of the convertible notes on behalf of Fang: 1) US$42.4 million (including US$0.2 million of interest expenses in 2021) in September 2021 and 2) US$41.8 million in November 2021, respectively. In addition, Fang repaid to the holders of the convertible notes: 1) US$42.4 million on September 28, 2021 (including US$0.2 million of interest expenses in 2021) and 2) US$41.8 million on November 15, 2021, respectively.

The Company and Fang further agree that if Fang repays all the liabilities born by the CIH no later than December 31, 2023, no interest will be accrued. In the event that Fang fails to make any payments to CIH in accordance with the timeline, the outstanding balance of Fang's Indebtedness shall accrue interest at one percent per annum and such unpaid amounts together with such interest thereon shall be immediately due and payable by Fang to CIH.

Based on the Company's credit assessment on the collectability of amounts due from Fang, taking into consideration of current market conditions and Fang's financial condition, as well as (1) Fang is subject to a winding-up petition by a noncontrolling shareholder in Cayman Court; (2) Fang is late in the filing of its annual 20-F for the year ended December 31, 2020; (3) Fang had to rely on the Company as the guarantor to settle the convertible notes agreements; and (4) the Company does not have any collateral placed by Fang against the amounts due from Fang, the Company has accrued 100% provision against the amounts due from Fang in the amount of RMB547,069 as of December 31, 2020, which was recorded as bad debt expense on the combined and consolidated statements of comprehensive income (loss) for the year ended December 31, 2020.

Fang did not make any repayment to the Company during the year ended December 31, 2021 nor subsequently.

Exhibit 2.4

**Description of rights of securities**
**registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act")**

American Depositary Shares ("ADSs"), each of which represents one Class A ordinary share of China Index Holdings Limited ("we," "us," "our company," or "our"), are listed and traded on the on the Nasdaq Global Select Market and, in connection with this listing (but not for trading), the Class A ordinary shares are registered under Section 12(b) of the Exchange Act. This exhibit contains a description of the rights of (i) the holders of Class A ordinary shares and (ii) the holders of ADSs. Class A ordinary shares underlying the ADSs are held by JPMorgan Chase Bank, N.A., as depositary, and holders of ADSs will not be treated as holders of Class A ordinary shares.

**Description of Class A Ordinary Shares**

The following is a summary of material provisions of our currently effective second amended and restated memorandum of association (the "Memorandum and Articles of Association") as well as the Companies Act (As Revised) of the Cayman Islands (the "Companies Act") insofar as they relate to the material terms of our Class A ordinary shares. As it is a summary, it may not contain all the information that you may otherwise deem important. For more complete information, you should read the entire Memorandum and Articles of Association, which has been filed with the Securities and Ex change Commission (the "SEC") as an exhibit to our Registration Statement on Form F-1 (File No. 333-231376).

*Type and Class of Securities (Item 9.A.5 of Form 20-F)*

The par value of Class A ordinary share is US$0.001 per share. The number of Class A ordinary shares that had been issued as of December 31, 2021 is provided on the cover of the annual report on Form 20-F for the fiscal year ended December 31, 2021. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are non-residents of the Cayman Islands may freely hold and vote their ordinary shares.

*Preemptive rights (Item 9.A.3 of Form 20-F)*

Our shareholders do not have preemptive rights.

*Limitations or Qualifications (Item 9.A.6 of Form 20-F)*

We have a dual-class share structure which consists of Class A ordinary shares and Class B ordinary shares. In respect of all matters upon which the ordinary shares are entitled to vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to ten (10) votes, voting together as one class. Due to the super voting power of Class B ordinary share holder, the voting power of the Class A ordinary shares may be limited.

*Rights of Other Types of Securities (Item 9.A.7 of Form 20-F)*

Not applicable.

*Rights of Class A Ordinary Shares (Item 10.B.3 of Form 20-F)*

*Classes of Ordinary Shares*

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares (and a further class of authorized but undesignated shares). Except for conversion rights and voting rights, the Class A ordinary shares and Class B ordinary shares shall carry equal rights and rank *pari passu* with one another, including but not limited to the rights to dividends (subject to the ability of the board of directors, under Memorandum and Articles of Association, to determine that a dividend shall be paid wholly or partly by the distribution of specific assets (which may consist of the shares or securities of any other company) and to settle all questions concerning such distribution (including fixing the value of such assets, determining that cash payment shall be made to some shareholders in lieu of specific assets and vesting any such specific assets in trustees on such terms as the directors think fit)) and other capital distributions.

*Dividends*

The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors (provided always that dividends may be declared and paid only out of funds legally available therefor, namely out of either profit, retained earnings or our share premium account, and provided further that a dividend may not be paid if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business). In addition, our shareholders may declare dividends by ordinary resolution, but no dividend shall exceed the amount recommended by our directors.

*Voting Rights*

Holders of Class A ordinary shares and Class B ordinary shares shall, at all times, vote together as one class on all matters submitted to a vote by the members at any general meeting of the Company. Each Class A ordinary share shall be entitled to one vote on all matters subject to the vote at general meetings of our company, and each Class B ordinary share shall be entitled to 10 votes on all matters subject to the vote at general meetings of our company. Voting at any meeting of shareholders is by show of hands unless a poll is demanded. A poll may be demanded by the chairman of such meeting or any one shareholder present in person or by proxy.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attached to the ordinary shares cast by those shareholders entitled to vote who are present in person or by proxy (or, in the case of corporations, by their duly authorized representatives) at a general meeting, while a special resolution requires the affirmative vote of a majority of no less than two-thirds of the votes attached to the ordinary shares cast by those shareholders who are present in person or by proxy (or, in the case of corporations, by their duly authorized representatives) at a general meeting. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Act and Memorandum and Articles of Association then in effect. A special resolution will be required for important matters such as a change of name or making changes to Memorandum and Articles of Association.

*Conversion*

Class B ordinary shares may be converted into the same number of Class A ordinary shares by the holders thereof at any time, while Class A ordinary shares cannot be converted into Class B ordinary shares under any circumstances. Upon any sale, transfer, assignment or disposition of Class B ordinary shares by a holder to any person or entity which is not an affiliate of such holder or upon a change of ultimate beneficial ownership of any Class B ordinary share to any person who is not an affiliate of such holder, or upon a change of ultimate beneficial ownership of any Class B ordinary share to any person who is not an affiliate of the registered shareholder of such share, each of such Class B ordinary shares shall be automatically and immediately converted into one Class A ordinary share in accordance with the Memorandum and Articles of Association.

*Transfer of Ordinary Shares*

Any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

However, our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid up or on which our company has a lien. Our board of directors may also decline to register any transfer of any ordinary share unless:

- the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of shares;

- the instrument of transfer is properly stamped, if required;

- a fee of such maximum sum as the NASDAQ may determine to be payable, or such lesser sum as the board of directors may from time to time require, is paid to the Company in respect thereof; and

- in the case of a transfer to joint holders, the transfer is not to more than four joint holders.

2

If our directors refuse to register a transfer they are required, within three months after the date on which the instrument of transfer was lodged, to send to each of the transferor and the transferee notice of such refusal.

*Liquidation*

On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of ordinary shares or, on a winding up, with the sanction of a special resolution of the Company and any other sanction required by the Companies Act), assets available for distribution among the holders of ordinary shares will be distributed among the holders of the ordinary shares on a pro rata basis (subject to, on a winding up where the assets available for distribution amongst the shareholders of the Company shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, a deduction from ordinary shares in respect of which there are monies due of all monies payable to the Company for unpaid calls or otherwise). If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that, as nearly as may be, the losses are borne by our shareholders proportionately. We are an exempted company with limited liability under the Companies Act, and under the Companies Act, the liability of our members is limited to the amount, if any, unpaid on the shares respectively held by them. The Memorandum and Articles of Association contains a declaration that the liability of our members is so limited.

*Calls on Ordinary Shares and Forfeiture of Ordinary Shares*

Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their ordinary shares (together with any interests which may have accrued). The ordinary shares that have been called upon and remain unpaid are subject to forfeiture.

**Redemption, Repurchase and Surrender of Ordinary Shares.**

We may issue shares on terms that such shares are subject to redemption, at our option or at the option of the holders thereof, on such terms and in such manner as may be determined, before the issue of such shares, by our board of directors or by an ordinary resolution of our shareholders. Our company may also repurchase any of our shares provided that the manner and terms of such purchase have been approved by our board of directors or by ordinary resolution of our shareholders, or are otherwise authorized by the Memorandum and Articles of Association. Under the Companies Act, the redemption or repurchase of any share may be paid out of our company's profits or out of the proceeds of a fresh issue of shares made for the purpose of such redemption or repurchase, or out of capital (including share premium account and capital redemption reserve) if our company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Act no such share may be redeemed or repurchased (1) unless it is fully paid up, (2) if such redemption or repurchase would result in there being no shares outstanding other than shares held as treasury shares, or (3) if the company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

**Variations of Rights of Shares.**

If at any time, our share capital is divided into different classes of shares, all or any of the attached to any such class may (subject to any rights or restrictions for the time being attached to any class of share) only be materially adversely varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by the holders of two-thirds of the issued shares of that class. The rights conferred upon the holders of the shares of any class issued with preferred or other rights will not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be materially adversely varied by the creation or issue of further shares ranking *pari passu* with or subsequent to such existing class of shares or the redemption or purchase of any shares of any class by the Company. The rights of the holders of shares shall not be deemed to be materially adversely varied by the creation or issue of shares with preferred or other rights including, without limitation, the creation of shares with enhanced or weighted voting rights.

*General Meetings of Shareholders and Shareholder Proposals*

As a Cayman Islands exempted company, we are not obliged by the Companies Act to call shareholders' annual general meetings. The Memorandum and Articles of Association provide that we may (but are not obliged to) in each year hold a general meeting as our annual general meeting in which case we shall specify the meeting as such in the notices calling it, and the annual general meeting shall be held at such time and place as may be determined by our directors.

Shareholders' annual general meetings and any other general meetings of our shareholders may be convened by a majority of our board of directors or our chairman. Advance notice of at least seven calendar days is required for the convening of our annual general shareholders' meeting and any other general meeting of our shareholders. A quorum required for a general meeting of shareholders consists of one or more shareholders present or by proxy, representing not less than one-third in nominal value of the total issued voting shares in our company.

Cayman Islands law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. The Memorandum and Articles of Association allow our shareholders holding shares representing in aggregate not less than one-third of all votes attaching to all issued and outstanding shares of our company that as at the date of the deposit of such requisition carry the right to vote at general meetings of the Company, to requisition an extraordinary general meeting of the shareholders, in which case our directors are obliged to call such meeting and to put the resolutions so requisitioned to a vote at such meeting; however, the Memorandum and Articles of Association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders.

*Inspection of Books and Records*

Holders of our ordinary shares have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records (save for our Memorandum and Articles, register of mortgages and charges and special resolutions of our shareholders). However, we intend to provide our shareholders with annual audited financial statements.

***Requirements to Change the Rights of Holders of Class A Ordinary Shares (Item 10.B.4 of Form 20-F)***

*Variations of Rights of Shares*

If at any time, our share capital is divided into different classes of shares, all or any of the attached to any such class may (subject to any rights or restrictions for the time being attached to any class of share) only be materially adversely varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by the holders of two-thirds of the issued shares of that class. The rights conferred upon the holders of the shares of any class issued with preferred or other rights will not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be materially adversely varied by the creation or issue of further shares ranking *pari passu* with or subsequent to such existing class of shares or the redemption or purchase of any shares of any class by the Company. The rights of the holders of shares shall not be deemed to be materially adversely varied by the creation or issue of shares with preferred or other rights including, without limitation, the creation of shares with enhanced or weighted voting rights.

***Limitations on the Rights to Own Class A Ordinary Shares (Item 10.B.6 of Form 20-F)***

There are no limitations under the laws of the Cayman Islands or under the Memorandum and Articles of Association that limit the right of non-resident or foreign owners to hold or vote Class A ordinary shares, other than anti-takeover provisions contained in the Memorandum and Articles of Association to limit the ability of others to acquire control of our company or cause our company to engage in change-of-control transactions.

***Provisions Affecting Any Change of Control (Item 10.B.7 of Form 20-F)***

*Anti-Takeover Provisions in the Memorandum and Articles of Association*

Some provisions of the Memorandum and Articles of Association may discourage, delay or prevent a change in control of our company or management that shareholders may consider favorable, including provisions that authorize our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders. However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under the Memorandum and Articles of Association, as amended and restated from time to time, for what they believe in good faith to be in the best interests of our company.

*Ownership Threshold (Item 10.B.8 of Form 20-F)*

There are no provisions under Cayman Islands law applicable to the Company, or under the Memorandum and Articles of Association, that require the Company to disclose shareholder ownership above any particular ownership threshold.

*Differences Between the Law of Different Jurisdictions (Item 10.B.9 of Form 20-F)*

The Companies Act is modeled after that of England and Wales but does not follow recent statutory enactments in England. In addition, the Companies Act differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Act applicable to us and the laws applicable to companies incorporated in the State of Delaware.

*Mergers and Similar Arrangements*

The Companies Act permits mergers and consolidations between Cayman Islands companies and between Cayman Islands companies and non-Cayman Islands companies. For these purposes, (1) "merger" means the merging of two or more constituent companies and the vesting of their undertaking, property and liabilities in one of such companies as the surviving company, and (2) a "consolidation" means the combination of two or more constituent companies into a consolidated company and the vesting of the undertaking, property and liabilities of such companies to the consolidated company. In order to effect such a merger or consolidation, the directors of each constituent company must approve a written plan of merger or consolidation, which must then be authorized by (1) a special resolution of the shareholders of each constituent company, and (2) such other authorization, if any, as may be specified in such constituent company's articles of association. The plan must be filed with the Registrar of Companies of the Cayman Islands together with a declaration as to the solvency of the consolidated or surviving company, a list of the assets and liabilities of each constituent company and an undertaking that a copy of the certificate of merger or consolidation will be given to the members and creditors of each constituent company and that notification of the merger or consolidation will be published in the Cayman Islands Gazette. Court approval is not required for a merger or consolidation which is effected in compliance with these statutory procedures.

A merger between a Cayman parent company and its Cayman subsidiary or subsidiaries does not require authorization by a resolution of shareholders. For this purpose a company is a "parent" of a subsidiary if it holds issued shares that together represent at least ninety percent of the votes at a general meeting of the subsidiary.

The consent of each holder of a fixed or floating security interest over a constituent company is required unless this requirement is waived by a court in the Cayman Islands.

Save in certain limited circumstances, a shareholder of a Cayman constituent company who dissents from the merger or consolidation is entitled to payment of the fair value of his shares (which, if not agreed between the parties, will be determined by the Cayman Islands court) upon dissenting to the merger or consolidation, provide the dissenting shareholder complies strictly with the procedures set out in the Companies Act. The exercise of dissenter rights will preclude the exercise by the dissenting shareholder of any other rights to which he or she might otherwise be entitled by virtue of holding shares, save for the right to seek relief on the grounds that the merger or consolidation is void or unlawful.

Separate from the statutory provisions relating to mergers and consolidations, the Companies Act also contains statutory provisions that facilitate the reconstruction and amalgamation of companies by way of schemes of arrangement, provided that the arrangement is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three-fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder has the right to express to the court the view that the transaction ought not to be approved, the court can be expected to approve the arrangement if it determines that:

- the statutory provisions as to the required majority vote have been met;

- the shareholders have been fairly represented at the meeting in question and the statutory majority are acting bona fide without coercion of the minority to promote interests adverse to those of the class;

- the arrangement is such that may be reasonably approved by an intelligent and honest man of that class acting in respect of his interest; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Act.

The Companies Act also contains a statutory power of compulsory acquisition which may facilitate the "squeeze out" of dissentient minority shareholder upon a tender offer. When a tender offer is made and accepted by holders of 90% of the shares affected within four months, the offeror may, within a two-month period commencing on the expiration of such four month period, require the holders of the remaining shares to transfer such shares to the offeror on the terms of the offer. An objection can be made to the Grand Court of the Cayman Islands but this is unlikely to succeed in the case of an offer which has been so approved unless there is evidence of fraud, bad faith or collusion.

If an arrangement and reconstruction is thus approved, or if a tender offer is made and accepted, a dissenting shareholder would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of Delaware corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

*Shareholders' Suits*

In principle, we will normally be the proper plaintiff and as a general rule a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, the Cayman Islands court can be expected to follow and apply the common law principles (namely the rule in *Foss v. Harbottle* and the exceptions thereto) so that a non-controlling shareholder may be permitted to commence a class action against, or a derivative action in the name of, a company to challenge the following acts in the following circumstances:

- a company acts or proposes to act illegally or ultra vires;

- the act complained of, although not ultra vires, could only be effected duly if authorized by more than a simple majority vote that has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority."

*Indemnification of Directors and Executive Officers and Limitation of Liability*

Cayman Islands law does not limit the extent to which a company's memorandum and articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. The Memorandum and Articles of Association permit indemnification of officers and directors for losses, damages, costs and expenses incurred in their capacities as such unless such losses or damages arise from dishonesty, wilful default or fraud of such directors or officers. This standard of conduct is generally the same as permitted under the Delaware General Corporation Law for a Delaware corporation. In addition, we have entered into indemnification agreements with our directors and executive officers that provide such persons with additional indemnification beyond that provided in our amended and restated memorandum and articles of association then in effect.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted for our directors, officers or persons controlling us under the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable as a matter of United States law.

*Anti-Takeover Provisions in the Memorandum and Articles of Association*

Some provisions of the Memorandum and Articles of Association may discourage, delay or prevent a change in control of our company or management that shareholders may consider favorable, including provisions that authorize our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders. However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under our amended and restated memorandum and articles of association, as amended and restated from time to time, for what they believe in good faith to be in the best interests of our company.

6

*Directors' Fiduciary Duties*

Under Delaware corporate law, a director of a Delaware corporation has a fiduciary duty to the corporation and its shareholders. This duty has two components: the duty of care and the duty of loyalty. The duty of care requires that a director act in good faith, with the care that an ordinarily prudent person would exercise under similar circumstances. Under this duty, a director must inform himself of, and disclose to shareholders, all material information reasonably available regarding a significant transaction. The duty of loyalty requires that a director acts in a manner he reasonably believes to be in the best interests of the corporation. A director must not use his or her corporate position for personal gain or advantage. This duty prohibits self-dealing by a director and mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally. In general, actions of a director are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. However, this presumption may be rebutted by evidence of a breach of one of the fiduciary duties. Should such evidence be presented concerning a transaction by a director, the director must prove the procedural fairness of the transaction, and that the transaction was of fair value to the corporation.

Under Cayman Islands law, our directors owe fiduciary duties to our company, including a duty to act honestly, and a duty to act in what they consider in good faith to be in our best interests. Our directors must also exercise their powers only for a proper purpose. Our directors also owe to our company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands. In fulfilling their duty of care to our company, our directors must ensure compliance with the Memorandum and Articles of Association, as amended and restated from time to time, and the rights vested thereunder in the holders of the shares. Our directors owe their fiduciary duties to our company and not to our company's individual shareholders, and it is our company which has the right to seek damages if a duty owed by our directors is breached. In limited exceptional circumstances, a shareholder may have the right to seek damages in our name if a duty owed by our directors is breached.

*Shareholder Action by Written Consent*

Under the Delaware General Corporation Law, a corporation may eliminate the right of shareholders to act by written consent by amendment to its certificate of incorporation. Cayman Islands law and the Memorandum and Articles of Association provide that shareholders may approve corporate matters by way of a unanimous written resolution signed by or on behalf of each shareholder who would have been entitled to vote on such matter at a general meeting without a meeting being held.

*Shareholder Proposals*

Under the Delaware General Corporation Law, a shareholder has the right to put any proposal before the annual meeting of shareholders, provided it complies with the notice provisions in the governing documents. A special meeting may be called by the board of directors or any other person authorized to do so in the governing documents, but shareholders may be precluded from calling special meetings.

The Companies Act provide shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. The Memorandum and Articles of Association allow our shareholders holding in aggregate not less than one-third of all votes attaching to the outstanding shares of our company entitled to vote at general meetings to requisition an extraordinary general meeting of our shareholders, in which case our board is obliged to convene an extraordinary general meeting and to put the resolutions so requisitioned to a vote at such meeting. Other than this right to requisition a shareholders' meeting, the Memorandum and Articles of Association do not provide our shareholders with any other right to put proposals before annual general meetings or extraordinary general meetings. As an exempted Cayman Islands company, we are not obliged by law to call shareholders' annual general meetings.

*Cumulative Voting*

Under the Delaware General Corporation Law, cumulative voting for elections of directors is not permitted unless the corporation's certificate of incorporation specifically provides for it. Cumulative voting potentially facilitates the representation of minority shareholders on a board of directors since it permits the minority shareholder to cast all the votes to which the shareholder is entitled on a single director, which increases the shareholder's voting power with respect to electing such director. There are no prohibitions in relation to cumulative voting under the laws of the Cayman Islands but the Memorandum and Articles of Association do not provide for cumulative voting. As a result, our shareholders are not afforded any less protections or rights on this issue than shareholders of a Delaware corporation.

*Removal of Directors*

Under the Delaware General Corporation Law, a director of a corporation with a classified board may be removed only for cause with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under the Memorandum and Articles of Association, directors may be removed with or without cause, by an ordinary resolution of our shareholders.

*Transactions with Interested Shareholders*

The Delaware General Corporation Law contains a business combination statute applicable to Delaware corporations whereby, unless the corporation has specifically elected not to be governed by such statute by amendment to its certificate of incorporation, it is prohibited from engaging in certain business combinations with an "interested shareholder" for three years following the date that such person becomes an interested shareholder. An interested shareholder generally is a person or a group who or which owns or owned 15% or more of the target's outstanding voting stock within the past three years. This has the effect of limiting the ability of a potential acquirer to make a two-tiered bid for the target in which all shareholders would not be treated equally. The statute does not apply if, among other things, prior to the date on which such shareholder becomes an interested shareholder, the board of directors approves either the business combination or the transaction which resulted in the person becoming an interested shareholder. This encourages any potential acquirer of a Delaware corporation to negotiate the terms of any acquisition transaction with the target's board of directors.

Cayman Islands law has no comparable statute. As a result, we cannot avail ourselves of the types of protections afforded by the Delaware business combination statute. However, although Cayman Islands law does not regulate transactions between a company and its significant shareholders, it does provide that such transactions must be entered into *bona fide* in the best interests of the company and for a proper corporate purpose and not with the effect of constituting a fraud on the minority shareholders.

*Dissolution; Winding Up*

Under the Delaware General Corporation Law, unless the board of directors approves the proposal to dissolve, dissolution must be approved by shareholders holding 100% of the total voting power of the corporation. Only if the dissolution is initiated by the board of directors may it be approved by a simple majority of the corporation's outstanding shares. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions initiated by the board. Under Cayman Islands law, a company may be wound up by either an order of the courts of the Cayman Islands or by a special resolution of its members or, if the company is unable to pay its debts as they fall due, by an ordinary resolution of its members. The court has authority to order winding up in a number of specified circumstances including where it is, in the opinion of the court, just and equitable to do so.

*Variation of Rights of Shares*

Under the Delaware General Corporation Law, a corporation may vary the rights of a class of shares with the approval of a majority of the outstanding shares of such class, unless the certificate of incorporation provides otherwise. Under the Memorandum and Articles of Association, if our share capital is divided into more than one class of shares, all or any of the attached to any such class may (subject to any rights or restrictions for the time being attached to any class of share) only be materially adversely varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by the holders of two-thirds of the issued shares of that class.

8

*Amendment of Governing Documents*

Under the Delaware General Corporation Law, a corporation's governing documents may be amended with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. As permitted by Cayman Islands law, the Memorandum and Articles of Association may only be amended with a special resolution of our shareholders.

*Rights of Non-Resident or Foreign Shareholders*

There are no limitations imposed by the Memorandum and Articles of Association on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our shares. In addition, there are no provisions in the Memorandum and Articles of Association governing the ownership threshold above which shareholder ownership must be disclosed.

*Exempted Company*

We are an exempted company with limited liabilities registered by way of continuation under the laws of the Cayman Islands. The Companies Act in the Cayman Islands distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary company except for the exemptions and privileges listed below:

- an exempted company does not have to file an annual return of its shareholders with the Registrar of Companies;

- an exempted company's register of members is not open to inspection;

- an exempted company does not have to hold an annual general meeting;

- an exempted company may issue no par value;

- an exempted company may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given for 20 years in the first instance);

- an exempted company may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

- an exempted company may register as a limited duration company; and

- an exempted company may register as a segregated portfolio company.

"Limited liability" means that the liability of each shareholder is limited to the amount unpaid by the shareholder on that shareholder's shares of the company (except in exceptional circumstances, such as involving fraud, the establishment of an agency relationship or an illegal or improper purpose or other circumstances in which a court may be prepared to pierce or lift the corporate veil). Upon the closing of the separation and distribution, we will be subject to reporting and other informational requirements of the Exchange Act, as applicable to foreign private issuers. We currently intend to comply with the NASDAQ rules in lieu of following home country practice after the completion of the separation and distribution. The NASDAQ rules require that every company listed on the NASDAQ hold an annual general meeting of shareholders. In addition, the Memorandum and Articles of Association allow directors to call special meeting of shareholders pursuant to the procedures set forth in our articles.

### Changes in Capital (Item 10.B.10 of Form 20-F)

Our shareholders may from time to time by ordinary resolution:

- increase our share capital by such sum, to be divided into shares of such classes and amount, as the resolution shall prescribe;

- consolidate and divide all or any of our share capital into shares of a larger amount than our existing shares;

9

- sub-divide our existing shares, or any of them into shares of a smaller amount, provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in case of the share from which the reduced share is derived; or

- cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of our share capital by the amount of the shares so canceled.

Our shareholders may by special resolution, subject to confirmation by the Grand Court of the Cayman Islands on an application by our company for an order confirming such reduction, reduce our share capital or any capital redemption reserve in any manner permitted by law.

**Debt Securities (Item 12.A of Form 20-F)**

Not applicable.

**Warrants and Rights (Item 12.B of Form 20-F)**

Not applicable.

**Other Securities (Item 12.C of Form 20-F)**

Not applicable.

**Description of American Depositary Shares (Item 12.D.1 and 12.D.2 of Form 20-F)**

*General*

JPMorgan Chase Bank, N.A., or JPMorgan, as depositary will issue the ADSs which you will be entitled to receive in this distribution. Each ADS will represent an ownership interest in a designated number of shares which we will deposit with the custodian, as agent of the depositary, under the deposit agreement among ourselves, the depositary and yourself as an ADR holder. In the future, each ADS will also represent any securities, cash or other property deposited with the depositary but which they have not distributed directly to you. Unless certificated ADRs are specifically requested by you, all ADSs will be issued on the books of our depositary in book-entry form and periodic statements will be mailed to you which reflect your ownership interest in such ADSs. In our description, references to American depositary receipts or ADRs shall include the statements you will receive which reflect your ownership of ADSs.

The depositary's office is located at 383 Madison Avenue, Floor 11, New York, NY 10179.

You may hold ADSs either directly or indirectly through your broker or other financial institution. If you hold ADSs directly, by having an ADS registered in your name on the books of the depositary, you are an ADR holder. This description assumes you hold your ADSs directly. If you have a beneficial ownership interest in ADSs but hold the ADSs through your broker or financial institution nominee, you are a beneficial owner of ADSs and must rely on the procedures of such broker or financial institution to assert the rights of an ADR holder described in this section. You should consult with your broker or financial institution to find out what those procedures are. If you are a beneficial owner, you will only be able to exercise any right or receive any benefit under the deposit agreement solely through the registered holder of the ADR(s) evidencing the ADSs owned by you, and the arrangements between you and the registered holder of the corresponding ADRs may affect your ability to exercise any rights you may have. For all purposes under the deposit agreement, an ADR holder is deemed to have all requisite authority to act on behalf of any and all beneficial owners of the ADSs evidenced by the ADR(s) registered in such holder's name. The depositary's only notification obligations under the deposit agreement shall be to the ADR holders, and notice to an ADR holder shall be deemed, for all purposes of the Deposit Agreement, to constitute notice to any and all beneficial owners of the ADSs evidenced by such holder's ADRs.

As an ADR holder, we will not treat you as a shareholder of ours and you will not have any shareholder rights. Cayman Island law governs shareholder rights. Because the depositary or its nominee will be the shareholder of record for the shares represented by all outstanding ADSs, shareholder rights rest with such record holder. Your rights are those of an ADR holder. Such rights derive from the terms of the deposit agreement to be entered into among us, the depositary and all registered holders and beneficial owners from time to time of ADRs issued under the deposit agreement. The obligations of our company, the depositary and its agents are also set out in the deposit agreement. Because the depositary or its nominee will actually be the registered owner of the shares, you must rely on it to exercise the rights of a shareholder on your behalf. The deposit agreement and the ADSs are governed by New York law. Under the deposit agreement, as an ADR holder or a beneficial owner of ADSs, you agree that any legal suit, action or proceeding against or involving us or the depositary, arising out of or based upon the deposit agreement, the ADSs or the transactions contemplated thereby, may only be instituted in a state or federal court in New York, New York, and you irrevocably waive any objection which you may have to the laying of venue of any such proceeding and irrevocably submit to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

The following is a summary of what we believe to be the material terms of the deposit agreement. Notwithstanding this, because it is a summary, it may not contain all the information that you may otherwise deem important. For more complete information, you should read the entire deposit agreement and the form of ADR which contains the terms of your ADSs. You can read a copy of the deposit agreement which is filed as an exhibit to the registration statement of which this prospectus forms a part. You may also obtain a copy of the deposit agreement at the SEC's Public Reference Room which is located at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-732-0330. You may also find the registration statement and the attached deposit agreement on the SEC's website at http://www.sec.gov.

### Dividends and Other Distributions

*How will you receive dividends and other distributions on the shares underlying the ADSs?*

We may make various types of distributions with respect to our securities. The depositary has agreed that, to the extent practicable, it will pay to you the cash dividends or other distributions it or the custodian receives on shares or other deposited securities, after converting any cash received into U.S. dollars (if it determines such conversion may be made on a reasonable basis) and, in all cases, making any necessary deductions provided for in the deposit agreement. The depositary may utilize a division, branch or affiliate of JPMorgan to direct, manage and/or execute any public and/or private sale of securities under the deposit agreement. Such division, branch and/or affiliate may charge the depositary a fee in connection with such sales, which fee is considered an expense of the depositary. You will receive these distributions in proportion to the number of underlying securities that your ADSs represent.

Except as stated below, the depositary will deliver such distributions to ADR holders in proportion to their interests in the following manner:

- *Cash.* The depositary will distribute any U.S. dollars available to it resulting from a cash dividend or other cash distribution or the net proceeds of sales of any other distribution or portion thereof (to the extent applicable), on an averaged or other practicable basis, subject to (i) appropriate adjustments for taxes withheld, (ii) such distribution being impermissible or impracticable with respect to certain registered ADR holders, and (iii) deduction of the depositary's and/or its agents' expenses in (1) converting any foreign currency to U.S. dollars to the extent that it determines that such conversion may be made on a reasonable basis, (2) transferring foreign currency or U.S. dollars to the United States by such means as the depositary may determine to the extent that it determines that such transfer may be made on a reasonable basis, (3) obtaining any approval or license of any governmental authority required for such conversion or transfer, which is obtainable at a reasonable cost and within a reasonable time and (4) making any sale by public or private means in any commercially reasonable manner. *If exchange rates fluctuate during a time when the depositary cannot convert a foreign currency, you may lose some or all of the value of the distribution.*

- *Shares.* In the case of a distribution in shares, the depositary will issue additional ADRs to evidence the number of ADSs representing such shares. Only whole ADSs will be issued. Any shares which would result in fractional ADSs will be sold and the net proceeds will be distributed in the same manner as cash to the ADR holders entitled thereto.

- *Rights to receive additional shares.* In the case of a distribution of rights to subscribe for additional shares or other rights, if we timely provide evidence satisfactory to the depositary that it may lawfully distribute such rights, the depositary will distribute warrants or other instruments in the discretion of the depositary representing such rights. However, if we do not timely furnish such evidence, the depositary may: (i)

11

- sell such rights if practicable and distribute the net proceeds in the same manner as cash to the ADR holders entitled thereto; or (ii) if it is not practicable to sell such rights by reason of the non-transferability of the rights, limited markets therefor, their short duration or otherwise, do nothing and allow such rights to lapse, in which case ADR holders will receive nothing and the rights may lapse. We have no obligation to file a registration statement under the Securities Act in order to make any rights available to ADR holders.

- *Other Distributions.* In the case of a distribution of securities or property other than those described above, the depositary may either (i) distribute such securities or property in any manner it deems equitable and practicable or (ii) to the extent the depositary deems distribution of such securities or property not to be equitable and practicable, sell such securities or property and distribute any net proceeds in the same way it distributes cash.

- *Elective Distributions.* In the case of a dividend payable at the election of our shareholders in cash or in additional shares, we will notify the depositary at least 30 days prior to the proposed distribution stating whether or not we wish such elective distribution to be made available to ADR holders. The depositary shall make such elective distribution available to ADR holders only if (i) we shall have timely requested that the elective distribution is available to ADR holders, (ii) the depositary shall have determined that such distribution is reasonably practicable and (iii) the depositary shall have received satisfactory documentation within the terms of the deposit agreement including any legal opinions of counsel that the depositary in its reasonable discretion may request. If the above conditions are not satisfied, the depositary shall, to the extent permitted by law, distribute to the ADR holders, on the basis of the same determination as is made in the local market in respect of the shares for which no election is made, either (x) cash or (y) additional ADSs representing such additional shares. If the above conditions are satisfied, the depositary shall establish procedures to enable ADR holders to elect the receipt of the proposed dividend in cash or in additional ADSs. There can be no assurance that ADR holders or beneficial owners of ADSs generally, or any ADR holder or beneficial owner in particular, will be given the opportunity to receive elective distributions on the same terms and conditions as the holders of shares.

If the depositary determines in its discretion that any distribution described above is not practicable with respect to any specific registered ADR holder, the depositary may choose any method of distribution that it deems practicable for such ADR holder, including the distribution of foreign currency, securities or property, or it may retain such items, without paying interest on or investing them, on behalf of the ADR holder as deposited securities, in which case the ADSs will also represent the retained items and shall, in the case of a distribution not being practicable with respect to all of the registered ADR holders, inform the Company of such impracticality.

Any U.S. dollars will be distributed by checks drawn on a bank in the United States for whole dollars and cents. Fractional cents will be withheld without liability and dealt with by the depositary in accordance with its then current practices.

*The depositary is not responsible if it fails to determine that any distribution or action is lawful or reasonably practicable.*

*There can be no assurance that the depositary will be able to convert any currency at a specified exchange rate or sell any property, rights, shares or other securities at a specified price, nor that any of such transactions can be completed within a specified time period. All purchases and sales of securities will be handled by the depositary in accordance with its then current policies, which are currently set forth in the "Depositary Receipt Sale and Purchase of Security" section of https://www.adr.com/Investors/FindOutAboutDRs, the location and contents of which the depositary shall be solely responsible for.*

12

*Deposit, Withdrawal and Cancellation*

*How does the depositary issue ADSs?*

The depositary will issue ADSs if you or your broker deposit shares or evidence of rights to receive shares with the custodian and pay the fees and expenses owing to the depositary in connection with such issuance. In the case of the ADSs to be issued under this prospectus, we will arrange with Fang to deposit such shares.

Shares deposited in the future with the custodian must be accompanied by certain delivery documentation and shall, at the time of such deposit, be registered in the name of JPMorgan, as depositary for the benefit of holders of ADRs or in such other name as the depositary shall direct.

The custodian will hold all deposited shares (including those being deposited by or on our behalf in connection with the separation and distribution to which this prospectus relates) for the account and to the order of the depositary for the benefit of registered holders of ADRs, to the extent not prohibited by law. ADR holders thus have no direct ownership interest in the shares and only have such rights as are contained in the deposit agreement. The custodian will also hold any additional securities, property and cash received on or in substitution for the deposited shares. The deposited shares and any such additional items are referred to as "deposited securities".

Upon each deposit of shares, receipt of related delivery documentation and compliance with the other provisions of the deposit agreement, including the payment of the fees and charges of the depositary and any taxes or other fees or charges owing, the depositary will issue an ADR or ADRs in the name or upon the order of the person entitled thereto evidencing the number of ADSs to which such person is entitled. All of the ADSs issued will, unless specifically requested to the contrary, be part of the depositary's direct registration system, and a registered holder will receive periodic statements from the depositary which will show the number of ADSs registered in such holder's name. An ADR holder can request that the ADSs not be held through the depositary's direct registration system and that a certificated ADR be issued. *How do ADR holders cancel an ADS and obtain deposited securities?* When you turn in your ADR certificate at the depositary's office, or when you provide proper instructions and documentation in the case of direct registration ADSs, the depositary will, upon payment of certain applicable fees, charges and taxes, deliver the underlying shares to you or upon your written order. Delivery of deposited securities in certificated form will be made at the custodian's office. At your risk, expense and request, the depositary may deliver deposited securities at such other place as you may request.

The depositary may only restrict the withdrawal of deposited securities in connection with:

- temporary delays caused by closing our transfer books or those of the depositary or the deposit of shares in connection with voting at a shareholders' meeting, or the payment of dividends;

- the payment of fees, taxes and similar charges; or

- compliance with any U.S. or foreign laws or governmental regulations relating to the ADRs or to the withdrawal of deposited securities.

This right of withdrawal may not be limited by any other provision of the deposit agreement.

***Record Dates***

The depositary may, after consultation with us if practicable, fix record dates (which, to the extent applicable, shall be as near as practicable to any corresponding record dates set by us) for the determination of the registered ADR holders who will be entitled (or obligated, as the case may be):

- to receive any distribution on or in respect of deposited securities,

- to give instructions for the exercise of voting rights,

- to pay the fee assessed by the depositary for administration of the ADR program and for any expenses as provided for in the ADR, or

- to receive any notice or to act or be obligated in respect of other matters,

13

all subject to the provisions of the deposit agreement.

***Voting Rights***

*How do you vote?*

If you are an ADR holder and the depositary asks you to provide it with voting instructions, you may instruct the depositary how to exercise the voting rights for the shares which underlie your ADSs. As soon as practicable after receiving notice from us of any meeting at which the holders of shares are entitled to vote, or of our solicitation of consents or proxies from holders of shares, the depositary shall fix the ADS record date in accordance with the provisions of the deposit agreement, provided that if the depositary receives a written request from us in a timely manner and at least 30 days prior to the date of such vote or meeting, the depositary shall, at our expense, distribute to the registered ADR holders a notice stating (i) final information particular to such vote and meeting and any solicitation materials, (ii) that each ADR holder on the record date set by the depositary will, subject to any applicable provisions of Cayman Island law, be entitled to instruct the depositary to exercise the voting rights, if any, pertaining to the shares underlying such holder's ADSs and (iii) the manner in which such instructions may be given or deemed given in accordance with the next paragraph, including instructions to give a discretionary proxy to a person designated by us. Each ADR holder is solely responsible for the forwarding of such notices to the beneficial owners of ADSs registered in such holder's name. Following actual receipt by the ADR department responsible for proxies and voting of ADR holders' instructions (including, without limitation, instructions of any entity or entities acting on behalf of the nominee for DTC), the depositary shall, in the manner and on or before the time established by the depositary for such purpose, endeavor to vote or cause to be voted the shares represented by the ADSs evidenced by such ADR holders' ADRs in accordance with such instructions insofar as practicable and permitted under the provisions of or governing our shares.

To the extent that (A) we have provided the depositary with at least 35 days' notice of a proposed meeting, (B) the notice described above will be received by all registered ADR holders and beneficial owners of ADSs no less than 10 days prior to the date of the meeting and/or the cut-off date for the solicitation of consents, and (C) the depositary does not receive instructions on a particular agenda item from a registered ADR holder (including, without limitation, any entity or entities acting on behalf of the nominee for DTC) in a timely manner, such holder shall be deemed, and the depositary is instructed to deem such holder, to have instructed the depositary to give a discretionary proxy for such agenda item(s) to a person designated by us to vote the shares represented by the ADSs for which actual instructions were not so given by all such ADR holders or beneficial owners of ADSs on such agenda item(s), provided that no such instruction shall be deemed given and no discretionary proxy shall be given unless (1) we inform the depositary in writing (and, in the deposit agreement we have agreed to provide the depositary with such instruction promptly in writing) that (a) we wish such proxy to be given with respect to such agenda item(s), (b) there is no substantial opposition existing with respect to such agenda item(s) and (c) such the agenda item(s), if approved, would not materially or adversely affect the rights of holders of Shares, and (2) the depositary has obtained an opinion of counsel, in form and substance satisfactory to the depositary, confirming that (i) the granting of such discretionary proxy does not subject the depositary to any reporting obligations in the Cayman Islands, (ii) the granting of such proxy will not result in a violation of Cayman Island laws, rules, regulations or permits, (iii) the voting arrangement and deemed instruction as contemplated herein will be given effect under Cayman Island laws, rules and regulations, and (iv) the granting of such discretionary proxy will not under any circumstances result in the Shares represented by the ADSs being treated as assets of the depositary under Cayman Island laws, rules or regulations. Under the deposit agreement the depositary may from time to time access information available to it to consider whether any of the circumstances described in (1)(b) or (1)(c) above exist, or request additional information from us in respect thereof. By taking any such action, the depositary shall not in any way be deemed or inferred to have been required, or have had any duty or responsibility (contractual or otherwise), to monitor or inquire whether any of the circumstances described in such (1)(b) or (1) (c) above existed. In addition to the limitations provided for in the deposit agreement, ADR holders and beneficial owners of ADSs holders are advised, and in the deposit agreement, are deemed to agree, that (a) the depositary will rely fully and exclusively on us to inform the depositary of any of the circumstances set forth in (1) above, and (b) neither the depositary, its Custodian nor any of their respective agents shall be obliged to inquire or investigate whether any of the circumstances described in (1)(b) or (1)(c) above exist and/or whether we have complied with our obligation to timely inform the depositary of such circumstances. Neither the depositary, its custodian nor any of their respective agents shall incur any liability to ADR holders or beneficial owners of ADSs (i) as a result of our failure to determine that any of the circumstances described in (1)(b) or (1)(c) above exist or our failure to timely notify the depositary of any such circumstances or (ii) if any agenda item which is approved at a meeting has, or is claimed to have, a material or adverse effect on the rights of holders of Shares. Because there is no guarantee that ADR holders or beneficial owners of ADSs will receive the notices described above with sufficient time to enable such ADR holders or beneficial owners of ADSs to return any voting instructions to the depositary in a timely manner, ADR holders and beneficial owners of ADSs may be deemed to have instructed the depositary to give a discretionary proxy to a person designated by us in such circumstances, and neither the depositary, its custodian nor any of their respective agents shall incur any liability to ADR holders or beneficial owners of ADSs in such circumstances.

14

ADR holders and beneficial owners of ADSs are strongly encouraged to forward their voting instructions to the depositary as soon as possible. For instructions to be valid, the ADR department of the depositary that is responsible for proxies and voting must receive them in the manner and on or before the time specified, notwithstanding that such instructions may have been physically received by the depositary prior to such time. The depositary will not itself exercise any voting discretion. Furthermore, neither the depositary nor its agents are responsible for any failure to carry out any voting instructions, for the manner in which any vote is cast or for the effect of any vote. Notwithstanding anything contained in the deposit agreement or any ADR, the depositary may, to the extent not prohibited by any law, rule or regulation, or by the rules and/or requirements of the stock exchange on which the ADSs are listed, in lieu of distribution of the materials provided to the depositary in connection with any meeting of, or solicitation of consents or proxies from, holders of deposited securities, distribute to the ADR holders a notice that provides such ADR holders with, or otherwise publicizes to such ADR holders, instructions on how to retrieve such materials or receive such materials upon request (*i.e.*, by reference to a website containing the materials for retrieval or a contact for requesting copies of the materials).

There is no guarantee that ADR holders and beneficial owners of ADSs, or any ADR holder or beneficial owner of ADSs in particular, will receive voting materials in time to instruct the depositary to vote and it is possible that you, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote.

We have advised the depositary that under the Cayman Islands law and our constituent documents, voting at any meeting of shareholders is by show of hands unless a poll is (before or on the declaration of the results of the show of hands) demanded. In the event that voting on any resolution or matter is conducted on a show of hands basis in accordance with our constituent documents, the depositary will refrain from voting and the voting instructions received by the depositary from holders shall lapse. The depositary will not demand a poll or join in demanding a poll, whether or not requested to do so by holders of ADSs.

***Reports and Other Communications***

*Will ADR holders be able to view our reports?*

The depositary will make available for inspection by ADR holders at the offices of the depositary and the custodian the deposit agreement, the provisions of or governing deposited securities, and any written communications from us which are both received by the custodian or its nominee as a holder of deposited securities and made generally available to the holders of deposited securities.

Additionally, if we make any written communications generally available to holders of our shares, and we furnish copies thereof (or English translations or summaries) to the depositary, it will distribute the same to registered ADR holders.

15

*Payment of Taxes*

ADR holders must pay any tax or other governmental charge payable by the custodian or the depositary on any ADS or ADR, deposited security or distribution. If any taxes or other governmental charges (including any penalties and/or interest) shall become payable by or on behalf of the custodian or the depositary with respect to any ADR, any deposited securities represented by the ADSs evidenced thereby or any distribution thereon, including, without limitation, any Chinese Enterprise Income Tax owing if the Circular Guoshuifa [2009] No. 82 issued by the Chinese State Administration of Taxation (SAT) or any other circular, edict, order or ruling, as issued and as from time to time amended, is applied or otherwise, such tax or other governmental charge shall be paid by the holder thereof to the depositary and by holding or having held an ADR or any ADSs, the holder and all beneficial owners of such ADRs and ADSs, and all prior holders and beneficial owners thereof, jointly and severally, agree to indemnify, defend and save harmless each of the depositary and its agents in respect of such tax or governmental charge. Each ADR holder and beneficial owner of ADSs, and each prior holder and beneficial owner thereof, by holding or having held an ADR or an interest in ADSs, acknowledges and agrees that the depositary shall have the right to seek payment of any taxes or governmental charges owing with respect to the relevant ADRs from any one or more current or prior holder or beneficial owner, as determined by the depositary in its sole discretion, without any obligation to seek payment from any other current or prior holder or beneficial owner. If an ADR holder owes any tax or other governmental charge, the depositary may (i) deduct the amount thereof from any cash distributions, or (ii) sell deposited securities (by public or private sale) and deduct the amount owing from the net proceeds of such sale. In either case the ADR holder remains liable for any shortfall. If any tax or governmental charge is unpaid, the depositary may also refuse to effect any registration, registration of transfer, split-up or combination of deposited securities or withdrawal of deposited securities until such payment is made. If any tax or governmental charge is required to be withheld on any cash distribution, the depositary may deduct the amount required to be withheld from any cash distribution or, in the case of a non-cash distribution, sell the distributed property or securities (by public or private sale) in such amounts and in such manner as the depositary deems necessary and practicable to pay such taxes and distribute any remaining net proceeds or the balance of any such property after deduction of such taxes to the ADR holders entitled thereto.

By holding an ADR or an interest therein, you will be agreeing to indemnify us, the depositary, its custodian and any of our or their respective officers, directors, employees, agents and affiliates against, and hold each of them harmless from, any claims by any governmental authority with respect to taxes, additions to tax, penalties or interest arising out of any refund of taxes, reduced rate of withholding at source or other tax benefit obtained.

*Reclassifications, Recapitalizations and Mergers*

If we take certain actions that affect the deposited securities, including (i) any change in par value, split-up, consolidation, cancellation or other reclassification of deposited securities or (ii) any distributions of shares or other property not made to holders of ADRs or (iii) any recapitalization, reorganization, merger, consolidation, liquidation, receivership, bankruptcy or sale of all or substantially all of our assets, then the depositary may choose to, and shall if reasonably requested by us:

- amend the form of ADR;

- distribute additional or amended ADRs;

- distribute cash, securities or other property it has received in connection with such actions;

16

- sell any securities or property received and distribute the proceeds as cash; or

- none of the above.

If the depositary does not choose any of the above options, any of the cash, securities or other property it receives will constitute part of the deposited securities and each ADS will then represent a proportionate interest in such property.

***Amendment and Termination***

*How may the deposit agreement be amended?*

We may agree with the depositary to amend the deposit agreement and the ADSs without your consent for any reason. ADR holders must be given at least 30 days' notice of any amendment that imposes or increases any fees or charges (other than stock transfer or other taxes and other governmental charges, transfer or registration fees, SWIFT, cable, telex or facsimile transmission costs, delivery costs or other such expenses), or otherwise prejudices any substantial existing right of ADR holders or beneficial owners of ADSs. Such notice need not describe in detail the specific amendments effectuated thereby, but must identify to ADR holders a means to access the text of such amendment. If an ADR holder continues to hold an ADR or ADRs after being so notified, such ADR holder and the beneficial owner of the corresponding ADSs are deemed to agree to such amendment and to be bound by the deposit agreement as so amended. Any amendments or supplements which (i) are reasonably necessary (as agreed by us and the depositary) in order for (a) the ADSs to be registered on Form F-6 under the Securities Act of 1933 or (b) the ADSs or shares to be traded solely in electronic book-entry form and (ii) do not in either such case impose or increase any fees or charges to be borne by ADR holders, shall be deemed not to prejudice any substantial rights of ADR holders or beneficial owners of ADSs. Notwithstanding the foregoing, if any governmental body or regulatory body should adopt new laws, rules or regulations which would require amendment or supplement of the deposit agreement or the form of ADR to ensure compliance therewith, we and the depositary may amend or supplement the deposit agreement and the form of ADR (and all outstanding ADRs) at any time in accordance with such changed laws, rules or regulations, which amendment or supplement may take effect before a notice is given or within any other period of time as required for compliance. No amendment, however, will impair your right to surrender your ADSs and receive the underlying securities, except in order to comply with mandatory provisions of applicable law.

*How may the deposit agreement be terminated?*

The depositary may, and shall at our written direction, terminate the deposit agreement and the ADRs by mailing notice of such termination to the ADR holders at least 30 days prior to the date fixed in such notice for such termination; provided, however, if the depositary shall have (1) resigned as depositary under the deposit agreement, notice of such termination by the depositary shall not be provided to registered holders unless a successor depositary shall not be operating under the deposit agreement within 60 days of the date of such resignation, and (2) been removed as depositary under the deposit agreement, notice of such termination by the depositary shall not be provided to registered holders of ADRs unless a successor depositary shall not be operating under the deposit agreement on the 60th day after our notice of removal was first provided to the depositary. Notwithstanding anything to the contrary herein, the depositary may terminate the deposit agreement without notifying us, but subject to giving 30 days' notice to the Holders, under the following circumstances: (1) in the event of our bankruptcy or insolvency, (2) if the shares cease to be listed on an internationally recognized stock exchange, (3) if we effect (or will effect) a redemption of all or substantially all of the deposited securities, or a cash or share distribution representing a return of all or substantially all of the value of the deposited securities, or (4) there occurs a merger, consolidation, sale of assets or other transaction as a result of which securities or other property are delivered in exchange for or in lieu of deposited securities. After the date so fixed for termination, (a) all direct registration ADRs shall cease to be eligible for the direct registration system and shall be considered ADRs issued on the ADR register maintained by the depositary and (b) the depositary shall use its reasonable efforts to ensure that the ADSs cease to be DTC eligible so that neither DTC nor any of its nominees shall thereafter be a registered holder of ADRs. At such time as the ADSs cease to be DTC eligible and/or neither DTC nor any of its nominees is an ADR holder, the depositary shall (a) instruct its custodian to deliver all shares to us along with a general stock power that refers to the names set forth on the ADR register maintained by the depositary and (b) provide us with a copy of the ADR register maintained by the depositary. Upon receipt of such shares and the ADR register maintained by the depositary, we have agreed to use our best efforts to issue to each registered holder a share certificate representing the shares represented by the ADSs reflected on the ADR register maintained by the depositary in such registered holder's name and to deliver such share certificate to the registered holder at the address set forth on the ADR register maintained by the depositary. After providing such instruction to the custodian and delivering a copy of the ADR register to us, the depositary and its agents will perform no further acts under the deposit agreement or the ADRs and shall cease to have any obligations under the deposit agreement and/or the ADRs.

*Limitations on Obligations and Liability to ADR holders*

*Limits on our obligations and the obligations of the depositary; limits on liability to ADR holders and beneficial owners of ADSs*

Prior to the issue, registration, registration of transfer, split-up, combination, or cancellation of any ADRs, or the delivery of any distribution in respect thereof, and from time to time in the case of the production of proofs as described below, we or the depositary or its custodian may require:

- payment with respect thereto of (1) any stock transfer or other tax or other governmental charge, (2) any stock transfer or registration fees in effect for the registration of transfers of shares or other deposited securities upon any applicable register and (3) any applicable fees and expenses described in the deposit agreement;

- the production of proof satisfactory to it of (1) the identity of any signatory and genuineness of any signature and (2) such other information, including without limitation, information as to citizenship, residence, exchange control approval, beneficial or other ownership of, or interest in, any securities, compliance with applicable law, regulations, provisions of or governing deposited securities and terms of the deposit agreement and the ADRs, as it may deem necessary or proper; and

- compliance with such regulations as the depositary may establish consistent with the deposit agreement.

The issuance of ADRs, the acceptance of deposits of shares, the registration, registration of transfer, split-up or combination of ADRs or the withdrawal of shares, may be suspended, generally or in particular instances, when the ADR register or any register for deposited securities is closed or when any such action is deemed advisable by the depositary; provided that the ability to withdraw shares may only be limited under the following circumstances: (1) temporary delays caused by closing transfer books of the depositary or our transfer books or the deposit of shares in connection with voting at a shareholders' meeting, or the payment of dividends, (2) the payment of fees, taxes, and similar charges, and (3) compliance with any laws or governmental regulations relating to ADRs or to the withdrawal of deposited securities.

The deposit agreement expressly limits the obligations and liability of the depositary, ourselves and each of our and the depositary's respective agents, provided, however, that no provision of the deposit agreement is intended to constitute a waiver or limitation of any rights which ADR holders or beneficial owners of ADSs may have under the Securities Act or the Exchange Act, to the extent applicable. In the deposit agreement it provides that neither we nor the depositary nor any such agent will be liable to ADR holders or beneficial owners of ADSs if:

- any present or future law, rule, regulation, fiat, order or decree of the United States, the Cayman Islands, the People's Republic of China (including the Hong Kong Special Administrative Region, the People's Republic of China) or any other country or jurisdiction, or of any governmental or regulatory authority or securities exchange or market or automated quotation system, the provisions of or governing any deposited securities, any present or future provision of our charter, any act of God, war, terrorism, nationalization, expropriation, currency restrictions, work stoppage, strike, civil unrest, revolutions, rebellions, explosions, computer failure or circumstance beyond our, the depositary's or our respective agents' direct and immediate control shall prevent or delay, or shall cause any of them to be subject to any civil or criminal penalty in connection with, any act which the deposit agreement or the ADRs provide shall be done or performed by us, the depositary or our respective agents (including, without limitation, voting);

- it exercises or fails to exercise discretion under the deposit agreement or the ADRs including, without limitation, any failure to determine that any distribution or action may be lawful or reasonably practicable;

- it performs its obligations under the deposit agreement and ADRs without gross negligence or willful misconduct;

18

- it takes any action or refrains from taking any action in reliance upon the advice of or information from legal counsel, accountants, any person presenting shares for deposit, any registered holder of ADRs, or any other person believed by it to be competent to give such advice or information, or in the case of the depositary only, our company; or

- it relies upon any written notice, request, direction, instruction or document believed by it to be genuine and to have been signed, presented or given by the proper party or parties.

The Depositary shall not be a fiduciary or have any fiduciary duty to ADR holders or beneficial owners of ADSs. Neither the depositary nor its agents have any obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities, the ADSs or the ADRs. We and our agents shall only be obligated to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or the ADRs, which in our opinion may involve us in expense or liability, if indemnity satisfactory to us against all expense (including fees and disbursements of counsel) and liability is furnished as often as may be required. The depositary and its agents may fully respond to any and all demands or requests for information maintained by or on its behalf in connection with the deposit agreement, any registered holder or holders of ADRs, any ADRs or otherwise related to the deposit agreement or ADRs to the extent such information is requested or required by or pursuant to any lawful authority, including without limitation laws, rules, regulations, administrative or judicial process, banking, securities or other regulators. The depositary shall not be liable for the acts or omissions made by, or the insolvency of, any securities depository, clearing agency or settlement system. Furthermore, the depositary shall not be responsible for, and shall incur no liability in connection with or arising from, the insolvency of any custodian that is not a branch or affiliate of JPMorgan. Notwithstanding anything to the contrary contained in the deposit agreement or any ADRs, the depositary shall not be responsible for, and shall incur no liability in connection with or arising from, any act or omission to act on the part of the custodian except to the extent that any ADR holder has incurred liability directly as a result of the custodian having (i) committed fraud or willful misconduct in the provision of custodial services to the depositary or (ii) failed to use reasonable care in the provision of custodial services to the depositary as determined in accordance with the standards prevailing in the jurisdiction in which the custodian is located. The depositary and the custodian(s) may use third party delivery services and providers of information regarding matters such as pricing, proxy voting, corporate actions, class action litigation and other services in connection with the ADRs and the deposit agreement, and use local agents to provide extraordinary services such as attendance at annual meetings of issuers of securities. Although the depositary and the custodian will use reasonable care (and cause their agents to use reasonable care) in the selection and retention of such third party providers and local agents, they will not be responsible for any errors or omissions made by them in providing the relevant information or services. The depositary shall not have any liability for the price received in connection with any sale of securities, the timing thereof or any delay in action or omission to act nor shall it be responsible for any error or delay in action, omission to act, default or negligence on the part of the party so retained in connection with any such sale or proposed sale.

The depositary has no obligation to inform ADR holders or beneficial owners of ADSs about the requirements of any laws, rules or regulations or any changes therein or thereto.

Additionally, none of us, the depositary or the custodian shall be liable for the failure by any registered holder of ADRs or beneficial owner thereof to obtain the benefits of credits or refunds of non-U.S. tax paid against such holder's or beneficial owner's income tax liability. The depositary is under no obligation to provide ADR holders and beneficial owners of ADSs, or any of them, with any information about the tax status of our company. Neither we nor the depositary shall incur any liability for any tax or tax consequences that may be incurred by registered holders or beneficial owners on account of their ownership or disposition of the ADRs or ADSs.

Neither the depositary nor its agents will be responsible for any failure to carry out any instructions to vote any of the deposited securities, for the manner in which any such vote is cast, including without limitation any vote cast by a person to whom the depositary is required to grant a discretionary proxy pursuant to the deposit agreement, or for the effect of any such vote. The depositary may rely upon instructions from us or our counsel in respect of any approval or license required for any currency conversion, transfer or distribution. The depositary shall not incur any liability for the content of any information submitted to it by us or on our behalf for distribution to ADR holders or for any inaccuracy of any translation thereof, for any investment risk associated with acquiring an interest in the deposited securities, for the validity or worth of the deposited securities, for the credit-worthiness of any third party, for allowing any rights to lapse upon the terms of the deposit agreement or for the failure or timeliness of any notice from us. The depositary shall not be liable for any acts or omissions made by a successor depositary whether in connection with a previous act or omission of the depositary or in connection with any matter arising wholly after the removal or resignation of the depositary. Neither we, the depositary nor any of our respective agents shall be liable to ADR holders or beneficial owners of interests in ADSs for any indirect, special, punitive or consequential damages (including, without limitation, legal fees and expenses) or lost profits, in each case of any form incurred by any person or entity (including, without limitation, holders and beneficial owners), whether or not foreseeable and regardless of the type of action in which such a claim may be brought.

19

The depositary and its agents may own and deal in any class of securities of our company and our affiliates and in ADSs.

*Disclosure of Interest in ADSs*

To the extent that the provisions of or governing any deposited securities may require disclosure of or impose limits on beneficial or other ownership of deposited securities, other shares and other securities and may provide for blocking transfer, voting or other rights to enforce such disclosure or limits, ADR holders and beneficial owners of ADSs agree to comply with all such disclosure requirements and ownership limitations and to comply with any reasonable instructions we may provide in respect thereof. We reserve the right to instruct ADR holders (and through any such holder, the beneficial owners of ADSs evidenced by the ADRs registered in such holder's name) to deliver their ADSs for cancellation and withdrawal of the deposited securities so as to permit us to deal directly with the holder and/or beneficial owner thereof as a holder of shares and, by holding an ADS or an interest therein, holders and beneficial owners will be agreeing to comply with such instructions.

*Books of Depositary*

The depositary or its agent will maintain a register for the registration, registration of transfer, combination and split-up of ADRs, which register shall include the depositary's direct registration system. ADR holders may inspect such records at the depositary's office at all reasonable times, but solely for the purpose of communicating with other holders in the interest of the business of our company or a matter relating to the deposit agreement. Such register may be closed at any time or from time to time, when deemed expedient by the depositary. The depositary may also close the issuance book portion of the ADR Register when reasonably requested by us solely in order to enable us to comply with applicable law.

The depositary will maintain facilities for the delivery and receipt of ADRs.

*Appointment*

In the deposit agreement, each ADR holder and each beneficial owner or ADSs, upon acceptance of any ADSs (or any interest therein) issued in accordance with the terms and conditions of the deposit agreement will be deemed for all purposes to:

- be a party to and bound by the terms of the deposit agreement and the applicable ADR or ADRs, and

- appoint the depositary its attorney-in-fact, with full power to delegate, to act on its behalf and to take any and all actions contemplated in the deposit agreement and the applicable ADR or ADRs, to adopt any and all procedures necessary to comply with applicable laws and to take such action as the depositary in its sole discretion may deem necessary or appropriate to carry out the purposes of the deposit agreement and the applicable ADR and ADRs, the taking of such actions to be the conclusive determinant of the necessity and appropriateness thereof.

Each ADR holder and beneficial owner of ADSs is further deemed to acknowledge and agree that (i) nothing in the deposit agreement or any ADR shall give rise to a partnership or joint venture among the parties thereto nor establish a fiduciary or similar relationship among such parties, (ii) the depositary, its divisions, branches and affiliates, and their respective agents, may from time to time be in the possession of non-public information about our company, the ADR holders, the beneficial owners of ADSs and/or their respective affiliates, (iii) the depositary and its divisions, branches and affiliates may at any time have multiple banking relationships with us, ADR holders, beneficial owners of ADSs and/or the affiliates of any of them, (iv) the depositary and its divisions, branches and affiliates may, from time to time, be engaged in transactions in which parties adverse to us or the ADR holders or beneficial owners may have interests, (v) nothing contained in the deposit agreement or any ADR(s) shall (A) preclude the depositary or any of its divisions, branches or affiliates from engaging in such transactions or establishing or maintaining such relationships, or (B) obligate the depositary or any of its divisions, branches or affiliates to disclose such transactions or relationships or to account for any profit made or payment received in such transactions or relationships, and (vi) the depositary shall not be deemed to have knowledge of any information held by any branch, division or affiliate of the depositary.

20

*Governing Law and Consent to Jurisdiction*

The deposit agreement and the ADRs are governed by and construed in accordance with the laws of the State of New York. In the deposit agreement, we have submitted to the jurisdiction of the courts of the State of New York and appointed an agent for service of process on our behalf.

Subject to the depositary's rights described below to refer matters to arbitration, by holding an ADS or an interest therein, ADR holders and beneficial owners of ADSs each irrevocably agree that any legal suit, action or proceeding against or involving us or the depositary, arising out of or based upon the deposit agreement, the ADSs or the transactions contemplated thereby, including causes of action based on U.S. securities law, may only be instituted in a state or federal court in New York, New York, and each irrevocably waives any objection which it may have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

Notwithstanding the foregoing, the depositary may, in its sole discretion, elect to institute any action, controversy, claim or dispute directly or indirectly based on, arising out of or relating to the deposit agreement or the ADRs or the transactions contemplated thereby, including without limitation any question regarding its or their existence, validity, interpretation, performance or termination, against any other party or parties to the deposit agreement (including, without limitation, against ADR holders and owners of interests in ADRs) in any competent court in the Cayman Islands, Hong Kong, the People's Republic of China and/or the United States, or, by having such disputes referred to and finally resolved by an arbitration either in New York, New York or in Hong Kong, subject to certain exceptions solely related to the aspects of such claims that are related to U.S. securities law, in which case the resolution of such aspects may, at the option of such ADR holder, remain in state or federal court in New York, New York. Any such arbitration shall be conducted in the English language either in New York, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association or in Hong Kong following the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

*Jury Trial Waiver*

The deposit agreement provides that, to the fullest extent permitted by applicable law, each party thereto (including, for avoidance of doubt, each holder and beneficial owner and/or holder of interests in ADSs) irrevocably waives the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our shares or other deposited securities, the ADSs, the ADRs, the deposit agreement, or any transaction contemplated therein, or the breach thereof (whether based on contract, tort, common law or other theory), including any claim under the U.S. federal securities laws. If we or the depositary were to oppose a jury trial demand based on such waiver, the court would determine whether the waiver was enforceable in the facts and circumstances of that case in accordance with applicable state and federal law, including whether a party knowingly, intelligently and voluntarily waived the right to a jury trial. The waiver to right to a jury trial of the deposit agreement is not intended to be deemed a waiver by any holder or beneficial owner of ADSs of our or the depositary's compliance with the Securities Act of 1933 or the Securities Exchange Act, to the extent applicable.

21

Exhibit 8.1

**List of Principal Subsidiaries and Variable Interest Entity of China Index Holdings Limited**

| Subsidiaries | Place of Incorporation |
|---|---|
| China Index Academy Limited | Hong Kong |
| Wall Street Index Research Center LLC | New York |
| Chinaindex Academy Limited | British Virgin Islands |
| Best Aligned Limited | British Virgin Islands |
| China Indices Academy Limited | Hong Kong |
| Zhong Zhi Xun Bo (USA) Data Information Technology LLC | California |
| Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. | PRC |
| Beijing Zhong Zhi Xun Bo Data Information Technology Co., Ltd. | PRC |
| Xinjiang Zhong Zhi Shi Zheng Data Information Technology Co., Ltd. | PRC |
| Xinjiang Zhong Zhi Data Information Technology Co., Ltd. | PRC |
| Xinjiang Zhong Zhi Shi Zheng Big Data Co., Ltd. | PRC |
| Tianjin Zhong Zhi Data Information Technology Co., Ltd. | PRC |

| Variable Interest Entities | Place of Incorporation |
|---|---|
| Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd. | PRC |
| Shouzheng Credit Rating Co., Ltd. | PRC |
| Beijing Zhong Zhi Information Technology Academy | PRC |

Exhibit 12.1

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Yu Huang, certify that:

1. I have reviewed this annual report on Form 20-F of China Index Holdings Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

April 26, 2022

By:      /s/ Yu Huang
Name:  Yu Huang
Title:   Chief Executive Officer

Exhibit 12.2

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Lili Chen, certify that:

1. I have reviewed this annual report on Form 20-F of China Index Holdings Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

April 26, 2022

By:     /s/ Lili Chen
Name:   Lili Chen
Title:  Deputy Chief Financial Officer

Exhibit 13.1

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of China Index Holdings Limited (the "Company") on Form 20-F for the year ended December 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Yu Huang, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 26, 2022

By:      /s/ Yu Huang
Name:  Yu Huang
Title:   Chief Executive Officer

Exhibit 13.2

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of China Index Holdings Limited (the "Company") on Form 20-F for the year ended December 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Lili Chen, Deputy Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 26, 2022

By:      /s/ Lili Chen

Name:  Lili Chen

Title:   Deputy Chief Financial Officer

**Exhibit 15.1**

# 競 天 公 誠 律 師 事 務 所
# JINGTIAN & GONGCHENG

34/F, Tower 3, China Central Place, 77 Jianguo Road, Beijing 100025, China
Telephone: (86-10) 5809-1000  Facsimile: (86-10) 5809-1100

April 26, 2022

China Index Holdings Limited

Tower A, No. 20 Guogongzhuang Middle Street
Fengtai District, Beijing 100070
The People's Republic of China

Dear Sirs:

We have acted as legal advisor as to the laws of the People's Republic of China to China Index Holdings Limited (the "Company") in connection with the filing by the Company with the United States Securities and Exchange Commission of an annual report on Form 20-F for the fiscal year ended December 31, 2021 and any amendments thereto (the "Annual Report"). We hereby consent to the use and reference to our name and our opinions and views in the Annual Report. We further consent to the filing of this letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the United States Securities Act of 1933, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Jingtian & Gongcheng

Jingtian & Gongcheng

**Exhibit 15.2**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in the Registration Statement (No. 333-237917) on Form S-8 of our report dated April 26, 2022, with respect to the audited consolidated financial statements of China Index Holdings Limited included in its Annual Report on Form 20-F for the year ended December 31, 2021.

*/s/ MaloneBailey, LLP*
www.malonebailey.com
Houston, Texas
April 26, 2022

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the registration statement (No. 333-237917) on Form S-8 of our report dated November 15, 2021, with respect to the consolidated financial statements of China Index Holdings Limited.

/s/ KPMG Huazhen LLP
Beijing, China
April 26, 2022

**Exhibt 16.1**

April 26, 2022

Securities and Exchange Commission
Washington, D.C. 20549

Ladies and Gentlemen:

We were previously principal accountants for China Index Holdings Limited (the "Company") and, under the date of November 15, 2021, we reported on the combined and consolidated financial statements of the Company as of and for the years ended December 31, 2020 and 2019. On December 17, 2021, we were dismissed. We have read the Company's statements included under Item 16F of its Form 20-F dated April 26, 2022, and we agree with such statements, except that we are not in a position to agree or disagree with the Company's statements that:

(1) on December 17, 2021, the Company appointed MaloneBailey, LLP as the Company's independent registered public accounting firm;

(2) the change of the Company's independent auditor was approved by the Company's board of directors and audit committee on December 17, 2021.

(3) during the two fiscal years ended December 31, 2020 and the subsequent period prior to the Company's engagement of MaloneBailey, LLP, neither the Company nor anyone on its behalf consulted with MaloneBailey, LLP regarding (i) either the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that would have been rendered on the Company's combined and consolidated financial statements, and neither a written report nor oral advice was provided to the Company that MaloneBailey, LLP concluded was an important factor considered by the Company in reaching a decision as to any accounting, audit, or financial reporting issue, (ii)  any matter that was the subject of a disagreement pursuant to Item 16F(a)(1)(iv) of the instructions to Form 20-F, or (iii) any reportable event pursuant to Item 16F(a)(1)(v) of the instructions to Form 20-F.

Very truly yours,

/s/ KPMG Huazhen LLP